Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Case 3:18-cv-00406-REP Document 361 Filed 02/07/20 Page 1 of 3 PageID# 12140
Exhibits 18 through 28 Page 1 of 325

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

LULA WILLIAMS, *et al.*,

      Plaintiffs,

v.                                  CIVIL ACTION NO. 3:17-CV-461

BIG PICTURE LOANS, LLC, *et al.*,

      Defendants.

_____

RENEE GALLOWAY, *et al.*,

      Plaintiffs,

v.                                  CIVIL ACTION NO. 3:18-CV-406

BIG PICTURE LOANS, LLC, *et al.*,

      Defendants.

_____

RENEE GALLOWAY, *et al.*,

      Plaintiffs,

v.                                  CIVIL ACTION NO. 3:19-CV-314

JUSTIN MARTORELLO, *et al.*,

      Defendants.

## **MOTION FOR CONSOLIDATION**

**Debtor's Ex. 18, p. 001**

Case 3:18-cv-00406-REP   Document 361   Filed 02/07/20   Page 2 of 5   PageID# 11341
Case 20-04008-elm   Doc 90-3   Filed 05/25/20   Entered 05/25/20 16:23:47   Desc
Exhibits 18 through 28   Page 2 of 325

Defendants Matt Martorello, Justin Martorello, Rebecca Martorello, Gallant Capital LLC, and Liont LLC (collectively, "Defendants")[1] pursuant to FED. R. CIV. P. 42, respectfully move for consolidation of the matters styled *Williams v. Big Picture Loans, LLC*, Civil Action No. 3:17-cv-00461 (*"Williams"*), *Galloway v. Big Picture Loans, LLC*, Civil Action No. 3:18-cv-00406 ("*Galloway I*"), and *Galloway v. Martorello*, Civil Action No. 3:18-cv-00314 ("*Galloway II*"), each of which is pending before the Court. The reasons in support of this motion are set forth in the accompanying Memorandum In Support Of Motion For Consolidation.

Dated: February 7, 2020                     Respectfully submitted,

*/s/ M. F. Connell Mullins, Jr.*
M. F. Connell Mullins, Jr. (VSB No. 47213)
cmullins@spottsfain.com
John M. Erbach (VSB No. 76695)
jerbach@spottsfain.com
SPOTTS FAIN PC
411 E Franklin Street
Suite 600
Richmond, VA 23219
Tel: (804) 697-2044
Fax: (804) 697-2144
jerbach@spottsfain.com

Richard Lawrence Scheff (*pro hac vice*)
Jonathan P. Boughrum (*pro hac vice*)
Michael C. Witsch (*pro hac vice*)
ARMSTRONG TEASDALE LLP
2005 Market Street, 29th Floor
One Commerce Square
Philadelphia, PA 19103
Tel: (267) 780-2012
Fax: (215) 405-9070
rlscheff@armstrongteasdale.com

---

[1] On January 28, 2020, Eventide Credit Acquisitions, LLC, filed a Notice of Suggestion of Bankruptcy and Automatic Stay of Proceedings in *Galloway v. Justin Martorello*, Civil Action No. 3:18-cv-00314, ECF 307. Accordingly, pursuant to 11 U.S.C. § 362(a), all matters against Eventide have been automatically stayed.

**Debtor's Ex. 18, p. 002**

Case 3:20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Case 3:18-cv-00406-REP Document 361 Filed 02/07/20 Page 3 of 16 PageID# 12142
Exhibits 18 through 28 Page 3 of 325

jboughrum@armstrongteasdale.com
mwitsch@armstrongteasdale.com

Michelle L. Alamo (*pro hac vice*)
ARMSTRONG TEASDALE LLP
4643 S Ulster Street, Suite 800
Denver, CO 80237
Tel: (720) 722-7189
Fax: (720) 200-0679
malamo@armstrongteasdale.com

Attorneys for Defendants
MATT MARTORELLO, JUSTIN
MARTORELLO, REBECCA
MARTORELLO, GALLANT CAPITAL LLC,
and LIONT LLC

## CERTIFICATE OF SERVICE

The undersigned counsel certified that on the 7th of February, 2020, the foregoing
was filed using the Court's CM/ECF system, thereby serving a copy on all counsel of record
electronically.

By: */s/ M. F. Connell Mullins, Jr.*
M. F. Connell Mullins, Jr. (VSB No. 47213)
cmullins@spottsfain.com
SPOTTS FAIN PC
411 East Franklin Street, Suite 600
Richmond, VA 23219
(804) 697-2000 (Telephone)
(804) 697-2100 (Facsimile)

**Debtor's Ex. 18, p. 003**

Case 20-04009-elm REP Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:22:47 Desc
Case 3:19-cv-00406-REP Document 362-5 Filed 02/07/20 Page 5 of 26 PageID# 12143
Exhibits 18 through 28 Page 4 of 325

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| LULA WILLIAMS, *et al.*, | |
| Plaintiffs, | |
| v. | CIVIL ACTION NO. 3:17-CV-461 |
| BIG PICTURE LOANS, LLC, *et al.*, | |
| Defendants. | |
| | |
| RENEE GALLOWAY, *et al.*, | |
| Plaintiffs, | |
| v. | CIVIL ACTION NO. 3:18-CV-406 |
| BIG PICTURE LOANS, LLC, *et al.*, | |
| Defendants. | |
| | |
| RENEE GALLOWAY, *et al.*, | |
| Plaintiffs, | |
| v. | CIVIL ACTION NO. 3:19-CV-314 |
| JUSTIN MARTORELLO, *et al.*, | |
| Defendants. | |

<u>**MEMORANDUM IN SUPPORT OF MOTION FOR CONSOLIDATION**</u>

**Debtor's Ex. 18, p. 004**

Case 20-04009-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:22:47 Desc
Case 3:19-cv-00406-REP Document 362-5 Filed 02/07/20 Page 5 of 26 PageID# 12144
Exhibits 18 through 28    Page 5 of 325

# I.  INTRODUCTION

Defendants Matt Martorello, Justin Martorello, Rebecca Martorello, Gallant Capital LLC, and Liont LLC (collectively, "Defendants")[1] move the Court under FED. R. CIV. P. 42, in the interest of judicial economy and to avoid unnecessary cost and delay, to consolidate the matters styled *Williams v. Big Picture Loans, LLC*, Civil Action No. 3:17-cv-00461 (*"Williams"*), *Galloway v. Big Picture Loans, LLC*, Civil Action No. 3:18-cv-00406 ("*Galloway I*"), and *Galloway v. Martorello*, Civil Action No. 3:18-cv-00314 ("*Galloway II*"), each of which is pending before the Court.  The undeniable substantial overlap of the parties, causes of action, and questions of fact and law across all three cases—which have been repeatedly acknowledged by Plaintiffs' counsel—warrants that they be consolidated, such that the remaining parties and the Court may conserve time and resources in bringing these matters to their swift and efficient conclusion on the merits.

Although Plaintiffs tout that they are ready to move forward with these cases, in reality, Plaintiffs have no interest in getting to the merits of these cases in a swift and efficient manner.  If they did, they would agree to consolidate *Williams* and the various subsequent copycat actions so that all of the claims advanced by all purported class members against all of the defendants are adjudicated once and for all in one single action.  Rather than doing so, Plaintiffs—who not long ago sought to consolidated these actions in an MDL proceeding[2]—want to maintain separate

---

[1] On January 28, 2020, Eventide Credit Acquisitions, LLC, filed a Notice of Suggestion of Bankruptcy and Automatic Stay of Proceedings in *Galloway v. Justin Martorello*, Civil Action No. 3:18-cv-00314, ECF 307.  Accordingly, pursuant to 11 U.S.C. § 362(a), all matters against Eventide have been automatically stayed.

[2] *See In re Big Picture Loans Litigation,* MDL No. 2906.  The *Williams* and *Galloway* Plaintiffs voluntarily withdrew their MDL petition on September 19, 2019, one week before the September 25, 2019 hearing date.  *See id.*, MDL No. 2906, ECF Nos. 54, 63.

2

**Debtor's Ex. 18, p. 005**

Case 20-04009-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:22:47 Desc
Case 3:19-cv-00406-REP Document 302-5 Filed 02/07/20 Page 5 of 26 PageID# 12145
Exhibits 18 through 28 Page 6 of 325

actions as long as possible so that they can re-litigate adverse rulings over and over, as evidenced by their attempt to re-litigate the Fourth Circuit's sovereign immunity ruling in *Galloway I* based on purported "new evidence," and prolong these matters as long as possible.

Plaintiffs' contention that these matters should not be consolidated because *Williams* is more procedurally advanced than the other two cases by virtue of the completion of class certification briefing should be flatly rejected. Plaintiffs advanced the exact opposite argument in support of the MDL petition, citing the fact that the Virginia actions were essentially on hold in light of the ongoing sovereign immunity related proceedings: "In other words, sovereign immunity is still at issue in all cases **and the *Williams* and *Galloway I* cases are not as 'procedurally advanced' as Defendants represent**." *See* Ex. 1, MDL No. 2906, ECF No. 29, at 8 (emphasis added). Nothing has changed in these matters since Plaintiffs' MDL petition other than the Tribal Defendants and certain other defendants attempting to settle their claims. Indeed, the Court recognized at the January 29, 2020 status conference that the merits case in *Williams* has in essence been stayed for months during the Fourth Circuit proceedings, as has the merits case in *Galloway I* due to Plaintiffs' attempt to re-litigate the Fourth Circuit's sovereign immunity ruling. *See* 1/20/2020 Hr'g Tr. at 26-27. And given the parties' agreement to cross-use of documents and discovery across cases, merits discovery in *Galloway II* is at the same point as merits discovery in *Williams* and *Galloway I.* Although there is some merits discovery to complete in all cases, as discussed below, Plaintiffs admit that discovery is largely the same and will involve the same witnesses.

Finally, the fact that class certification has been briefed in *Williams* (with the exception of the supplemental briefing recently permitted by the Court) does not counsel against consolidation. With the exception of the upcoming supplemental briefing, *Williams* and *Galloway I* are in the

**Debtor's Ex. 18, p. 006**

Case 20-04009-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Case 3:19-cv-00406-REP Document 302-5 Filed 02/07/20 Page 7 of 26 PageID# 12146
Exhibits 18 through 28 Page 7 of 325

same procedural posture today with respect to class certification briefing as they were at the time Plaintiffs sought to consolidate them in the MDL proceeding, contending that consolidation was "necessary to prevent inconsistent rulings and duplicative discovery in cases involving substantially identical legal claims, overlapping classes, and common issues of law and fact." *See* Ex. 1, MDL No. 2906, ECF No. 29, at 1 (citing *Williams* and *Galloway I*). Nothing has changed with respect to class certification briefing to warrant Plaintiffs' change in position on this issue. Moreover, the proposed Virginia classes in *Williams* are subsumed within the proposed classes in *Galloway I* and *Galloway II* and no additional discovery is needed for Plaintiffs to proceed right now with class certification briefing as to their other proposed classes in *Galloway I* and *Galloway II*.[3] Accordingly, to conserve time and resources in bringing all of these matters to their swift and efficient conclusion, the matters should be consolidated, a briefing schedule should be set to address the additional (identical) proposed classes in *Galloway I & II*, and a single expedited case schedule should be set to move forward on the merits of Plaintiffs' claims.

## II. BACKGROUND

### A. The Pending Litigations are Substantially Similar.

**<u>Williams</u>**: *Williams* was filed in June 2017, naming as defendants Matt Martorello, several leaders of the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe"), and two tribal entities. *Williams*, ECF No. 1. The tribal leaders were dismissed early in the action.

---

[3] As set forth in their pending motions to dismiss, Defendants contend that the non-Virginia plaintiffs are not properly before the Court and should be dismissed. *See Galloway I,* ECF No. 46 at 7 & n.4; *Galloway I,* ECF No. 74 at 3; *Galloway II,* ECF No. 94 at 2, 30; ECF No. 99 at 2, 29; ECF No. 104 at 2, 29. Accordingly, it is Defendants' position that no class certification briefing is required with respect to the proposed non-Virginia classes because they should be dismissed.

4

**Debtor's Ex. 18, p. 007**

Case 3:19-cv-00470-REP Document 962-5 Filed 02/07/20 Page 5 of 16 PageID# 22147
Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:22:47 Desc
Exhibits 18 through 28 Page 8 of 325

*Williams*, ECF No. 122. Per the terms of the class action settlement in *Galloway III*, it is anticipated that Matt Martorello will be the only remaining defendant in *Williams*.[4]

The *Williams* plaintiffs allege federal RICO claims, violation of Virginia usury law and unjust enrichment, and seek a declaratory judgment that the choice of law and forum selection clauses in Plaintiffs' loan agreements are void and unenforceable. *Williams*, ECF No. 1. Plaintiffs originally identified three putative classes, each with a sub class, consisting of residents of Virginia or individuals located in Virginia who took loans from Big Picture Loans and met certain other criteria. In their class certification briefing, Plaintiffs re-defined the putative classes to include:

**Big Picture RICO Class:** All Virginia consumers who entered into a loan agreement with Big Picture where a payment was made on or after June 22, 2013, but before the date of the Court's class certification order.

**Red Rock RICO Class:** All Virginia consumers who entered into a loan agreement with Red Rock where a payment was made on or after June 22, 2013, but before the date of the Court's class certification order.

---

[4] On December 20, 2019, a Preliminary Approval Order, ECF No. 65, was entered in *Galloway v. Williams*, Civil Action No. 3:19-cv-00470-REP ("*Galloway III*"), granting preliminary approval of a class action settlement between Plaintiffs and various Settling Defendants. In order to effectuate the class action settlement, the Plaintiffs and Settling Defendants from *Williams*, *Galloway I*, and *Galloway II*, were added to *Galloway III*, thereby consolidating the actions between those parties into a single action. *See* Am. Class Action Compl., *Galloway III*, ECF No. 23; *see also* Memo. Supp. Mot. Am., *Galloway III*, ECF No. 17, ¶ 4 ("The settlement requires Plaintiffs to seek leave to amend their complaint to add persons who are parties to the settlement. The settlement specifically provides that the amended complaint in this action will represent a consolidation of the allegations against all the settling defendants. . . . See Settlement Agreement § 5.1."). Section 5.1 of the Class Action Settlement Agreement and Release further provides that after the Plaintiffs and Settling Defendants are consolidated in *Galloway III*, "*Williams, Galloway I, Galloway II, Duggan,* and *Smith* shall be voluntarily dismissed as to the Settling Defendants only." *See Galloway III*, ECF No. 18-1, § 5.1. Although not dismissed as of the date of this filing, it is anticipated that the following Settling Defendants will be dismissed from *Williams, Galloway I,* and *Galloway II*: all tribal entities and affiliates, including: Big Picture Loans, LLC; Ascension Technologies, Inc.; DTA Trinity Wealth Transfer Trust; DMA Trinity Wealth Transfer Trust; Amlaur Resources; Columbia Pipe & Supply, Co.; Brian McFadden; James Dowd; Simon Liang; Brian Jedwab; Timothy Arenberg; and Terrance Arenberg.

**Debtor's Ex. 18, p. 008**

Case 3:19-cv-00406-REP Document 362 Filed 02/07/20 Page 9 of 26 PageID# 12148
Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:22:47 Desc
Exhibits 18 through 28 Page 9 of 325

**RICO Injunctive Relief Big Picture Class:** All Virginia consumers with remaining balances on their loan agreements with Big Picture.

**RICO Injunctive Relief Red Rock Class:** All Virginia consumers with remaining balances on their loan agreements with Red Rock.

**Big Picture Usury Class:** All Virginia consumers who paid any principal, interest, or fees on their loan with Big Picture on or after June 22, 2015, but before the date of the Court's class certification order.

**Red Rock Usury Class:** All Virginia consumers who paid any principal, interest, or fees on their loan with Red Rock on or after June 22, 2015, but before the date of the Court's order certifying the class.

**Big Picture Unjust Enrichment Class:** All Virginia consumers who paid any amount on their loan with Big Picture on or after June 22, 2014, but before the date of the Court's class certification order.

**Red Rock Unjust Enrichment Class**: All Virginia consumers who paid any amount on their loan with Red Rock on or after June 22, 2014, but before the date of the Court's class certification order.

*Williams*, ECF No. 236 at 16–17.

**_Galloway I_:** *Galloway I* was originally filed in June 2018, naming Matt Martorello and the same two tribal entities as defendants. *Galloway I*, ECF No. 1. Per the terms of the class action settlement in *Galloway III*, it is anticipated that Matt Martorello will be the only remaining defendant in *Galloway I*. *See supra*, n.4. *Galloway I*, as amended, alleges the same federal RICO claims, violation of Virginia usury law, and unjust enrichment, but also expands to include claims under California, Illinois, Indiana, Ohio, Washington, Texas, Florida, New Jersey, North Carolina, and Maryland state law.[5] *Galloway*, ECF No. 30, ¶¶ 227–346. Plaintiffs identified twelve putative classes. Eleven classes were more or less defined as "All individuals located in X State who entered into a loan agreement with Big Picture or Red Rock and paid any amounts on the loan,"

---

[5] As indicated *supra,* n.3, Defendants contend in their pending motions to dismiss that the non-Virginia plaintiffs are not properly before the Court and should be dismissed.

**Debtor's Ex. 18, p. 009**

Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:22:47 Desc
Case 3:18-cv-00406-REP Document 862-5 Filed 02/07/20 Page 7 of 26 PageID# 22149
Exhibits 18 through 28 Page 10 of 325

with an additional vague and undefinable catch-all class adding "states with similar laws." *Galloway I*, ECF No. 30, ¶¶ 195–206. The "Virginia Class" is broadly defined so as to include all putative classes from *Williams*, specifically "*[a]ll individuals located in Virginia who entered into a loan agreement with Big Picture or Red Rock and paid any amounts on the loan.*" *Id.* ¶ 195 (emphasis in original).

**_Galloway II_:** *Galloway II* was filed in April 2019, naming a new set of defendants, including Matt Martorello's wife and brother, as well as former employees of businesses related to Matt Martorello, investors in those businesses, and the businesses themselves. *Galloway II*, ECF No. 1. Plaintiffs initially named nineteen defendants, but per the terms of the class action settlement in *Galloway III*, it is anticipated that only nine will remain, all with alleged ties to Matt Martorello according to Plaintiffs' allegations: Justin Martorello, Rebecca Martorello, Jeremy Davis, Eventide Credit Acquisitions, Liont LLC, Gallant, Bluetech Irrevocable Trust, Breakwater Holdings, LLC, and Kairos Holdings, LLC. *See supra*, n.4. *Galloway II* alleges the same federal RICO claims, violation of Virginia usury law, and unjust enrichment as *Williams* and *Galloway I*. It also includes the same California, Illinois, Indiana, Ohio, Washington, Texas, Florida, New Jersey, North Carolina, and Maryland state law claims as *Galloway I*. Plaintiffs added to their original complaints (which were brought by substantially the same plaintiffs' counsel) new state law claims under Georgia and Michigan law, as well as civil conspiracy and aiding and abetting claims.[6] ECF No. 1, ¶¶ 501–17, 522–27. Plaintiffs identified fourteen putative classes. Each class was once again more or less defined as "All individuals located in X State who entered into a loan agreement with Big Picture or Red Rock and paid any amounts on the loan." *Galloway II*, ECF No.

---

[6] Again, as indicated *supra,* n.3, Defendants contend in their pending motions to dismiss that the non-Virginia plaintiffs are not properly before the Court and should be dismissed.

**Debtor's Ex. 18, p. 010**

Case 20-04009-elm    Doc 90-3    Filed 05/25/20    Entered 05/25/20 16:22:47    Desc
Case 3:19-cv-00406-REP    Document 302-5 Filed 02/07/20    Page 3 of 26   PageID# 12150
Exhibits 18 through 28    Page 11 of 325

1, ¶¶ 331–344.  The "Virginia Class" is again broadly defined so as to include all putative classes

from *Williams*, specifically "*All individuals located in Virginia who entered into a loan agreement*

*with Big Picture or Red Rock and paid any amounts on the loan*."  ECF No. 1, ¶ 331 (emphasis in

original).[7]  The classes for each of the states identified in *Galloway I* are identical in *Galloway II,*

as is the proposed vague and undefinable catch-all class.  ECF No. 1, ¶¶ 331–44.  The named

plaintiffs in *Galloway I* are named in *Galloway II* as well.

### B.    The Nucleus of Facts Across the Cases is the Same.

It is undeniable that across all three actions, Plaintiffs base their claims on the same alleged

wrongdoing by the same set of individuals and entities.  Indeed, Plaintiffs admitted such in their

Motion for Transfer and Consolidation filed before the MDL Panel, expressly arguing in support

of transfer and consolidation that the cases "assert nearly identical factual allegations relating to

the rent-a-tribe enterprise masterminded by Martorello.  The complaints also assert the same legal

claims—violations of RICO and state usury laws-against the same defendants."  Ex. 2, MDL No.

2906, ECF No. 1-1 at 6; *see also* Ex. 1, MDL No. 2906, ECF No. 29 at 3 ("The central factual

allegation in this litigation is that Matt Martorello orchestrated an illegal tribal lending enterprise

in order to charge consumers up to 400% interest for online, short-term loans.").  Plaintiffs also

argued to the MDL panel that the claims in *Galloway III* present numerous common issues

warranting consolidation:

> [T]he Virginia Plaintiffs have learned that Martorello's illegal
> enterprise is complicated and extensive, including not only entities

---

[7] Although worded differently, the *Galloway I* and *Galloway II* "Virginia Classes" are
substantively the same as the *Williams* classes combined.  If, as Plaintiffs argue, *Williams* proceeds
to trial first, the *Galloway* "Virginia Classes" would fall out of those two actions, and only non-
Virginia residents would remain.  As noted in Defendants' pending motions to dismiss, under
*Bristol-Myers Squibb*, the non-Virginia Plaintiffs' claims are not properly before the Court and
should be dismissed.  *Bristol-Myers Squibb v. Superior Court of California*, 582 U.S. ---, 137 S.Ct.
1773, 1781 (2017); *see also supra, n.3.*

**Debtor's Ex. 18, p. 011**

Case 20-04009-elm Doc 80-3 Filed 05/25/20 Entered 05/25/20 16:22:47 Desc
Case 3:19-cv-00406-REP Document 902-5 Filed 02/07/20 Page 5 of 26 PageID# 22151
Exhibits 18 through 28   Page 12 of 325

associated with Native American tribes that purportedly provided the enterprise with "immunity" from state and federal usury laws, but also third-party investors, trusts, Martorello's family members, and lawyers. Some of these individuals played integral roles in the operation and management of the enterprise; others knowingly provided the capital used to make the high-interest loans and, in return, generated large profits from their investment in the scheme; still others were created by Martorello to disguise his business interests and protect the illegal money received from consumers. The key common factual and legal issues to be decided at trial are (1) whether all of these players constitute an "enterprise" under RICO, 18 U.S.C. §§ 1962(c); (2) whether the players conducted the affairs or participated in the enterprises affairs; (3) whether the enterprise engaged in unfair or deceptive acts or practices; and (4) whether the enterprise violated RICO by charging interest rates more than twice the legal limit under state law.

Ex. 1, MDL No. 2906, ECF No. 29 at 4.

Plaintiffs further argued in their MDL consolidation petition that "[i]mportantly, the Defendants' payday lending scheme did not vary from state to state. The rates charged in all states were over the state usury limits, and Defendants' defense in all cases is that state law does not apply to them because they are entitled to tribal immunity," thereby supporting consolidation, according to Plaintiffs. *See id*. Plaintiffs further argued that "[r]esolution of the common issues in a single forum would further the convenience of all parties and witnesses, as well as the courts" and that "because all eight cases [including *Williams* and *Galloway I*] assert virtually identical allegations and raise common factual questions, the plaintiffs in each case will require depositions of the same persons and entities and discovery of the same documents." *Id*.

Plaintiffs further admitted to the MDL panel that consolidation "was particularly appropriate for these eight actions [including *Williams* and *Galloway I*] to prevent inconsistent rulings on class certification and other class-related issues" and that "[a]ll of the cases assert RICO violations in addition to state usury law claims, so each court will have to address the propriety of certification of the same issues and claims." *Id*. at 11. According to Plaintiffs, the risk for

Case 20-04008-elm   Doc 90-3   Filed 05/25/20   Entered 05/25/20 16:23:47   Desc
Case 5:19-cv-00406-REP   Document 382   Filed 02/07/20   Page 20 of 26   PageID# 11152
Exhibits 18 through 28    Page 13 of 325

inconsistent rulings "is especially important in class cases where a decision on class certification necessarily effects [sic] the rights of parties to cases with overlapping classes."   Ex. 1, MDL No. 2906, ECF No. 29 at 6.

Finally, Plaintiffs argued to the MDL panel that consolidation of *Williams, Galloway I,* and *Galloway II* was necessary to minimize duplicative discovery:

> In all cases, the plaintiffs must prove the existence of the enterprise and thus will need discovery from all the major players in the enterprise whether they are named in the enterprise or not. For example, just as Plaintiffs in *Williams* and *Galloway I* have deposed, among others, Matt Martorello, corporate witnesses from Ascension and Big Picture, James Dowd, and Justin Martorello, in order to obtain information about the illegal enterprise, Plaintiffs in *Galloway II* will need discovery from the same individuals in order to prove the existence of the unlawful enterprise. Consolidation is necessary to minimize such duplicative discovery.

*Id.* at 4-5.

It is undeniable that Matt Martorello is at the core of the allegations in every complaint. *See Williams*, ECF No. 1, ¶¶ 26–67; *Galloway I*, ECF No. 30, ¶¶ 1–12; *Galloway II*, ECF No. 1, ¶¶ 1–18.  In Plaintiffs' own words, all of the cases "involve the same legal claims . . . , overlapping classes, and common issues of law and fact."  Ex. 2, MDL No. 2906, ECF No. 1-1 at 5; 1/20/2020 Hr'g Tr. at 29 (Plaintiffs' Counsel stating that "[t]he question of illegality will be the same in *Galloway II* and *Williams*"); *see also Galloway I*, ECF No. 223, 8 (Plaintiffs arguing for joinder of additional defendants because "[i]n this case, the questions of fact and law are entirely common").

### III. ARGUMENT

The Court should consolidate *Williams*, *Galloway I*, and *Galloway II,* set a briefing schedule to address the additional (identical) proposed classes in *Galloway I & II*, and set a single expedited case schedule to move forward on the merits of Plaintiffs' claims.  Doing so will

**Debtor's Ex. 18, p. 013**

Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Case 3:19-cv-00408-REP Document 552 Filed 02/07/20 Page 31 of 16 PageID# 22153
Exhibits 18 through 28    Page 14 of 325

significantly lessen the burdens of bringing these cases to trial on all of the remaining parties, as
well as on the witnesses (who would be the same in each case), and on the Court.  Consolidation
would also be consistent with Rule 42's other considerations—in addition to lessened litigation
cost and time for all involved, it is beyond dispute that each of those cases alleges exactly the same
core questions of law and fact, risks no confusion or prejudice to Plaintiffs, and will allow the
Court to decide the key issues, which are (with some very limited exceptions) the same in each
case, one time, thereby avoiding the possibility of conflicting decisions on those issues.  As
outlined below, the minor substantive and procedural differences among these cases are not an
impediment to consolidation, which is manifestly appropriate in these circumstances.

Rule 42 grants federal courts the power to consolidate actions that contain common
questions of law or fact.  FED. R. CIV. P. 42(a).  The Court has broad discretion to determine
whether consolidation is appropriate.  *Kelen v. World Financial Network Nat. Bank*, 302 F.R.D.
56, 63 (S.D.N.Y. 2014).  The party moving for consolidation must demonstrate that there are
common legal and factual issues among the cases sought to be consolidated.  *Delre v. Perry*, 288
F.R.D. 241, 246 (E.D.N.Y. 2012). In explaining this standard, the Fourth Circuit has instructed
that proper application of Rule 42(a) requires the district court to determine whether the specific
risks of prejudice and possible confusion from consolidation were overborne by the risk of
inconsistent adjudications . . ., the burden on parties, witnesses, and available judicial resources
posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single
one, and the relative expense to all concerned of the single-trial, multiple-trial
alternatives. *Campbell v. Bos. Sci. Corp.*, 882 F.3d 70, 74 (4th Cir. 2018) (modification in original)
(internal quotation marks omitted) (granting consolidation where Plaintiffs all suffered from

**Debtor's Ex. 18, p. 014**

Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Case 3:19-cv-00408-REP Document 382 Filed 02/07/20 Page 22 of 26 PageID# 11154
Exhibits 18 through 28    Page 15 of 325

similar product malfunction, used same evidence and relied on same expert witnesses, and defendants relied on same defenses).

Minor differences between the actions should not stop a court from utilizing Rule 42(a). "In fact, [d]ifferences in causes of action, defendants, or the class period do not render consolidation inappropriate if the cases present sufficiently common questions of fact and law, and the differences do not outweigh the interests of judicial economy served by consolidation." *Rauch v. Vale S.A.*, 378 F. Supp. 3d 198, 205 (E.D.N.Y. 2019) (modification in original) (internal quotation marks omitted) (granting consolidation where two cases involved common questions of law and fact and alleged violations of the same securities laws, notwithstanding first case having longer class period, since allegations had the same factual basis, and despite presence of additional defendant in first case).

Applying these well-established standards, consolidation is warranted here.

**A.  Core Questions of Law and Fact Overlap in All of the Subject Cases.**

Across all three actions, Plaintiffs' allegations rest on overlapping core questions of law and fact.  Plaintiffs universally allege—albeit baselessly—that: Defendants "rented" the Tribe in order to offer internet loans that circumvented various state usury laws; the scheme was in violation of federal RICO law and various state usury and consumer protection laws; and Plaintiffs were harmed while Defendants profited from the lending operation.  *See* Ex. 2, MDL No. 2906, ECF No. 1-1 at 6.  In each case, the key individuals and entities, time periods, and basic lending structure are exactly the same, and Plaintiffs allege that Matt Martorello was the mastermind behind the lending scheme.

As detailed above, Plaintiffs themselves know this.  In recently seeking consolidation of the various litigations before an MDL panel—a request they abruptly withdrew—Plaintiffs argued that the cases "assert nearly identical factual allegations," and "the same legal claims."  Ex. 2,

**Debtor's Ex. 18, p. 015**

Case 1:20-cv-04406-LGLP  Document 90-3  Filed 05/25/20  Entered 05/25/20 16:33:47  Desc
Case 3:19-cv-00408-REP  Document 582  Filed 02/07/20  Page 16 of 26  PageID# 12155
Exhibits 18 through 28    Page 16 of 325

MDL No. 2906, ECF No. 1-1 at 6; *accord* Ex. 1, MDL No. 2906, ECF No. 29 at 3 (noting that

each case made one "central factual allegation" related to Matt Martorello's involvement with

LVD's lending business).  In seeking consolidation, Plaintiffs pointed to various common factual

and legal issues across the cases, including legal questions regarding interpretation of the RICO

statute and tribal sovereignty and the various individuals' and entities' roles in the business.  Ex.

1, MDL No. 2906, ECF No. 29 at 3-4.  Having argued just how similar they view these various

litigations, both factually and legally, Plaintiffs cannot now turn an about face and claim any sort

of factual or legal disparity that cuts against consolidation.  *See, e.g.*, Ex. 2, MDL No. 2906, ECF

No. 1-1 at 5; 1/20/2020 Hr'g Tr. At 29 (Plaintiffs' Counsel stating that "[t]he question of illegality

will be the same in Galloway II and Williams"); Galloway I, ECF No. 223, 8 (Plaintiffs arguing

for joinder of additional defendants because "[i]n this case, the questions of fact and law are

entirely common"); *see also Bendzak v. Midland Nat. Life Ins. Co.*, 240 F.R.D. 449, 451 (S.D.

Iowa 2007) (noting that consolidated cases both outlined the same nine questions of law or fact

that were common among the class members and were "identical" "except for very minor

differences in the facts of each case, such as the number of deferred annuities that were sold . . .");

*Brady v. Top Ships Inc.*, 324 F. Supp. 3d 335, 344 (E.D.N.Y. 2018) (finding consolidation

appropriate "in light of the highly similar allegations and claims in the two putative class actions

against defendants").

     Accordingly, and as Plaintiffs themselves have argued in the past, consolidation is

therefore appropriate here, where cases involve common and overlapping questions of law and

fact.  FED. R. CIV. P. 42.

### B.  Consolidation Presents No Risk of Confusion or Prejudice to Plaintiffs.

     Courts routinely consolidate cases with similar questions of law or fact, even where minor

differences exist among the claims or parties.  *See Rauch*, 378 F. Supp. 3d 198 (consolidating cases

13

Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Case 3:19-cv-00406-REP Document 382 Filed 02/07/20 Page 14 of 16 PageID# 12156
Exhibits 18 through 28 Page 17 of 325

with slightly different class periods and different defendants); *Bendzak*, 240 F.R.D. at 45 (consolidating cases with different defendants). And while it is true that consolidation may not be appropriate where "it would deny a party a fair trial," *Campbell*, 882 F.3d at 74, there is no risk that Plaintiffs would be denied such a fair trial in the event that these nearly identical cases are consolidated.

There is no risk of confusion or prejudice to Plaintiffs. *Galloway II* names thirteen putative classes (the majority of which Defendants contend are not properly before the Court and should be dismissed) bringing thirty causes of action against nine defendants.[8] Further, Plaintiffs have previously argued in favor of consolidation of *eight* related cases, including the three at issue here. *See* Ex. 2, MDL No. 2906, ECF No. 1-1. Plaintiffs cannot claim that consolidation would prejudice them or cause confusion now.

Consolidation would only add one more individual defendant, Matt Martorello, to those remaining in *Galloway II*. As the Court knows, and as Plaintiffs have themselves contended, Matt Martorello is a key figure in all or almost all of the operative facts giving rise to each of the causes of action across all three lawsuits.[9] Plaintiffs specifically allege that the corporate defendants in *Galloway II* are mere alter egos or shell entities of Martorello. *See Galloway II,* ECF No. 1 at ¶¶ 17, 167, 238-246 ("The Role of Matt Martorello's Shell Companies and Trusts in The Enterprise").

Importantly, Matt Martorello will be entitled to a trial alone in both *Williams* and *Galloway I* as the sole remaining defendant. Martorello is therefore the only Party who could

---

[8] *See*, *supra*, n.5.

[9] At a hearing before the Court on January 29, 2020, Plaintiffs' counsel referred to Matt Martorello as "the primary defendant," called his "exposure" "the core question," and acknowledged that the question of whether or not the lending operation "was illegal" was a central issue to all of the pending litigations. 1/20/2020 Hr'g Tr. at 31, 35, 37.

**Debtor's Ex. 18, p. 017**

potentially suffer prejudice by consolidation.  Yet he understands the significant cost and time savings that consolidation would occasion—particularly as litigation costs continue to mount, not just to him but to all Parties.

The claims at issue in *Galloway II* include each of the causes of action in *Williams* and *Galloway I*—with the exception of one.  The only additional claim found in *Williams* and not the *Galloway* matters is one for declaratory judgment on choice of law and forum selection clauses in the Plaintiffs loan agreements.  Although *Galloway I* and *II* do not plead claims for declaratory judgment on these issues, adjudication of conflicts of law and whether the forum selection clauses in Plaintiffs' loan agreements are valid and enforceable is necessary and unavoidable in all three actions.  Courts will grant consolidation when, as here, an additional claim "does not alter the Court's conclusion that the [consolidated] cases involve common questions of law or fact" when the new claim "is premised on the same allegations that plaintiffs suffered damages as a result of defendants' scheme . . ."  *Brady*, 324 F. Supp. 3d at 345.  Not only is the declaratory judgement cause of action "premised on the same allegations" as the other claims, the issues *must* be adjudicated in every case.

These cases are different iterations of essentially the same lawsuit—and although nominally brought on behalf of different lead Plaintiffs, by the same set of plaintiffs' lawyers, seeking to represent various classes of consumers alleging the same thing against essentially the same people.  For example, the *Galloway I* Plaintiffs are also Plaintiffs in *Galloway II*.  The *Galloway I* putative classes are named and defined identically in *Galloway II*.  The *Williams* putative classes are the most narrowly defined, but fall into the definitions of the *Galloway I* and *Galloway II* classes; even though individual *Williams* Plaintiffs are not named in the *Galloway* actions, their interests are at stake in both. Indeed, if the cases are not consolidated, and a Virginia-

15

Case 3:19-cv-00406-REP   Document 362   Filed 02/07/20   Page 16 of 26 PageID# 12158
Case 20-04008-elm   Doc 90-3   Filed 05/25/20   Entered 05/25/20 16:23:47   Desc
Exhibits 18 through 28   Page 19 of 325

only class is certified in *Williams*, presumably all that would remain of *Galloway I* and *II* would

be non-Virginia plaintiffs, and those actions would therefore require dismissal. *See supra*, n.3.

And the lawyers seeking to represent those people are, as the Court is aware, the same, and

coordinating their litigation efforts together across all three cases (as well as in litigation pending

elsewhere in the country). There is no risk of prejudice to any Plaintiff in these circumstances for

all of their claims, all of which are pending before this Court, to be litigated and decided together

at once.

Because *Galloway II*'s allegations encompass the same facts, classes, and claims as

*Williams* and *Galloway I*, Plaintiffs do not risk prejudice by consolidating the actions. Nor does

adding a single claim to the thirty causes of action or a single defendant to the eight defendants

present a risk of confusion.

### C.  Multiple Trials Present a Risk of Inconsistent Adjudication of the Same Questions of Fact and Law.

Adjudicating the same questions of fact and law in three separate trials runs the risk of

inconsistent outcomes. When multiple class actions share factual and legal overlap, it is "essential

to avoid any risk of inconsistent rulings on class action issues, such as composition of classes and

sub-classes." *Byerson v. Equifax Info. Servs., LLC*, 467 F. Supp. 2d 627, 636 (E.D. Va. 2006).

Rather, it is "preferable that one court assess the factors that point to factual and legal overlap and

sort out the class action issues that will arise in each of the related actions." *Id.* (granting

consolidation where class complaints were "quite similar, involving the same provision of federal

law and the same basic conduct by the same three defendants," and where "similarities [were]

more significant than [were] the differences). Here, the risk of inconsistent outcomes in *three*

different class actions weighs heavily in favor of consolidation. Indeed, Plaintiffs would be hard

pressed to colorably argue otherwise, given their earlier assertion that "[c]onsolidation will

**Debtor's Ex. 18, p. 019**

Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Case 3:19-cv-00406-REP Document 562 Filed 02/07/20 Page 57 of 67 PageID# 22159
Exhibits 18 through 28    Page 20 of 325

mitigate the possibility of inconsistent rulings, including rulings on the propriety of class certification." Ex. 2, MDL No. 2906, ECF No. 1-1 at 5.

### D.  Multiple Trials Create Additional Burdens on the Parties, Witnesses, and Judicial Resources.

Consolidation is appropriate to "economize both judicial resources and the resources of the parties." *Endress v. Gentiva Health Servs., Inc.*, 278 F.R.D. 78, 82 (E.D.N.Y. 2011). The burdens and costs to all involved would be significantly reduced by consolidating these cases. This factor weighs heavily in favor of consolidation.

Plaintiffs' counsel have recognized the efficiencies in sharing resources across these cases. Plaintiffs' original lead counsel in *Williams*, Kelly & Crandall, PLC (now Kelly Guzzo, PLC), and Plaintiff's original lead counsel in *Galloway I*, Consumer Litigation Associates, P.C., have joined forces, and are working together with co-counsel Berger Montague and Terrell Marshall Law Group PLLC in these matters and coordinating with the law firm of Caddell & Chapman (lead counsel in related litigation in Oregon and Massachusetts) on their litigation strategy more broadly. Indeed, because the cases are essentially the same, the Parties have agreed to cross-use of the same documents in all cases to avoid duplicative discovery efforts. It would be counterintuitive and false for Plaintiffs to claim that consolidating these cases would prejudice them, when in fact it would only save their counsel time and money in litigating these cases. Indeed, Plaintiffs admitted to the MDL panel that "[r]esolution of the common issues in a single forum would further the convenience of all parties and witnesses, as well as the courts." Ex. 2, MDL No. 2906, ECF No. 1-1 at 7. In part, they correctly represented that this was so because all of the related cases pending across the country "assert virtually identical allegations and raise common factual questions," and therefore each case would require the same depositions of the same persons and entities and discovery of the same documents. Ex. 1, MDL No. 2906, ECF No. 29 at 3-4. Plaintiffs cannot

17

Case 1:20-cv-00008-clm   Doc 90-3   Filed 05/25/20   Entered 05/25/20 16:23:47   Desc
Case 3:19-cv-00406-REP   Document 862   Filed 02/07/20   Page 16 of 16   PageID# 11160
Exhibits 18 through 28    Page 21 of 325

point to anything that has occurred in *Williams, Galloway I*, or *Galloway II* that would render their statement made to the MDL panel untrue today with respect to consolidation of these actions.

Weighing the relevant considerations of economy of consolidation, including the length of time individual trials would take compared to a single trial, the relative cost of a single trial compared to multiple trials, and the burden on witnesses, the courts, and the parties, *Campbell*, 882 F.3d at 74, consolidation is appropriate given the circumstances involved in these litigations.

### 1. The Putative Class Members Suffer from Financing Multiple Actions.

The putative classes in *Williams* and *Galloway I* will themselves suffer undue costs if the cases proceed unconsolidated. If successful, the putative class members in each individual action will share the attorneys' fees for that action. The *Williams* classes are most narrowly defined, and those class members also fall into the definitions of classes in *Galloway I* and *II*. Thus, if successful, the *Williams* class members will have paid to litigate their rights three times, with three sets of attorneys' fees and costs, with all causes of action stemming from the same questions of fact and law. Similarly, the *Galloway I* class members would fall into the *Galloway II* classes as well, and pay attorneys' fees and costs in both cases to litigate their rights.

Additionally, the named plaintiffs in *Galloway I* are also plaintiffs in *Galloway II*, and must bear the burden of the time and energy, in addition to monetary expenses, of litigating both actions.

### 2. The Burden on Defendants is Unnecessarily Greater in Multiple Actions.

If the Court does not consolidate the cases, the Defendants will unnecessarily bear the burden of participating in multiple actions that all stem from the same nucleus of facts. Matt Martorello will be forced to defend himself against the same claims in *Williams* and *Galloway I*, with *Galloway I* merely casting a wider net. The cost and time commitment to each trial is immense and such effect would be nothing more than punitive with respect to Matt Martorello and

**Debtor's Ex. 18, p. 021**

Case 1:19-cv-00408-REP Document 382 Filed 02/07/20 Page 22 of 26 PageID# 11161
Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Exhibits 18 through 28 Page 22 of 325

the other remaining defendants. Matt Martorello also will then have to participate as a witness in *Galloway II* and facilitate those trials for his entities Liont and Gallant Capital.

Similarly, while the *Galloway II* defendants are not named in the other actions, they will be forced to participate as witnesses to the same set of facts giving rise to all three cases.

The burden can be lessened by consolidating all three cases.

### 3. Multiple Actions Drain Judicial Resources.

Each of these cases has spurred a feverish motions practice, for a combined total of over 1,300 docket entries. Given how immensely costly litigating these cases has been to Defendants, they likewise expect that they have been equally, if not more taxing to the Court's resources, and require a great deal of the Court's attention, often to address similar motions across all cases. For example, the Court will face largely duplicative motions for summary judgment on choice of law in each of the three cases. Consolidation should, at a minimum, result in a significant lessening of repetitive motions practice and streamline these litigations toward an eventual trial.

Adding a single defendant and a single cause of action to the remaining defendants[10] and actions in *Galloway II* would only marginally, if at all, increase the length of any trial. And in these circumstances, separate trials would make no sense. Each of the three trials would look essentially the same, require the presentation of the same evidence and witnesses, and be tried by the same lawyers and before same judge. Absent consolidation, not only would the Court and parties have to prepare for and go through the process of trying three separate cases, but doing so

---

[10] In the event that the settlement is not approved, Plaintiffs' claims against the Settling Defendants, each now named as a defendant in *Galloway III,* will presumably proceed in *Galloway III*.

19

**Debtor's Ex. 18, p. 022**

Case 3:19-cv-00408-REP Document 362 Filed 02/07/20 Page 20 of 26 PageID# 11162
Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Exhibits 18 through 28 Page 23 of 325

would also require the undue participation of multiple juries, expending juror time and repeating

voir dire in triplicate.

In *Campbell*, the Fourth Circuit affirmed consolidation in similar circumstances where

> [b]oth plaintiffs and defendants benefit from lessened litigation costs and the reduced need for expert testimony. Witnesses benefit from reduced demands on their time by limiting the need for them to provide repetitive testimony. The community as a whole benefits from reduced demands on its resources, including reduced demand for jurors. The judicial system benefits from the freedom consolidation affords judges to conscientiously resolve other pending cases.

*Campbell*, 882 F.3d at 76. Consolidation would afford all involved here the same

efficiencies and preservation of resources, and is thus appropriate.

### E.   Any Minor Differences, if any, in the Procedural Postures of the Cases are Not an Impediment to Consolidation.

While Plaintiffs have recently complained that the three litigations are in different

procedural postures such that consolidation is inappropriate, *e.g.*, 1/29/20 Hr'g Tr. at 25, this is

simply not true. The Parties' agreement to cross-use of the documents and discovery across the

three cases means that merits discovery in each case is at essentially the same stage in each case.

As Plaintiffs acknowledged in their motion in *Galloway I* seeking cross-use of discovery, Eventide

and Justin Martorello already produced documents in *Williams,* and Matt Martorello produced

"financial information regarding several of the *Galloway II* defendants, including Kairos Holdings,

LLC, Breakwater Holdings, LLC, Gallant Capital, LLC, Liont, LLC, and Bluetech Irrevocable

Trust." *See Galloway I*, ECF No. 311, at 4. Matt Martorello has produced over 14,200 individual

documents (totaling over 87,900 images) and over 900 native files; Justin Martorello has produced

over 3,600 individual documents (totaling over 8,100 images); and Liont has produced over 8,200

individual documents (totaling over 39,800 images) and over 900 native files. The limited

20

Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Case 3:19-cv-00408-REP Document 882 Filed 02/07/20 Page 21 of 26 PageID# 11163
Exhibits 18 through 28    Page 24 of 325

remaining anticipated discovery that will be required is the same in each case, and will involve that discovery being taken from the same persons and entities.

Moreover, even if there were some minor difference in the progression of discovery in the various cases, any such difference would not, in itself, be an impediment to consolidation. *Bendzak v. Midland Nat. Life Ins. Co.*, 240 F.R.D. 449, 451 (S.D. Iowa 2007) ("Nor do the slight differences among the class periods proposed, measures of damages sought, or *stages of discovery* preclude consolidation.") (emphasis added).  Again, the Parties have already agreed to cross-use of the hundreds of thousands of pages of documents produced in *Williams*, advancing discovery in *Galloway I* and *Galloway II* to precisely the same place the parties are in *Williams*, which is therefore is not significantly, if at all, more advanced than the other cases.

Importantly, merits discovery is not complete in any of the three matters.  There are key witnesses yet to be deposed in all matters, including witnesses Plaintiffs subpoenaed:  Jennifer Weddle, John Williams, Jennifer Galloway, Karrie Wichtman, Joette Pete, and Robert Rosette. For example, the Parties discussed at the January 29, 2020 hearing that Plaintiffs' document subpoena and supplemental deposition subpoena of Jennifer Weddle were still outstanding. 1/20/2020 Hr'g Tr. at 73–79.  Although there are some differences in the discovery that remains across the cases, none of that discovery is especially voluminous or complex, and it does not inhibit consolidation.  In fact, Plaintiffs have previously argued that despite "Defendants' efforts to exaggerate the complexity of this case, it boils down to a few common questions, provable through common evidence, with respect to each one of the Plaintiffs and Defendants."  *Galloway I*, ECF No. 223, 10.

**Debtor's Ex. 18, p. 024**

Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Case 3:19-cv-00406-REP Document 862 Filed 02/07/20 Page 22 of 26 PageID# 11164
Exhibits 18 through 28    Page 25 of 325

### F.    Determination of Lead Plaintiff(s) is Not an Impediment to Consolidation.

That *Williams* proposes different lead plaintiffs than *Galloway I* and *Galloway II* is not an obstacle to consolidation.  Courts may grant consolidation of class actions despite competing motions for lead plaintiff.  *Reitan v. China Mobile Games & Entm't Grp., Ltd.*, 68 F. Supp. 3d 390 (S.D.N.Y. 2014) (granting consolidation despite competing motions for appointment of lead plaintiff); *Atanasio v. Tenaris S.A.*, 331 F.R.D. 21, 25 (E.D.N.Y. 2019) (same).  Any such concern is muted here by the fact that the Plaintiffs' lawyers in all three cases are either the same, or working together in tandem to prosecute their claims.  This is not a situation where there are competing putative class representatives in actions pending in different districts, but one in which Plaintiffs' counsel have simply filed serial lawsuits alleging the same things that are all pending before this Court.  Given this, the Court should afford little weight to any hypothetical future conflict among the proposed class representatives in Williams and the Galloway cases.

### G.    Plaintiffs' Objections to Consolidation are Unfounded.

Plaintiffs have objected to consolidation of the cases, arguing that Defendants are bound by their opposition to joining in the *Galloway I* action what later became the *Galloway II* defendants in March 2019.  Plaintiffs fail to take into account the development in all three cases since that time.  Plaintiffs agree that sufficient overlap of fact and law makes these cases appropriate for consolidation.  *See* Ex. 2, MDL No. 2906, ECF No. 1-1 at.  Their only remaining argument that the cases are in different procedural postures falls flat.

Since March 2019, Plaintiffs have reached a proposed settlement agreement with the tribal defendants, which (if accepted) would dismiss many of the defendants in all three cases, and would leave only Matt Martorello in *Williams* and *Galloway I* and eight defendants in *Galloway II*.  It will eliminate two of the claims in *Galloway II* as well.  As a result, *Galloway I* and *II* are less

22

Case 3:19-cv-00406-REP Document 382 Filed 02/07/20 Page 26 of 26 PageID# 11165
Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Exhibits 18 through 28    Page 26 of 325

complex than they were a year ago when Plaintiffs moved to add seventeen new defendants and sixteen additional causes of action.

First, Plaintiffs acknowledged in their motion to transfer and consolidate eight separate class action lawsuits pending around the country that *Williams* and *Galloway I* were "far more advanced than the cases filed in other courts around the country," including that class certification was fully briefed in *Williams*. *Id.* at 2, 4.

At the time of Plaintiffs' motion to amend their complaint to join additional parties, discovery was plowing ahead in both *Williams* and *Galloway I*. Defendants were opposed to adding so many new parties because discovery was progressing rapidly. Shortly after Plaintiff's motion to amend their complaint was denied, discovery came to a screeching halt in both cases. The Fourth Circuit's decision on the Tribe's sovereign immunity led to a stay in *Williams* on July 3, 2019. 1/20/2020 Hr'g Tr. at 26. Plaintiffs subsequently re-raised the issue of sovereign immunity in *Galloway I*, virtually suspending discovery in that case.

Further, in the interim, the Parties have agreed to cross-use of documents already produced in *Williams*, rendering many of Plaintiffs' document requests moot in both *Galloway I* and *II*, and significantly advancing discovery in both. The fact that the Parties still have depositions to take is not incompatible with consolidation. *See supra*, Section E.

## IV. CONCLUSION

The many common questions of fact and law woven across all three actions make them appropriate for consolidation pursuant to FED. R. CIV. P. 42(a). All involved—from the Parties to witnesses and the Court—will enjoy greater efficiencies from consolidation. Plaintiffs and the putative class members suffer no risk of prejudice of confusion by joining two relatively less complex actions, *Williams* and *Galloway I*, with the most complex action, *Galloway II*.

**Debtor's Ex. 18, p. 026**

Case 3:19-cv-00408-REP Document 382 Filed 02/07/20 Page 24 of 26 PageID# 12166
Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Exhibits 18 through 28 Page 27 of 325

Consolidation would add to the most complex case only one defendant and one cause of action, with all of the *Williams* and *Galloway I* putative class members already represented in *Galloway II*.

Defendants ask the Court to exercise its broad discretion to consolidate *Williams*, *Galloway I*, and *Galloway II*.

24

Case 3:19-cv-00408-REP Document 382 Filed 02/07/20 Page 25 of 26 PageID# 11167
Case 20-04008-elp Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Exhibits 18 through 28    Page 28 of 325

Dated: February 7, 2020   Respectfully submitted,

*/s/ M. F. Connell Mullins, Jr.*
M. F. Connell Mullins, Jr. (VSB No. 47213)
cmullins@spottsfain.com
John M. Erbach (VSB No. 76695)
jerbach@spottsfain.com
SPOTTS FAIN PC
411 E Franklin Street
Suite 600
Richmond, VA 23219
Tel: (804) 697-2044
Fax: (804) 697-2144
jerbach@spottsfain.com

Richard Lawrence Scheff (*pro hac vice*)
Jonathan P. Boughrum (*pro hac vice*)
Michael C. Witsch (*pro hac vice*)
ARMSTRONG TEASDALE LLP
2005 Market Street, 29th Floor
One Commerce Square
Philadelphia, PA 19103
Tel: (267) 780-2012
Fax: (215) 405-9070
rlscheff@armstrongteasdale.com
jboughrum@armstrongteasdale.com
mwitsch@armstrongteasdale.com

Michelle L. Alamo (*pro hac vice*)
ARMSTRONG TEASDALE LLP
4643 S Ulster Street, Suite 800
Denver, CO 80237
Tel: (720) 722-7189
Fax: (720) 200-0679
malamo@armstrongteasdale.com

Attorneys for Defendants
MATT MARTORELLO, JUSTIN
MARTORELLO, REBECCA
MARTORELLO, GALLANT CAPITAL LLC,
and LIONT LLC

**Debtor's Ex. 18, p. 028**

Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Case 3:19-cv-00408-REP Document 362 Filed 02/07/20 Page 26 of 26 PageID# 12168
Exhibits 18 through 28 Page 29 of 325

## CERTIFICATE OF SERVICE

The undersigned counsel certified that on the 7th of February, 2020, the foregoing was filed using the Court's CM/ECF system, thereby serving a copy on all counsel of record electronically.

By: /s/ M. F. Connell Mullins, Jr.
M. F. Connell Mullins, Jr. (VSB No. 47213)
cmullins@spottsfain.com
SPOTTS FAIN PC
411 East Franklin Street, Suite 600
Richmond, VA 23219
(804) 697-2000 (Telephone)
(804) 697-2100 (Facsimile)

**Debtor's Ex. 18, p. 029**

# Exhibit 1

Debtor's Ex. 18, p. 030

Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Case 3:18-cv-00406-REP Document 602 Filed 02/04/20 Page 2 of 71 PageID# 13170
Exhibits 18 through 28 Page 31 of 325

BEFORE THE UNITED STATES JUDICIAL PANEL ON
MULTI-DISTRICT LITIGATION

|  |  |
|---|---|
| In re | MDL No. 2906 |
| BIG PICTURE LOANS LITIGATION | |

**CONSOLIDATED REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER
OF ACTIONS TO THE EASTERN DISTRICT OF VIRGINIA AND FOR
CONSOLIDATION PURSUANT TO 28 U.S.C. § 1407**

Case 3:18-cv-00406-REP Document 662 Filed 02/10/20 Page 3 of 72 PageID# 15171
Case 20-04008-elm   Doc 90-3   Filed 05/25/20   Entered 05/25/20 16:23:47   Desc
Exhibits 18 through 28   Page 32 of 325

## **INTRODUCTION**

This litigation presents a textbook example of why multi-district litigation is necessary to prevent inconsistent rulings and duplicative discovery in cases involving substantially identical legal claims, overlapping classes, and common issues of law and fact. Discovery in the Virginia cases — *Williams v. Big Picture Loans, LLC*, No. 3:17-cv-461 (E.D. Va.) (*Williams*) and *Galloway v. Big Picture Loans, LLC*, No. 3:18-cv-00406-REP (E.D. Va.) (*Galloway I*) — is far more advanced than any of the other cases. The *Williams* and *Galloway I* Plaintiffs have taken 25 depositions, served dozens of subpoenas, and obtained approximately 290,132 pages of documents from Defendants, experts, and third parties, much of which was only produced after contested discovery motions. Much of the information that the *Williams* and *Galloway I* Plaintiffs have obtained is highly relevant to threshold jurisdictional issues that are being briefed across the country, yet no global agreement to share such information exists and thus plaintiffs in the other cases do not have access to much of it. Instead, to support their positions on jurisdiction, plaintiffs in the non-Virginia cases have been forced to rely on the subset of information that Defendants have agreed to produce and any information they can scour from the dockets. To ensure a level playing field, the matters should be transferred and consolidated.

Moreover, discovery continues in *Williams* and *Galloway I* and threshold subject matter jurisdiction issues remain pending and in dispute. Important depositions, including the deposition of the attorney who advised the tribe on the illegal lending scheme, are scheduled to take place in the next month. And Judge Robert Payne, who is presiding over *Williams* and *Galloway I*, recently ordered an evidentiary hearing on subject matter jurisdiction to be held on October 28, 2019. *Galloway v. Big Picture Loans, LLC*, No. 3:18-cv-00406-REP, ECF No. 270 (E.D. Va.

**Debtor's Ex. 18, p. 032**

Case 3:18-cv-04088-RBP Document 1002 Filed 02/04/20 Page 4 of 73 PageID #: 13172
Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:33:47 Desc
Exhibits 18 through 28 Page 33 of 325

July 23, 2019). Judge Payne ordered this hearing because Plaintiffs brought to the Court's attention serious material misrepresentations made by Defendants in support of their motions to dismiss for lack of subject matter jurisdiction. *See Galloway I* at ECF No. 249. The parties in *Galloway I* will then submit new briefs in support of their respective positions on sovereign immunity based on findings made at the evidentiary hearing. As for *Williams*, the Court has asked the parties to submit briefs setting forth their positions on how the Fourth Circuit's recent ruling on sovereign immunity affects the claims in that case.

The new evidence that continues to be unearthed in the *Williams* and *Galloway I* matters impacts all the related cases. Courts considering jurisdictional issues in the cases across the country almost certainly will face motions to supplement the records or for reconsideration based on what happens at the evidentiary hearing in Virginia. Plaintiffs in the other cases also may insist on holding their own evidentiary hearings to ensure they have an opportunity to participate in the process. Consolidation will prevent such time-consuming, duplicative, and expensive motion work and discovery.

Defendants maintain that consolidation is not necessary because the parties can simply share information by stipulation. But as the *Cumming* Plaintiffs point out in support of consolidation, Defendants have resisted sharing with the non-Virginia plaintiffs all the information available in *Williams* and *Galloway I*, particularly third-party discovery. *See* ECF No. 49 at 4. And although plaintiffs in all of the related cases could file motions to compel a fulsome exchange of information, they should not have to beg for shared discovery and courts should not be required to dig through other courts' dockets to figure out what discovery has been done and what needs to be shared. The fact remains that no global sharing agreement exists in this litigation. And given that discovery continues in Virginia, courts across the country will need

- 2 -

**Debtor's Ex. 18, p. 033**

Case 30-04008-elm Doc 00-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Case 3:18-cv-00406-REP Document 682 Filed 02/03/20 Page 5 of 7 PageID# 13173
Exhibits 18 through 28   Page 34 of 325

to continuously address issues of which documents should be shared and whether briefing should
be supplemented. All of this causes inefficiency, delay, and expense to the parties and various
courts involved.

The fact that the Tribal Defendants have raised jurisdictional issues does not preclude
transfer. *See In re Ivy*, 901 F.2d 7, 9 (2d Cir. 1990). Where, as here, sovereign immunity issues
remain pending, it is far more efficient for the transferee judge to decide sovereign immunity
issues for all cases based on the same factual record. For all these reasons, Plaintiffs request for
transfer to be granted.

<u>**ARGUMENT**</u>

**I.     Transfer is necessary to prevent inconsistent rulings and duplicative discovery.**

Defendants do not dispute that the objective of transfer "is to eliminate duplication in
discovery, avoid conflicting rulings and schedules, reduce litigation cost, and save the time and
effort of the parties, the attorneys, the witnesses, and the courts." Manual for Complex Litig. §
20.131 (4th ed. May 2019 update). Nor do they really dispute that the nine cases Plaintiffs seek
to consolidate involve "one or more common questions of fact." 28 U.S.C.A. § 1407. Defendants
instead maintain that any factual overlap is limited and thus voluntary coordination among
plaintiffs' counsel will be sufficient to ensure consistent rulings and efficient discovery. For the
following reasons, Defendants are wrong.

**A.  Numerous common issues permeate all the cases.**

The central factual allegation in this litigation is that Matt Martorello orchestrated an
illegal tribal lending enterprise in order to charge consumers up to 400% interest for online,
short-term loans. For over two years, the *Williams* and *Galloway I* Plaintiffs ("Virginia
Plaintiffs") have aggressively sought the information necessary to prove their claims. In the

**Debtor's Ex. 18, p. 034**

process, the Virginia Plaintiffs have learned that Martorello's illegal enterprise is complicated

and extensive, including not only entities associated with Native American tribes that

purportedly provided the enterprise with "immunity" from state and federal usury laws, but also

third-party investors, trusts, Martorello's family members, and lawyers. Some of these

individuals played integral roles in the operation and management of the enterprise; others

knowingly provided the capital used to make the high-interest loans and, in return, generated

large profits from their investment in the scheme; still others were created by Martorello to

disguise his business interests and protect the illegal money received from consumers. The key

common factual and legal issues to be decided at trial are (1) whether all of these players

constitute an "enterprise" under RICO, 18 U.S.C. §§ 1962(c); (2) whether the players conducted

the affairs or participated in the enterprises affairs; (3) whether the enterprise engaged in unfair

or deceptive acts or practices; and (4) whether the enterprise violated RICO by charging interest

rates more than twice the legal limit under state law.[1]

     Because the focus at trial will be on the scope and contours of Martorello's unlawful

enterprise, it does not matter for consolidation purposes that some of the cases name certain

members of the enterprise while others do not. *See* ECF No. 42 at 19 (wrongly asserting that the

"lack of overlap between the defendants in *Galloway I* and *Galloway II* weighs against

consolidation"). In all cases, the plaintiffs must prove the existence of the enterprise and thus

will need discovery from all the major players in the enterprise whether they are named in the

enterprise or not. For example, just as Plaintiffs in *Williams* and *Galloway I* have deposed,

among others, Matt Martorello, corporate witnesses from Ascension and Big Picture, James

Dowd, and Justin Martorello, in order to obtain information about the illegal enterprise, Plaintiffs

---

[1] All of the actions for which transfer is sought allege either federal or state-based RICO claims.

**Debtor's Ex. 18, p. 035**

Case 3:18-cv-00406-REP Document 662 Filed 02/04/2021 Page 36 of 325
Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:33:47 Desc
Exhibits 18 through 28 Page 36 of 325

in *Galloway II* will need discovery from the same individuals in order to prove the existence of the unlawful enterprise. Consolidation is necessary to minimize such duplicative discovery. *See In re Airport Car Rental Antitrust Litig.*, 448 F. Supp. 273, 275 (J.P.M.L. 1978) (consolidation for defendants named in only one action — such as some of the defendants named in *Galloway II* — is appropriate where discovery related to those co-defendants is tied to common discovery).

The *Galloway II* Defendants assert that the common factual issues in this case are not "complex enough" to warrant transfer, but this is misleading. Even if the substantive factual issues are not particularly complex, Defendants' "Sherman-esque" discovery tactics have created serious procedural complexities. *See* ECF No. 1 (noting Judge Payne observed that Defendants' discovery obstruction had "reached enormous proportions" unlike any he had seen on the bench and that Judge Payne had fielded approximately thirty contested discovery motions). Most recently, Judge Payne ordered an evidentiary hearing in *Galloway I* in order to address alleged material misrepresentations that Defendants made to the Court in support of their motions to dismiss for lack of subject matter jurisdiction. *See Galloway v. Big Picture Loans, LLC*, No. 3:13-cv-406, ECF No. 270 (E.D. Va. July 23, 2019). The *Cumming* Plaintiffs confirm that similar obstruction has occurred in that lawsuit. *See* ECF No. 49 at 4-5 (observing that Defendants "have exploited … differing discovery rulings to their advantage, tactically designating nearly all discovery material as confidential and refusing to agree to reproductions, insisting on costly and protracted discovery disputes that are a waste of resources for all involved (including Defendants) and thus can only be explained as an attempt to prejudice the plaintiffs ability to successfully obtain the discovery they need" and citing court orders describing Defendants' obstructionist discovery conduct). Without consolidation, the parties around the country will be forced to continually return to the courts to provide updates regarding the

- 5 -

**Debtor's Ex. 18, p. 036**

Case 3:18-cv-00406-REP Document 662 Filed 02/10/20 Page 8 of 77 PageID# 19176
Case 20-04008-elm  Doc 90-3  Filed 05/25/20  Entered 05/25/20 16:23:47  Desc
Exhibits 18 through 28    Page 37 of 325

constantly-changing status of discovery in the *Williams* and *Galloway I* matters and to request an order requiring Defendants to share that information.

The Martorello Defendants' argument that "individual questions of fact predominate over any common questions of fact in the cases Plaintiffs seek to consolidate" (ECF No. 44 at 8) also should be rejected. The gist of Martorello's argument appears to be that the various players in the unlawful lending enterprise varied over the course of time. Thus, a consumer who was sold a usurious loan at one time period may be differently situated than a consumer that was sold a loan at a different period in time. Plaintiffs disagree that this is true: Defendants violated usury laws during both periods. Even if differences exist, such differences do not impact the discovery that Plaintiffs need to prove all claims. The crux of Plaintiffs' position is that Martorello and his cronies restructured the enterprise to avoid liability for violating lending laws. For example, Red Rock Tribal Lending was "sold" to the LVD and Big Picture and Ascension formed in order to protect Martorello from the consequences of making usurious loans and collecting unlawful debt. To prove this, they need information from both periods and such discovery is relevant regardless of whether the consumer was sold a loan before or after the sale.

### B.  Informal coordination will not suffice to prevent inconsistent rulings and duplicative discovery.

Defendants do not dispute that because the cases involve substantially the same factual allegations, types of claims, and defendants, there is a significant risk of inconsistent pretrial rulings. This factor is especially important in class cases where a decision on class certification necessarily effects the rights of parties to cases with overlapping classes. *See* ECF No. 1-1 (citing cases). There also is no real dispute that duplicative discovery can and ought to be avoided and Defendants concede that some coordination of discovery has been contemplated. *See* ECF No. 42 at 15 (noting Judge Payne "expressly stated that he would consider whether the Filing

Debtor's Ex. 18, p. 037

Case 3:18-cv-00406-REP Document 802 Filed 02/10/21 Page 5 of 73 PageID# 19177
Case 20-04008-elm Doc 80-3 Filed 05/25/20 Entered 05/25/20 16:33:47 Desc
Exhibits 18 through 28   Page 38 of 325

Plaintiffs could use discovery from *Galloway I* in *Galloway II*"); ECF No. 44 at 17 (noting

discovery can be shared across cases through stipulation); ECF No. 45 at 12 (asserting "informal

cooperation between the parties is possible and occurring" in the litigation).

But informal coordination cannot mitigate the serious risk of inconsistent pretrial rulings.

And while it is true in many cases that informal coordination provides an effective alternative to

consolidation, such coordination would be extraordinarily difficult here. *See* ECF No. 1-1 at 8-9.

Jurisdictional discovery is closed in most of the cases around the country. Thus, the plaintiffs in

the non-Virginia cases will not have the benefit of evidence regarding sovereign immunity that is

developed during the evidentiary hearing to occur in *Galloway I* on October 28, 2019. *See, e.g.,*

*Duggan v. Big Picture Loans, LLC*, No. 1:18-cv-12277-JGD, ECF No. 67 (D. Mass. July 10,

2019); *Smith v. Big Picture Loans, LLC*, No. 3:18-cv-01651, ECF No. 80 (D. Or. June 11, 2019)

(granting parties' stipulation to complete discovery by July 3, 2019). Consolidation is necessary

to ensure that courts around the country do not enter a ruling on sovereign immunity without

evidence from this crucial hearing.

The Martorello Defendants' assertion that Martorello "has already agreed to turn over

discovery from *Williams* in both California actions, as well as the Oregon, Massachusetts, and

Georgia actions" (ECF No. 44 at 17) is, at best, misleading and, at worst, just plain false. As the

*Cumming* Plaintiffs point out, although Martorello agreed "to a reproduction of documents *he*

had produced in *Williams*, he would not agree to a reproduction of documents produced by third

parties, insisting that he was precluded from doing so due to a protective order and suggesting

that the *Cummings* plaintiffs should have to serve the same subpoena to third parties that the

Williams plaintiffs had already served." *See* ECF No. 49 at 5 (emphasis in original). The fact that

Martorello was less than forthright to the Panel in his submission here underscores why the

**Debtor's Ex. 18, p. 038**

Case 3:18-cv-00406-REP   Document 362   Filed 02/07/20   Page 1 of 13 PageID# 12178
Case 20-04008-elm   Doc 90-3   Filed 05/25/20   Entered 05/25/20 16:23:47   Desc
Exhibits 18 through 28   Page 39 of 325

Martorello Defendants cannot be trusted to informally share information.

### C. The procedural posture of the Virginia actions supports consolidation.

Plaintiffs acknowledge that in some cases the fact that one case is more procedurally advanced than another case can make consolidation undesirable. But that is not the situation here. This litigation is unique in that the judge presiding over the arguably more procedurally-advanced cases has ordered an evidentiary hearing to determine whether the Defendants made misrepresentations that materially affected the record on a central jurisdictional issue decided early on in the case. Judge Payne ordered this hearing after the Virginia Plaintiffs unearthed evidence that appears to undermine many of the positions that Defendants took in their sovereign immunity briefing. After the hearing, Judge Payne will give all parties in the *Galloway I* matter a chance to re-brief the sovereign immunity issues. *See Galloway v. Big Picture Loans, LLC*, No. 3:18-cv-00406-REP, ECF No. 270 (E.D. Va. July 23, 2019). Judge Payne also has ordered all parties to brief the impact that the Fourth Circuit's decision has on further proceedings in *Williams* and pending motions in all of the related cases. *See Williams v. Big Picture Loans, LLC*, No. 3:17-cv-00461-REP, ECF No. 599 (E.D. Va. July 22, 2019). In other words, sovereign immunity is still at issue in all cases and the *Williams* and *Galloway I* cases are not as "procedurally advanced" as Defendants represent.

That said, the status of ***discovery*** in *Williams* and *Galloway I* is more advanced than any of the other actions. Plaintiffs have taken 25 depositions, performed expert work, and have obtained 290,132 pages of documents from Defendants, experts, and third parties. The majority of these documents — 246,147 pages — were produced after the parties initially briefed sovereign immunity. Many were produced only after contested discovery battles. Consolidation and transfer will allow all related cases to share this discovery, will avoid re-litigation of the

**Debtor's Ex. 18, p. 039**

Case 3:18-cv-00406-REP Document 624 Filed 02/07/20 Page 12 of 12 PageID# 12179
Case 20-04006-elm   Doc 90-3   Filed 05/25/20   Entered 05/25/20 16:23:47   Desc
Exhibits 18 through 28    Page 40 of 325

same discovery issues multiple times, and will ensure that key threshold issues like sovereign

immunity and class certification are based on the same factual record in all cases.

Consolidation also will allow the parties to take advantage of Judge Payne's "expertise

with this complex litigation." *See In re Four Seasons Sec. Laws Litig.*, 361 F. Supp. 636, 638

(J.P.M.L. 1973). Judge Payne has fielded dozens of motions in *Williams* and *Galloway I* and has

entered dozens of orders. He is familiar with the facts of this litigation and with Defendants'

positions on discovery and other matters. Thus, transferring the cases to Judge Payne "will

promote the efficient utilization of judicial resources." *See id.*

The Tribal Defendants maintain that all the cases have made "substantial litigation

progress" which "undercuts the convenience and efficiency of an MDL." ECF No. 45 at 16. This

is simply not true. As described above, jurisdictional discovery continues in the *Galloway I* case

and **new evidence** highly relevant to jurisdictional issues continues to be unearthed. Without

consolidation and transfer, the plaintiffs in all the cases around the country will need to request

to re-open discovery and jurisdictional briefing to take advantage of the new information thus

undermining any "litigation progress" that may have been made. It is far more efficient to

transfer all cases to the Eastern District of Virginia so that all parties can participate in the very

important evidentiary hearing that is scheduled to occur in October. These unique circumstances

make this case different from other actions.

**D.  There are a sufficient number of cases to warrant consolidation.**

The Tribal Defendants object that the actions are not sufficiently numerous to warrant

consolidation, asserting that the moving party bears a "heightened burden" to show that

"common questions of fact are so complex and the accompanying common discovery so time

consuming as to overcome the inconvenience to the party whose action is being transferred and

**Debtor's Ex. 18, p. 040**

Case 20-04006-elm Doc 60-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Case 3:18-cv-00406-REP Document 062 31 Filed 02/07/20 Page 122 of 124 PageID# 12180
Exhibits 18 through 28 Page 41 of 325

its witnesses." *See* ECF No. 45 at 13-15 (quoting *In re Scotch Whiskey*, 299 F. Supp. 543, 544 (J.P.M.L. 1969)). Plaintiffs meet that test here. Defendants have not asserted that they would be inconvenienced by transfer, nor could they: all of them have already been sued in the Eastern District of Virginia. And no *plaintiff* has asserted that he or she would be inconvenienced by the transfer. In contrast, Plaintiffs have established that discovery in the Virginia actions has been, and continues to be, complicated, time-consuming, and extremely important. Transfer is warranted to ensure that all plaintiffs have access to the same information.

## II. Sovereign immunity issues do not preclude transfer.

The Tribal Defendants maintain the Panel lacks jurisdiction to transfer the actions because there is no subject matter jurisdiction over them. ECF No. 45 at 10 (asserting lack of subject matter jurisdiction "precludes transfer under § 1407"). That is wrong. "Section 1407 does not empower the MDL Panel to decide questions going to the jurisdiction or the merits of a case …." *In re Ivy*, 901 F.2d 7, 9 (2d Cir. 1990) (denying petition for writ of mandamus to vacate order transferring action for MDL consolidation). The only issue before the Panel is "the merits of [a] transfer viewed against the purposes of the multidistrict statutory scheme, whether or not there is a pending jurisdictional objection." *Id.* Accordingly, in other cases the Panel has declined to postpone transfer pending resolution of jurisdictional issues in the transferor courts and has specifically noted that the transferee judge "certainly has the power to determine" the jurisdictional questions. *See In re Air Crash Disaster at Florida Everglades*, 368 F. Supp. 812, 813 (J.P.M.L. 1973); *see also Wolgamott v. Asbestos Defendants*, No. C 09-5667 SBA (N.D. Cal. Feb. 16, 2010) (noting "[c]onsistency as well as economy is thus served" when the transferee court decides a jurisdictional objection).

- 10 -

**Debtor's Ex. 18, p. 041**

The Tribal Defendants wrongly rely on *BancOhio Corp. v. Fox*, 516 F.2d 29 (6th Cir.

1975). In that case, the Panel had stayed an order transferring a case to an established MDL

pending resolution of a jurisdictional issue. At the time the transfer order was stayed, the district

court in the underlying action already had ruled on the jurisdictional issue, finding the district

court had subject matter jurisdiction, but the defendant had petitioned for a writ of mandamus

seeking to reverse the district court's decision. The Sixth Circuit ultimately granted the writ of

mandamus, holding the federal court lacked jurisdiction. Although the Sixth Circuit observed in

dicta that transfer "cannot be made unless the district court properly has jurisdiction over the

subject matter of the case," *see id.*, it did not hold that a jurisdictional question must be resolved

**before** the Panel can enter an order transferring a case to a MDL. That question —identical to the

question presented here — was addressed by the Second Circuit in *In re Ivy*, which, as described

above, held that a pending jurisdictional question does not preclude transfer because the

transferee court can address jurisdiction. The Second Circuit distinguished *Fox* because in *Fox*

the jurisdictional question already had been answered and a writ of mandamus sought. Similarly,

the jurisdictional question has not been decided in **any** of the cases sought to be consolidated

here and thus the Second Circuit's reasoning applies.

Here, it is fair and efficient for Judge Payne to decide the jurisdictional issues on a

consolidated basis. Judge Payne is intimately familiar with the factual record that the Fourth

Circuit considered before holding that the Tribal Defendants had sovereign immunity. He also is

familiar with the extensive evidence that has been developed since the parties briefed the

sovereign immunity issue two years ago. And he will become even more familiar with these new

facts and the impact they will have on the case after he holds the evidentiary hearing in October.

Thus, he is well-situated to make a fair and informed decision for all the cases in light of all the

- 11 -

**Debtor's Ex. 18, p. 042**

Case 20-04006-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Case 3:18-cv-00406-REP Document 262-1 Filed 02/20/20 Page 12 of 13 PageID# 12182
Exhibits 18 through 28 Page 43 of 325

facts. Judge Payne's recent request for briefing on the impact of the Fourth Circuit's decision on
the various pending motions in the Virginia cases confirms that he stands ready and willing to
make decisions regarding any effect the Fourth Circuit's decision has not only on Plaintiffs'
claims against the Tribal Defendants, but also on Plaintiffs' ability to obtain discovery from the
Tribal Defendants to support their claims against Martorello and other non-tribal defendants. To
avoid conflicting rulings on these important issues and to ensure that discovery proceeds
efficiently and fairly, transfer and consolidation in front of Judge Payne is appropriate.

### III. Defendants' accusations of "improper motives" are meritless and the fact that all Defendants oppose transfer is not dispositive.

Defendants accuse Plaintiffs of forum shopping, but Defendants' own contradictory
assertions on that score show that such accusations are meritless. On the one hand, the Tribal
Defendants accuse Plaintiffs of trying to "lock in" favorable rulings. *See* ECF No. 45 at 18. On
the other hand, the *Galloway II* and Martorello Defendants accuse Plaintiffs of trying to
circumvent Judge Payne's unfavorable ruling on their motion for leave to amend in *Galloway I*.
*See* ECF No. 42 at 17; ECF No. 44 at 18. Neither is true. If Plaintiffs truly were "forum
shopping," they would seek transfer to a district court outside of the Fourth Circuit in order to
avoid any binding effect of the Fourth Circuit's decision on sovereign immunity. Far from forum
shopping, Plaintiffs seek transfer and consolidation to prevent conflicting rulings on key issues
and to ensure that discovery progresses fairly and efficiently. Plaintiffs are particularly
concerned that courts in the other jurisdictions — where jurisdictional discovery is now closed
— will decide sovereign immunity and class certification without the benefit of the full record
that continues to develop in the Virginia cases.

It is also untrue that the Panel must deny transfer simply because Defendants are opposed
to it. *See In re Asbestos and Asbestos Insulation Material Prods. Liability Litig.*, 431 F. Supp.

- 12 -

**Debtor's Ex. 18, p. 043**

906, 910 (J.P.M.L. 1977) ("*Asbestos*") (observing virtually unanimous opposition to transfer though persuasive, is not determinative). In *Asbestos*, although the Panel noted that unanimous opposition to a request for consolidation is "persuasive," the Panel's analysis ultimately focused exclusively on the substance of the parties' arguments regarding the Section 1407 factors, rather than on the fact of unanimity itself. The Panel reasoned similarly in *In re Natural Gas Liquids Regulation Litig.*, 434 F. Supp. 665, 667-68 (J.P.M.L. 1977) (finding transfer inappropriate where disparate questions predominated over common questions, but noting Panel's "power to order transfer in multidistrict litigation even if no party favors transfer"). In other words, the parties' preferences are less important to the Panel's transfer analysis than the other factors articulated in Section 1407. *See In re Griseofluvin Antitrust Litig.*, 395 F. Supp. 1402, 1403-04 (J.P.M.L. 1975) (ordering transfer despite the fact that all but one defendant opposed transfer because sec. 1407 factors weighed heavily in favor of transfer); *In re Capital Underwriters, Inc. Securities Litig.*, 464 F. Supp. 955, 959 (J.P.M.L. 1979) (ordering consolidation and transfer despite opposition of all but one defendant who took no position because other factors overwhelmingly supported consolidation); *In re Westinghouse Elec. Corp. Uranium Contracts Litig.*, 405 F. Supp. 316, 317-18 (J.P.M.L. 1975) (finding transfer and consolidation appropriate despite opposition from all but nonmoving party).

Defendants' opposition should be afforded little persuasive weight here. The Section 1407 factors strongly favor transfer. And Defendants have their own interests in preventing other plaintiffs from participating in the continued discovery that is taking place in Virginia. Conflicting rulings that almost certainly will tie issues up in the courts of appeals also would benefit Defendants by slowing the proceedings down. Thus, it is not surprising that they oppose the efficiencies that come with consolidation and transfer of the various matters.

**Debtor's Ex. 18, p. 044**

Case 20-04006-elm Doc 60-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Case 3:18-cv-00406-REP Document 62 Filed 02/08/20 Page 15 of 16 Page ID# 2184
Exhibits 18 through 28 Page 45 of 325

## **CONCLUSION**

For all these reasons, the *Williams* and *Galloway I* Plaintiffs respectfully request that the

Panel grant their motion and order transfer of the actions listed in the Schedule of Actions, as

well as any tag-along actions, to the Eastern District of Virginia for consolidated pretrial

proceedings before Judge Payne.

RESPECTFULLY SUBMITTED AND DATED this 29th day of July, 2019.

BERGER MONTAGUE PC

By: /s/ E. Michelle Drake
    E. Michelle Drake
    Email: emdrake@bm.net
    John G. Albanese
    Email: jalbanese@bm.net
    43 SE Main Street, Suite 505
    Minneapolis, Minnesota 55414
    Telephone: (612) 594-5999
    Facsimile: (612) 584-4470

    Leonard A. Bennett
    Email: lenbennett@clalegal.com
    Elizabeth W. Hanes
    Email: elizabeth@clalegal.com
    Craig C. Marchiando
    Email: craig@clalegal.com
    CONSUMER LITIGATION
      ASSOCIATES, P.C
    763 J. Clyde Morris Boulevard, Suite 1-A
    Newport News, Virginia 23601
    Telephone: (757) 930-3660
    Facsimile: (757) 930-3662

**Debtor's Ex. 18, p. 045**

Case 20-04006-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Case 3:18-cv-00406-REP Document 582 Filed 02/20/20 Page 17 of 26 PageID# 22185
Exhibits 18 through 28    Page 46 of 325

Kristi C. Kelly
Email: kkelly@kellyguzzo.com
Andrew J. Guzzo
Email: aguzzo@kellyguzzo.com
Casey S. Nash
Email: casey@kellyguzzo.com
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, Virginia 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167

Beth E. Terrell
Email: bterrell@terrellmarshall.com
Jennifer Rust Murray
Email:  jmurray@terrellmarshall.com
Elizabeth A. Adams
Email: eadams@terrellmarshall.com
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103
Telephone: (206) 816-6603
Facsimile: (206) 319-5450

Matthew Wessler
Email: matt@guptawessler.com
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
Telephone: (202) 888-1741
Facsimile: (202) 888-7792

*Attorneys for Plaintiffs Lula Williams, Gloria
Turnage, George Hengle, Dowin Coffy, Felix
Gillison, Jr., Renee Galloway, Dianne Turner, Earl
Browne, Rose Marie Buchert, Regina Nolte, Teresa
Titus, Kevin Minor, Dominique de la Bay, Lori
Fitzgerald, Andrea Scarborough, Burry Pough, Lisa
Martinez, Sonji Grandy, Anastasia Sherman, Jerry
Avent, Lucinda Gray, Anthony Green, Linda
Madison, Derek Geter, Keisha Hamm, Faith
Thomas, Sharon Paavo, and Latanya Tarleton*

- 15 -

# Exhibit 2

Debtor's Ex. 18, p. 047

Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:33:47 Desc
Case 3:18-cv-00406-REP Document 302-1 Filed 09/09/19 Page 2 of 194 PageID# 13187
Exhibits 18 through 28 Page 48 of 325

BEFORE THE UNITED STATES JUDICIAL PANEL ON
MULTI-DISTRICT LITIGATION

| | |
|---|---|
| In re | MDL No. |
| BIG PICTURE LOANS LITIGATION | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER OF
ACTIONS TO THE EASTERN DISTRICT OF VIRGINIA AND FOR
CONSOLIDATION PURSUANT TO 28 U.S.C. § 1407**

**Debtor's Ex. 18, p. 048**

Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:33:47 Desc
Case 3:18-cv-09406-RHK-NO Document 362-1 Filed 02/21/20 Page 3 of 13 PageID# 12188
Exhibits 18 through 28    Page 49 of 325

## INTRODUCTION

Pursuant to 28 U.S.C. § 1407 and the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, Plaintiffs in three class action cases in the Eastern District of Virginia respectfully move the Judicial Panel on Multidistrict Litigation for an order transferring the eight pending related cases listed in the Schedule of Actions, as well as any subsequently filed tag-along cases involving similar facts and claims, to the Eastern District of Virginia for coordinated or consolidated proceedings. The cases in the Eastern District of Virginia are far more advanced than the cases filed in other courts around the country. Transfer will preserve the parties' and the courts' resources and will ensure consistent outcomes across cases.

This litigation involves Defendants' scheme to make online usurious short term loans (commonly called "payday loans"). These loans carry triple-digit interest rates, often exceeding 400%, and are illegal. Payday loans target vulnerable borrowers and, left unregulated, can economically devastate borrowers and their communities. Consumers often renew the loans or take out new loans when they are unable to pay their original loans off, creating a cycle of mounting debt. Some payday lenders have devised a method to avoid state usury laws—the "rent-a-tribe" scheme. In a rent-a-tribe scheme, the payday lender—which does most of its lending over the internet—affiliates with a Native American tribe to attempt to insulate itself from federal and state law by piggy-backing on the tribe's sovereign legal status and its general immunity from suit under federal and state laws. Lenders argue that because their businesses are located on a Native American reservation or affiliated with a Native American tribe, they are bound by the laws of that reservation or tribe only and not by federal or state law.

The rent-a-tribe enterprise at issue in this litigation was created and operated by defendant Matt Martorello, a Chicago entrepreneur with no lineage to the Lac Vieux Desert

**Debtor's Ex. 18, p. 049**

Case 3:18-cv-00406-REP Document 602-21 Filed 09/09/20 Page 4 of 83 PageID# 13189
Case 20-04008-elm Doc 30-3 Filed 05/25/20 Entered 05/25/20 16:38:47 Desc
Exhibits 18 through 28 Page 50 of 325

Bank of Lake Superior Chippewa Indians ("LVD"). Over the past seven years, the enterprise made high-interest loans to consumers through Red Rock Tribal Lending, LLC, and Big Picture Loans, LLC, two companies claiming to be owned and operated by the LVD. In reality, these two entities were formed to ostensibly provide sovereign immunity to Martorello from the consequences of making usurious loans and collecting unlawful debt. Plaintiffs contend that Martorello reaped the vast majority of the profits from the loans and maintained control of the day to day lending operations.

On June 22, 2017, Plaintiffs Lula Williams, Gloria Turnage, George Hengle, Dowin Coffy, and Felix Gillison, Jr. (the *Williams* Plaintiffs) filed a class action complaint in the Eastern District of Virginia on behalf of all persons who received a loan with an interest rate greater than 12% from Red Rock or Big Picture Loans when residing or located in Virginia. The *Williams* Plaintiffs allege that the defendants—Martorello, Big Picture, and Ascension Technologies, LLC—violate Virginia's usury laws and the Racketeer Influenced and Corrupt Organizations Act (RICO) in making the extortionate loans to proposed class members.

On June 12, 2018, Plaintiffs Renee Galloway, Dianne Turner, Earl Browne, Rose Marie Buchert, Regina Nolte, Teresa Titus and Kevin Minor (the *Galloway* Plaintiffs) filed a class action complaint in the Eastern District of Virginia on behalf of all persons living in Virginia, California, Illinois, Indiana, Ohio, Washington, and states with similar usury laws who received a loan with an interest rate greater than 12% from Red Rock or Big Picture Loans. The *Galloway* Plaintiffs allege that defendants Martorello, Big Picture Loans, and Ascension violate RICO and state usury laws by making the high-interest loans. The *Williams* and *Galloway* Plaintiffs also filed a new case in the Eastern District of Virginia naming as defendants several additional

**Debtor's Ex. 18, p. 050**

Case 3:18-cv-00406-REP Document 382-2 Filed 05/26/20 Page 52 of 326 PageID# 13190
Case 20-04008-elm Doc 30-3 Filed 05/25/20 Entered 05/25/20 16:33:47 Desc
Exhibits 18 through 28 Page 51 of 325

persons and entities who were involved in and profited from the lending scheme, as well as plaintiffs from additional states.

This litigation has been hard fought from the start. The Defendants are pursuing every procedural and legal challenge available, and third parties are disputing the scope of Plaintiffs' subpoenas in courts around the country, spawning additional litigation. There are over **five hundred** docket entries in the *Williams* matter alone, and the court has issued over **one hundred rulings** on virtually every issue imaginable, from sovereign immunity to motions to dismiss to privilege waivers to countless discovery disputes. More than **25 depositions** have been taken, class certification is fully briefed. The Fourth Circuit recently heard argument on the corporate defendants' appeal of the denial of their motion to dismiss on sovereign immunity grounds.[1] The court has fielded approximately **thirty** contested discovery motions. During a recent hearing, the court called Defendants' discovery tactics "Sherman-esque" and observed that discovery obstruction had "reached enormous proportions" unlike any he had seen since he has been on the bench. *See* Transcript at 6, 26, *Galloway v. Big Picture Loans, LLC*, No. 3:18-cv-406 (E.D. Va. May 22, 2019), ECF No. 242. The court has entered an additional **forty orders** in *Galloway* and recently entered an order allowing Plaintiffs to supplement the record on sovereign immunity and to describe in detail any misrepresentations Defendants have made to the court. *See Galloway*, ECF No. 246 at 6-8.

Starting nearly a year after the *Williams* Plaintiffs filed their class action complaint, five additional cases with effectively identical copycat allegations were filed in five different

---

[1] The corporate defendants are not necessary parties to this litigation because Plaintiffs argue that Matt Martorello and related entities and individuals conspired to evade state and federal law by unlawfully piggy-backing on purported tribal sovereign immunity. Thus, even if the Fourth Circuit holds the corporate defendants have tribal sovereign immunity, the litigation would still proceed against Martorello and related non-tribal individuals and entities.

- 4 -

Case 3:18-cv-00406-REP Document 634-21 Filed 01/26/20 Page 53 of 84 PageID# 15191
Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:33:47 Desc
Exhibits 18 through 28 Page 52 of 325

districts: Northern District of California (*Cumming*), Northern District of Georgia (*McKoy*), District of Oregon (*Smith*), District of Massachusetts (*Duggan*), and Central District of California (*Kobin*). *See* Schedule of Actions. All of the cases assert state usury law and RICO violations against similar groups of defendants and were filed on behalf of proposed classes of state residents. The *Cumming* and *Kobin* cases were also filed on behalf of proposed nationwide classes. Not surprisingly, the defendants have pursued the same early tactics in these cases as in *Williams* and *Galloway*, filing motions to dismiss on various grounds including sovereign immunity. The plaintiffs in the copycat cases have responded by seeking the discovery the *Williams* Plaintiffs obtained before responding to the motions. To be clear: these plaintiffs have literally requested the discovery from *Williams*, including "pleadings and evidence" referred to in jurisdictional motion briefing and "unredacted versions" of evidence that the Eastern District of Virginia considered when ruling on motions. The plaintiffs in these copycat cases are represented by five different law firms: Tycko & Zaveeri LLP, McRae Bertschi & Cole LLC, Stoll Berne Lokting & Schlachter P.C., Bailey & Glasser LLP, and Caddell & Chapman.

Because all eight cases involve the same legal claims and defendants, overlapping classes, and common issues of law and fact, consolidation will promote the convenience of the parties and witnesses and the just and efficient conduct of the litigation. *See* 28 U.S.C. § 1407. Consolidation will mitigate the possibility of inconsistent rulings, including rulings on the propriety of class certification, and will promote judicial economy by providing a single forum to which future tag-along actions can be transferred. The Eastern District of Virginia is the most appropriate forum for these cases to proceed. The *Williams* and *Galloway* Plaintiffs therefore respectfully move the Panel for transfer and consolidation of the eight cases to the Eastern District of Virginia. On June 5, 2019, Plaintiffs asked Defendants to provide their opinion

**Debtor's Ex. 18, p. 052**

regarding transfer and consolidation. On June 7, 2019, Defendants informed Plaintiffs they were still consulting their clients and had not stated their position.

## ARGUMENT

**I.    The litigation satisfies the requirements for consolidation and transfer under 28 U.S.C. § 1407(a).**

Transfer and consolidation is permitted if civil actions pending in different districts "involv[e] one or more common questions of fact" and the Panel determines that transfer will further "the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). "The objective of transfer is to eliminate duplication in discovery, avoid conflicting rulings and schedules, reduce litigation cost, and save the time and effort of the parties, the attorneys, the witnesses, and the courts." Manual for Complex Litigation § 20.131 (4th ed. May 2019 update). Transfer and consolidation of the eight pending cases for pretrial proceedings will achieve these objectives.

### A.    The litigation involves common questions of fact.

To assess whether transfer and consolidation is appropriate under section 1407, the Panel considers the pleadings to determine the extent to which the cases involve common questions of fact. The complaints in the eight pending cases assert nearly identical factual allegations relating to the rent-a-tribe enterprise masterminded by Martorello. The complaints also assert the same legal claims—violations of RICO and state usury laws—against the same defendants. Many of the key factual allegations in the *Williams* Plaintiffs' complaint are repeated nearly verbatim in the copycat complaints filed in other jurisdictions. *Compare* Class Action Complaint ¶¶ 13-15, 26-53, *Williams v. Big Picture Loans, LLC*, No. 3:17-cv-461-REP (E.D. Va. June 22, 2017), ECF No. 1 *with* Amended Class Action Complaint ¶¶ 16-42, *Cumming v. Big Picture Loans, LLC*, No. 5:18-cv-03476-EJD (N.D. Cal. June 26, 2018) ECF No. 6; Class Action Complaint ¶¶ 62-75,

- 6 -

**Debtor's Ex. 18, p. 053**

Case 3:18-cv-00406-RCJ-WGC Document 36-21 Filed 05/25/20 Page 54 of 325
Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:38:47 Desc
Exhibits 18 through 28   Page 54 of 325

*McKoy v. Big Picture Loans, LLC*, No. 1:18-cv-03217-MLB (N.D. Ga. July 3, 2018), ECF No.

1; Class Action Allegation Complaint ¶¶ 33-46, *Smith v. Big Picture Loans, LLC*, No. 3:18-cv-

01651-AC (D. Or. Sept. 11, 2018), ECF No. 1; Class Action Complaint ¶¶ 44-57, *Duggan v. Big

Picture Loans, LLC*, No. 18-cv-12277-JGC (D. Mass. Oct. 31, 2018), ECF No. 1; Class Action

Complaint ¶¶ 38-50, *Kobin v. Big Picture Loans, LLC*, No. 2:19-cv-02842-CJC-E (C.D. Cal.

Apr. 12, 2019), ECF No. 1.

     Importantly, the Defendants' payday lending scheme did not vary from state to state. The

rates charged in all states were over the state usury limits, and Defendants' defense in all cases is

that state law does not apply to them because they are entitled to tribal immunity. The issues

related to tribal immunity are factually intricate and legally complex.

     **B.**    **The parties face duplicative discovery absent transfer and consolidation.**

     Resolution of the common issues in a single forum would further the convenience of all

parties and witnesses, as well as the courts. *See* 28 U.S.C. § 1407(a). Because all eight cases

assert virtually identical allegations and raise common factual questions, the plaintiffs in each

case will require depositions of the same persons and entities and discovery of the same

documents. In fact, the plaintiffs in several of the cases have already sought discovery the

*Williams* Plaintiffs obtained to respond to the defendants' similar motions to dismiss on

jurisdictional grounds. *See*, *e.g.*, Plaintiffs' Motion for Jurisdictional Discovery, *McKoy v. Big

Picture Loans, LLC*, No. 1:18-cv-03217-MLB (N.D. Ga. July 3, 2018), ECF No. 51 (requesting

production of "all pleadings and evidence that were filed as attachments or referred to in briefing

on jurisdictional motions in the *Williams* case"); Plaintiff's Motion for Jurisdictional Discovery

and Briefing Schedule at 4, *Smith v. Big Picture Loans, LLC*, No. 3:18-cv-01651-AC (D. Or. Jan.

11, 2019), ECF No. 62 ("Plaintiff served jurisdictional discovery on Defendants, seeking

documents relevant to factors courts have considered relevant to sovereign immunity, including

**Debtor's Ex. 18, p. 054**

Case 3:18-cv-08406-RJ-KLM   Document 202-21   Filed 05/25/20   Page 55 of 325   PageID# 12194
Case 30-04008-elm   Doc 30-3   Filed 05/25/20   Entered 05/25/20 16:38:47   Desc
Exhibits 18 through 28    Page 55 of 325

unredacted versions of the evidence that the Eastern District of Virginia considered.").

Defendants have objected to these requests, leading to motion practice.

It is inefficient for different judges across the country to try to decide which discovery

completed in *Williams* should be made available to the plaintiffs in other cases. Doing so will

require those judges to become familiar with the record in *Williams*, which is voluminous and

constantly developing as the court continues to rule on discovery motions, including disputes

over third party subpoenas transferred from other districts and ongoing privilege disputes. *See,*

*e.g.,* Memorandum Order, *Williams v. Big Picture Loans, LLC*, No. 3:17-cv-461-REP (E.D. Va.

May 28, 2019), ECF No. 513 (ordering Rosette LLP, a law firm that represented Ascension and

Big Picture Loans, to produce unredacted versions of documents or submit proposed redactions

in camera for review); Memorandum Opinion, ECF No. 478 (granting in part plaintiffs' motion

to compel information withheld on the basis of attorney-client privilege). One court considering

a motion to transfer a subpoena-related action characterized its efforts to "gain an understanding

of the more nuanced facts as well as the progress of" the *Williams* action as a struggle, noting

that at that time the docket "comprises 463 docket entries." Order at 10, *Weddle v. Williams*, No.

18-mc-00225-RBJ-KLM at 10 (D. Colo. Apr. 15, 2019), ECF No. 27.

Given Defendants' obstructionist approach to discovery, it is also not possible to rely on

the parties in the various cases to coordinate and cooperate during discovery. For example,

Plaintiffs understand that the parties in the *Duggan* and *Smith* cases have entered into an

agreement where defendants' "document production, deposition testimony, and responses to

written discovery in *Smith*" may be used in *Duggan*. *Duggan*, ECF No. 61 at 2. But the

discovery ordered in *Smith* is far more limited than the discovery Plaintiffs have now taken in

*Williams* and that the Eastern District of Virginia has permitted Plaintiffs to use to support their

- 8 -

Case 3:18-cv-00401-DJH-RSE Document 12-2 Filed 05/25/20 Page 56 of 325 PageID #: 2195
Case 20-04008-sor Doc 30-3 Filed 05/25/20 Entered 05/25/20 16:38:47 Desc
Exhibits 18 through 28 Page 56 of 325

position on sovereign immunity. For example, in *Smith*, the tribal defendants have only made two tribal witnesses—Chairman James William Jr. and Michelle Hazen—available for depositions and there is no indication in the Stipulation that the plaintiffs will be able to depose Martorello or any of the other key non-party witnesses that participated in this scheme. *See id.* at 2-3. The *Williams* Plaintiffs, by contrast, have taken 25 depositions, including Martorello and numerous other participants in the scheme. These depositions have generated critical information supporting Plaintiffs' position on sovereign immunity issues.

It also appears that the written discovery in *Smith* and *Duggan* will be limited to discovery conducted in connection with defendants' original sovereign immunity motion in *Williams*. But as the *Williams* court noted in its recent order permitting supplementation of the record, the new evidence the *Williams* Plaintiffs developed since sovereign immunity was originally briefed "raises substantive doubts about the accuracy of evidence presented in [*Galloway*] and the *Williams* Case by [Ascension and Big Picture] and Martorello about: (1) the genesis of the tribal lending arrangements; (2) the creation and structure of [Ascension and Big Picture], including the sale and merger transactions that were involved in the corporate restructuring; (3) the role of Rosette, LLP and its leader, Rob Rosette, in the sale and merger transactions involved in the corporate restructure; and (4) the value (or lack of value) of the key asset (Bellicose Capital, LLC) involved in the corporate restructuring." *Galloway*, ECF No. 246 at 3. The court concludes that the *Galloway* Plaintiffs should be permitted to file a new brief on sovereign immunity because "there is significant new and important evidence that will be critical to deciding whether Big Picture and Ascension enjoy sovereign immunity." *Id.*

Put plainly, Defendants appear to be continuing their obstructionist ways in *Smith* and *Duggan*, hoping to limit jurisdictional discovery in those actions to the limited record that

- 9 -

Case 3:18-cv-00406-REP Document 362-21 Filed 02/07/20 Page 57 of 108 PageID# 12196
Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:33:47 Desc
Exhibits 18 through 28 Page 57 of 325

existed when sovereign immunity was first briefed in *Williams*. Transfer and consolidation will ensure that all the actions are supervised by a single judge familiar with the full factual record as well as Defendants' attempts to restrict discovery. Because the District Court for the Eastern District of Virginia is familiar "from day-to-day contact with all aspects of the litigation," it is "in the best position to design a pretrial program that will prevent duplicative discovery, eliminate the possibility of conflicting rulings and substantially conserve the time and efforts of the parties, the witnesses and the federal judiciary." *In re Resource Exploration Inc. Sec. Litig.*, 483 F. Supp. 817, 821 (J.P.M.L. 1980). Absent consolidation and transfer, courts may enter decisions on sovereign immunity and other important issues without the benefit of the full record that the *Williams* Plaintiffs have developed.

Without consolidation, courts in all the related matters will have to constantly monitor the *Williams* and *Galloway* dockets and revisit their rulings each time the court in the Eastern District of Virginia decides a discovery issue in the *Williams* case. Consolidation will mitigate these problems by allowing a single judge to manage discovery and the parties to coordinate their efforts. This will reduce litigation costs and minimize inconvenience to the parties and witnesses, to the benefit of litigants, third parties, and the courts. *See In re Enfamil Lipil Mktg. and Sales Practices Litig.*, 764 F. Supp. 2d 1356, 1357 (J.P.M.L. 2011) ("centralization under Section 1407 allows us to assign these six actions, each of which contain statewide or nationwide class allegations, to a single judge who can ensure that pretrial proceedings are conducted in a streamlined manner leading to the just and expeditious resolution of all actions to the overall benefit of all parties and the courts").

### C. Transfer and consolidation will prevent inconsistent pretrial rulings.

Because the cases involve the same factual allegations, the same types of claims, and the

**Debtor's Ex. 18, p. 057**

Case 3:18-cv-04045 Document 362-21 Filed 07/06/21 Page 1 of 10 Page ID #:2197
Case 20-04006-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:33:47 Desc
Exhibits 18 through 28 Page 58 of 325

same defendants, there is a significant risk of inconsistent pretrial rulings. The Panel considers the possibility of inconsistent rulings on pretrial issues because of the possible res judicata or collateral estoppel effect on other cases. *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 196 F. Supp. 2d 1375, 1376 (J.P.M.L. 2002) (granting a transfer in part to prevent inconsistent pretrial rulings, particularly with respect to questions of class certification). The defendants have already filed motions to dismiss in several of the cases filed after *Williams* that seek dismissal on the same grounds. The defendants are also likely to file similar summary judgment motions in the cases.

Transfer and consolidation is particularly appropriate for these eight actions to prevent inconsistent rulings on class certification and other class-related issues. *See In re LLRice 601 Contamination Litig.*, 466 F. Supp. 2d 1351, 1352 (J.P.M.L. 2006) ("Centralization … is necessary in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings (especially with respect to questions of class certification), and conserve the resources of the parties, their counsel and the judiciary."). All of the cases assert RICO violations in addition to state usury law claims, so each court will have to address the propriety of certification of the same issues and claims. This Panel has "consistently held that transfer of actions under Section 1407 is appropriate, if not necessary, where the possibility of inconsistent class determinations exists." *In re Sugar Indus. Antitrust Litig.*, 395 F. Supp. 1271, 1273 (J.P.M.L. 1975); *accord In re Resource Exploration*, 483 F. Supp. at 821 ("It is desirable to have a single judge oversee the class action issues in these actions to avoid duplicative efforts and inconsistent rulings in this area.").

By eliminating the risk of duplicative discovery, and the corresponding risk of repetitive and inconsistent pretrial rulings, consolidation will promote the just and efficient resolution of

- 11 -

Case 3:18-cv-00406-REP   Document 362-22   Filed 02/06/21   Page 59 of 325 PageID# 12198
Case 20-04008-elm   Doc 90-3   Filed 05/25/20   Entered 05/25/20 16:33:47   Desc
Exhibits 18 through 28   Page 59 of 325

these actions. It will permit discovery to be effectively and efficiently managed while conserving the resources of the parties, attorneys, and judicial system.

> **D.     There is a sufficient number of actions to support transfer and consolidation.**

Finally, the eight pending cases and any tag-along cases that are filed are sufficiently numerous and complex to warrant consolidation. The Panel has routinely ordered centralization of five or fewer cases. *See, e.g., In re Gold King Mind Release in San Juan County, Colorado, on August 5, 2015*, 291 F. Supp. 1373, 1374 (J.P.M.L. 2018) (ordering centralization of four cases rather than informal coordination and cooperation because of "the apparent complexity of the factual issues, as well as the potential for significant tag-along activity"); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 291 F. Supp. 3d 1367, 1368-69 (J.P.M.L. 2018) (centralizing five actions); *In re Epipen Mktg., Sales Practices & Antitrust Litig.*, 268 F. Supp. 3d 1356, 1359-60 (J.P.M.L. 2017) (centralizing five actions and commending plaintiffs' willingness to work cooperatively but finding that coordination "appears problematic" because of "the likely complexity of the factual questions" and a "lack of agreement among counsel").

## II.     The Eastern District of Virginia is the appropriate transferee forum.

Plaintiffs respectfully suggest that the Eastern District of Virginia is the superior forum for the consolidated action. In choosing an appropriate forum, the Panel considers where the largest number of cases is pending; where discovery has occurred; where cases have progressed furthest; the site of the occurrence of the common facts; where the cost and inconvenience will be minimized; and the experience, skill, and caseloads of available judges. Manual for Complex Litigation § 20.132. These criteria point to the Eastern District of Virginia as the most appropriate forum for the transfer and consolidation.

- 12 -

**Debtor's Ex. 18, p. 059**

Case 20-04006-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:33:47 Desc
Case 3:18-cv-00040-eeh Doc 90-3 Filed 06/06/20 Page 60 of 325 PageID #: 12199
Exhibits 18 through 28 Page 60 of 325

The first three considerations strongly support transfer to the Eastern District of Virginia. There are three cases pending in the District and, so far, eight subpoena-related actions have been transferred pursuant to Federal Rule Civil Procedure 45(f). The *Williams* matter, which has been on file since June 2017, currently has 538 docket entries and the *Galloway* matter has 248 docket entries. The *Williams* court ruled on the defendants' motions to dismiss nearly a year ago. The corporate defendants appealed the district court's denial of their motion to dismiss on sovereign immunity grounds and the Fourth Circuit heard oral argument on May 7, 2019. In the meantime, Plaintiffs and defendant Martorello engaged in voluminous discovery that has been hotly contested, requiring the district court to resolve approximately thirty contested discovery motions. *See Williams*, ECF Nos. 16, 45, 49, 111, 116, 310, 312, 320, 321, 324, 326, 327, 328, 329, 349, 358, 361, 415, 416, 435, 440, 441, 460, 461, 462, 478, 479, 502, 511, 513. Recently, the district court issued a lengthy opinion on the Plaintiffs' motion to compel information Martorello withheld on the basis of attorney-client privilege, finding among other things that "the plaintiffs have made a prima facie case that Martorello violated RICO." Memorandum Opinion at 37, *Williams v. Big Picture Loans, LLC*, No. 3:17-cv-461-REP (E.D. Va. May 3, 2019), ECF No. 478. Twenty depositions of fact witnesses have been taken, including all the named plaintiffs. Martorello and the *Williams* Plaintiffs have exchanged expert reports and conducted expert depositions, including the deposition of Plaintiffs' expert and five of Martorello's seven experts. The *Williams* Plaintiffs filed a motion for class certification of their claims against Martorello in September 2018 and the motion is now fully briefed. The *Williams* Plaintiffs have also served subpoenas on approximately 55 third parties, including the subpoenas that resulted in disputes transferred to the Eastern District of Virginia pursuant to Rule 45(f). The *Galloway* Plaintiffs also have served subpoenas, including 37 on state attorneys general.

- 13 -

**Debtor's Ex. 18, p. 060**

Case 20-04008-elm  Doc 90-3  Filed 05/25/20  Entered 05/25/20 16:33:47  Desc
Case 3:18-cv-09408-RBK  Document 362-21  Filed 07/07/21  Page 61 of 325 PageID #: 12200
Exhibits 18 through 28   Page 61 of 325

None of the other cases has proceeded beyond the pleading stage. The docket in
*Cumming* totals 106 entries and the court has entered 23 orders, the majority of which are
administrative in nature. The *Cumming* court is scheduled to hear argument on the defendants'
motions to dismiss on July 18, 2019 and the parties are still discussing the scope of jurisdictional
discovery. *See Cumming*, ECF No. 104 (joint letter brief regarding discovery). *McKoy*, *Smith*,
and *Duggan* have 60, 78, and 62 docket entries respectively. The defendants have moved to
dismiss, and the parties are in the early stages of conducting jurisdictional discovery. The
defendants have not yet appeared in *Kobin*.

*Galloway*, which is also pending in the Eastern District of Virginia and currently has 248
docket entries, is further along. Judge Payne heard oral argument on the defendants' motions to
dismiss on May 22, 2019 and entered an order permitting the *Galloway* Plaintiffs to file a new
brief on sovereign immunity issues that incorporates all the discovery that the *Williams* Plaintiffs
developed over the last year. As noted above, however, similar coordination does not appear to
be possible with the other cases where defendants have resisted the plaintiffs' attempts to obtain
discovery acquired in *Williams* or have been able to limit discovery to the incomplete factual
record before the court on the *Williams* sovereign immunity decision. *See, e.g., Cumming*, ECF
No. 97 (refusing to produce information produced in the Williams matter on various grounds).

There is no single "site of the occurrence of the common facts." Martorello's enterprise
made loans online to consumers throughout the country. The call center that handled consumer
complaints is located in the Philippines and the entities and individuals comprising the enterprise
are dispersed throughout the United States, Puerto Rico, and the Virgin Islands. The Eastern
District of Virginia is convenient because it is served by two international airports and dozens of
reputable hotels. *See In re Groupon Mktg. & Sales Practices Litig.*, 787 F. Supp. 2d 1362, 1364

**Debtor's Ex. 18, p. 061**

Case 3:18-cv-00400-REP   Document 362-21   Filed 02/07/2017   Page 18 of 158   PageID# 12201
Case 20-04008-elm   Doc 90-3   Filed 05/25/20   Entered 05/25/20 16:33:47   Desc
Exhibits 18 through 28   Page 62 of 325

(J.P.M.L. 2011) (selecting court where the first-filed action was pending for transfer of nationwide litigation in part "because it … is located in an accessible metropolitan area"); *In re Pamidronate Products Liability Litig.*, 657 F. Supp. 2d 1368, 1369 (J.P.M.L. 2009) (same). And the docket in the Eastern District of Virginia is among the least burdened by multidistrict litigation with only three cases pending. *See* MDL Statistics Report—Distribution of Pending MDL Dockets by District (May 15, 2019), *available at*

https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-May-15-2019.pdf.

The relevant considerations support transfer to the Eastern District of Virginia for consolidation. The first-filed *Williams* case is pending before the Honorable Robert E. Payne, an experienced judge who is familiar with the factual and legal issues in this litigation and is not currently presiding over another multidistrict litigation docket. *See In re Enfamil*, 764 F. Supp. 2d at 1357 (transferring cases to the judge who was familiar with the merits of the litigation and had ruled on numerous substantive matters).

## CONCLUSION

The *Williams* and *Galloway* Plaintiffs respectfully request that the Panel grant their motion and order transfer of the actions listed in the Schedule of Actions, as well as any tag-along actions, to the Eastern District of Virginia for consolidated pretrial proceedings.

RESPECTFULLY SUBMITTED AND DATED this 7th day of June, 2019.

BERGER MONTAGUE PC

By: /s/ E. Michelle Drake
    E. Michelle Drake
    Email: emdrake@bm.net
    John G. Albanese
    Email: jalbanese@bm.net

**Debtor's Ex. 18, p. 062**

Case 20-04006-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:33:47 Desc
Case 3:18-cv-05654-RBL Document 362-2 Filed 07/06/17 Page 164 of 164 PageID #: 12202
Exhibits 18 through 28 Page 63 of 325

43 SE Main Street, Suite 505
Minneapolis, Minnesota 55414
Telephone: (612) 594-5999
Facsimile: (612) 584-4470

Leonard A. Bennett
Email: lenbennett@clalegal.com
Elizabeth W. Hanes
Email: elizabeth@clalegal.com
Craig C. Marchiando
Email: craig@clalegal.com
CONSUMER LITIGATION
  ASSOCIATES, P.C
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, Virginia 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662

Kristi C. Kelly
Email: kkelly@kellyguzzo.com
Andrew J. Guzzo
Email: aguzzo@kellyguzzo.com
Casey S. Nash
Email: casey@kellyguzzo.com
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, Virginia 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167

Beth E. Terrell
Email: bterrell@terrellmarshall.com
Jennifer Rust Murray
Email:  jmurray@terrellmarshall.com
Elizabeth A. Adams
Email: eadams@terrellmarshall.com
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103
Telephone: (206) 816-6603
Facsimile: (206) 319-5450

**Debtor's Ex. 18, p. 063**

Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Case 3:18-cv-00406-REP Document 362-21 Filed 06/07/19 Page 18 of 138 PageID# 12203
Exhibits 18 through 28 Page 64 of 325

Matthew Wessler
Email: matt@guptawessler.com
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
Telephone: (202) 888-1741
Facsimile: (202) 888-7792

*Attorneys for Plaintiffs Lula Williams, Gloria
Turnage, George Hengle, Dowin Coffy, Felix
Gillison, Jr., Renee Galloway, Dianne Turner, Earl
Browne, Rose Marie Buchert, Regina Nolte, Teresa
Titus, Kevin Minor, Dominique de la Bay, Lori
Fitzgerald, Andrea Scarborough, Burry Pough, Lisa
Martinez, Sonji Grandy, Anastasia Sherman, Jerry
Avent, Lucinda Gray, Anthony Green, Linda
Madison, Derek Geter, Keisha Hamm, Faith
Thomas, Sharon Paavo, and Latanya Tarleton*

- 17 -

Case 20-04002-elm Doc 80-3 Filed 05/25/20 Entered 05/25/20 16:22:47 Desc
Case 3:18-cv-00406-REP Document 303 Filed 02/17/20 Page 1 of 14 PageID# 12204
Exhibits 18 through 28 Page 65 of 325

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

LULA WILLIAMS, *et al.*,

        Plaintiffs,

v.

BIG PICTURE LOANS, LLC, *et al.*,

        Defendants.

_____

RENEE GALLOWAY, *et al.*,

        Plaintiffs,

v.

BIG PICTURE LOANS, LLC, *et al.*,

        Defendants.

_____

RENEE GALLOWAY, *et al.*,

        Plaintiffs,

v.

JUSTIN MARTORELLO, *et al.*,

        Defendants.

CIVIL ACTION NO. 3:17-cv-461 (REP)

CIVIL ACTION NO. 3:18-cv-406 (REP)

CIVIL ACTION NO. 3:19-cv-314 (REP)

## PLAINTIFFS' OPPOSITION TO
## DEFENDANTS' MOTION FOR CONSOLIDATION

      Plaintiffs oppose Defendants' Motion for Consolidation (*Williams*, Dkt. 661) as a tactic to

delay the more procedurally advanced *Williams* case. Consistent with the prior Order of this Court,

the Court should deny Defendants' Motion.

**Debtor's Ex. 19, p. 001**

Case 20-04009-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Case 3:18-cv-00406-REP Document 903 Filed 02/17/20 Page 2 of 14 PageID# 22205
Exhibits 18 through 28    Page 66 of 325

# I.    INTRODUCTION

Defendants seek to delay *Williams v. Big Picture Loans, LLC*, Civil Action No. 3:17-cv-00461 ("*Williams*"), by consolidating it into *Galloway v. Big Picture Loans, LLC*, Civil Action No. 3:18-cv-00406 ("*Galloway I*"), and *Galloway v. Martorello*, Civil Action No. 3:18-cv-00314 ("*Galloway II*").[1] This is just the latest example of Defendants' repeated efforts to impede this Court's consideration of the merits of this litigation.  If Defendants were sincerely interested in consolidated litigation as anything more than a tactic for avoidance and delay, they would have agreed to consolidation a year ago when there were two opportunities to combine the litigation. Instead, Defendants opposed the combination of the *Galloway II* claims into the *Galloway I* action, and by Order dated May 10, 2019, this Court agreed that they should not be consolidated by amendment of the *Galloway I* complaint:

> [T]he addition of new parties and claims at this time to this already complex case
> will not be in the interest of justice insofar as the existing parties are concerned,
> will cause prejudice to the existing defendants, and will cause significant delay in
> the already delayed progress of this case.

(Order dated May 10, 2019, *Galloway v. Big Picture Loans, LLC*, No., 3:18-cv-406 (E.D. Va.) ("*Galloway I*"), Dkt. 228.) Defendants also opposed consolidation of the cases into an MDL proceeding, claiming that consolidation would be "unhelpful," "counterproductive," and would "not promote the just or efficient conduct of this action." (*In re Big Picture Loans Litig.*, MDL No. 2906, Dkt. 44 at 17, 20.)   Defendants belatedly reverse their arguments and now seek consolidation.   However, Defendants' motivations conflict with the legitimate purpose of consolidation;  instead of seeking efficiency, Defendants are only interested in slowing the

---

[1] Defendants also may be attempting to consolidate the cases as a part of their recent efforts to ensnare the litigation in bankruptcy court in the Northern District of Texas.  Eventide Credit Acquisitions, LLC ("Eventide") is a defendant in *Galloway II*, but not the other two cases.  If *Williams* and *Galloway I* were consolidated into *Galloway II*, Defendants would potentially attempt to stay and transfer the combined litigation to Texas.

2

**Debtor's Ex. 19, p. 002**

Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:22:47 Desc
Case 3:18-cv-00406-REP Document 963-5 Filed 02/17/20 Page 3 of 14 PageID# 22206
Exhibits 18 through 28    Page 67 of 325

progression of *Williams*, which is much further advanced than the other cases. The factors for denying consolidation of *Williams* into the *Galloway* cases are now much more compelling than they were for denying consolidation of *Galloway I* and *II* one year ago. The *Williams* case is ready for class certification and trial; *Galloway I* and *Galloway II*, on the other hand, are in their procedural infancy. Consistent with its ruling on May 10, 2019, the Court should deny consolidation of the *Williams*, *Galloway I*, and *Galloway II* cases.

## II.    BACKGROUND AND PROCEDURAL HISTORY

### A.  Comparison of the *Williams*, *Galloway I*, and *Galloway II* Litigation

The *Williams*, *Galloway I*, and *Galloway II* lawsuits arise from the same core predatory and usurious lending enterprise. However, the claims and causes of action in the *Galloway* cases are more complex, targeting a broader spectrum of consumer protection statutes and asserting claims on behalf of classes and subclasses that are broader than those in *Williams*. Additionally, *Galloway II* alleges causes of action against nine defendants, unlike *Williams* and *Galloway I*, which only have claims remaining against Matt Martorello, the architect and primary beneficiary of the unlawful lending enterprise. Accordingly, the lending statutes and consumer protection laws in *Williams* are less numerous and complex than those in the *Galloway* cases. The chart below serves to illustrate the relative complexities of *Galloway II* in contrast to the simpler claims against Matt Martorello in the *Williams* case.

| Case/Style | Date Filed | Plaintiffs | Non-Settling Defendants | Causes of Action |
|---|---|---|---|---|
| *Williams, et al. v. Big Picture Loans, LLC et al.*, No. 3:17-cv-461 (E.D. Va.) <br><br> ("*Williams*") | 6/22/17 | Lula Williams, Gloria Turnage, George Hengle, Dowin Coffy, Felix Gillison, Jr. | Matt Martorello | Declaratory Judgment <br><br> Violations of Virginia lending laws and consumer protection statutes |

3

**Debtor's Ex. 19, p. 003**

Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:22:47 Desc
Case 3:18-cv-00406-REP Document 303 Filed 02/17/20 Page 4 of 14 PageID# 12207
Exhibits 18 through 28    Page 68 of 325

| | | | | Violations of RICO, 18 U.S.C. §§ 1962(c) & (d)<br><br>Unjust Enrichment |
|---|---|---|---|---|
| *Renee Galloway, et al. v. Big Picture Loans, LLC, et al.*, No. 3:18-cv-406 (E.D. Va.)<br><br>("*Galloway I*") | 6/11/18 | Renee Galloway<br>Dianne Turner<br>Earl Browne<br>Rose Marie Buchert<br>Regina Nolte<br>Kevin Minor<br>Teresa Titus<br>Lisa Martinez<br>Anthony Green<br>Sonji Grandy<br>Anastasia Sherman<br>Burry Pough<br>Linda Madison<br>Dominique de la Bay<br>Lucinda Gray<br>Andrea Scarborough<br>Jerry Avent | Matt Martorello | Violations of Virginia, California, Florida, Illinois, Indiana, Maryland, New Jersey, North Carolina, Ohio, Texas, Washington lending laws and consumer protection statutes<br><br>Violations of RICO, 18 U.S.C. §§1962(c) & (d)<br><br>Unjust Enrichment |
| *Renee Galloway, et al. v. Matt Martorello, et al.,* No. 3:19-cv-314 (E.D. Va.)<br><br>("*Galloway II*") | 4/24/19 | Renee Galloway<br>Dianne Turner<br>Earl Browne<br>Rose Marie Buchert<br>Regina Nolte<br>Kevin Minor<br>Teresa Titus<br>Lisa Martinez<br>Anthony Green<br>Sonji Grandy<br>Anastasia Sherman<br>Burry Pough<br>Linda Madison<br>Dominique de la Bay<br>Lucinda Gray<br>Andrea Scarborough<br>Jerry Avent<br>**George Hengle[2]**<br>**Keisha Hamm**<br>**Faith Thomas** | Justin Martorello<br><br>Eventide Credit Acquisitions, LLC<br><br>Rebecca Martorello<br><br>Jeremy Davis<br><br>Kairos Holdings, LLC<br><br>Breakwater Holdings LLC<br><br>Gallant Capital LLC<br><br>Liont, LLC | Violations of Virginia, California, Florida, **Georgia**, Illinois, Indiana, Maryland, **Michigan**, New Jersey, North Carolina, Ohio, Texas, Washington lending laws and consumer protection statutes<br><br>Violations of RICO, 18 U.S.C. §§ 1962(a), (b), (c) & (d)<br><br>Unjust Enrichment<br><br>Civil Conspiracy<br><br>Aiding and Abetting |

[2] The bolded names and states in *Galloway II* highlight differences between it and Galloway I, aside from the obvious difference of the defendants in the two cases.

4

**Debtor's Ex. 19, p. 004**

Case 20-04003-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:22:47 Desc
Case 3:19-cv-00409-REP Document 903-5 Filed 02/17/20 Page 5 of 14 PageID# 12208
Exhibits 18 through 28    Page 69 of 325

| | | **Sharon Paavo** **Latanya Tarleton** | Bluetech Irrevocable Trust[3] | |
|---|---|---|---|---|

### B.  The *Williams* Litigation Is Much Further Developed than *Galloway II*

The *Williams* case is procedurally advanced for class action litigation, particularly when contrasted against *Galloway II*.  In *Williams*, the parties have essentially completed discovery.  The parties have been deposed and responded to several rounds of written discovery.  Experts have been designated. Plaintiffs' motion for class certification was filed in September 2018 (*Williams*, ECF 189 and 190), and it is fully briefed except for a supplemental brief that Plaintiffs will file by February 26, 2020.  (*Id.*, ECF 656.)  Plaintiff's motion for class certification is set for hearing on March 6, 2020. (*Id.*)

*Galloway II*, on the other hand, was filed almost two years after the *Williams* litigation and is in its relative infancy.  Preliminary dispositive motions in *Galloway II* are pending. (*Galloway II*, ECF 65, 67, 91, 92, 93, 96, 97, 98, 101, 102, 103, 132, 133, and 134.)  The parties are still negotiating the intended scope of discovery, and Eventide has moved for a protective order staying discovery.  (*Id.*, ECF 264, 281.)  None of the 22 Plaintiffs in *Galloway* have been deposed. Plaintiffs have yet to depose the Defendants.  Experts have not been designated.  Also, the *Galloway* Plaintiffs have not yet moved for class certification.[4] In short, the *Williams* case is

---

[3] In addition, due to Martorello and Eventide's refusal to agree to their dismissal, the Settling Defendants remain parties in *Galloway II*. And if Eventide succeeds in derailing the settlement, Galloway II will continue to have these defendants.

[4] Martorello and the other defendants will lodge unique defenses to certification in *Galloway*. In particular, Plaintiffs anticipate that Martorello will retain Ronald Mann, a law professor at Columbia University, to provide an opinion on the impact of state law differences on class certification. Mann provided a comparable opinion in the litigation against Martorello's competitor, Think Finance, and Martorello has already retained some of the "experts" previously designated by Think Finance.

**Debtor's Ex. 19, p. 005**

Case 20-04009-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:22:47 Desc
Case 3:18-cv-00406-REP Document 983-5 Filed 02/17/20 Page 5 of 14 PageID# 22209
Exhibits 18 through 28    Page 70 of 325

procedurally far more advanced than *Galloway II* or even *Galloway I*. Also, in *Galloway II*,

Eventide has filed a suggestion of bankruptcy. (*Id.*, ECF 307.)

### C. Defendants Have Already Opposed Consolidation Twice, and This Court Disposed of the Issue

On March 22, 2019, Plaintiffs filed a motion seeking leave to amend their complaint in

*Galloway I* for a consolidated action against the Defendants. (*Galloway I*, ECF 185.) Defendants

opposed, claiming that an amendment of the claims was untimely. (*Id.*, ECF 207.) In its Order

dated May 10, 2019, this Court held that consolidation of the litigation into one action would be

improper given their disparity in postures:

> [T]he addition of new parties and claims at this time to this already complex case
> will not be in the interest of justice insofar as the existing parties are concerned,
> will cause prejudice to the existing defendants, and will cause significant delay in
> the already delayed progress of this case.

(*Id.*, ECF 228.)

Then, in June 2019, Plaintiffs sought to combine the subject cases into a multi-district

litigation ("MDL") action. (*In re Big Picture Loans Litig.*, MDL No. 2906, ECF 1.) Defendants

once again opposed consolidation of the cases:

> In sum, **consolidation would not promote the just or efficient conduct of this
> action**, and whatever efficiency gains may be had by consolidation may be realized
> just as easily, if not more so, through informal means, such as those the parties are
> already using.

(*Id.*, ECF 44 at 17 (emphasis added).) In their opposition, Defendants argued that consolidation

should be denied for the reasons noted in this Court's May 10, 2019 Order:

> [T]his is not Plaintiffs' first attempt to expand Judge Payne's control over these
> matters. Just two months ago, Judge Payne denied a motion brought by Plaintiffs
> in *Galloway II* to consolidate their recently filed case with the more procedurally
> mature *Galloway I*. See Order, *Galloway I*, No. 3:18-cv-406 (E.D. Va. May 10,
> 2019), ECF No. 228. The reasons for the denial are revealing. In his Order, Judge
> Payne found that combining the cases 'would cause significant delay in the already
> delayed progress of this case,' such that 'the addition of new parties and claims at
> this time . . . will not be in the interests of justice" and would "cause prejudice" to
> the existing defendants and the proposed defendants alike. *Id*. Instead, Judge

6

Case 20-04009-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:22:47 Desc
Case 3:19-cv-00406-REP Document 303-5 Filed 02/17/20 Page 71 of 14 PageID# 12210
Exhibits 18 through 28 Page 71 of 325

> Payne instructed that claims against the 'new' defendants in *Galloway II* should be adjudicated in a 'separate case or cases,' allowing the possibility that discovery in *Galloway I* could be used in *Galloway II* or other cases. *Id.* Judge Payne – no ally to Defendants – has determined that combining even *Galloway I* and *II* would cause delay and prejudice. This shows all the more how **unhelpful and even counter-productive it would be to consolidate each of the cases**….

(*Id.*, ECF 44 at 19 (emphasis added).) Defendants further noted their agreement with this Court's prior findings "that **the matters were too disparate, and the procedural progress too great, to merit consolidation**." (*Id.*, ECF 44 at 20 (emphasis added).) Plaintiffs ultimately withdrew their petition for MDL and have since continued litigating the earlier cases as expected.

The point is not that the Defendants should be forever bound by their inconsistent position so much as it is that their new claim of burden and efficiency should not be believed. If Defendants' representation of their expected burden and difficulty at consolidation when the cases were only yards apart was genuine, the Court has to expect that these burdens and challenges would only be greater today.

### D. Defendants' Request for Consolidation Is Just One of Its Many Efforts to Undermine This Court's Presiding Over the Litigation

Defendants have a history of seeking delay and other courts' involvement as a means of side-tracking this litigation. In addition to repeatedly opposing consolidated litigation into active management by this Court, Defendants have also attempted to involve courts in other jurisdictions to enjoin this Court from action. For example, in the Western District of Michigan, Defendant Eventide sought a temporary restraining order to stay this Court's disposition of the proposed settlement in *Galloway v. Williams*, Case No. 3:19-cv-470 (E.D. Va.) ("*Galloway III*"). *Eventide Credit Acquisitions, LLC v. Big Picture Loans, LLC*, Case No. 2:19-cv-00256-JTN-MV (W.D. Mich. Dec. 17, 2019). When the district court in Michigan denied the request for a TRO (Order dated Dec. 19, 2019, *id.*, Dkt. 14), Eventide dismissed the lawsuit.

**Debtor's Ex. 19, p. 007**

Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:22:47 Desc
Case 3:18-cv-00406-REP Document 903-3 Filed 02/17/20 Page 3 of 14 PageID# 22211
Exhibits 18 through 28 Page 72 of 325

Most recently, Defendant Eventide filed a sham bankruptcy in the Northern District of Texas as a tool to prevent this Court from continuing to preside over the litigation and to delay the prosecution of the case. *In re Eventide Credit Acquisitions, LLC*, No. 20-40349-elm11 (N.D. Tex. Bankr.). Eventide seeks protection in bankruptcy despite the fact that it claims assets that greatly exceed its liabilities: assets in excess of $50 million and liabilities allegedly less than $10 million. (*Id.*, Dkt. 1 at 11-12.) To enjoin further litigation in this Court, Eventide has filed an adversary proceeding in the bankruptcy court with an accompanying motion for preliminary injunction. (*Eventide Credit Acquisitions, LLC v. Big Picture Loans, LLC*, Adv. Proc. 20-04008-elm (N.D. Tex. Bankr. Jan. 29, 2020), Dkt. 1.) Eventide requests that the Northern District of Texas extend the bankruptcy stay and suspend further litigation in *Williams*, *Galloway I*, *Galloway II*, and other cases nationwide. (*Id.*, Dkt. 1 at 25.) Additionally, Eventide has noted its intent to circumvent this Court's jurisdiction over the cases by filing "forthcoming motions to transfer venue" of the *Williams* and *Galloway* cases to the bankruptcy court. (*Id.* at 4 n.1.) This motion to consolidate is yet another effort to stymie the orderly, efficient progress of this action.

## III. ARGUMENT AND AUTHORITIES

### A. Considerations and Standard of Review for Consolidation

Pursuant to Rule 42 of the Federal Rules of Civil Procedure, "[i]f actions before the court involve a common question of law or fact, the court may: (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay." FED. R. CIV. P. 42(a). Upon a showing that the cases involve "a common question of law or fact," the decision whether to consolidate them becomes an issue of judicial discretion. *Mears Group, Inc. v. Kiawah Island Utility, Inc.*, No. 2:17-cv-2418-DCN, 2019

**Debtor's Ex. 19, p. 008**

Case 20-04009-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:22:47 Desc
Case 3:19-cv-00406-REP Document 363-5 Filed 02/17/20 Page 73 of 14 PageID# 12212
Exhibits 18 through 28    Page 73 of 325

WL 5395963, at *2 (D. S.C. Oct. 22, 2019), *quoting Pariseau v. Anodyne Healthcare Mgmt., Inc.*,
2006 WL 325379, at *1 (W.D.N.C. Feb. 9, 2006).

This Court has "broad discretion" under Rule 42(a) to deny consolidation of causes pending
in the same district. *Mears Group, Inc.*, 2019 WL 5395963, at *2, *quoting A/S J. Ludwig
Mowinckles Rederi v. Tidewater Constr. Corp.*, 559 F.2d 928, 933 (4th Cir. 1977); *see also Good
v. Am. Water Works Co.*, No. 2:14–01374, 2014 WL 2481821, at *2 (S.D. W. Va. June 3, 2014)
(noting that the Fourth Circuit affords broad discretion to district courts on matters of consolidation
and "recognizing the superiority of the trial court in determining how best to structure similar
pieces of litigation"). The moving party bears the burden of showing consolidation is appropriate.
*Rendon v. City of Fresno*, No. 1:05-CV-00661 OWW DLB, 2006 WL 1582307 (E.D. Ca. June 2,
2006) (denying consolidation where a third case was still in its "formative stages" because it was
filed ten months after one case and seven months after the second).

In determining whether consolidation is warranted, courts consider "whether the specific
risks of prejudice and possible confusion were overborne" by (1) "the risk of inconsistent
adjudications of common factual and legal issues"; (2) "the burden on parties, witnesses and
available judicial resources posed by multiple lawsuits"; (3) "the length of time required to
conclude multiple suits as against a single one"; and (4) "the relative expense to all concerned of
the single-trial, multiple-trial alternatives." *Arnold v. Eastern Airlines, Inc.*, 681 F.2d 186, 193 (4th
Cir. 1982). Stated differently, the determinative analysis is whether consolidation would avoid
unnecessary costs or delay without prejudicing the rights of the parties. *Mills v. Beech Aircraft
Corp.*, 886 F.2d 758, 761 (5th Cir. 1989); *see also Milliken & Co. v. Evans*, No. 7:14-CV-778-
BHH, 2016 WL 470017, at *3 (D.S.C. Feb. 8, 2016) ("consolidation is appropriate when to do so
will foster clarity, efficiency and the avoidance of confusion and prejudice") (citation and internal

9

**Debtor's Ex. 19, p. 009**

Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Case 3:19-cv-00408-REP Document 868 Filed 02/17/20 Page 50 of 147 PageID# 12213
Exhibits 18 through 28    Page 74 of 325

quotations omitted).    In exercise of its broad discretion, the Court "should consider both equity and judicial economy." *Devlin v. Transp. Commc'n Int'l Union*, 175 F.3d 121, 130 (2d Cir. 1999). Where, as here, one of the factors indicates that consolidation is improper, the Court may deny consolidation without getting to the other factors. *Beauregard v. Sherb & Co., LLP*, 1:07CV785, 2012 WL 12546800, at *1 (M.D. N.C. March 29, 2012) (potential prejudice to plaintiffs dictated that consolidation should be denied; noting that "[c]onsideration of the remaining applicable factors does not require a different result").

### B. Consolidation Would Prejudice the *Williams* Parties by Delay in the Timely Disposition of Class Certification and Trial

Plaintiffs oppose consolidation at this late stage of the *Williams* matter because the requested consolidation is no more than an attempt to delay class certification and trial in *Williams*. The delay in concluding multiple suits compared to proceeding through class certification in *Williams* would cause undue prejudice to Plaintiffs. In other words, the difference in the procedural posture of these cases weighs strongly against consolidation. *See e.g.*, *Maron v. Virginia Polytechnic Inst. & State Univ.*, No. 7:08-CV-00579, 2011 WL 1002685, at *3 (W.D. Va. Mar. 18, 2011) ("Because consolidation would unnecessarily prolong resolution of the [first] case, this factor weighs <u>heavily</u> against consolidation.") (emphasis added); *Int'l Speedway Corp. v. SunTrust Bank*, No. 619CV1544ORL41LRH, 2019 WL 5391181, at *3 (M.D. Fla. Oct. 22, 2019) (denying consolidation where the first case was further advanced and less complex).

"The court may decide that consolidation is inappropriate where two cases have markedly different procedural postures, with one rapidly nearing final judgment and the other just beginning, so consolidation would not serve judicial economy, but instead delay final resolution in the older case and create unneeded repetition and confusion." *Bucklew v. Bonham*, No. 3:19-CV-435-N, 2019 WL 2141792 *2 (N.D. Tex. May 16, 2019) (citations and internal quotations omitted); *see*

10

**Debtor's Ex. 19, p. 010**

Case 3:19-cv-00408-REP   Document 868   Filed 02/17/20   Page 51 of 147 PageID# 22214
Case 20-04008-elm   Doc 90-3   Filed 05/25/20   Entered 05/25/20 16:23:47   Desc
Exhibits 18 through 28   Page 75 of 325

*also Mears Group, Inc.*, 2019 WL 5395963 at *2 (denying consolidation where one case was procedurally advanced and the related case was only beginning discovery); *Aerotel, Ltd. v. Verizon Commc'ns, Inc.*, 234 F.R.D. 64, 67 (S.D.N.Y. 2005) (holding that consolidation is improper when minimal discovery in one case would significantly delay a case where discovery is almost complete). Where "cases stand in significantly different stages of litigation," there is a substantial potential for delay and a certainty of prejudice to the plaintiffs. *Lowry Economic Redevelopment Auth. v. United States*, 71 Fed. Cl. 549, 553 (2006). Although cases may share common factual and legal issues, consolidation is improper when "the potential judicial economies from consolidation would be outweighed by the risk of delay and prejudice." *Id.*, *citing Lucent Tech., Inc. v. United States*, 69 Fed. Cl. 512, 515 (2006) ("the distinct procedural postures of [the cases] vitiate any judicial economy that might be gained by consolidation").

Here, like the cases cited above, "judicial economy would not be served through consolidation as these [three] actions are at different stages of litigation." *Ruane v. County of Suffolk*, 923 F. Supp. 2d 454, 461 (E.D.N.Y. 2013).

### C.  Denial of Consolidation Will Not Cause Inconsistent Rulings in this Court

The separate development and trial of the *Williams* and *Galloway* cases pose little risk for inconsistent adjudication of the facts and legal principles. First, this Court presides over all of the cases at issue, so there is no potential for inconsistent rulings on class certification, discovery and evidentiary rulings, or dispositive issues. Second, *Williams* will serve as a bellwether case for the litigation of the claims against the defendants in the other actions.[5] The Plaintiffs' proof of their

---

[5] "A bellwether trial is a test case that is typically used to facilitate settlement in similar cases by demonstrating the likely value of a claim or by aiding in predicting the outcome of tricky questions of causation or liability." *Briggs v. Merck Sharp & Dohme Corp.*, 796 F.3d 1038, 1051 (2015), *citing* Alexandra D. Lahav, Bellwether Trials, 76 Geo. Wash. L.Rev. 576, 577–78 (2008).

**Debtor's Ex. 19, p. 011**

Case 1:19-cv-00408-REP Document 868 Filed 02/17/20 Page 12 of 14 PageID# 11215
Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Exhibits 18 through 28 Page 76 of 325

claims and favorable findings against Martorello in *Williams* would serve as a compelling indicator about the merits of their claims against the other Defendants. The opposite results would be equally instructive. Therefore, denial of consolidation provides the fastest track toward a resolution of this matter.

### D. Denial of Consolidation Will Not Increase the Burden on the Parties, Witnesses, and Judicial Resources

Plaintiffs' continued litigation of *Williams* and *Galloway* cases as separate suits will impose negligible additional burden on the parties and may actually conserve judicial resources. It would actually increase the financial burden on the *Williams* Plaintiffs for them to incur costs and delay pending the development of the *Galloway II* litigation. Also, as previously noted, *Williams* will serve as a bellwether case for the litigation of the claims in *Galloway II*. The Plaintiffs' proof of their claims and favorable findings against Martorello in *Williams* would potentially conserve judicial resources by demonstrating the merits of Plaintiffs' claims and the financial exposure of the *Galloway II* Defendants.

### E. Plaintiffs have never changed their position with respect to *Williams*

Defendants rely on Plaintiffs' former position in favor of consolidation to support their argument that consolidation must be warranted now. Plaintiffs, however, <u>never</u> attempted to consolidate *Williams*, which Plaintiffs always intended to serve as a bellwether. Additionally, while Plaintiffs sought to consolidate the Galloway *I* matter in March 2019, they were unsuccessful for the reasons explained in the Court's Order dated May 10, 2019. *See* Dkt. 228. That finding applies with even more force today, especially when considering that the requested amendment in *Galloway I* would not have impacted the status of *Williams*, *i.e.*, the longest pending and most advanced case, which was filed a year before *Galloway I* and 22 months before *Galloway II*. *Compare Williams* (filed on June 22, 2017); *with Galloway I* (filed on June 11, 2018); *Galloway*

**Debtor's Ex. 19, p. 012**

Case 1:20-cv-00408-REP Document 368 Filed 02/17/20 Page 78 of 147 PageID# 12216
Case 3:18-cv-04088-JPR Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Exhibits 18 through 28    Page 77 of 325

*II* (filed on April 24, 2019). Because of the advanced posture of *Williams*—where expert deadlines have passed, class certification is fully briefed, and discovery has been largely completed—it should continue to proceed separately rather than consolidating it with *Galloway I* and *Galloway II*, where Rule 12 motions are still pending and discovery has not even commenced. *See Galloway I* at Dkt. No. 45 (Martorello's motion to dismiss); *Galloway II* at Dkt. Nos. 65, 67, 91, 92, 93, 96, 97, 98, 101, 102, 103, 105, 132, 133, 134 (motions to dismissed filed by Justin Martorello, Rebecca Martorello, Eventide, Liont, Kairos, Breakwater and Bluetech).

In short, there is no cause to slow the disposition of *Williams* by consolidating it with the *Galloway* litigation. If the Court consolidates *Williams*, it will effectively restart a case that has been pending for two and a half years, which is ready for class certification and trial.

## IV.    CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that the Court deny Defendants' Motion for Consolidation of the *Williams*, *Galloway I*, and *Galloway II* cases.

Respectfully submitted,

**PLAINTIFFS**

By:    */s/ Leonard A. Bennett*

Leonard A. Bennett, Esq., VSB #37523
Craig C. Marchiando, Esq., VSB #89736
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA  23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email:  lenbennett@clalegal.com
Email: craig@clalegal.com

*Counsel for Plaintiffs*

13

**Debtor's Ex. 19, p. 013**

Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Case 3:18-cv-00406-REP Document 868 Filed 02/17/20 Page 54 of 147 PageID# 22217
Exhibits 18 through 28    Page 78 of 325

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of February 2020, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system which will send a notification of such filing (NEF) to all counsel of record.


_____/s/_____

Leonard A. Bennett, Esq., VSB #37523
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA  23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email:  lenbennett@clalegal.com

14

**Debtor's Ex. 19, p. 014**

Case 3:19-cv-00406-REP Document 374 Filed 04/13/20 Page 1 of 10 PageID# 12503
Case 20-04008-elm REP Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Exhibits 18 through 28    Page 79 of 325

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


LULA WILLIAMS, et al.,

    Plaintiffs,

v.                               Civil Action No. 3:17cv461

BIG PICTURE LOANS, LLC,
et al.,

    Defendants.


RENEE GALLOWAY, et al.,

    Plaintiffs,

v.                               Civil Action No. 18cv406

BIG PICTURE LOANS, LLC,
et al.,

    Defendants.


RENEE GALLOWAY, et al.,

    Plaintiffs,

v.                               Civil Action No. 3:19cv314

JUSTIN MARTORELLO, et al.,

    Defendants.

**Debtor's Ex. 20, p. 001**

Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Case 3:18-cv-00406-REP Document 374 Filed 04/13/20 Page 2 of 13 PageID# 12504
Exhibits 18 through 28 Page 80 of 325

**ORDER**

For the reasons set forth in the accompanying Memorandum Opinion, it is hereby ORDERED that the MOTION FOR CONSOLIDATION (ECF No. 660) in <u>Lula Williams, et al. v. Big Picture Loans, LLC, et al.</u>, Civil Action No. 3:17cv461; (ECF No. 361) filed in <u>Renee Galloway, et al. v. Big Picture Loans, LLC, et al.</u>, Civil Action No. 3:18cv406; and (ECF No. 313) filed in <u>Renee Galloway, et al. v. Justin Martorello, et al.</u>, Civil Action No. 3:19cv314 is denied.

It is so ORDERED.

_____ /s/ _____
Robert E. Payne
Senior United States District Judge


Richmond, Virginia
Date: April ___, 2020

**Debtor's Ex. 20, p. 002**

Case 3:18-cv-00406-REP  Document 373  Filed 04/13/20  Page 12 of 36 PageID# 22494

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


LULA WILLIAMS, et al.,

    Plaintiffs,

v.                                    Civil Action No. 3:17cv461

BIG PICTURE LOANS, LLC,
et al.,

    Defendants.


RENEE GALLOWAY, et al.,

    Plaintiffs,

v.                                    Civil Action No. 18cv406

BIG PICTURE LOANS, LLC,
et al.,

    Defendants.


RENEE GALLOWAY, et al.,

    Plaintiffs,

v.                                    Civil Action No. 3:19cv314

JUSTIN MARTORELLO, et al.,

    Defendants.

Debtor's Ex. 20, p. 003

Case 3:18-cv-00406-REP Document 373 Filed 04/13/20 Page 82 of 325 PageID# 12495
Case 3:19-cv-00406-REP Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Exhibits 18 through 28 Page 82 of 325

## MEMORANDUM OPINION

This matter is before the Court on the MOTION FOR CONSOLIDATION (the "MOTION") filed in three pending actions. In Lula Williams, et al. v. Big Picture Loans, LLC, et al., Civil Action No. 3:17cv461, the MOTION is ECF No. 660. In Renee Galloway, et al. v. Big Picture Loans, LLC, et al., Civil Action No. 3:18cv406 ("Galloway I"), the MOTION is ECF No. 361. In Renee Galloway, et al. v. Justin Martorello, et al., Civil Action No. 3:19cv314 ("Galloway II"), the MOTION is ECF No. 313. The MOTION, the supporting, opposing and reply briefs are virtually identical and certainly so in substance. Having considered the Motion, the supporting, opposing and reply briefs, the MOTION FOR CONSOLIDATION (ECF No. 660 in Williams, ECF No. 361 in Galloway I, and ECF No. 313 in Galloway II) will be denied.

## BACKGROUND

The Plaintiffs have filed, in Williams, Galloway I, and Galloway II, three similar, but in many respects substantively quite different, actions arising out of a so-called "Rent A Tribe" scheme allegedly orchestrated by Matt Marterello, members of his family, companies that he controls, and investors who allegedly funded the scheme (the "Martorello Defendants"). Also, defendants in those three actions are certain entities related to the Lac Vieux Desert Band of Lake Superior Chippewa Indians and officers, employees and agents of those entities (the "Non-Martorello

2

Debtor's Ex. 20, p. 004

Case 3:19-cv-00406-REP Document 79-3 Filed 04/13/20 Page 5 of 16 PageID# 2496
Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Page 6
Exhibits 18 through 28    Page 83 of 325

Defendant(s)"). The Non-Martorello Defendants have reached a settlement with the Plaintiffs as to claims asserted against them in Williams, Galloway I, and Galloway II. As part of that settlement, the Plaintiffs, with the agreement of the Non-Martorello Defendants, have filed Renee Galloway, et al. v. James Williams, Jr., et al., Civil Action No. 3:19cv470 ("Galloway III"), naming, as defendants, just the Non-Martorello Defendants in Williams, Galloway I, and Galloway II. Thus, Galloway III is the vehicle by which the Plaintiffs seek certification of a settlement class action in which the Plaintiffs' claims against the Non-Martorello Defendants will be settled for a cash payment and other consideration. In return, and upon approval of the Settlement Agreement, the Plaintiffs' claims against the Non-Martorello Defendants will be released.

The Court has entered an order preliminarily approving the settlement in Galloway III. And, as has been agreed, the Plaintiffs have dismissed the Non-Martorello Defendants in Williams, Galloway I, and Galloway II.

As a result of the settlement in Galloway III, if it is finally approved, the only remaining defendant in Williams will be Matt Martorello. Also, as a result of the settlement in Galloway III, if finally approved, Matt Martorello will be the only remaining defendant in Galloway I. In Galloway II, Matt Martorello is not a defendant but, his wife and brother, and

3

Case 3:19-cv-00406-REP Document 978 Filed 04/13/20 Page 4 of 10 PageID# 22497
Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Exhibits 18 through 28 Page 84 of 325

certain former employees of the businesses that Matt Martorello controls, as well as investors in those businesses, and the businesses themselves, have been named as defendants.[1]

The Plaintiffs and the Martorello Defendants agree that all three actions (Williams, Galloway I, and Galloway II) arise from the same basic facts or, as the plaintiffs would have it, the same predatory, usurious, and illegal lending enterprise. As the Plaintiffs correctly state, however, the claims and causes of actions in Galloway I and Galloway II are considerably more complex than those in Williams because the claims in the Galloway I and Galloway II involve a broader spectrum of consumer protection statutes than are asserted in Williams, and those claims are asserted on behalf of classes and subclasses that are broader than those in Williams.

In Williams, discovery, both class discovery and considerable merit discovery, has been completed. Williams was filed in 2017 and, at the time the MOTION was filed, argument on the class certification motion as to claims against Matt Martorello (which has been completely briefed) was to be heard on March 6, 2020. However, because Matt Martorello's briefing on class certification called into play certain statements made by Martorello and others

---

[1] It appears as if the remaining defendants in Galloway II, if the settlement in Galloway III is approved, will be Justin Martorello, Rebecca Martorello, Jeremy Davis, Eventide Credit Acquisitions, Liont LLC, Gallant, BlueTech Irrevocable Trust, Breakwater Holdings, LLC, and Kairos Holdings LLC.

4

**Debtor's Ex. 20, p. 006**

Case 3:18-cv-00406-REP Document 978 Filed 04/13/20 Page 5 of 16 PageID# 22498
Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Page 9
Exhibits 18 through 28 Page 85 of 325

that the Plaintiffs allege to be untrue,[2] the Court continued the
hearing on class certification and required further briefing about
the impact of the alleged misrepresentations and Martorello's
assertions on the issue of class certification. (ORDER, ECF No.
673, filed in Williams). Additionally, the Court moved the class
certification date to June 5, 2020. Id. Then, upon studying all
of the briefing respecting whether the misrepresentation issue
necessitates an evidentiary hearing, the Court continued the class
certification hearing from June 5, 2020 and set an evidentiary
hearing on the alleged misrepresentations on that date.

Galloway I and Galloway II are materially further behind the
Williams case. However, there are many pending motions in
Galloway I and Galloway II and some discovery has been taken. In
addition, the allegations in Galloway I and Galloway II,
respectively, are considerably different even though there is
substantial overlap in the factual predicate for those two cases.
And, the Court previously has denied, at the Martorello Defendants'

_____

[2] PLAINTIFFS' STATEMENT OF POSITION REGARDING MATERIAL
MISREPRESENTATIONS MADE TO THE COURT BY DEFENDANTS IN SUPPORT OF
THEIR MOTIONS TO DISMISS FOR LACK OF JURISDICTION; MATT
MARTORELLO'S RESPONSE TO PLAINTIFFS' STATEMENT OF POSITION
REGARDING MATERIAL MISREPRESENTATIONS MADE TO THE COURT BY
DEFENDANTS IN SUPPORT OF THEIR MOTIONS TO DISMISS FOR LACK OF
JURISDICTION (ECF 249); PLAINTIFFS' REPLY IN SUPPORT OF STATEMENT
OF POSITION REGARDING MATERIAL MISREPRESENTATIONS MADE TO THE
COURT BY DEFENDANTS; (ECF Nos. 249, 272 and 286, respectively,
filed in Galloway I.

Debtor's Ex. 20, p. 007

Case 3:18-cv-00406-REP Document 978 Filed 04/13/20 Page 6 of 19 PageID# 22499
Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Exhibits 18 through 28 Page 86 of 325

urging, the Plaintiffs' request that <u>Galloway I</u> and <u>Galloway II</u> be consolidated.

## DISCUSSION

To determine whether consolidation is warranted, it is appropriate to ascertain "whether the specific risks of prejudice and possible confusion [of proceeding individually] were overborne" by (1) "the risk of inconsistent adjudications of common factual and legal issues;" (2) "the burden on parties, witnesses and available judicial resources posed by multiple lawsuits;" (3) "the length of time required to conclude multiple suits as against a single one;" and (4) "the relative expense to all concerned of the single-trial, multiple-trial alternatives." <u>Arnold v. Eastern Airlines, Inc.</u>, 681 F.2d 186, 193 (4th Cir. 1982). As the Fifth Circuit has correctly articulated, the dispositive analysis is to determine whether consolidation would avoid unnecessary cost or delay without prejudicing the rights of the parties. <u>Mills v. Beech Aircraft Corp.</u>, 886 F.2d 758, 761 (5th Cir. 1989). The district court for the District of South Carolina put it quite appropriately in <u>Milliken & Co. v. Evans</u>, No. 7:14-CV-778-BHH, 2016 WL 470017, at *3 (D.S.C. Feb. 8, 2016) in observing that "consolidation is appropriate when to do so will foster clarity, efficiency and the avoidance of confusion and prejudice." (citations omitted). It is the burden of the moving party to show that consolidation is appropriate.

6

**Debtor's Ex. 20, p. 008**

Case 3:18-cv-00406-REP Document 979 Filed 04/13/20 Page 87 of 325 PageID# 22500
Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Exhibits 18 through 28    Page 87 of 325

The Williams case is significantly further along than are Galloway I and Galloway II. And, although all cases in this district have been somewhat delayed as a result of Orders entered in efforts to deal with the health circumstances created by COVID-19, by mid-June the Court will determine whether, as the Plaintiffs allege, the misrepresentations by Matt Martorello occurred and what, if any, impact that has on class certification in Williams. Then, shortly therafter, the issue of class certification in Williams will be resolved.

The Martorello Defendants argue in conclusory fashion and with no substantive support, that separate litigation of each case will increase the burden on the parties, the witnesses, and on scarce judicial resources. Plaintiffs have shown that the litigation of the cases separately will impose a negligible additional burden on them.

Moreover, because the issues in Williams are far less complex than those in Galloway I and Galloway II, consolidation will heavily burden, and slow the process of, Williams.

The record is clear that the interests of the Plaintiffs in Williams will be prejudiced if Williams, Galloway I, and Galloway II are consolidated. The already delayed resolution of Williams will be further delayed while the other two cases catch up. Further, the Plaintiffs argue that the Williams case likely will

7

Case 3:19-cv-00406-REP Document 73 Filed 04/13/20 Page 6 of 15 PageID# 1501
Case 20-04008-elm Doc 90-3 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Exhibits 18 through 28    Page 88 of 325

serve as a bellweather case and thus will facilitate easier and faster disposition on the cases of Galloway I and Galloway II.

The Martorello Defendants argue that, absent consolidation, there is a significant risk of inconsistent rulings. That, of course, is a factor to be considered in deciding the MOTION. However, in these cases there is little risk of inconsistent rulings because the same judge will be making the rulings in each of the cases. And, because the judge will be familiar with each of the cases, there is a great likelihood of avoiding inconsistent rulings.

Finally, the Court, at the urging of the Martorello Defendants, has previously denied the plaintiffs' request to consolidate Galloway I and Galloway II. In so doing, the Court held that consolidation of Galloway I and Galloway II would be improper because:

> The addition of new parties and claims at this time to this already complex case will not be in the interest of justice insofar as existing parties are concerned, will cause prejudice to the existing defendants, and will cause significant delay in the already delayed process of this case.
>
> The record is clear that at various times the plaintiffs and defendants have been on opposite sides of the consolidation point, notably at the request of the plaintiffs for multidistrict treatment.
>
> Further, it appears that the defendants' Motion is part of an overall effort to delay adjudication of the claims against Matt Martorello, his family and the entities that

8

**Debtor's Ex. 20, p. 010**

Case 3:18-cv-00406-REP Document 973 Filed 04/13/20 Page 9 of 10 PageID# 22502
Case 20-04008-elm   Doc 90-3   Filed 05/25/20   Entered 05/25/20 16:23:47   Desc
Exhibits 18 through 28   Page 89 of 325

he controls, which lie at the heart of the
claims asserted by the plaintiffs.  Having
reviewed the files in Williams, Galloway I,
and Galloway II, the Court is of the view that
proceeding promptly with the resolution of
Williams while requiring discovery to go
forward in Galloway I and Galloway II will
result in least prejudice to all parties and
is the most efficient means of proceeding.[3]

There is nothing before the Court to warrant a change to that

decision.

In sum, consolidation of Williams, Galloway I, and Galloway

II is not supported by any of the precepts that warrant

consolidation.

## CONCLUSION

For the foregoing reasons, the MOTION TO CONSOLIDATE (ECF

Nos. 660, 361, and 313) will be denied.

It is so ORDERED.

_____ /s/ _____
                         Robert E. Payne
                         Senior United States District Judge

Richmond, Virginia
Date: April ___, 2020

---

[3] However, it is entirely possible that all or some of the
defendants' dispositive motions in Galloway I and Galloway II may
be granted and the cases, and the motions, proceed on somewhat
individual theories, that circumstance further counsels denial of
the consolidation and supports the view that the Williams case is
further along toward trial than Galloway I and Galloway II.

9

**Debtor's Ex. 20, p. 011**

Case 20-04008-elm Doc 1-1 Filed 01/29/20 Entered 01/29/20 16:22:48 Page 2 of 6

**Exhibit 1**

*In re Eventide Credit Acquisitions, LLC – Summary of Pending Actions*

| Case | Defendants | Comments |
|------|-----------|----------|
| *Williams et al. v. Big Picture Loans, LLC et al.*, No. 3:17-cv-461 (E.D. Va.) (**"Williams I"**) | **Non-Settling Defendant:** <ul><li>Matt Martorello</li></ul> **Tribal Officer Defendants:** <ul><li>James Williams, Jr.</li><li>Gertrude McGeshick</li><li>Susan McGeshick</li><li>Giiwegiizhigookway Martin</li></ul> **Settling Defendants:** <ul><li>Big Picture Loans, LLC</li><li>Ascension Technologies, LLC</li></ul> | Case commenced on 6/22/17. Tribal Officer Defendants were dismissed per Notice of Voluntary Dismissal at Docket No. 121. No amended complaint or dismissal of the Settling Defendants was filed as of 1/27/20. |
| *Galloway et al. v. Big Picture Loans, LLC et al.*, No. 3:18-cv-406 (E.D. Va.) (**"Galloway I Action"**) | **Non-Settling Defendant:** <ul><li>Matt Martorello</li></ul> **Settling Defendants:** <ul><li>Big Picture Loans, LLC</li><li>Ascension Technologies, LLC</li></ul> | Case commenced on 6/11/18. No amended complaint filed evidencing dismissal of Settling Defendants as of 1/27/20. |
| *Smith et al. v. Martorello and Eventide Credit Acquisitions, LLC*, No. 3:18-cv-01651-AC (D. Oreg.) (**"Smith Action"**) | **Non-Settling Defendants:** <ul><li>Matt Martorello</li><li>Eventide Credit Acquisitions, LLC</li></ul> **Settling Defendants:** <ul><li>Big Picture Loans, LLC</li><li>Ascension Technologies, LLC</li></ul> | Cased commenced on 9/11/18. Settling Defendants dismissed via Notice of Voluntary Dismissal filed on 12/30/19 at Docket No. 96. The Debtor was added as a defendant via First Amended Complaint filed on 1/17/20 at Docket No. 100. |

Case 20-04008-elm Doc 90-2 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Case 20-04008-elm Doc 1-1 Filed 01/29/20 Entered 01/29/20 16:22:48 Page 9 of 6
Exhibits 18 through 28 Page 91 of 325

| Case | Defendants | Comments |
|------|-----------|----------|
| *Duggan et al. v. Martorello and Eventide Credit Acquisitions, LLC*, No. 1:18-cv-12277-JGD (D. Mass.) ("**Duggan Action**") | **Non-Settling Defendants:**<br>• Matt Martorello<br>• Eventide Credit Acquisitions, LLC<br><br>**Settling Defendants:**<br>• Brian McFadden*<br>• Big Picture Loans, LLC<br>• Ascension Technologies, LLC<br>• James Williams, Jr.<br>• Michelle Hazen<br>• Henry Smith, Andrea Russell<br>• Alice Brunk<br>• Tina Caron<br>• Mitchell McGeshick<br>• Jeffrey McGeshick<br>• Roberta Ivey<br>• June Saad<br><br>*Settling Indemnified Defendant | Case commenced on 10/31/18.<br><br>The Debtor was first named a defendant in the amended complaint filed on 7/16/19 at Docket No. 72.<br><br>A notice of dismissal of the Settling Defendants was filed on 12/30/19 at Docket No. 112.<br><br>The second amended complaint was filed on 1/15/20 at Docket No. 118 naming only Matt and Eventide as defendants. |
| *Williams et al. v. Microbilt et al.*, No. 3:19-cv-85 (E.D. Va.) ("**Williams Action**") | **Defendants:**<br>• Matt Martorello<br>• Microbilt Corporation (consumer reporting agency)<br>• Philip Burgess (founder of Microbilt)<br>• Karrie Wichtman (General Counsel for LVD) | Commenced on 2/11/19.<br><br>Unlike the other Pending Actions, this one is based on an alleged violation of the FCRA.<br><br>No claims asserted in this action are released pursuant to the Settlement Agreement. *See* Settlement Agreement at § 12.3. |

Case 20-04008-elm Doc 90-2 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Case 20-04008-elm Doc 1-1 Filed 01/29/20 Entered 01/29/20 16:22:48 Page 4 of 6
Exhibits 18 through 28    Page 92 of 325

| Case | Defendants | Comments |
|------|-----------|----------|
| *Galloway et al. v. Martorello et al.*, No. 3:19-cv-00314-REP (E.D. Va.) ("**Galloway II Action**") | **Non-Settling Defendants:**<br>• Justin Martorello<br>• Eventide Credit Acquisitions, LLC<br>• Rebecca Martorello<br>• Kairos Holdings, LLC<br>• Breakwater Holdings, LLC<br>• Gallant Capital, LLC<br>• Liont, LLC<br>• Bluetech Irrevocable Trust<br>• Jeremy Davis (provided capital to make the loans)<br><br>**Settling Defendants:**<br>• Brian McFadden*<br>• James Dowd*<br>• Simon Liang*<br>• Brian Jedwab<br>• Amlaur Resources<br>• Columbia Pipe & Supply Co.<br>• Timothy Arenberg<br>• Terrance Arenberg<br>• DTA Trinity Wealth Transfer Trust<br>DMA Trinity Wealth Transfer Trust<br><br>*Settling Indemnified Defendants | Case commenced 4/24/19 because defendants could not be added to Galloway I given how far it was advanced per order at Docket No. 228 entered in Galloway I.<br><br>No amended complaint filed evidencing dismissal of Settling Defendants as of 1/27/20. |
| *Galloway et al. v. Williams et al.*, No. 3:19-cv-470 (E.D. Va.) ("**Galloway III Action**") | **Original Settling Defendants:**<br>• James Williams, Jr. in individual and official capacities at LVD | Case commenced on 6/26/19 against Original Settling Defendants. |

Case 20-04008-elm Doc 90-2 Filed 05/25/20 Entered 05/25/20 16:23:47 Desc
Case 20-04008-elm Doc 1-1 Filed 01/29/20 Entered 01/29/20 18:22:48 Page 5 of 6
Exhibits 18 through 28    Page 93 of 325

| Case | Defendants | Comments |
|------|-----------|----------|
| | • Michelle Hazen in individual capacity<br>• Henry Smith in official capacity at LVD<br>• Alice Brunk in official capacity at LVD<br>• Andrea Russell in official capacity at LVD<br>• Tina Caron in official capacity at LVD<br>• Mitchell McGeshick in official capacity at LVD<br>• Jeffrey McGeshick in official capacity at LVD<br>• Roberta Ivey in official capacity at LVD<br>• June Saad in official capacity at LVD<br><br>**Additional Settling Defendants:**<br>• James Dowd*<br>• Simon Liang*<br>• Brian McFadden*<br>• Big Picture Loans, LLC<br>• Ascension Technologies, LLC<br>• Gertrude McGeshick in official capacity at LVD<br>• Susan McGeshick in official capacity at LVD | The Settlement Agreement was filed at Docket No. 18 as attachment to Plaintiffs' Motion for Preliminary Approval of Class Action Settlement.<br><br>First Amended Complaint filed at Docket No. 23 on 12/3/19 adding Additional Settling Defendants as well as Plaintiffs across all Pending Actions and asserting claims under the laws of additional states, all as contemplated by the Settlement Agreement.<br><br>The Debtor moved to intervene on 12/18/19 at Docket No. 42.<br><br>Preliminary Approval Order relating to the Settlement Agreement was entered on 12/20/19 at Docket No. 65. |

Case 20-04008-elm   Doc 90-2   Filed 05/25/20   Entered 05/25/20 16:23:47   Desc
Case 20-04008-elm   Doc 1   Filed 01/29/20   Entered 01/29/20 18:22:48   Page 6 of 6
Exhibits 18 through 28   Page 94 of 325

| Case | Defendants | Comments |
|---|---|---|
| | <ul><li>Giiwegiizhigookway Martin in her official capacity at LVD</li><li>Columbia Pipe & Supply Co.</li><li>Timothy Arenberg</li><li>Terrance Arenberg</li><li>DTA Trinity Wealth Transfer Trust</li><li>Deborah M. Arenberg Living Trust</li><li>Amlaur Resources, LLC</li><li>Brian Jedwab</li></ul>*Settling Indemnified Defendants | |

OPERATING AGREEMENT
OF
EVENTIDE CREDIT ACQUISITIONS, LLC
A Delaware Limited Liability Company

THIS OPERATING AGREEMENT (this "Agreement") is made and entered into as of February 9, 2015, by and among the Members whose signatures appear on <u>Schedule A</u>, as may be amended from time to time, which shall be, and remain after subsequent amendment, part and parcel of this Agreement.

Whereas, this Agreement is intended to govern the relationships among the Company, its Manager and its Members.

In consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, agree as follows:

## SECTION I
## ORGANIZATION & FORMATION

A.　<u>Formation</u>. The Company has been organized as a Delaware limited liability company under and pursuant to the Delaware Limited Liability Company Act (the "Act") by the filing of Certificate of Formation (the "Certificate") with the State of Delaware Secretary of State, on February 9, 2015, as required by the Act.

B.　<u>Name</u>. The name of the Company shall be "Eventide Credit Acquisitions, LLC". Upon proper notice and filing with the State of Delaware Secretary of State, the Company may conduct its business under one or more assumed names.

C.　<u>Purpose</u>. The purpose of the Company is to operate any lawful business permitted by the law of the State of Delaware or any other State, Territory or Commonwealth in which it is registered to do business. The Company shall have all the powers necessary or convenient to affect any purpose for which it is formed, including all powers granted by the Act.  The Company is authorized to apply for any and all tax exemptions and other benefits for which it may be eligible, including without limitation, benefits provided by the Department of Economic Development and Commerce of the Commonwealth of Puerto Rico.

D.　<u>Duration</u>. The Company shall continue in existence perpetually, beginning on the date of filing of the Certificate, unless terminated by law or dissolved and terminated pursuant to this Agreement.

E.　<u>No Partnership</u>.  The Members intend that the Company not be a partnership (including, without limitation, a limited partnership) or joint venture, that no Member be a partner or joint venturer for any purposes other than federal, state and territorial tax purposes, and this Agreement may not be construed to suggest otherwise.

F.　<u>Registered Office, Resident Agent and Place of Business</u>. The registered office and principal place of business of the Company shall be at 1407 Plantation Village, Dorado, Puerto Rico 00646 or such other place or places as the Manager may hereafter determine. The Resident Agent of the Company for service of process in Delaware shall be Incorporating Services, Ltd., 3500 South Dupont Highway, Dover, DE 19901.

## SECTION II
## MEMBERS, MEMBERSHIP INTEREST & CLASSES

A.　<u>Definitions</u>.

(i) "Act" shall mean the Delaware Limited Liability Company Act, Title 6 of the Delaware Code, as in effect in the State of Delaware and as amended from time to time. Reference to any section of the Act shall be deemed to refer to a similar provision in any amendment to the Act. To the extent the Company redomiciles, it may be required to amend and restate this Agreement in accordance with the laws of its new domicile.

(ii) "Additional Member" shall mean any Member admitted, to the Company after the date of this Agreement as provided for in Section II E.

(iii) "Capital Account" shall mean the account maintained for each Member described in Section III of the Agreement.

(iv) "Capital Contribution" shall mean, with respect to any Member, the total amount of contributions by all the Members or any class of Members or any one Member, as the case may be (or the predecessor holders of the interests of such Members), to the capital of the Company in cash, property, or services for an interest in the Company, valued at fair market value without deduction of selling, organization, or other expenses; and shall include all such contributions to the capital of the Company whenever made.

(v) "Class" or "Classes": Membership Interests may include voting interest, economic interest and equity interest, and may be divided into separate Classes in the sole discretion of the Manager, which Classes and Membership Interests shall have such rights and preferences as the Manager shall determine, including (without limitation) different fee, expense and allocation structures and different voting privileges. The Manager shall cause separate and distinct records to be kept with respect to Company Property associated with each Class. Certain classes of the Company shall entitle a Member to participate only in the future profits, losses and/or appreciation of the Company Property allocated to a particular Class of Membership Interest. The designation of Class and rights of any Member, shall be designated by the Manager, and shall either be described herein in this Agreement, or made pursuant to an ancillary agreement among the Company and the proposed Member.  All Classes of Membership Interest shall be shown on <u>Schedule A</u>, attached hereto and made a part hereof, as amended from time to time.

(vi) "Company Property" or "Property" each shall mean the real property and any other assets or property (tangible or intangible, personalty or real, choate or inchoate, fixed or contingent) of the Company, including all earnings and proceeds which may arise therefrom from time to time.

(vii) "Economic Interest" shall mean a Member's share of the Classes' future net profits and net losses specifically associated with a particular Class pursuant to this Agreement. Economic Interests shall be non-voting interests. It is the intention of the parties hereto that all Economic Interests shall be deemed to be "profits interests" of the Company in accordance with Rev. Proc. 93-27 and 2001-43 and that the Economic Interest holders are only entitled to participate in the future net profits and or net losses of the Company accruing after each Member's date of execution of this Agreement and are not entitled to participate in profits or losses related to the sale of assets or equity.

(vii) "Equity Interest" shall mean a Member's share of the value upon a sale or liquidation of the Company, its subsidiaries, or the asset(s) specifically associated with a particular Class of Equity Interest and set forth in section II C below.

(viii) "Initial Capital Contribution" shall mean, with respect to any Member, the initial contribution by such Member to the capital of the Company as set forth on Schedule A hereto.

2

**Debtor's Ex. 22, p. 002**

(ix) "Internal Revenue Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, or any corresponding provision or provisions of succeeding laws. The term "Internal Revenue Code" shall be abbreviated as "IRC" or "Code".

(x) "Member" shall mean each of the persons or entities holding a Membership Interest in the Company and each of the persons or entities who may hereafter become a Member holding a Membership Interest. Members' rights to participate in the management and affairs of the Company, to share in the profits, gains or losses of the Company, to share in the value upon sale or liquidation of the asset(s) associated with a particular Class of Membership Interest, or to vote at meetings of the Members shall be determined pursuant to this Agreement, or to any ancillary agreements between the Member and the Company executed contemporaneously with this Agreement, or to any resolutions of the Members executed in connection with the issuance of a new class of interests.

(xi) "Membership Interest" shall mean a Member's voting interest, economic interest and/or equity interest in a particular Class, including the right to vote associated with such Membership Interest, if any, and such other rights and privileges that the Member may enjoy by being such a Member.

(xii) "Voting Interest" shall mean with respect to each Class A Member, such Class A Member's right to vote on, consent to or otherwise participate in any decision or action of or by the Members granted pursuant to this Operating Agreement or the Act. A.

B.    <u>Members</u>.  The Members are set forth on <u>Schedule A</u> hereto, and shall include any other person hereafter admitted to the Company as a Member as provided in this Agreement.  The term "Members" shall not include any person who has ceased to be a member of the Company.

C.    <u>Classes</u>.  The following Classes have been designated by the Manager as of the Effective Date of this Agreement:

(i)    <u>Class A Membership Interest</u>.  Class A Membership Interest shall be the membership interest in the Company not otherwise designated to any other Class of Membership Interest.

(a) <u>Class A Voting Interest</u>: Class A Voting Interest shall be the only Class of Membership entitled to vote on any and all matters presented to the Company for Member approval.  Class A Voting Interest shall not include an Economic Interest or an Equity Interest.

(b) <u>Class A Economic Interest</u>: Class A Economic Interest shall be a Class A Member's economic interest in the Company's future net profits and net losses pursuant to this Operating Agreement and the Act, as more particularly set forth in <u>Schedule A</u> to this Operating Agreement as the same may be amended from time to time by the Class A Members holding Class A Voting Interest, but shall not include any right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Class A Members holding Class A Voting Interest, nor shall it include an Equity Interest.

(c) <u>Class A Equity Interest</u>:  Class A Equity Interest shall be entitled to the value of the Company upon sale or liquidation, the gain or losses from the sale of some or all of the companies assets, and the sharing in liabilities pursuant to this Operating Agreement and the Act, as more particularly set forth in <u>Schedule A</u> to this Operating Agreement as the same may be amended from time to time by the Manager, but shall not include any right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Class A Members holding Class A Voting Interest, nor shall it include an Economic Interest.

**Debtor's Ex. 22, p. 003**

D.      Representations and Warranties of the Members.  As of the date on which any person becomes a Member, such person severally (and not jointly) hereby represents and warrants, as to itself and no other Member, to, and covenants with, the Company and each of the other Members that: (i) such person understands that the offer and sale or other transfer of the Membership Interest to such person have not been registered under the Securities Act or the securities laws of any state or territory, and further understands that such Membership Interest has not been approved or disapproved by the Securities and Exchange Commission or any other federal or state agency; (ii) such person understands that there are substantial restrictions on the transfer of Membership Interests, including without limitation, that Membership Interests may not be transferred except as permitted by this Section II; (iii) such person has carefully reviewed and understands this Agreement in its entirety; (iv) the Manager has not made and hereby makes no warranties or representations to such person other than those set forth in this Agreement.

E.      Membership Interests; Additional Membership Interests.  Ownership of the Company shall be divided into and represented by Membership Interests.  The Class and types of Membership Interests of the Members are set forth on Schedule A.  The Manager is expressly authorized to provide for the issuance from time to time of additional Membership Interests for such consideration, and with rights, privileges, preferences, qualifications, limitations and restrictions as shall be stated and expressed in the resolution or resolutions adopted by the Manager providing for the issuance of additional Membership Interests and as may be permitted by the Act.  The Manager shall reflect the issuance of any additional Membership Interest and, if applicable, the admission of a new Member, pursuant to an amendment to Schedule A, which such amendment shall not be required to be executed by any other Member.

F.      Transfer of Membership Interests.  Subject to the limitations of transferability set forth herein in this Agreement, Members may transfer any or all of their Membership Interest to any person or persons, at any time and from time to time.  Subject to the provisions of this Section, Members may assign their Membership Interest in the Company in whole or in part. The assignment of a Membership Interest does not itself entitle the assignee to participate in the management and affairs of the Company or to become a Member. Such assignee is entitled only to receive the distributions of cash and other property and the allocations of income, gains, losses, deductions, credits or similar items to which its assignor would have been entitled to, and such assignee shall only become an assignee of a Membership Interest and not a substituted Member. An assignee of Membership Interest shall be admitted as a substitute Member and shall be entitled to all the rights and powers of the assignor only if the Manager consents in writing. If admitted, the substitute Member, has to the extent assigned, all of the rights and powers, and is subject to all of the restrictions and liabilities of the Members.

H.      Right of First Refusal.  Before any Membership Interest ("Interest") held by any Member is sold or otherwise transferred (including, but not limited to transfer by gift, operation of law, or pursuant to Section II H below) the Company shall have an uncontested and irrevocable right of first refusal to purchase the Interest on the following terms and conditions:

        (i)     The selling Member shall deliver to the Company a written notice stating: (a) the Member's bona fide intention to sell or otherwise transfer such Interest; (b) the name of the proposed purchaser or other transferee ("Proposed Transferee"); (c) the percent of Interest to be transferred to each Proposed Transferee; (d) the bona fide cash price or other consideration to be exchanged for the Interest ("Offered Price"); and (e) the terms and conditions of the proposed transfer.

        (ii)    At any time within forty-five (45) days after receipt of this notice, the Company may, by written notice to the selling Member, elect to purchase all, or any part of the Interest at Fair Market Value (as defined in Section J below) or at the Offered Price, whichever price is lower.

        (iii)   The right of first refusal shall not terminate upon any transfer of Interest.

Debtor's Ex. 22, p. 004

(iv)    The right of first refusal shall be freely assignable by the Company at any time and in its sole discretion.

(v)    Any transfer done without adherence to this Section II F shall be void.

I.    <u>Mandatory Repurchase</u>.  The Manager, in his sole and absolute discretion, may require a Member to sell all or a portion of the Interest of such Member, on not less than fourteen (14) days' notice (a "Mandatory Repurchase").  Such Mandatory Repurchase shall become effective on the date (the "Repurchase Date") specified in such notice.  A Member who is so required to sell its Interest pursuant to this Section shall receive the Fair Market Value of the Interest, computed as of the date on which such Mandatory Repurchase shall become effective (a Member whose Interest is repurchased pursuant to this Section is referred to herein as a "Repurchased Member").

J.    <u>Payments in Connection with Mandatory Repurchase</u>.

(i)    Within 30 days after a Repurchase Date there shall be paid or distributed to a Repurchased Member an amount in cash, or, in the discretion of the Manager, in securities selected by the Manager, or, in the discretion of the Manager, partly in cash and partly in securities selected by the Manager, equal in value to not less than 90% of the estimated Fair Market Value of the Interest being repurchased. Within 30 days after the Manager has determined the Fair Market Value of the Interest being redeemed or repurchased as of such date, the Company shall pay to the Repurchased Member in cash, or, in the discretion of the Manager, in securities selected by the Manager, or, in the discretion of the Manager, partly in cash and partly in securities selected by the Manager, the amount of the excess, if any, of the Fair Market Value of the redeemed or repurchased Interest over the amount so paid.

a.    "Fair Market Value" shall mean the value of the Interest, as applicable, as determined by Manager using reasonable valuation criteria, all in the Manager's sole discretion.

b.    The Company's assets will be valued from time to time in the discretion of the Manager.  In those cases where an exchange-based pricing mechanism is unavailable, the Manager or Manager's representative will develop an assessment of Fair Market Value, which will be reviewed and approved by the Manager whose consent shall not be unreasonably withheld.  In the absence of bad faith, such determination, as approved by the Manager, shall be conclusive.  Fair Market Value shall reflect any declared but unpaid distributions with respect to the Interest.

(ii)    If, in the discretion of the Manager, the assets of the Company are committed in such a manner as not to reasonably permit immediate withdrawal of such assets, then, on the applicable Repurchase Date (the "Repurchase Effective Date"), the Manager may adopt a deferred payment system in accordance with the following:

a.    The Manager will attempt to liquidate, as of the earliest date on or after the Repurchase Effective Date upon which the Company is permitted to do so or on which market conditions make same feasible, from the Company's investments, such portion thereof as is allocable to the Interest of the Repurchased Member;

b.    Within 30 days following the Repurchase Effective Date, the Repurchased Member will be entitled to receive an amount equal to the Repurchased Member's percentage of all cash and the fair market value of all liquid securities held directly by the Company with respect to any applicable Interest; provided, however, that any such amount shall be subject to the provisions of this Section;

**Debtor's Ex. 22, p. 005**

c.      The balance due to the Repurchased Member shall be paid from time to time, within 30 days after the Company receives the proceeds from the liquidation of the previously illiquid portion of the Company's investments, but only to the extent that such proceeds plus the Repurchased Member's percentage of cash and the fair market value of liquid securities held by the Company with respect to any applicable Membership exceed such Member's percentage of the Company's liabilities and any amount retained pursuant to this Section with respect to any applicable Membership; provided, however, that in any event, at least 80% of the amount due a Repurchased Member shall be paid within one year following the Redemption Effective Date; and

d.      The Fair Market Value of the Interest attributable to a Repurchased Member shall be subject to an adjustment equal to a credit or charge for the Repurchased Member's percentage of the increase or decrease in the net asset value of the Company's investments with respect to any applicable Interest from the Redemption Effective Date through the date on which final payment of such Repurchased Member's percentage is made.

K.      <u>Involuntary Transfers</u>.  In the event of an Involuntary Transfer of any Interest to any person, the transferee (which term, as used herein, shall include any and all transferees and subsequent transferees of the initial transferee) shall take and hold such Interest subject to this Agreement and to all the obligations and restrictions upon the transferor, and shall observe and comply with this Agreement and with such obligations and restrictions.  As used in this Section II, the term "Involuntary Transfer" shall mean any transaction, proceeding or action by or in which a Member or other person is involuntarily deprived or divested of any right, title or interest in or to any Interest (including without limitation, a seizure under levy of attachment or execution, transfer to a trustee in bankruptcy or receiver or other officer or agency pursuant to a statute pertaining to escheat or abandoned property, a Member's death or the appointment of a guardian with respect to a Member).

L.      <u>Admission of New Members</u>.  No person shall be admitted as a Member of the Company unless: (i) the Manager shall have consented in writing to the admission of such person as a new Member; (ii) the person has executed and delivered all documents reasonably deemed appropriate by the Manager to reflect such person's admission as a Member, and its agreement to be bound by this Agreement; and (iii) such person has paid all expenses connected with its admission.

SECTION III
CAPITAL ACCOUNT

A.      <u>Capital Account</u>.  A capital account ("Capital Account") shall be maintained for the Members, and any additional Members in accordance with the provisions of this Section and subject to any ancillary agreements entered into between the Company and the Members.

(i)      Increases in Capital Account.  The Capital Account of the Members shall be increased by:

a.      The fair market value of the Members' initial capital contribution and any additional capital contributions by the Members to the Company.  If any property, other than cash, is contributed to or distributed by the Company, the adjustments to Capital Accounts required by Treasury Regulation Section 1.704-1(b)(2)(iv)(d), (e), (f) and (g) and Section 1.704-1(b)(4)(i) shall be made.

b.      The Members' share of the increase in the tax basis of Company property, if any, arising out of the recapture of any tax credit.

c.      Allocations to the Members of profit.

6

**Debtor's Ex. 22, p. 006**

d.      The Members' share of Company income or gain (including income and gain exempt from income taxation) as provided under this Agreement, or otherwise by Regulation Section 1.704-1(b)(2)(iv).

e.      The Members' share of the amount of Company liabilities that are assumed by the Members.

(ii)      Decreases in Capital Account.  The Capital Account of the Members shall be decreased by:

a.      The Members' share of the amount of money distributed to the Members of the Company pursuant to any provision of this Agreement.

b.      The Members' share of the fair market value of property distributed to the Members by the Company (net liabilities secured by such distributed property that such Members are considered to assume or take subject to Code Section 752).

c.      Allocations to the Members of losses.

d.      Allocations to the Members of deductions, expenses, Nonrecourse Deductions and net losses allocated to it pursuant to this Agreement, and the Members' share of Company expenditures which are neither deductible nor properly chargeable to Capital Accounts under Code Section 705(a)(2)(B) or are treated as such expenditures under Treasury Regulation Section 1.704-1(b)(2)(iv)(i).  "Nonrecourse Deductions" shall have the meaning set forth in Treasury Regulation Section 1.704-2.

e.      The Members' share of the amount of any liabilities of the Members that are assumed by the Company.

SECTION IV
ALLOCATIONS AND DISTRIBUTIONS

A.      <u>Allocations</u>.

(i)      Allocations shall be made at such times as the Manager shall deem, in his sole discretion, to the Members listed and described on <u>Schedule A</u> attached hereto in accordance with the terms and rights of their interests.  Except as may be expressly provided otherwise in this Section IV or agreed to among the parties, and subject to the provisions of Sections 704(b) and 704(c) of the Code, the net income, net loss, or gains of the Company for each year of the Company shall be allocated to the Members, in accordance with the rights attributable to their respective Interests.

(ii)      Net profits, net losses, or any other items allocable to any period shall be determined by the Manager, in his discretion, using any permissible method under Code Section 706 and the related Treasury Regulations and in accordance with the rights attributable to their respective Interests.

(iii)      Acknowledgement.  The Members are aware of the income and other tax consequences of the allocations in or referred to by this Section IV and hereby agree to be bound by the provisions of this Section IV in reporting the share of items of Company income, gain, loss, deduction and expense for tax purposes.

(iv)      Determination by Manager of Certain Matters.  All matters not expressly provided for by the terms of this Agreement concerning the manner in which capital accounts and allocations are computed shall be determined in good faith by the Manager, in his reasonable discretion, whose determination shall be final and conclusive as to all the Members.  In the event the Manager determines that it is prudent to modify the

7

**Debtor's Ex. 22, p. 007**

manner in which capital accounts or any allocations under this Agreement are computed in order to comply with Section 704(b) of the Code and Treasury Regulations thereunder, the Manager shall make such modification. In the event that unanticipated events might otherwise cause this Agreement not to comply with such law, the Manager, consistent with the prior sentence, shall make such modifications as he deems reasonable.

B.     <u>Allocations for Tax Purposes</u>.  Except as otherwise provided in and after giving effect to Section IV A, as of the end of each fiscal year, items of Company income, gain, loss, deduction and expense, shall be allocated among the Members pursuant to this Section IV B and as otherwise agreed to in writing by the parties for federal income tax purposes.  In accordance with Code Section 704(c) and the related Treasury Regulations, income, gain, loss and deduction with respect to any property contributed to the capital of the Company, solely for tax purposes, will be allocated among the Members so as to take account of any variation between the adjusted basis to the Company of the property for federal income tax purposes and the initial Book Value of the property.  If the Book Value of any Company asset is adjusted under clause "b." of the definition of Book Value, subsequent allocations of income, gain, loss and deduction with respect to that asset will take account of any variation between the adjusted basis of the asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) and the related Treasury Regulations.  Any elections or other decisions relating to allocations under this Section IV B will be made in any manner that the Manager determines reasonably reflects the purpose and intention of this Agreement. The allocations in or referred to by this Section IV B are solely for federal, state, territorial and local income tax purposes and shall not affect, or in any way be taken into account in computing, any Member's capital account or share of net profit or net loss or other items described in this Agreement.

C.     <u>Acknowledgement</u>.  The Members are aware of the income and other tax consequences of the allocations in or referred to by this Section IV and hereby agree to be bound by the provisions of this Section IV in reporting their shares of items of Company income, gain, loss, deduction and expense for tax purposes.

D.     <u>Certain Tax Related Definitions</u>.  For the purposes of this Agreement, unless the context otherwise requires:

(i)     "Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's capital account as of the end of the relevant fiscal year or other period, after giving effect to the following adjustments.

a.     Credit to such capital account any amounts which such Member is obligated to restore or is deemed to be obligated to restore pursuant to the penultimate sentence of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5);

b.     Debit to such capital account the item described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6); and

c.     Credit and debit to such capital account, in the sole and absolute discretion of the Manager, any other items required or permitted under Section 704(b) of the Code and Treasury Regulations thereunder.

(ii)     "Book Value" means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

a.     the initial Book Value of any asset contributed by a Member to the Company shall be the asset's gross fair market value at the time of the contribution;

8

**Debtor's Ex. 22, p. 008**

b.      the Book Value of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Manager in his reasonable judgment:

1.      if any adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company as of (x) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minims* capital contribution, or (y) the distribution by the Company to a Member of more than a *de minims* amount of Company property as consideration for an interest in the Company;

2.      As of the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); and

3.      Whenever else allowed under Treasury Regulations Section 1.704-1(b)(2)(iv)(f) or Proposed Treasury Regulations Section 1.704-1(b)(2)(iv)(s).

c.      The Book Value of any Company asset distributed to any Member will be the gross fair market value of the asset on the date of distribution; and

d.      The Book Value of Company assets will be increased or decreased to reflect any adjustment to the adjusted basis of the assets under Code Section 734(b) or 743(b), but only to the extent that the adjustment is taken into account in determining capital accounts under Treasury Regulations Section 1.704-1(b)(2)(iv)(m), provided that Book Values will not be adjusted hereunder to the extent that the Manager determines that an adjustment under clause "b." is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment under this clause "d."

e.      After the Book Value of any asset has been adjusted under this Section IV F(ii) above, Book Value will be adjusted by the depreciation taken into account with respect to the asset for purposes of computing net profit and net loss.

(iii)     "Treasury Regulations" means the Income Tax Regulations promulgated under the Internal Revenue Code, as such regulations may be amended from time to time (including corresponding provisions of successor regulations).

E.      Distributions.

(i)     The Manager, in his sole and absolute discretion, may at any time cause the Company to distribute to Members in accordance with their respective Interest any cash available for distribution with respect to each Interest.  The Manager shall reserve the right to make distributions to certain Classes of Interests and not to others, as well as certain Members and not to others.

(ii)     The Manager, in his sole and absolute discretion, may use the capital accounts of any Member and any class or type of Membership Interest for purposes that it deems appropriate, including funding or investing in companies related or unrelated to the Company subsidiary associated with a particular type of Membership Interest, and no interest or other benefits shall accrue to the Member whose capital account is so used.

(iii)    Distributions made pursuant to this Section IV E will be calculated separately for each Interest and will be distributed to the Members participating in that Interest based on their respective Interest, as applicable.

(iv)    The Members agree to be bound by all the provisions of this Section IV in reporting their share of Company income and loss for income tax purposes.

**Debtor's Ex. 22, p. 009**

F.      Distributions upon Liquidation of the Company.

(i)      At the termination of the Company and after the Company has satisfied or provided for the satisfaction of all the Company's debts and other obligations, the Company's assets will be distributed to the Members and any dissociated members whose interests have not been previously redeemed first, in discharge of their respective capital interests; and then, in proportion to the respective Membership Interest, as applicable.  Assets will be distributed only to Members holding Equity Interests in the Company, unless so determined by the Manager in his sole and absolute discretion.

(ii)      If the Company lacks sufficient assets to make the distributions described in the foregoing paragraph, the Company will make distributions in proportion to the amount of the respective capital interest of the Members and any dissociated members whose interests have not been previously redeemed, and all in accordance with each Member's respective Membership Interest.

SECTION V
MANAGEMENT OF THE COMPANY

A.      The business and affairs of the Company shall be managed by or under the direction of the Manager, who may exercise all powers of the Company and do all such lawful acts and things as are not by statute, the Certificate, or by this Agreement directed or required to be exercised and done by the Members having a right to vote ("Manager").  The Manager of the Company shall be: Liont, LLC.

B.      Without prejudice to such general powers, but subject to the same limitations, it is hereby expressly declared that the Manager shall have the following powers:

(i)      to conduct, manage and control the business and affairs of the Company and to make such rules and regulations therefor not inconsistent with the law, the Certificate or this Agreement, as the Manager shall deem to be in the best interest of the Company;

(ii)      to appoint and remove at his pleasure the Officers (if any), agents and employees of the Company, prescribe their duties and fix their compensation;

(iii)      to appoint boards or committees in accordance with Section K of this Article.

(iv)      to borrow money and incur indebtedness for the purposes of the Company, and to cause to be executed and delivered therefor, in the Company's name, promissory notes, bonds, debentures, deeds of trust, mortgages, pledges, hypothecations, or other evidences of debt and securities therefor;

(v)      to amend this Agreement, with the consent of the Members holding 51% of the Class A Voting Interests;

(vi)      to make all other arrangements and do all things which are necessary or convenient to the conduct, promotion or attainment of business, purposes or activities of the Company.

C.      The Manager shall hold office until his successor is elected and qualified, or his earlier death, dissolution, resignation or removal.

D.      A vacancy in the Manager shall be deemed to exist in case of the death, dissolution, resignation or removal of a Manager, if the authorized number of Managers is increased, or if the Members fail, at any meeting of Members at which any Manager or Managers are to be elected by those Members with Class A Voting Interest, to elect the full authorized number of Managers to be voted for at such meeting.  Unless the

10

**Debtor's Ex. 22, p. 010**

Members shall have elected a Manager to fill a vacancy, vacancies may be filed by (i) a majority of the Managers then in office, whether or not less than a quorum, or by a sole remaining Manager, or (ii) failing the election of a Manager pursuant to clause (i), by the Members with Class A Voting Interest.

E.      Any Manager may be removed, with or without cause, by the vote of Members holding not less than a majority of Class A Voting Interests represented and voting at a duly held meeting at which a quorum is present (which Members voting affirmatively also constitute at least a majority of the required quorum), or, in lieu of a meeting, by way of written consent of Members holding fifty-one percent (51%) of the Class A Voting Interests.

F.      No Manager shall receive any compensation for serving as a Manager, except that (i) a Manager shall receive such compensation as is otherwise determined by the Members holding Class A Voting Interest, and (ii) a Manager shall be reimbursed for reasonable and necessary expenses.

G.      Except as expressly set forth in this Agreement or required by law, no Manager shall be personally liable for any debt, obligation or liability of the Company, whether arising in contract, tort or otherwise, solely by reason of being a Manager of the Company.

H.      <u>Compensation and Fees</u>.

        (i)      No Member shall be paid any fee or other compensation whatsoever for services as a Manager or otherwise, whether ordinary or extraordinary, foreseen or unforeseen, rendered to or for the benefit of the Company, except as otherwise provided in this Section.

        (ii)      The Manager shall be paid such compensation for his services as shall be set forth by the majority holders Class A Voting Interest.

I.      <u>Certain Related Party Transactions Permitted</u>.   The Company may (i) employ or retain a Member or a person directly or indirectly related to or affiliated with an Member to render or perform a service on behalf of the Company, and/or (ii) contract to purchase property from a Member or a person directly or indirectly related to or affiliated with a Member, provided that the charges made for services rendered and materials furnished by such Member, person or persons must be reasonable and competitive with those charged by others in the same line of business and not so related.

J.      <u>No Resignation</u>.   Except pursuant to an authorized transfer of its entire Membership Interest in accordance with this Agreement, no Member shall have the right to resign from the Company as a Member prior to the dissolution and winding up of the Company without the prior written consent of the Manager. Any Member which purports to resign from the Company in violation of the foregoing provision or which has ceased for any reason to be a Member shall be liable to the Company and the other Members for any damages sustained by reason of such resignation or cessation.

K.      <u>Boards and Committees</u>. The Manager may appoint individuals to serve on boards or committees to assist the Manager in overseeing certain aspects of the Company's operations, including but not limited to appointing a board to oversee the Company's legal and regulatory compliance. The manner of functioning of said boards and committees will be as set forth by the Manager in a separate written resolution.

L.      <u>Indemnity</u>. Neither the Manager nor any of the Company's officers, directors, partners, employees, agents, affiliates, successors or assigns shall be liable to the Company or the Members for any loss or damage incurred by reason of any act performed or omitted in connection with the activities of the Company or in dealing with third parties on behalf of the Company, unless such act or omission was taken or omitted by such Manager or such other persons as noted above, in bad faith, and such act or omission constitutes fraud, gross negligence or willful breach of fiduciary duty.

11

**Debtor's Ex. 22, p. 011**

The Company, its receiver or its trustee, shall indemnify and save harmless the Manager and its officers, directors, partners, employees, agents, Affiliates, successors and assigns, including any guarantors of Company obligations (each of the foregoing being a "Covered Person"), from any claim, liability, loss, judgment or damage incurred by them by reason of any act performed or omitted to be performed in connection with the activities of the Company or in dealing with third parties on behalf of the Company, including costs and attorneys' fees (which attorneys' fees may be paid as incurred) and any amounts expended in the settlement of any claims of liability, loss or damage provided that the act or omission of the Covered Person is not found by a final, non-appealable ruling of a court of competent jurisdiction to have resulted from an act or omission of the Covered Person taken in bad faith and that constitutes fraud, gross negligence or willful breach of fiduciary duty by the Covered Person. The Company shall advance all sums required to indemnify and hold each Covered Person harmless as provided herein from the initiation of any claim against such Covered Persons, subject to acknowledgment in writing by such Covered Person of the obligation to reimburse the Company in the event that, following the entry of a final, non-appealable judgment, it is determined that the Company was not obligated to indemnify such Person pursuant to this Agreement. All judgments against the Company and a Covered Person, wherein the Covered Person is entitled to indemnification, must first be satisfied from Company assets before the Covered Person shall be responsible for such obligations. The Company shall not pay for any insurance covering liability of a Covered Person for actions or omissions for which indemnification is not permitted hereunder; provided, that nothing contained herein shall preclude the Company from purchasing and paying for such types of insurance, including extended coverage liability and casualty and worker's compensation, as would be customary for any person owning comparable property and engaged in a similar business or from naming the Manager and any Covered Person as additional insured parties thereunder. The provisions of this Section shall survive the termination of the Company.

## SECTION VI
## MEETING OF MEMBERS

A.    Meetings and Voting.  Notwithstanding anything to the contrary herein, only Members owning Class A Voting Interests in the Company, which confer voting rights, shall be entitled to vote with regards to any issue concerning the Company. Neither an assignee nor transferee may vote any Class A Voting Interest unless such assignee or transferee is admitted as a Member with voting rights. Furthermore, Members who only hold Economic Interests or Equity Interests in the Company shall not be entitled to vote on any issues concerning the Company.

B.    Special Meetings.  Special meetings of the Members may be called at any time by the Manager and shall be called at the written request of the holders of a majority of the Class A Voting Interest then outstanding and entitled to vote thereat. The meeting may be dispensed with if all Members who would have been entitled to vote on such action if such meeting was held consent in writing to the action to be taken.

C.    Place of Meetings.  All meetings of the Members shall be held in the Commonwealth of Puerto Rico at the principal office of the Company, or at such other places as shall be designated in the notices or waivers of notice of such meetings and may be held telephonically.

D.    Notice of Meetings.

(i)    Except as otherwise provided by statute, written notice of each meeting of the Members, stating the time when and the place where it is to be held, shall be served either personally, by mail, or by email or other electronic communication,, not less than ten (10) or more than fifty (50) days before the meeting, upon each Member of record entitled to vote at such meeting, or the Member's designated agent, and to any other member to whom the giving of notice may be required by law.  Notice of a meeting shall

**Debtor's Ex. 22, p. 012**

also state the purpose or purposes for which the meeting is called, and shall indicate that it is being issued by, or at the direction of, the person or persons calling the meeting. If mailed, such notice shall be directed to each such Member entitled to vote at the Member's address as it appears on the records of the Members of the Company, unless he or she has previously notified the Manager of the Company in writing that notices intended for the Member to be mailed to the Member's agent and/or some other address, in which case, it shall be mailed to the person and address designated in such request.

(ii)     Notice of any meeting need not be given to any person who may become a Member of record after the mailing of such notice and prior to the meeting, or to any Member who attends such meeting in person or by proxy, or to any Member who, in person or by proxy, submits a signed waiver of notice either before or after such meeting. Holders of non-voting Classes of Membership Interest shall only be permitted to attend Member meetings if they receive advance written permission of the Manager, which permission the Manager may withhold in his sole discretion.

(iii)     Whenever the vote of the Members at a meeting thereof is required or permitted to be taken in connection with any Company action, by any Section of this Agreement, the meeting and vote of the Members may be dispensed with, if all other Members who would have been entitled to vote upon the action if such meeting were held, shall consent in writing to such Company action being taken.

(iv)     Whenever any notice is required to be given under the provisions of this Section, or under the provisions of the Certificate, a waiver thereof in writing, signed by the person or persons entitled to said notice, whether before or after the time stated in said notice, shall be deemed equivalent thereto.

E.     Quorum.  Except as otherwise provided herein, or by the applicable provisions of the Delaware Code, or in the Certificate, at all meetings of the Members of the Company, the presence at the commencement of such meetings in person or by proxy of any number of Members holding of record a majority of the total number of the Class A Voting Interests of the Company then issued and outstanding and entitled to vote shall be necessary and sufficient to constitute a quorum for the transaction of any business. The withdrawal of any Member holding Class A Voting Interests after the commencement of a meeting shall have no effect on the existence of a quorum after a quorum has been established at such meeting.

F.     Voting.

(i)     Except as otherwise provided by the Certificate, any Company action to be taken by vote of the Members shall be authorized by a majority of votes cast at a meeting of Members at which a quorum is present by the holders of Class A Voting Interest.

(ii)     Each Member entitled to vote or to express consent or dissent without a meeting, may do so by proxy; provided, however, that the instrument authorizing such proxy to act shall have been executed in writing by the Member or the Member's attorney in fact thereunto duly authorized in writing.  No proxy shall be valid after expiration of eleven (11) months from the date of its execution, unless the person executing same directs in said proxy that it shall continue in force for a longer period of time.  Such instrument shall be exhibited to the Manager at the meeting and shall be filed with the records of the Company.

(iii)     Class A Voting Interest registered in the name of another entity, if entitled to be voted, may be voted by the President (or the equivalent) of said entity or a proxy appointed by the President of such other entity, unless some other person has been appointed to vote such shares pursuant to a by-law or a resolution of the board of directors (or the equivalent) of such other entity, in which case such person may vote such Class A Voting Interest. Any fiduciary may vote Class A Voting Interest registered in the name of such entity as such fiduciary, either in person or by proxy.

13

**Debtor's Ex. 22, p. 013**

(iv)     Any resolution in writing, signed by all the Class A Voting Interest, shall be and constitute action by such members to the effect therein expressed, with the same force and effect as if the same had been duly passed by fifty-one percent (51%) of the Class A Voting Interests at a duly called meeting of members of such resolution.

## SECTION VII
## EXCULPATION OF LIABILITY; INDEMNIFICATION

A.     <u>Liability of Members to the Company and One Another</u>.  No Member shall be liable for the debts, liabilities, contracts, or any other obligation of the Company, except to the extent expressly provided herein or under Delaware law, or as expressly provided otherwise.  No Member shall be liable for the debts or liabilities of any other Member.  With respect to the Company and its business and the enterprise established by this Agreement, no Member shall be liable, responsible or accountable in damages or otherwise to the Company or any other Member for any act performed by it (i) within the scope of the authority conferred on it by this Agreement and in good faith; (ii) based on the good faith opinion of legal counsel or other appropriate expert; or (iii) otherwise made in good faith.

B.     <u>Indemnification</u>.

(i)     The Company, its receiver or its trustee, shall indemnify any Member, employee or agent of the Company who was or is a party or is threatened to be made a party to a threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative, and whether formal or informal, other than an action by or in the right of the Company, by reason of the fact that such person is or was a Member, employee or agent of the Company, against expenses, including attorneys' fees, judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with the action, suit or proceeding, if the person acted in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner that such person reasonably believed to be in the best interests of the Company and with respect to a criminal action or proceeding, if such person had no reasonable cause to believe such person's conduct was unlawful.

(ii)     Any Member, employee or agent of the Company shall be indemnified against actual and reasonable expenses, including attorneys' fees, incurred by such person in connection with the action, suit or proceeding and any action, suit or proceeding brought to enforce the mandatory indemnification provided herein.  The Company shall advance all sums required to indemnify and hold each Member, employee or agent of the Company harmless as provided herein from the initiation of any claim against such persons, subject to acknowledgment in writing by such persons of the obligation to reimburse the Company in the event that, following the entry of a final, non-appealable judgment, it is determined that the Company was not obligated to indemnify such persons pursuant to this Agreement.

## SECTION VIII
## DISSOLUTION AND LIQUIDATION

A.     <u>Dissolution</u>.  The Company shall dissolve and its affairs shall be wound up on the first to occur of the following:

(i)     The written consent of the Members holding at least fifty-one percent of the Class A Voting Interests;

(ii)     The entry of a decree of judicial dissolution of the Company under Section 1801(4) of the Act or a judicial determination under Section 1805(5) of the Act.

(iii)     The sale of all or substantially all of the assets of the Company.

**Debtor's Ex. 22, p. 014**

The death, insanity, retirement, resignation, expulsion, bankruptcy, or dissolution of any Member, or the occurrence of any other event that terminates the continued membership of a Member in the Company, shall not cause a dissolution of the Company.

B.      Liquidation.  On dissolution of the Company, the Manager shall act as liquidator.  The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act.  The costs of liquidation shall be borne as a Company expense.  Until final distribution, the liquidator shall continue to manage the Company with all of the power and authority of the Manager.

## SECTION IX
## CONFIDENTIALITY; NON-DISCLOSURE; NON-SOLICITATION; AND NON-COMPETE

Each Member of the Company shall be required to execute, prior to the issuance of any Interest in the Company, a separate confidentiality, non-disclosure, non-solicitation and non-compete agreement.

## SECTION X
## BOOKS AND RECORDS

A.      Access to Books and Records.  To the fullest extent permissible under law, all non-voting Classes hereby waive any rights they may have under the laws of the State of Delaware, or otherwise, to access the books and records of the Company.

B.      No Access to Information.  Notwithstanding any right of access to the books and records of the Company that may be applicable, under no circumstances shall any books or records be deemed to include any books and records concerning the information deemed to be covered by the agreements executed pursuant to Section IX, and all non-voting Classes and Interests hereby irrevocably waive any access whatsoever to any of said information.  All non-voting Classes and Interests hereby covenant and agree that it is unreasonable and otherwise improper under all circumstances to demand access to said information.

## SECTION XI
## MISCELLANEOUS PROVISIONS

A.      Section Headings.  The Section headings and numbers contained in this Agreement have been inserted only as a matter of convenience and for reference, and in no way shall be construed to define, limit or describe the scope or intent of any provision of this Agreement.

B.      Severability.  The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

C.      Amendment.  This Agreement may be amended or revoked at any time, in writing, with the consent of the Manager or a vote of the Members holding fifty-one percent (51%) of the outstanding Class A Voting Interests. No change or modification to this Agreement shall be valid unless in writing and signed by the Manager or the Members entitled to vote.

D.      Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and shall inure to the benefit of the parties, and their respective distributees, heirs, successors and assigns.

**Debtor's Ex. 22, p. 015**

E.      Governing Law.  Regardless of the place where this Agreement may be executed by the Member, the rights and obligations of the Member, and any claims and disputes relating thereto, shall be subject to, governed by, construed and enforced in accordance with the laws of the State of Delaware.

F.      Power of Attorney.  Each Member hereby appoints the Manager to exercise the rights set forth in this Section XI F, acting individually, as the true and lawful representative of such Member and attorney-in-fact, in such Member's name, place and stead, to:

        (i)      Complete or correct, on behalf of such Member, all documents to be executed by such Member in connection with such Member's subscription for an Interest, including, without limitation, filling in or amending amounts, dates, and other pertinent information.

        (ii)      Make, execute, sign, acknowledge, swear to, and file: (i) any and all instruments, certificates, and other documents which may be deemed necessary or desirable to effect the winding-up and termination of the Company; (ii) any business certificate, fictitious name certificate, amendment thereto, or other instrument, agreement, or document of any kind necessary or desirable to accomplish the business, purpose and objectives of the Company, or required by any applicable federal, state, territorial, tribal or local law;  (iii) any counterpart of this Agreement to be entered into pursuant to this Agreement and any amendment to which such Member is a signatory; (iv) any amendments to this Agreement; (v) all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct its business; (vi) any and all certificates, documents, and other instruments necessary or desirable for purposes of applying to and complying with the Puerto Rico Department of Economic Development and Commerce tax incentives program; (vii) all other filings with agencies of the federal government, of any state, territorial, tribal or local government, or of any other jurisdictions, which the Manager considers necessary or desirable to carry out the purposes of this Agreement and the business of the Company.

        (iii)      This power of attorney granted pursuant to this Section XI F is a special power of attorney coupled with an interest and is irrevocable and shall survive the death, disability, or cessation of the existence as a legal entity of a Member; and shall survive the delivery of an assignment by a Member of the whole or any portion of its interest in the Company, except that, when the assignee thereof has been approved by the Manger for admission to the Company as a Member, the power of attorney shall survive the delivery of such assignment for the sole purpose of enabling the Manger to execute, acknowledge, and file any instrument necessary to effect such substitution.

G.      Waiver of Certain Rights.  All holders of non-voting Classes of Membership Interest irrevocably waive any right they may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

H.      Arbitration.

        (i)      Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The prevailing party shall recover its costs and expenses of arbitration and the collection of the award, including its reasonable attorney fees.

        (ii)      Solely upon agreement of the parties, the parties may dispense with administration by the American Arbitration Association and agree to self-administer any dispute or, alternatively, agree to have the dispute administered by any other agreed upon organization/tribunal and pursuant to any other agreed upon rules.

**Debtor's Ex. 22, p. 016**

      (iii)     Any self-administered arbitration shall be conducted in English before an arbitrator chosen by the parties and who shall reside in the Commonwealth of Puerto Rico.  Any certified mediator in Puerto Rico shall be deemed to have the minimum qualifications to arbitrate the dispute.  The parties shall split the arbitrator's fees, including any required prepayment deposit.  The arbitration shall be governed by the Commercial Rules of the American Arbitration Association ("AAA") including the Fast Track/Expedited Procedures except as modified herein.  Within 10 days of the written notice and a demand for arbitration, the parties shall provide to each other the names of 3 persons residing in Puerto Rico, who would be acceptable as arbitrators.  If the parties agree on any person, that person shall be chosen as the arbitrator.  If the agreed upon person declines to act as the arbitrator for any reason, the parties shall have 5 days to submit alternate names.  If the parties are unable to agree on an arbitrator within 25 days of the written notice and demand for arbitration, either party may proceed with AAA administered arbitration pursuant to clause (a) above.  If an arbitrator is agreed upon, the final arbitration hearing shall commence within 120 days of the arbitrator being chosen. The arbitrator shall hold an initial hearing, which may be held telephonically, and shall enter a scheduling order.  The parties may, but are not required, to mediate the case prior to the final hearing.  The parties may modify these rules to the extent there is agreement by the parties to do so.  The decision of the arbitrator shall be final and binding.  Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

I.    <u>Entire Agreement</u>.   This Agreement, including Schedules, supersedes all previous Operating Agreements entered into by the Company.

[SIGNATURES TO FOLLOW ON SCHEDULE A]

**Debtor's Ex. 22, p. 017**

## SCHEDULE A
### OF
### THE OPERATING AGREEMENT
### OF
### EVENTIDE CREDIT ACQUISITIONS, LLC

## MEMBER LISTING/INTEREST/PERCENTAGE INTEREST

| | Voting Interest | Date Issued | Economic Interest | Date Issued | Equity Interest | Date Issued |
|---|---|---|---|---|---|---|
| **Class A Membership Interest:** | | | | | | |
| **Member:** | | | | | | |
| Breakwater Holding, LLC | 1,000 Units (100%) | 1/1/2016 | 596 Units (59.6%) | 1/1/2016 | 596 Units (59.6%) | 1/1/2016 |
| Gallant Capital, LLC | N/A | | 255 Units (25.5%) | 7/15/2015 | 255 Units (25.5%) | 7/15/2015 |
| Justin Martorello | N/A | | 99 Units (9.9%) | 2/9/2015 | 99 Units (9.9%) | 2/9/2015 |
| Brian McFadden | N/A | | 15 Units (1.5%) 5 Units (0.5%) 20 Units (2.0%) | 2/9/2015 3/1/2015 | 15 Units (1.5%) 5 Units (0.5%) 20 Units (2.0%) | 2/9/2015 3/1/2015 |
| James Dowd | N/A | | 15 Units (1.5%) | 2/9/2015 | 15 Units (1.5%) | 2/9/2015 |
| Simon Liang | N/A | | 15 Units (1.5%) | 2/9/2015 | 15 Units (1.5%) | 2/9/2015 |

Date Amended: January 1, 2016

ACCEPTED AND AGREED

By its Manager, LIONT, LLC

By: _____
Name: Matt Martorello
Title: President

By GALLANT CAPITAL, LLC

By: _____
Name: Matt Martorello
Title: President of its Manager

By BREAKWATER HOLDING, LLC

By: _____
Name: Matt Martorello
Title: President of its Manager

**Debtor's Ex. 22, p. 018**

 Neutral

As of: March 2, 2020 10:38 PM Z

# *Williams v. Big Picture Loans, LLC*

United States Court of Appeals for the Fourth Circuit

May 7, 2019, Argued; July 3, 2019, Decided

No. 18-1827

**Reporter**

929 F.3d 170 *; 2019 U.S. App. LEXIS 19957 **

LULA WILLIAMS; GLORIA TURNAGE;
GEORGE HENGLE; DOWIN COFFY; FELIX
GILLISON, JR., on behalf of themselves and all
individuals similarly situated, Plaintiffs —
Appellees, v. BIG PICTURE LOANS, LLC;
ASCENSION TECHNOLOGIES, LLC,
Defendants — Appellants, and DANIEL
GRAVEL; JAMES WILLIAMS, JR.; GERTRUDE
MCGESHICK; SUSAN MCGESHICK;
GIIWEGIIZHIGOOKWAY MARTIN; MATT
MARTORELLO, Defendants.NATIONAL
CONGRESS OF AMERICAN INDIANS;
NATIONAL INDIAN GAMING ASSOCIATION;
NATIONAL CENTER FOR AMERICAN
INDIAN ENTERPRISE DEVELOPMENT;
CONFERENCE OF TRIBAL LENDING
COMMISSIONERS; ONLINE LENDERS
ALLIANCE, Amici Supporting Appellant.
DISTRICT OF COLUMBIA; STATE OF
CONNECTICUT; STATE OF HAWAII; STATE
OF ILLINOIS; STATE OF IOWA; STATE OF
MAINE; STATE OF MARYLAND; STATE OF
MASSACHUSETTS; STATE OF MINNESOTA;
STATE OF NEW JERSEY; STATE OF NEW
YORK; STATE OF NORTH CAROLINA; STATE
OF PENNSYLVANIA; STATE OF VERMONT;
STATE OF VIRGINIA; CENTER FOR
RESPONSIBLE LENDING, Amici Supporting
Appellee.

**Prior History: [**1]** Appeal from the United
States District Court for the Eastern District of
Virginia, at Richmond. (3:17-cv-00461-REP—
RCY). Robert E. Payne, Senior District Judge.

*Williams v. Big Picture Loans, LLC, 329 F. Supp.
3d 248, 2018 U.S. Dist. LEXIS 127476 (E.D. Va.,
July 27, 2018)*

**Disposition:** REVERSED AND REMANDED
WITH INSTRUCTIONS.

## Core Terms

Tribe, Entities, tribal, district court, immunity,
weighed, sovereign immunity, lending, arms,
economic development, stated purpose, factors,
burden of proof, employees, arm-of-the-tribe,
funds, tribal member, self-governance, non-tribal,
general fund, documents, manage, loans,
reinvestment, day-to-day, consumers, formation,
purposes, parties, vendor

## Case Summary

Williams v. Big Picture Loans, LLC

## Overview

HOLDINGS: [1]-In Virginia residents' action against entities formed under tribal law, claiming that payday loans they obtained through the entities carried unlawfully high interest rates, the entities were entitled to sovereign immunity as arms of the Tribe because, inter alia, they were both organized through resolutions by the Tribe Council, the Tribe stated a purpose for each entity that related to broader goals of tribal self-governance separate from the entity's commercial activities, the Tribe's general fund benefited significantly from the revenue generated, the Tribe unequivocally stated its intention to share its immunity in the entities' formation documents, and a finding of no immunity would weaken the Tribe's ability to govern itself, become self-sufficient, and develop economic opportunities for its members.

## Outcome

Judgment reversed and remanded.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

Civil Procedure > Appeals > Standards of Review > De Novo Review

*HN1*[⬇] **Standards of Review, Clearly Erroneous Review**

On appeal from a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(1)*, the court of appeals reviews the district court's factual findings with respect to jurisdiction for clear error and the legal conclusion that flows therefrom de novo. A factual finding is clearly erroneous if the court is left with the definite and firm conviction that a mistake has been committed.

Governments > Native Americans > Tribal Sovereign Immunity

*HN2*[⬇] **Native Americans, Tribal Sovereign Immunity**

Indian tribes are domestic dependent nations that exercise inherent sovereign authority over their members and territories. Tribal immunity may remain intact when a tribe elects to engage in commerce using tribally created entities, i.e., arms of the tribe.

Evidence > Burdens of Proof > Allocation

Governments > Native Americans > Tribal Sovereign Immunity

*HN3*[⬇] **Burdens of Proof, Allocation**

Given the unique attributes of sovereign immunity, the burden of proof falls to an entity seeking immunity as an arm of the state, even though a plaintiff generally bears the burden to prove subject matter jurisdiction. The same burden allocation applies to an entity seeking immunity as an arm of the tribe. Placing the burden of proof on the defendant entity aligns with the reasoning that sovereign immunity is akin to an affirmative defense and gives proper recognition to the similarities between state sovereign immunity and tribal sovereign immunity. Moreover, such an allocation recognizes that an entity that is formally distinct from the tribe should only be immune from suit to the extent that it is an arm of the tribe. Unlike the tribe itself, an entity should not be given

**Debtor's Ex. 23, p. 002**

a presumption of immunity until it has demonstrated that it is in fact an extension of the tribe. Once a defendant has done so, the burden to prove that immunity has been abrogated or waived would then fall to the plaintiff. Finally, as a practical matter, it makes sense to place the burden on defendants as they will likely have the best access to the evidence needed to demonstrate immunity.

Governments > Native Americans > Tribal Sovereign Immunity

## HN4[⬇]  Native Americans, Tribal Sovereign Immunity

In an arm-of-the-tribe immunity analysis, non-exhaustive factors are: (1) the method of the entities' creation; (2) their purpose; (3) their structure, ownership, and management; (4) the tribe's intent to share its sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) the policies underlying tribal sovereign immunity and the entities' connection to tribal economic development, and whether those policies are served by granting immunity to the economic entities. Like the Ninth Circuit, the U.S. Court of Appeals for the Fourth Circuit adopts the first five Breakthrough factors to analyze arm-of-the-tribe sovereign immunity and allow the purpose of tribal immunity to inform our entire analysis. The sixth Breakthrough factor, whether the purposes underlying tribal sovereign immunity would be served by granting an entity immunity, overlaps significantly with the first five Breakthrough factors. Thus, the extent to which a grant of arm-of-the-tribe immunity promotes the purposes of tribal sovereign immunity is too important to constitute a single factor and will instead inform the entire analysis.

Governments > Native Americans > Tribal Sovereign Immunity

## HN5[⬇]  Native Americans, Tribal Sovereign Immunity

In considering the method of creation of the economic entities, in an arm-of-the-tribe immunity analysis, the court focuses on the law under which the entities were formed. Formation under tribal law weighs in favor of immunity.

Governments > Native Americans > Tribal Sovereign Immunity

## HN6[⬇]  Native Americans, Tribal Sovereign Immunity

The second Breakthrough factor, in an arm-of-the-tribe immunity analysis, incorporates both the stated purpose for which the entities were created as well as evidence related to that purpose. The stated purpose need not be purely governmental to weigh in favor of immunity as long as it relates to broader goals of tribal self-governance.

Governments > Native Americans > Tribal Sovereign Immunity

## HN7[⬇]  Native Americans, Tribal Sovereign Immunity

The third Breakthrough factor, in an arm-of-the-tribe immunity analysis, examines the structure, ownership, and management of the entities, including the amount of control the tribe has over the entities. Relevant to this factor are the entities' formal governance structure, the extent to which the entities are owned by the tribe, and the day-to-day management of the entities.

Governments > Native Americans > Tribal Sovereign Immunity

## HN8[⬇]  Native Americans, Tribal Sovereign Immunity

The fourth Breakthrough factor, in an arm-of-the-tribe immunity analysis, assesses the tribe's intent to extend its immunity to the entities. In some cases, the tribal ordinances or articles of incorporation creating the entities will state whether the tribe intended the entities to share in the tribe's immunity.

Governments > Native Americans > Tribal Sovereign Immunity

*HN9*[⤓]  **Native Americans, Tribal Sovereign Immunity**

The fifth Breakthrough factor, in an arm-of-the-tribe immunity analysis, considers the financial relationship between the tribe and the entities. As the district court recognized, whether a judgment against an entity would reach the tribe's assets is a relevant consideration. However, direct tribal liability for an entity's actions is neither a threshold requirement for immunity nor a predominant factor in the overall analysis. Instead, courts consider the extent to which a tribe depends on the entity for revenue to fund its governmental functions, its support of tribal members, and its search for other economic development opportunities. If a judgment against the entity would significantly impact the tribal treasury, this factor will weigh in favor of immunity even if the tribe's liability for an entity's actions is formally limited.

Governments > Native Americans > Tribal Sovereign Immunity

*HN10*[⤓]  **Native Americans, Tribal Sovereign Immunity**

Where a judgment against the entities could significantly impact the tribe's treasury, this factor weighs in favor of immunity even though the tribe's formal liability is limited.

Governments > Native Americans > Tribal Sovereign Immunity

*HN11*[⤓]  **Native Americans, Tribal Sovereign Immunity**

An entity's entitlement to tribal immunity cannot and does not depend on a court's evaluation of the respectability of the business in which a tribe has chosen to engage.

Constitutional Law > State Sovereign Immunity > Abrogation of Immunity

Governments > Native Americans > Tribal Sovereign Immunity

*HN12*[⤓]  **State Sovereign Immunity, Abrogation of Immunity**

It is Congress—not the courts—that has the power to abrogate tribal immunity.

**Counsel:** ARGUED: William H. Hurd, TROUTMAN SANDERS, LLP, Richmond, Virginia, for Appellants.

Matthew W.H. Wessler, GUPTA WESSLER PLLC, Washington, D.C., for Appellees.

ON BRIEF: David N. Anthony, Timothy J. St. George, TROUTMAN SANDERS, LLP, Richmond, Virginia; Justin A. Gray, ROSETTE, LLP, Mattawan, Michigan, for Appellants.

Kristi C. Kelly, Andrew Guzzo, Casey S. Nash, KELLY & CRANDALL, PLC, Fairfax, Virginia; Alexandria Twinem, GUPTA WESSLER PLLC, Washington, D.C., for Appellees.

Pilar M. Thomas, LEWIS ROCA ROTHGERBER

CHRISTIE LLP, Tucson, Arizona; Derrick Beetso, NATIONAL CONGRESS OF AMERICAN INDIANS, Washington, D.C., for Amici National Congress of American Indians, National Indian Gaming Association, and National Center for American Indian Enterprise Development.

Sarah J. Auchterlonie, BROWNSTEIN HYATT FARBER SCHRECK LLP, Denver, Colorado; Brendan Johnson, Sioux Falls, South Dakota, Luke A. Hasskamp, ROBINS KAPLAN LLP, Minneapolis, Minnesota, for Amicus Conference of Tribal Lending Commissioners. [**2]

Brian Foster, Michael Nonaka, Luis Urbina, COVINGTON & BURLING LLP, Washington, D.C., for Amicus Online Lenders Alliance.

William Corbett, Diane M. Standaert, CENTER FOR RESPONSIBLE LENDING, Durham, North Carolina, for Amicus Center for Responsible Lending.

Karl A. Racine, Attorney General, Loren L. AliKhan, Solicitor General, Caroline S. Van Zile, Deputy Solicitor General, Richard S. Love, Senior Assistant Solicitor General, OFFICE OF THE ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA, Washington, D.C.; George Jepsen, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF CONNECTICUT, Hartford, Connecticut; Lisa Madigan, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF ILLINOIS, Chicago, Illinois; Janet T. Mills, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF MAINE, Augusta, Maine; Maura Healey, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE COMMONWEALTH OF MASSACHUSETTS, Boston, Massachusetts; Gurbir S. Grewal, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF NEW JERSEY, Trenton, New Jersey; Joshua

H. Stein, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF NORTH CAROLINA, Raleigh, North Carolina; [**3] Thomas J. Donovan, Jr., Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF VERMONT, Montpelier, Vermont; Russell A. Suzuki, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF HAWAII, Honolulu, Hawaii; Tom Miller, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF IOWA, Des Moines, Iowa; Brian E. Frosh, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF MARYLAND, Baltimore, Maryland; Lori Swanson, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF MINNESOTA, St. Paul, Minnesota; Barbara D. Underwood, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF NEW YORK, New York, New York; Josh Shapiro, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE COMMONWEALTH OF PENNSYLVANIA, Harrisburg, Pennsylvania; Mark R. Herring, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE COMMONWEALTH OF VIRGINIA, Richmond, Virginia, for Amici District of Columbia, State of Connecticut, State of Hawaii, State of Illinois, State of Iowa, State of Maine, State of Maryland, Commonwealth of Massachusetts, State of Minnesota, State of New Jersey, State of New York, State of North Carolina, Commonwealth of Pennsylvania, [**4] State of Vermont, and Commonwealth of Virginia.

**Judges:** Before GREGORY, Chief Judge, AGEE, and DIAZ, Circuit Judges. Chief Judge Gregory wrote the opinion, in which Judge Agee and Judge Diaz joined.

**Opinion by:** GREGORY

# Opinion

[*174]  GREGORY, Chief Judge:

The Lac Vieux Desert Band of the Lake Superior Chippewa Indians ("the Tribe") formed two business entities under tribal law. This appeal arises from a suit brought by five Virginia residents against those entities, Big Picture Loans, LLC and Ascension Technologies, LLC (collectively "the Entities"). In the underlying action, the Virginia residents claimed that they obtained payday loans on the internet from Big Picture and that those loans carried unlawfully high interest rates. The Entities moved to dismiss the case for lack of subject matter jurisdiction on the basis that they are entitled to sovereign immunity as arms of the Tribe. After concluding that the Entities bore the burden of proof in the arm-of-the-tribe analysis, the district court found that the Entities failed to prove that they are entitled to tribal sovereign immunity.

The Entities now appeal that decision. Although the district court properly placed the burden of proof on the Entities claiming tribal [**5] sovereign immunity, we hold that the district court erred in its determination that the Entities are not arms of the Tribe. We therefore reverse the district court's decision and remand the case with instructions to dismiss the complaint.

I.

The Tribe entered the business of online lending in 2011 when it organized Red Rock Lending as a tribally owned LLC. Two members of the Tribe managed Red Rock, and the Tribe was its sole member. Red Rock provided loans to consumers from its offices on the Reservation and was subject to the Tribe's Tribal Financial Services Regulatory Code, which is enforced by the Tribal Financial Services Regulatory Authority. Red Rock contracted with Bellicose, a non-tribal LLC, to provide vendor management services, compliance management assistance, marketing material development, and risk modeling and data analytics development. Matt Martorello, a non-tribe member, was its founder and chief executive officer.[1]

Two years after the formation of Red Rock, in February 2013, the New York Department of Financial Services sent cease and desist letters to several lending entities, including Red Rock, accusing them of "using the Internet to offer and originate illegal payday [**6] loans to New York consumers, in violation of New York's civil and criminal usury laws." *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs., 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013)*. The Tribe and entities sought a preliminary injunction based in part on a claim that New York's regulation would infringe on tribal sovereignty. The district court denied the request, however, finding that the entities had not shown a likelihood of success on the merits because their online lending to New York customers constituted off-reservation activity and could thus be properly regulated under New York's anti-usury law. *See id. at 360-61*. The Second Circuit affirmed this decision in October 2014. *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs., 769 F.3d 105 (2d Cir. 2014)*.

Around the same time, the Tribe formed three entities central to this appeal. On August 26, 2014, months before the Second Circuit's decision in *Otoe-Missouria*, the Tribe organized Big Picture as an independent tribal lending entity that would ultimately consolidate the activities of its other lending entities, including Red Rock. On [*175] February 5, 2015, the Tribe Council formed another entity, Tribal Economic Development Holdings, LLC ("TED"), to operate the Tribe's current and future lending companies. Also on February 5, 2015, the Tribe formed Ascension as a subsidiary of TED for the purpose of engaging in marketing, [**7] technological, and vendor

---

[1] Bellicose assigned its interest in the contract to SourcePoint, a Bellicose subsidiary, in 2012. J.A. 158.

services to support the Tribe's lending entities. The Tribe was the sole member of TED, and TED became Big Picture's and Ascension's sole member.

Also in early 2015, Martorello and the Tribe agreed on a basic framework for the sale of Bellicose: a seller-financed transaction with non-fixed payments over a seven-year term, with any outstanding amount due to be forgiven at the end of that term. Prior to that time, the Tribe and Martorello had engaged in multiple conversations about the potential sale of Martorello's consulting companies to the Tribe, which would allow the Tribe to engage in online lending without relying on outside vendors for support services. The seller-financier would be Eventide Credit Acquisitions, LLC, a company managed and majority-owned by multiple entities of which Martorello was the president. In short, Eventide would provide a $300 million loan to TED, which TED would then use to purchase Bellicose.

After continuing negotiations, the parties reached a final agreement in September 2015, memorializing the terms of the deal in a loan agreement and a promissory note. Under those terms, Big Picture would first make a distribution to TED **[**8]** of its gross revenues. TED would then distribute 2% of those revenues to the Tribe and reinvest an additional 2% of gross revenues in growing Big Picture's loan portfolio. The parties agreed to increase the monthly distribution to the tribe from 2% to 3% in September 2016, and the agreement also provided that the percentage distribution would increase to 6% when half the loan had been repaid. In January 2016, the Tribe completed its purchase of Bellicose and acquired all of Bellicose's data and software. By September 2017, TED had distributed approximately $20 million in loan payments to Eventide and nearly $5 million to the Tribe.

TED now oversees both Big Picture and Ascension, and all three entities have their headquarters on the Reservation. Big Picture currently employs 15 tribal members on the Reservation, and Ascension employs 31 individuals, most of whom work outside the Reservation. An Intratribal Servicing

Agreement sets forth the relationship between Big Picture and Ascension, with Ascension handling certain day-to-day aspects of the loan operations for Big Picture. Michelle Hazen and James Williams, both Tribe Council members, co-manage all three companies. Hazen is also **[**9]** chief executive officer of Big Picture, but Ascension's president is a non-tribal member.

In June 2017, Plaintiffs Lula Williams, Gloria Turnage, George Hengle, Dowin Coffy, and Felix Gillison, Jr. brought a putative class action against Big Picture and Ascension, as well as individual defendants who are not parties to this appeal. Plaintiffs sought declaratory and injunctive relief, alleging that Big Picture charges interest rates on its loans that are substantially-50 times—higher than would be allowed if Virginia law were applicable. Before the district court, the Entities appeared specially to claim that they are entitled to tribal sovereign immunity, submitting documentation in support of their assertion that they are arms of the Tribe.

Following jurisdictional discovery, the district court rejected the Entities' invocation of arm-of-the-tribe immunity. In reaching its decision, the district court determined that the driving force behind the **[*176]** formation of Big Picture and Ascension was "to shelter outsiders from the consequences of their otherwise illegal actions." J.A. 222. The district court placed the burden of proof for the immunity issue on the Entities. The Entities timely appealed. **[**10]**

II.

*HN1*[⬆] On appeal from a motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(1)*, we review "the district court's factual findings with respect to jurisdiction for clear error and the legal conclusion that flows therefrom de novo." *In re KBR, Inc., Burn Pit Litig., 744 F.3d 326, 333 (4th Cir. 2014)*. A factual finding is clearly erroneous if we are "left with the definite and firm conviction that a mistake has been committed." *United States v. Chandia, 675 F.3d*

*329, 337 (4th Cir. 2012)*.

HN2[↑] "Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories." *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe, 498 U.S. 505, 509, 111 S. Ct. 905, 112 L. Ed. 2d 1112 (1991)* (quoting *Cherokee Nation v. Georgia, 30 U.S. 1, 17, 8 L. Ed. 25 (1831))*. The Supreme Court has recognized that tribal immunity may remain intact when a tribe elects to engage in commerce using tribally created entities, *i.e.*, arms of the tribe, but the Court has not articulated a framework for determining whether a particular entity should be considered an arm of the tribe. *See Inyo Cty. v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony, 538 U.S. 701, 704, 705 n.1, 123 S. Ct. 1887, 155 L. Ed. 2d 933 (2003)* (holding that a tribe and its wholly-owned gaming corporation, an arm of the tribe, were not "persons" who could sue under *42 U.S.C. § 1983*). This Court has recognized the existence of arm-of-the-tribe immunity but has likewise never applied the doctrine to determine whether an entity qualifies as an arm of a tribe. *See United States v. Bly, 510 F.3d 453, 465 (4th Cir. 2007)* (acknowledging the Supreme Court's ruling in *Inyo County*).

III.

A.

As an initial matter, the parties dispute the proper [**11] allocation of the burden of proof in the arm-of-the-tribe analysis. The district court held that Big Picture and Ascension, as the parties claiming arm-of-the-tribe immunity, bore the burden of proving their entitlement to immunity. Big Picture and Ascension contend that this was in error, arguing that the tribal documents establishing the Entities should create a presumption of immunity to be rebutted by Plaintiffs. Plaintiffs argue, by contrast, that the district court properly looked to arm-of-the-state doctrine in reaching its decision as to the burden of proof. We agree with Plaintiffs on this point.

In determining the proper burden allocation in this context, this Court's arm-of-the-state doctrine guides our analysis. HN3[↑] Given the unique attributes of sovereign immunity, we have held that the burden of proof falls to an entity seeking immunity as an arm of the state, even though a plaintiff generally bears the burden to prove subject matter jurisdiction. *Hutto v. S.C. Retirement Sys., 773 F.3d 536, 543 (4th Cir. 2014)*. The same burden allocation applies to an entity seeking immunity as an arm of the tribe. Placing the burden of proof on the defendant entity aligns with our reasoning in *Hutto* that sovereign immunity is "akin to an affirmative [**12] defense" and gives proper recognition to the similarities between state sovereign immunity and tribal sovereign immunity. *Id.* Moreover, such an allocation recognizes that an entity that is formally distinct from [*177] the tribe should only be immune from suit to the extent that it is an arm of the tribe. Unlike the tribe itself, an entity should not be given a presumption of immunity until it has demonstrated that it is in fact an extension of the tribe. Once a defendant has done so, the burden to prove that immunity has been abrogated or waived would then fall to the plaintiff. Finally, as a practical matter, it makes sense to place the burden on defendants like Ascension and Big Picture, as they will likely have the best access to the evidence needed to demonstrate immunity. For these reasons, the district court properly determined that Ascension and Big Picture must prove that they are entitled to tribal immunity as arms of the Tribe by a preponderance of the evidence.

B.

Turning to HN4[↑] the arm-of-the-tribe immunity analysis, the district court applied the factors set forth in *Breakthrough Management Group, Inc. v. Chukchansi Gold Casino & Resort, 629 F.3d 1173 (10th Cir. 2010)*. Those non-exhaustive factors are: (1) the method of the entities' creation; (2) their purpose; (3) their structure, [**13] ownership, and management; (4) the tribe's intent to share its sovereign immunity; (5) the financial relationship

between the tribe and the entities; and (6) the policies underlying tribal sovereign immunity and the entities' "connection to tribal economic development, and whether those policies are served by granting immunity to the economic entities." *Id. at 1187*. The Ninth Circuit has adopted the first five *Breakthrough* factors to analyze arm-of-the-tribe immunity and also considers the central purposes underlying the doctrine of tribal sovereign immunity. *See White v. Univ. of Cal., 765 F.3d 1010, 1026 (9th Cir. 2014)*. The parties did not and do not dispute that these factors should guide our analysis.

Like the Ninth Circuit, we adopt the first five *Breakthrough* factors to analyze arm-of-the-tribe sovereign immunity and allow the purpose of tribal immunity to inform our entire analysis. The sixth *Breakthrough* factor, whether the purposes underlying tribal sovereign immunity would be served by granting an entity immunity, overlaps significantly with the first five *Breakthrough* factors. Thus, the extent to which a grant of arm-of-the-tribe immunity promotes the purposes of tribal sovereign immunity is too important to constitute a single factor and **[**14]** will instead inform the entire analysis.

Here, we find no clear error in the district court's factual findings. Reviewing the district court's legal conclusions de novo, however, we hold that the Entities are entitled to sovereign immunity as arms of the Tribe and therefore reverse the district court's decision.

## 1. Method of Creation

*HN5*[↑] In considering the "method of creation of the economic entities," we focus on the law under which the entities were formed. *Breakthrough, 629 F.3d at 1191-92*. Formation under tribal law weighs in favor of immunity. *Id. at 1191*; *see also White, 765 F.3d at 1025*. Here, as the district court found, Big Picture and Ascension were both organized through resolutions by the Tribe Council, exercising powers delegated to it by the Tribe's

Constitution, and the Entities operated pursuant to the Tribe's Business Ordinance. It is therefore undisputed that Big Picture and Ascension were "created under tribal law," which "weighs in favor of the conclusion that these entities are entitled to tribal sovereign immunity." *Breakthrough, 629 F.3d at 1191*. Accordingly, this factor weighs in favor of tribal sovereign immunity for both Entities. *See Breakthrough, 629 [*178] F.3d at 1191-92* (finding first factor weighed in favor of immunity where entities were created under tribal law).

## 2. Purpose

*HN6*[↑] The second *Breakthrough* [**15]** factor incorporates both the stated purpose for which the Entities were created as well as evidence related to that purpose. *629 F.3d at 1192-93*. The stated purpose need not be purely governmental to weigh in favor of immunity as long as it relates to broader goals of tribal self-governance. For example, in *Breakthrough*, the Tenth Circuit found that this factor weighed in favor of immunity where the stated purpose of a casino was to financially benefit the tribe and enable it to engage in various governmental functions—even though the entities themselves engaged in commercial activities. *Id. at 1192*; *see also Michigan v. Bay Mills Indian Cmty., 572 U.S. 782, 789, 134 S. Ct. 2024, 188 L. Ed. 2d 1071 (2014)* (holding that tribal immunity extends to "suits arising from a tribe's commercial activities, even when they take place off Indian lands").

Here, the district court accurately noted that the Tribe has stated a purpose for each Entity that relates to broader goals of tribal self-governance separate from the Entity's commercial activities, *i.e.*, tribal economic development and self-sufficiency. Big Picture's stated purpose, included in its articles of organization, is to "engage in the business of operating one or more Tribal lending business(es)" as part of the Tribe's "strategic economic development efforts" **[**16]** aimed at "diversify[ing] the economy of the Tribe's

Reservation in order to improve the Tribe's economic self-sufficiency." J.A. 365, 370. Similarly, Ascension's stated purpose, also included in its articles of organization, is to "engage in the business of operating one or more Tribal marketing, technology and vendor service business(es)," thereby fulfilling the same tribal economic development efforts. J.A. 380, 387. Thus, the stated purpose of the Entities supports the conclusion that this factor weighs in favor of immunity.

In holding otherwise, the district court reasoned: (1) the formation of the businesses was "for the real purpose of helping Martorello and Bellicose to avoid liability, rather than to help the Tribe start a business"; and (2) Big Picture and Ascension "do not fulfill their stated purposes in practice." J.A. 206-07. Neither rationale holds up.

The record indeed shows that the Tribe created Big Picture and Ascension following the Second Circuit's adverse ruling and the Consumer Financial Protection Bureau's enforcement action against another online lender, Western Sky, that claimed immunity based on its relationship with another tribe. *See* J.A. 1321-22 (Martorello **[**17]** emailing Tribal Council members and the Tribe's counsel regarding his concerns about the CFPB and New York enforcement actions); J.A. 1329 (emails after the enforcement actions between Martorello and the head of the Tribal Council scheduling a time to discuss "a potential bigger deal for [the Tribe] learning the Servicing business"). However, the evidence does not support the district court's conclusion that the creation of the Entities was only or primarily intended to benefit Martorello or that the creation of Big Picture and Ascension was solely the product of Martorello's design and urging. Indeed, the district court recognized that both Martorello *and* the Tribe "looked for ways to restructure Red Rock's lending operations to reduce exposure to liability." J.A. 201. The email communications among Martorello, the Tribe Council members, and the Tribe also indicate that the Tribe and Martorello were both interested in avoiding a potential CFPB enforcement action so

that the **[\*179]** lending operations could continue. As the district court found, the evidence "does not indicate that Martorello himself has received any substantial economic benefit from Big Picture." J.A. 212.

While Martorello **[\*\*18]** certainly stood to benefit from the creation of Big Picture and Ascension and the continuation of the Tribe's lending operation, so too did the Tribe. Thus, the district court's conclusion that the "real purpose" of Big Picture and Ascension was simply to protect Martorello does not hold up (and is in fact contradicted by other findings in the district court's order). Unlike the tribe in *People ex rel. Owen v. Miami Nation Enters*, a California Supreme Court case relied upon heavily by the district court, the Tribe here did not create Big Picture and Ascension solely, or even primarily, to protect and enrich a non-tribe member. *See* 2 Cal. 5th 222, 211 Cal. Rptr. 3d 837, 386 P.3d 357, 378 (Cal. 2016). Rather, the Tribe created Big Picture and Ascension so that its lending operations could continue, along with the economic benefits associated with that continuation. The fact that the Tribe created Big Picture and Ascension in part to reduce exposure to liability does not necessarily invalidate or even undercut the Tribe's stated purpose, *i.e.*, tribal economic development. Indeed, in order to reach its stated goal, the Tribe may have deemed it necessary to reduce its exposure to liability. The district court therefore erred in finding this factor weighed **[\*\*19]** against tribal sovereign immunity on this basis.

The district court's reasoning as to the fulfillment of the Entities' stated purposes was also in error. The district court determined that Big Picture and Ascension do not fulfill their stated purposes, because: (1) the Tribe's explanation as to how revenue from Big Picture is used is too vague, and the revenue received by the Tribe is a sliver of Big Picture's total earnings; (2) Ascension does not employ Tribe members; and (3) Ascension and Big Picture's compensation structures indicate that the Entities primarily benefit individuals and entities

outside of the Tribe.

As to the first conclusion, the district court found that the money generated by Big Picture constitutes more than 10% of the Tribe's general fund and may contribute more than 30% of the fund within the next few years. Despite this evidence that Big Picture's revenue constituted a significant percentage of the Tribe's general fund, the district court nevertheless deemed the information provided by the Tribe as to the specific uses of those funds to be too vague. Without pointing to any evidence casting doubt on Hazen's assertions, the district court hypothesized that Big [**20] Picture's revenue might not actually fund the "governmental essential services" identified by Tribe Council member Hazen. J.A. 208.

The district court's conclusion on this front was wrong for three reasons. First, one of the primary purposes underlying tribal immunity is the promotion of tribal self-governance, which counsels against courts demanding exacting information about the minutiae of a tribe's budget. That these funds constitute a significant portion of the Tribe's general fund in and of itself suggests that Big Picture's revenue has contributed to the Entities' stated purpose of tribal economic development.

Second, even applying the district court's exacting standard, the record shows—and the district court recognized—the specific Tribal activities that Big Picture's revenue has funded. Indeed, the district court explicitly recognized that Big Picture's funds had been used, in whole or in part, to:

&bull; meet requirements necessary to secure $14.1 million in financing for the Tribe's new health clinic;

[*180] &bull; refinance casino debt;
&bull; fund college scholarships and pay for educational costs for members such as student housing, books, school supplies and equipment;

&bull; create home ownership [**21] opportunities for members through tribally purchased homes;

&bull; subsidize tribal members' home purchases and rentals;
&bull; provide a bridge loan to complete the new tribal health clinic that offers services to the regional community;
&bull; fund new vehicles for the Tribe's Police Department;
&bull; fund an Ojibwe language program and other cultural programs;
&bull; provide foster care payments for eligible children, propane assistance, and assistance for family care outside of the community; cover burial and other funeral expenses for members' families;
&bull; fund renovations and new office space for the Tribe's Social Services Department; fund youth activities;
&bull; renovate a new space for the Tribe's Court and bring in telecom services for remote court proceedings;
&bull; and fund tribal elder nutrition programs and tribal elder home care and transport services. J.A. 179-80.

In deeming the Tribe's evidence "far too general," the district court appeared to require a breakdown of exactly what percentage of the Tribe's budget went to each of these activities and exactly what percentage of the funding for these activities constituted Big Picture revenue. Such a requirement is at odds with policy considerations of tribal self-governance [**22] and economic development.

The district court also erred in determining that this factor weighed against tribal sovereign immunity on the basis that the Tribe did not receive enough of a benefit from Big Picture compared with Eventide. The district court found that the promissory note between TED and Eventide limits the funds available to the Tribe to 5% of Big Picture's total monthly earnings—a 3% monthly distribution and a 2% reinvestment amount. The district court also found that Big Picture has given the Tribe a little under $5 million (about $3 million in distributions and $2 million for reinvestment) and that TED has

Williams v. Big Picture Loans, LLC

made loan repayments to Eventide of approximately $20 million. On these facts, the district court concluded that "the Tribe has only received about 20% of Big Picture's total revenue, still a relatively small percentage." J.A. 210. The district court further recognized that Big Picture will not owe Eventide anything after the note terminates in seven years. Nevertheless, based on these facts, the district court concluded that the "revenue distribution disparity" between Big Picture and Eventide was so great that it weighed against a finding of immunity. We disagree. [**23]

As an initial matter, the district court cited to no authority suggesting that a tribe must receive a certain percentage of revenue from a given entity for the entity to constitute an arm of the tribe. Indeed, the evidence suggests that the Tribe would not have been able to finance a loan operation on its own and thus entered a loan agreement with a non-tribal entity in order to obtain revenue both now and in the future. Indeed, when the loan was originally signed, the Tribe received a one-time reinvestment of $1.3 million. J.A. 1346. Currently, the Tribe receives 5% of Big Picture's gross revenue distribution, and this percentage will increase to 8% upon [*181] payment of half the loan.[2] Finally, after seven years, the remaining balance will be forgiven, with all net revenue to the Tribe. At that time, in only a few years, not only will all revenue belong to the Tribe, but it will own outright all of the components of the commercial lending enterprise.

Thus, the facts of this case are a far cry from the circumstances in *Miami Nation*, where the evidence indicated that the tribe received barely any revenue, and the entities could not identify the percentage of profits from the lending operations [**24] that flowed to the tribe or how those profits were used. *386 P.3d at 378*. Even more importantly, policy considerations of tribal self-governance and self-

determination counsel against second-guessing a financial decision of the Tribe where, as here, the evidence indicates that the Tribe's general fund has in fact benefited significantly from the revenue generated by an entity.

In addition to its concerns about revenue sharing, the district court found the Entities' employment opportunities and compensation structures to be problematic. While the district court recognized that Big Picture's employees consist mainly of the Tribe's members, it noted that Ascension does not employ any Tribe members, instead relying on employees who previously worked at Bellicose. The district court reasoned that this "composition may have been justified when Ascension was formed in 2015 because the company needed individuals with certain technical knowledge for the required support services, and Bellicose's employees were the perfect candidates." J.A. 211. The district court found the current lack of tribal employees unacceptable, however, and faulted the Tribe for doing "little more than encourag[ing] tribal members [**25] to pursue educational opportunities that would allow them to work for Ascension and Big Picture in the future." J.A. 211. At the same time, the district court rejected Plaintiffs' argument that the Tribe should have started training programs for tribal members to work at the company, because there was no indication that the Tribe had the capacity or funds to do so. The district court nevertheless found that Ascension had failed to contribute to the Tribe's stated purposes for the Entities, because Ascension only supported Big Picture's "minimal revenue generation" and did not provide hiring opportunities for tribal members. J.A. 211.

While employment of tribe members may be an indication that an entity is contributing to a tribe's self-governance or economic development, it is not required for this factor to weigh in favor of immunity. As the district court noted, there is no evidence that the Tribe had the capacity to train its members to take on skilled employment at Ascension, but the district court nonetheless faulted

---

[2] This total includes a distribution of 6% of Big Picture's gross revenues to the Tribe plus 2% for reinvestment into Big Picture. *See* J.A. 1607.

the Tribe for not doing more to increase tribal employment. More importantly, Ascension's support of Big Picture's lending operations, which the evidence indicates [**26] is important to Big Picture's operations, is directly related to achievement of the Tribe's stated purposes.

As to the compensation structures at Ascension and Big Picture, the district court found it problematic that Tribe Council member Hazen has been paid more than other tribal members at Big Picture and that Ascension's employees are paid more than Big Picture's employees. The district court determined that these differences "lead to the conclusion that Big Picture and Ascension primarily [*182] benefit individuals and entities outside the Tribe, or only one tribal leader, both of which are inconsistent with the goal of economic development." J.A. 212. The Entities accurately point out that Hazen is chief executive officer of Big Picture and that it should therefore not be surprising that she is paid more than other Tribe members at the company. The district court also found that Big Picture's employees require less technical training than Ascension employees, which may naturally lead to a pay differential. At any rate, the district court erroneously determined that these pay differences necessitate a conclusion that the Entities *primarily* benefit individuals and entities outside the Tribe. [**27] Such a conclusion disregards the substantial revenue that the Tribe has received (and will continue to receive) in the form of payouts and reinvestments.

In sum, because Big Picture and Ascension serve the purposes of tribal economic development and self-governance, this factor weighs in favor of immunity for both Entities.

### 3. Control

*HN7*[⬆] The third *Breakthrough* factor examines the structure, ownership, and management of the entities, "including the amount of control the Tribe has over the entities." *629 F.3d at 1191*. Relevant to this factor are the entities' formal governance

structure, the extent to which the entities are owned by the tribe, and the day-to-day management of the entities. Here, the district court found that this factor weighed against a finding of immunity for both Entities. We conclude, however, that this factor weighs in favor of immunity for Big Picture and only slightly against a finding of immunity for Ascension.

Big Picture is an LLC managed by two Tribe Council members, Hazen and Williams, who were appointed by majority vote of the Tribe Council and must be removed in the same way. As co-managers, Hazen and Williams are granted broad authority to bind Big Picture individually and "to [**28] do and perform all actions as may be necessary or appropriate to carry out the business of Big Picture including but not limited to the power to enter into contracts for services, to manage vendor relationships, and to manage personnel issues and affairs of Big Picture." J.A. 458. Hazen and Williams are precluded only from selling Big Picture's assets or waiving its sovereign immunity. J.A. 450-51. The district court found that the Tribe has a substantial role in the operations of Big Picture, "as the entity employs a number of tribal members"-including Hazen as its chief executive officer—and "conducts all of its operations on the Reservation." J.A. 214. On these facts, the district court correctly recognized that this "general structure is to assure that Big Picture is answerable to the Tribe at every level, which supports immunity." J.A. 215. Despite this conclusion, the district court found that this factor ultimately weighed against immunity for Big Picture, because its structure was outweighed by Ascension's substantial role in Big Picture's operations. We disagree.

The district court's determination rested on two underlying conclusions: "(1) that the Tribe's formal oversight [**29] of Big Picture is meaningless given Ascension's dominant role in Big Picture's lending operations; and (2) that, assuming Ascension has such a role, that entity is not controlled by the Tribe." J.A. 216.

As to the first conclusion, while Ascension does manage many of the day-to-day activities associated with Big Picture's lending, an entity's decision to outsource management in and of itself does not weigh against tribal immunity, as the district court recognized. *See Miami Nation, [\*183] 386 P.3d at 373*. The Intratribal Servicing Agreement, which lays out the relationship between the two Entities, indicates that Big Picture remains in control of its essential functions. Indeed, the Intratribal Servicing Agreement expressly forbids Ascension from engaging in origination activities, executing loan documentation, or approving the issuance of loans to consumers. The Agreement assigns Ascension the duties to give "pre-qualified leads" to Big Picture and to provide the "necessary credit-modeling data and risk assessment strategies" used by Big Picture to decide whether to issue a loan. J.A. 419. But the Agreement also provides that the "criteria used to extend funds to individual borrowers will remain within the sole and absolute [\*\*30] discretion" of Big Picture and that Big Picture "shall execute all necessary loan documentation." J.A. 420. The district court discounted these facts and instead speculated that, given Ascension's responsibility to identify borrowers based on its credit-modeling system, "it does not appear that Big Picture has much discretion to exercise when it receives recommendations or documents from Ascension." J.A. 216-17. But the Agreement itself provides that Big Picture may always "within [its] sole and absolute discretion" change the criteria used to extend funds when and if it deems such a change appropriate. J.A. 420. In other words, the fact that Big Picture currently chooses to utilize Ascension's criteria does not mean that it does not have the power to choose differently in the future.

The district court recognized that Hazen and Williams have been actively involved in discussing items like Big Picture's operating budget and employee handbook and have approved forms sent by employees concerning a variety of policies and procedures. J.A. 217. The district court also discounted this evidence, however, finding that Williams's testimony that he was not knowledgeable about certain Big Picture [\*\*31] subsidiaries or customer service representatives demonstrated that the Tribe did not actually control Big Picture. J.A. 218. Given the evidence of the Tribe's broad power, through Hazen and Williams, over Big Picture's important business decisions and management and evidence that Hazen and Williams in fact exercised that power with frequency, the district court erred in concluding that Big Picture was not controlled by the Tribe simply because of Hazen and Williams's outsourcing of certain day-to-day management tasks and their lack of knowledge of some aspects of the lending operation. Indeed, even assuming Hazen and Williams lack knowledge as to certain aspects of the operation and did outsource aspects of day-to-day management to a non-tribal entity, such an arrangement would not in itself weigh against immunity, given the other evidence of Tribal control. *See Miami Nation, 386 P.3d at 373*.

As to Ascension, we agree with the district court that the control question is closer. Like Big Picture, Ascension is owned by its sole member, TED, and Hazen and Williams serve as managers of the company with a Tribe Council vote required for their removal. J.A. 218. Unlike Big Picture, Ascension has a non-tribal president, [\*\*32] Brian McFadden, and it conducts most of its business outside the Reservation with non-tribe members. J.A. 218. McFadden must obtain Hazen's or Williams's approval for "changes in operations, personnel, or distributions," and the evidence demonstrates that Ascension employees have submitted request and approval forms to Hazen and Williams for certain business decisions. J.A. 219. However, Hazen and Williams have delegated to McFadden the authority to approve Ascension's strategic direction, execute documents on the company's behalf, open and manage Ascension's [\*184] bank accounts, and oversee all matters necessary for the daily management of Ascension. Additionally, the Loan Agreement prevents TED and Ascension from modifying the Intratribal Servicing Agreement or terminating or replacing

any managers or officers of Ascension without Eventide's consent. Given Hazen and Williams's delegation of authority as to certain aspects of Ascension, this evidence, on balance, tends to weigh slightly against a finding of immunity for Ascension.

In sum, this factor weighs in favor of immunity for Big Picture and slightly against a finding of immunity for Ascension.

### 4. Tribal Intent

HN8[⬆] The fourth *Breakthrough [**33]* factor assesses the tribe's intent to extend its immunity to the entities. In some cases, the tribal ordinances or articles of incorporation creating the entities will state whether the tribe intended the entities to share in the tribe's immunity. That was the case here. The Tribe unequivocally stated its intention to share its immunity in Big Picture and Ascension's formation documents. Before the district court, Plaintiffs conceded that this factor weighed in favor of Big Picture and Ascension but argued that the district court should accord it the least weight out of all the factors. The district court rejected this argument but nevertheless concluded that this factor weighed against a finding of immunity "because to do otherwise is to ignore the driving force for the Tribe's intent to share its immunity." J.A. 222. This conclusion was in error, because the district court improperly conflated the purpose and intent factors. This factor focuses solely on whether the Tribe intended to provide its immunity to the Entities. As Plaintiffs conceded, it did. This factor thus weighs in favor of immunity for both Entities.

### 5. Financial Relationship

HN9[⬆] The fifth *Breakthrough* factor considers the [**34] financial relationship between the tribe and the entities. *629 F.3d at 1194*. As the district court recognized, whether a judgment against an entity would reach the tribe's assets is a relevant consideration. However, direct tribal liability for an

entity's actions "is neither a threshold requirement for immunity nor a predominant factor in the overall analysis." *Miami Nation, 386 P.3d at 373*. Instead, courts consider the extent to which a tribe "depends . . . on the [entity] for revenue to fund its governmental functions, its support of tribal members, and its search for other economic development opportunities." *Breakthrough, 629 F.3d at 1195*. If a judgment against the entity would significantly impact the tribal treasury, this factor will weigh in favor of immunity even if the tribe's liability for an entity's actions is formally limited. *Id.*

Here, as the district court recognized, the Tribe would not be directly liable for a judgment against Big Picture or Ascension. This fact alone has little significance in the analysis. Rather, the relevant inquiry evaluates the extent to which the Tribe depends on these Entities for revenue to fund its governmental functions and other tribal development. The district court found that this factor weighed against immunity, [**35] because the actual effect on the Tribe of a reduction in Big Picture's revenue "appears to be insubstantial" and Big Picture's revenue "does not play as important a role in the Tribe's general fund as in other cases where this factor supported immunity." J.A. 225.

Neither the cases cited by the district court nor the record support the [*185] proposition that the Tribe does not significantly depend on Big Picture's revenue. Given that 10% of the Tribe's general fund comes from Big Picture, a judgment against Big Picture or Ascension could in fact significantly impact the tribal treasury, which is at the heart of this analysis, even if it is unclear what the exact repercussions of that impact might be on tribal members and services.[3] HN10[⬆] Where, as here, a judgment against the Entities could significantly impact the Tribe's treasury, this factor weighs in favor of immunity even though the Tribe's formal

---

[3] As the district court acknowledged, a judgment against Ascension could "drastically reduce Big Picture's revenue." J.A. 226. Thus, a judgment against either Entity could impact the Tribe's treasury.

Williams v. Big Picture Loans, LLC

liability is limited. *See Breakthrough, 629 F.3d at 1195*.

C.

In summary, we find that all of the factors weigh in favor of immunity for Big Picture and all but one of the factors weigh in favor of immunity for Ascension. Accordingly, both Entities are entitled to immunity as arms of the Tribe.

We reach this conclusion with due consideration **[**36]** of the underlying policies of tribal sovereign immunity, which include tribal self-governance and tribal economic development as well as protection of "the tribe's monies" and the "promotion of commercial dealings between Indians and non-Indians." *Breakthrough, 629 F.3d at 1187-88*. The evidence here shows that the Entities have increased the Tribe's general fund, expanded the Tribe's commercial dealings, and subsidized a host of services for the Tribe's members. Accordingly, the Entities have promoted "the Tribe's self-determination through revenue generation and the funding of diversified economic development." *Breakthrough, 629 F.3d at 1195*. A finding of no immunity in this case, even if animated by the intent to protect the Tribe or consumers, would weaken the Tribe's ability to govern itself according to its own laws, become self-sufficient, and develop economic opportunities for its members.

Although Plaintiffs stress the injuries they allegedly face as a result of the Entities' commercial activities, *HN11*[⬆] an entity's entitlement to tribal immunity cannot and does not depend on a court's evaluation of the respectability of the business in which a tribe has chosen to engage. Accordingly, the potential merit of the borrowers' claims against Big Picture **[**37]** and Ascension—and the lack of a remedy for those alleged wrongs—does not sway the tribal immunity analysis. *HN12*[⬆] It is Congress—not the courts—that has the power to abrogate tribal immunity. *See Bay Mills, 572 U.S. at 800* ("[I]t is fundamentally Congress's job, not ours, to determine whether or how to limit tribal

immunity.").

Because a proper weighing of the factors demonstrates by a preponderance of the evidence that the Entities are indeed arms of the Tribe, Big Picture and Ascension are entitled to tribal sovereign immunity.

IV.

For the foregoing reasons, we reverse the district court's order and remand with instructions to grant the Entities' motion to dismiss for lack of subject matter jurisdiction.

*REVERSED   AND   REMANDED   WITH INSTRUCTIONS*

---

End of Document

**In the Matter Of:**

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.

# LULA WILLIAMS

*October 04, 2018*



**Debtor's Ex. 24, p. 001**

Case 20-04008-elm   Doc 90-3   Filed 05/25/20   Entered 05/25/20 16:23:47   Desc
Exhibits 18 through 28   Page 130 of 325
LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

_____

LULA WILLIAMS, et al.,

      Plaintiffs,

      v.          Civil Case No. 3:17-cv-461 (REP)

BIG PICTURE LOANS, LLC, et al.,

      Defendants.
_____

VIDEOTAPED DEPOSITION OF LULA WILLIAMS

October 4, 2018

Richmond, Virginia

HALASZ REPORTING & VIDEO

1011 E. Main Street, Suite 100
Richmond, VA 23219
(804) 708-0025

Reported by:  Heather R. Gunn

Debtor's Ex. 24, p. 002

                    Videotaped deposition of LULA WILLIAMS, taken by

and before Heather R. Gunn, Notary Public in and for the

Commonwealth of Virginia at large, pursuant to the Federal

Rules of Civil Procedure, and by Notice to take deposition,

commencing at 10:00 a.m., October 4, 2018, at the offices of

the Virginia Poverty Law Center, 919 East Main Street, Suite

610, Richmond, Virginia 23219.


Appearances:

            KELLY & CRANDALL PLC
            By:  CASEY NASH, ESQ.,
            3925 Chain Bridge Road, Suite 202
            Fairfax, VA 22030
            attorney, counsel for the Plaintiffs


            ARMSTRONG TEASDALE LLP
            By:  RICHARD SCHEFF, ESQ.,
            By:  KATHARINE LADD, ESQ.,
            1500 Market Street, 12th Floor, East Tower
            Philadelphia, PA 19102
            attorneys, counsel for Matt Martorello


Also present:

            Marc Langelier, Videographer - Halasz Reporting

Debtor's Ex. 24, p. 003

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

# I N D E X

**Deponent:**              **Examination:**              **Page:**

**Ms. Williams**

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                                    Page 5

# E X H I B I T S

| Exhibit: | Description: | Page: |
|----------|--------------|-------|
| 1 | Complaint | 6 |
| 2 | Responses | 21 |
| 3 | Agreement | 35 |
| 4 | Complaint | 72 |
| 5 | Complaint | 72 |
| 6 | Complaint | 72 |
| 7 | Complaint | 73 |
| 8 | Responses | 79 |
| 9 | E-mail | 80 |
| 10 | E-mail | 89 |
| 11-32 | E-mails | 91 |

Debtor's Ex. 24, p. 005

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

1          THE VIDEOGRAPHER:  Today is October 4,

2   2018.  We are going on the record at 10:03 a.m.

3   This is the videotaped deposition of Lula

4   Williams.  The cause is Lula Williams, et al.,

5   plaintiffs v. Big Picture Loans, LLC, et al.,

6   defendants, Civil Action No. 3:17-CV-461 (REP)

7   in the U.S. District Court for the Eastern

8   District of Virginia, Richmond Division.

9          This deposition is being held at the

10  Virginia Poverty Law Center, 919 East Main

11  Street, Richmond, Virginia 23219.  The court

12  reporter is Heather Gunn.  The videographer is

13  Marc Langelier both representing Halasz

14  Reporting & Video in Richmond, Virginia.  Will

15  counsel please identify themselves for the

16  record.

17          MR. SCHEFF:  Richard L. Scheff.  I'm

18  representing Matt Martorello.

19          MS. NASH:  And Casey Nash on behalf of the

20  plaintiff.

21          THE VIDEOGRAPHER:  Please --

22          MS. LADD:  I'm Katy Ladd representing Matt

23  Martorello.

24          THE VIDEOGRAPHER:  Please swear in the

25  witness.

Case 20-04008-elm   Doc 90-3   Filed 05/25/20   Entered 05/25/20 16:23:47   Desc
Exhibits 18 through 28   Page 135 of 325
LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

Page 5

```
 1                    LULA WILLIAMS

 2            was sworn and deposed as follows:

 3                       EXAMINATION

 4   BY MR. SCHEFF:

 5       Q    Ms. Williams, good morning.

 6       A    Good morning.

 7       Q    My name is Richard Scheff and I represent

 8   Matt Martorello.  And are you aware that you are

 9   here today to have your deposition taken?

10       A    Yes.

11       Q    Okay.  And I know that you've had your

12   deposition taken before; isn't that right?

13       A    Yes.

14       Q    And that was about a month ago or so?

15       A    Yeah.

16       Q    Okay.  So this is going to be the same

17   format.  I'm going to ask you questions, and please

18   give me truthful answers because you've been placed

19   under oath.  Do you understand that?

20       A    Uh-huh.

21       Q    Okay.  And when you respond to one of my

22   questions, if you could respond verbally as opposed

23   to saying uh-huh --

24       A    Oh, okay.  Right.

25       Q    -- because the court reporter is preparing
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                                Page 6

```
 1   a transcript --

 2        A    Okay.

 3        Q    And that's the official record of this

 4   proceeding.

 5        A    Okay.

 6        Q    Okay?

 7        A    You can't do uh-huh.

 8        Q    Well you can but when you do, I'll ask you

 9   to say something.  If at any time you don't

10   understand a question that I ask, just tell me.

11        A    Okay.

12        Q    And I'll try and clarify it.

13        A    Okay.

14        Q    If you answer a question, I'm going to

15   assume you understand it.

16        A    Okay.

17        Q    Okay?  And if you want to take a break,

18   just let us know and you will be given an

19   opportunity to take a break.

20        A    Okay.

21        Q    Okay.  Do you have any questions of me?

22        A    No.

23        Q    All right, good.  So who -- let me show

24   you what we're going to mark as Exhibit 1.

25        (The Complaint was marked Exhibit No. 1.)
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

```
 1    BY MR. SCHEFF:

 2         Q    Ms. Williams, have you ever seen this

 3    document before?

 4         A    Yes.

 5         Q    And when's the first time you saw it?

 6         A    During my last case.

 7         Q    Your last case?

 8         A    Yes.

 9         Q    When you say your last case, do you mean

10    when you were deposed about a month ago?

11         A    Yes.

12         Q    Okay.  So according to the information

13    that I have, you were deposed on September 6, 2018,

14    so about a month ago, and it was in connection with

15    a matter relating to a company called Think Finance.

16    Does that refresh your recollection?

17         A    Yes.

18         Q    Okay.  If you look in the caption of

19    Exhibit 1 -- and when I say the caption, it's this

20    section on page one at the top -- Think Finance's

21    name does not appear there.  Okay.  Do you agree

22    with that?

23         A    Yes.

24         Q    Okay.  So again, I want to ask you have

25    you ever seen this document before?
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

Page 8

```
 1        A    No.

 2        Q    Never seen this document before.  Okay.

 3   Do you see that your name is on the upper, left-hand

 4   corner as one of the plaintiffs?

 5        A    Yes.

 6        Q    Okay.  And this case was filed in June of

 7   2017, so about 15 months ago, 16 months ago?

 8        A    Yes.

 9        Q    All right.  Did you see the complaint --

10   this is the complaint.  See it says class action

11   complaint on the first page?

12        A    Uh-huh.

13        Q    Did you see this complaint before it was

14   filed?

15        A    No.

16        Q    Okay.  Now if you look through the

17   complaint and what I would like you to do is take a

18   look at paragraph three.  So it starts on page two.

19   So if you turn the page, you will see paragraph

20   three around the middle of the page.

21        A    Uh-huh.

22        Q    And I just want you to read paragraph

23   three to yourself.  Okay?

24        A    (Peruses document.)

25        Q    And just so we're clear, paragraph three
```

Debtor's Ex. 24, p. 010

Case 20-04008-elm    Doc 90-3    Filed 05/25/20    Entered 05/25/20 16:23:47    Desc
Exhibits 18 through 28    Page 139 of 325
LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                                    Page 9

1    is the one that your hand is over.  That's the one

2    I'd like you to read but you can read anything you

3    would like in this complaint of course, but the one

4    I want to refer you to is paragraph three.

5         A    Okay.

6         Q    So do you have any personal knowledge

7    which supports what is stated in paragraph three?

8         A    Yes.

9         Q    Okay.  What's that?

10        A    No, I don't.

11        Q    Okay.

12        A    I don't have the knowledge of this.

13        Q    That's fine.  Would you also please take a

14   look at paragraph 14?  It's on page five.  And

15   again, if you could read that to yourself.

16        A    Did you say 13?

17        Q    I'm sorry, paragraph 14.

18        A    Fourteen.

19        Q    Right there in the middle of the page.

20   Just read that to yourself.

21        A    (Peruses document.)  Okay.

22        Q    And do you have any personal knowledge

23   about any of the facts that are alleged in paragraph

24   14?

25        A    No.

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

1      Q    Okay.  Now if you'd go please to page

2  eight, paragraph 28.  Again, it's roughly in the

3  middle of the page and if you could just read that

4  to yourself.

5      A    (Peruses document.)  Okay.

6      Q    Do you have any personal knowledge --

7      A    No.

8      Q    -- of the facts that are alleged in

9  paragraph 28?

10     A    No, I don't.

11     Q    Okay.  Have you ever heard of Scott

12  Tucker?

13     A    No.

14     Q    No?  Do you know anything about

15  Mr. Tucker's lending operation?

16     A    No.

17     Q    Okay.  Do you have any idea whether

18  Mr. Tucker's lending operation is the same as Big

19  Picture Loans?

20     A    I have no idea.

21     Q    Okay.  So as you're sitting here today, is

22  this the first time you are seeing this complaint?

23     A    Yes.

24     Q    Okay.  Now, take a look, please, at

25  paragraph 34.  It's on page nine sort of right in

Case 20-04008-elm   Doc 90-3   Filed 05/25/20   Entered 05/25/20 16:23:47   Desc
Exhibits 18 through 28   Page 141 of 325
LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018
Page 11

1    the middle of the page.  If you could, again, just

2    read that to yourself.

3        A    What?

4        Q    Paragraph 34.

5        A    Thirty-four.  (Peruses document.)  Okay.

6        Q    You read that?

7        A    Uh-huh.

8        Q    Do you have any personal knowledge of the

9    facts that are alleged in paragraph 34?

10        A    No, I don't.

11        Q    Before today, have you ever heard of Matt

12    Martorello?

13        A    No.

14        Q    Okay.  And as far as you know, you've

15    never met Mr. Martorello?

16        A    No.

17        Q    You've never spoken to him?

18        A    No.

19        Q    Okay.  Have you heard of a company called

20    Bellicose Capital?

21        A    Never heard it.

22        Q    Never heard of it.  And what about

23    SourcePoint VI, have you ever heard of that company?

24        A    No.

25        Q    Okay.  Have you ever heard of Big Picture

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                                    Page 12

```
 1   Loans?

 2        A    Yes.

 3        Q    You've heard of Big Picture Loans?

 4        A    Uh-huh.

 5        Q    Okay.  Is that because you took some loans

 6   from Big Picture?

 7        A    Yes.

 8        Q    Okay.  And they were in 2016; is that

 9   correct?

10        A    Yes.

11        Q    All right.  Have you ever heard of

12   Ascension Technologies?

13        A    No, no.

14        Q    All right.  Okay.  Who's representing you

15   in this lawsuit?

16        A    Kelly & Crandall.

17        Q    Kelly & Crandall?

18        A    Uh-huh.

19        Q    And when did you retain Kelly & Crandall

20   approximately?  I'm not looking for an exact date

21   unless you have one.

22        A    I think it was 2016.

23        Q    2016?

24        A    Uh-huh.

25        Q    Was it before or after you took out loans
```

Case 20-04008-elm   Doc 90-3   Filed 05/25/20   Entered 05/25/20 16:23:47   Desc
Exhibits 18 through 28   Page 143 of 325
LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

Page 13

```
 1    from Big Picture Loans?

 2         A    Before.

 3         Q    It was before.  So Kelly & Crandall

 4    represented you before the loans that you got from

 5    Big Picture?

 6         A    Yes.

 7         Q    Okay.  How did you -- how did Kelly &

 8    Crandall come to be your lawyer?

 9         A    I found them and gave them a call.

10         Q    I'm sorry, you found them and gave them a

11    call?

12         A    Yeah.

13         Q    Okay.  And you --

14         A    For another case that I had.

15         Q    For another case that you had?

16         A    (Deponent nods head.)

17         Q    And what case was that?

18         A    It was Allied Cash Advance.

19         Q    Cash Advance?

20         A    Uh-huh.

21         Q    And that is a -- is that another company?

22         A    Allied.

23         Q    I'm sorry, say it again.

24         A    Allied Cash Advance.

25         Q    Allied Cash Advance?
```

Case 20-04008-elm   Doc 90-3   Filed 05/25/20   Entered 05/25/20 16:23:47   Desc
Exhibits 18 through 28   Page 144 of 325
LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018
Page 14

1       A       (Deponent nods head.)

2       Q       And that's another lawsuit that Kelly &

3    Crandall brought on your behalf?

4       A       Yes.

5       Q       And did you take a loan from Allied Cash

6    Advance?

7       A       Yes, it was a revolving loan.

8       Q       A revolver loan?

9       A       Uh-huh.

10      Q       Okay.  So like a revolving line of credit?

11      A       Yeah.

12      Q       And when did you take that loan?  Again,

13   just ballpark the date if you can remember.

14      A       I can't remember.

15      Q       Okay.  And so at the point in time that

16   you borrowed money from Big Picture Loans -- strike

17   that.  Does Len Bennett represent you?

18      A       I never heard of him.

19      Q       Never heard of him, okay.  And -- okay.

20   So, Ms. Williams, I want to sort of take a couple of

21   steps back and talk about sort of the rules of the

22   deposition, just want to make sure that we're all on

23   the same page.

24      A       Okay.

25      Q       So I'm going to ask you questions and you,

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                          Page 15

1   as you've been providing to me, you're going to

2   provide me truthful responses, right?

3        A    Yes.

4        Q    Okay.  Have you taken any medication in

5   the last 24 or 48 hours which affects your memory?

6        A    No.

7        Q    Okay.  And are -- and again, I'm not

8   looking for specifics on this but are you generally

9   in good health?

10       A    Yes.

11       Q    Okay.  Where do you live?

12       A    I live on Mechanicsville.

13       Q    I'm sorry?

14       A    On Mechanicsville.

15       Q    Mechanicsville?

16       A    Turnpike, uh-huh.

17       Q    Okay.  And how long have you lived at that

18  address?

19       A    Thirteen years.

20       Q    And do you own or rent?

21       A    Rent.

22       Q    And do you live there alone or with other

23  people?

24       A    Alone.

25       Q    Okay.  And how long have you lived there

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                        Page 16

```
 1   alone?

 2        A    Since 2008.

 3        Q    2008?  All right.  Now are you currently

 4   employed?

 5        A    No.

 6        Q    When was the last time you were employed

 7   outside the home?

 8        A    I think it was in 2000 -- 2002.

 9        Q    2002?  And how were you employed at that

10   time?

11        A    I was at -- worked at hotel.

12        Q    Worked at a hotel?

13        A    Laundry.

14        Q    I'm sorry, laundry you said?

15        A    (Deponent nods head.)

16        Q    Okay.  And for approximately how long had

17   you worked at the hotel?

18        A    Five years.

19        Q    I'm sorry, say it again?

20        A    Five.

21        Q    Five years?  What was the name of the

22   hotel?

23        A    Wyndham.

24        Q    And was that here in Richmond?

25        A    Yes.
```

Debtor's Ex. 24, p. 018

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

```
 1        Q    Okay, good.  All right.  Do you have an

 2   e-mail address?

 3        A    Yes.

 4        Q    And what is your e-mail address?

 5        A    Javion06@gmail.com.

 6        Q    Say it again, please?

 7        A    Javion06@gmail.com.

 8        Q    Javion?

 9        A    Uh-huh.

10        Q    06@gmail.com.

11        A    At gmail, uh-huh.

12        Q    Okay.

13        A    That's 102906@gmail.com.

14        Q    102906 at --

15        A    Uh-huh.

16        Q    -- gmail.com.  How long have you had that

17   gmail address?

18        A    It's my grandson's.

19        Q    Your grandson's.

20        A    But I'm using it, yes.

21        Q    And what is his name?

22        A    Javion Wiggins.

23        Q    J?

24        A    J-a-v-i-o-n.

25        Q    Oh, Javion, okay.  Javion Wiggins.
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

```
 1       A    Uh-huh.

 2       Q    W-i-g-g-i-n-s?

 3       A    Uh-huh.

 4       Q    How old is your grandson?

 5       A    He's twelve.

 6       Q    Okay.  How long have you been using his

 7   e-mail address?

 8       A    Well, it's my daughter that uses it.  It's

 9   been about two years.

10       Q    And --

11       A    Or three years.

12       Q    I'm sorry, I didn't mean to interrupt you.

13   What is your daughter's name?

14       A    Miracle Williams.

15       Q    Miracle Williams, okay.  So do you have

16   access to that e-mail account or does your grandson

17   or daughter give you information when something

18   comes in for you on that e-mail account?

19       A    My daughter does.

20       Q    She gives it to you?

21       A    Yeah.

22       Q    Do you know you how to operate the

23   computer yourself?

24       A    No.

25       Q    Okay.  And do you have a telephone that
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

```
 1   accesses the internet?

 2        A    I think so.  I think it does.

 3        Q    Okay.  And do you access the internet

 4   through your telephone?

 5        A    No.

 6        Q    You do not?

 7        A    No.

 8        Q    So -- and again, I just -- I'm not -- I

 9   don't want to put words in your mouth.  I just want

10   to try and understand.  Would I understand it

11   correctly that to the extent that you are accessing

12   the internet, someone is doing it on your behalf --

13        A    Yeah.

14        Q    -- either your daughter on your grandson?

15        A    Yes.

16        Q    Okay.  Anyone else?

17        A    No.

18        Q    Other than the e-mail address that you've

19   given us a few minutes ago, is there any other

20   e-mail address that you've ever used?

21        A    LulaWilliams102906@ -- 06@gmail.com.

22        Q    At gmail.com?

23        A    Uh-huh.

24        Q    And when did you have that e-mail address

25   if you can recall?
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                                    Page 20

```
 1       A    About nine months, eight, nine months.

 2       Q    You had it for approximately eight or nine

 3  months?

 4       A    Uh-huh.

 5       Q    Do you still have it now?

 6       A    Yes.

 7       Q    Okay.  So you got it about eight or nine

 8  months ago?

 9       A    Uh-huh.

10       Q    And who -- do you use that account

11  yourself?

12       A    Very, very rarely.

13       Q    Okay.  Who uses it for you if anyone?

14       A    My daughter, Miracle Williams.

15       Q    Miracle, okay.  Thank you.  The loans that

16  you obtained -- strike that.  How many loans, if you

17  can recall, did you obtain from Big Picture Loans?

18       A    I think it was two.

19       Q    Two?  And we have some dates of it being

20  in 2016; is that --

21       A    That sounds good.

22       Q    -- accurate?  Okay.

23            Katy, can I have the interrogatory

24  answers please?  Thank you.  Thank you.  Can we mark

25  this as Exhibit 2, please.
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

```
 1           (The Responses were marked Exhibit No. 2.)

 2    BY MR. SCHEFF:

 3           Q     Ms. Williams, the court reporter has

 4    placed in front of you a document that has been

 5    marked as Exhibit 2.  See it in the lower,

 6    right-hand corner it's marked as Exhibit 2?

 7           A     Yes.

 8           Q     Okay.  Could you turn to the -- strike

 9    that.  And if you look at the first page, for the

10    caption in bold, it says plaintiff Lula Williams'

11    responses to Matt Martorello's first set of

12    interrogatories relating to class certification.  Do

13    you see that?

14           A     Yes.

15           Q     Okay.  Could you turn to the very last

16    page.  Just flip it over.  And -- no, no, you have

17    it.  You have the correct page.  I'm sorry.  Let me

18    put it in front of you to help you out.  This page

19    right here --

20           A     Oh, okay.

21           Q     -- the very last page.  Okay.  And this is

22    the last page of the document and it says

23    verification.  Do you see that?

24           A     Yes.

25           Q     And then it says I declare under penalty
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

Page 22

1    of perjury that the foregoing information contained

2    in plaintiff Lula Williams' objections and responses

3    to Matt Martorello's first set of interrogatories

4    relating to class certification is true and correct

5    to the best of my knowledge, executed on August 29,

6    2018 and then there is a signature.  Have I read

7    that correctly?

8        A    Yes.

9        Q    Is that your signature?

10       A    Yes.

11       Q    Do you remember signing this verification?

12       A    Yes.

13       Q    And is it also your handwriting that

14   filled in the date, the August 29 date?

15       A    No.  I didn't fill that in.

16       Q    You didn't fill that in.  Take a look at

17   what has been marked as Exhibit 2 and I just want

18   you to thumb through it, look at it as carefully as

19   you want or -- or not and tell me if you can whether

20   you've ever seen this document before.

21       A    (Peruses document.)  No, I haven't.

22       Q    You have not you said?

23       A    (Deponent shakes head.)

24       Q    Okay.  Well take a look and --

25            MS. NASH:  Make sure you read it

Case 20-04008-elm   Doc 90-3   Filed 05/25/20   Entered 05/25/20 16:23:47   Desc
Exhibits 18 through 28   Page 153 of 325
LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                                     Page 23

 1        carefully.

 2              MR. SCHEFF:  -- just make sure.  Yeah,

 3        just make sure.

 4              THE DEPONENT:  All the way through all the

 5        pages?

 6   BY MR. SCHEFF:

 7        Q    Well take a -- take a look at as much of

 8   it as you feel you need to in order answer my

 9   question truthfully.

10        A    I don't remember seeing this.

11        Q    Okay.  If you would please, turn to

12   page -- just give me a moment, please.  Okay.  Take

13   a look at -- turn to page ten, please.  Okay.  You

14   have page ten?

15        A    Uh-huh.

16        Q    And I'm going to direct you to

17   interrogatory -- this one, No. 5.  I'm pointing to

18   it.  Okay?

19        A    Uh-huh.

20        Q    Can you read the interrogatory, that is

21   this part that I'm pointing to, this paragraph, just

22   read it to yourself because I want you to understand

23   what the question was that was posed.  Okay?

24        A    (Peruses document.)  Okay.

25        Q    Okay.  Now if you go down to the part that

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

Page 24

```
 1    starts with response and you'll see that that's the

 2    bottom roughly five lines of page ten and then the

 3    top four lines of page eleven.  Could you read that

 4    to yourself, please?

 5         A    (Peruses document.)  Okay.

 6         Q    Is that an accurate response?

 7         A    Yes.

 8         Q    Okay, good.  So, Ms. Williams, what --

 9    what this says is that you took a loan on or about

10    August 3, 2016, for $800, right?

11         A    Yes.

12         Q    And that you applied for another loan from

13    Big Picture Loans for $800 on September 30, 2016.

14    Did you do that?

15         A    Yes.

16         Q    Did you get that loan?

17         A    Yes.

18         Q    Okay.  And it also references a loan that

19    was funded on November 2, 2016.  Do you see that?

20         A    Yes.

21         Q    And do you not recall applying for that

22    loan?

23         A    Yeah, I recall.

24         Q    You do recall applying for that loan,

25    okay.  Were each of these loans applied for online;
```

Debtor's Ex. 24, p. 026

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                          Page 25

```
 1    that is, on the computer?

 2        A    Yes.

 3        Q    And did your daughter do that for you?

 4        A    Yes.

 5        Q    So when your daughter did that for you,

 6    what role did you play, if any, in applying for

 7    these three loans?

 8        A    All of them, all of them.

 9        Q    Okay.  What does that mean?  I'm --

10        A    I was with her when she did it.  I gave

11    her my information and she applied online for me.

12        Q    Okay.  So I just want to get a visual in

13    my head.  All right?

14        A    Uh-huh.

15        Q    So this is what I understand you saying

16    but I want you to correct me if I'm wrong, just I

17    want to make sure that I understand this.  I get

18    this picture of your daughter sitting at the

19    computer.

20        A    Uh-huh.

21        Q    And you either sitting next to her or

22    standing next to her.

23        A    Right.

24        Q    And she's going through whatever is on the

25    screen and she's asking you questions.
```

Debtor's Ex. 24, p. 027

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                               Page 26

```
 1        A    Yeah, right.

 2        Q    And you're giving her answers.

 3        A    Yes.

 4        Q    Is that right?

 5        A    That's right.

 6        Q    Okay.  So for each loan, that was the

 7   process that you followed?

 8        A    Yes.

 9        Q    All right.  And your daughter would read

10   something and you'd respond?

11        A    Yes.

12        Q    Did you read the loan applications as well

13   that --

14        A    Yes.

15        Q    You did.

16        A    Uh-huh.

17        Q    Okay.  And who is it that found Big

18   Picture Loans?  Was it you, your daughter, or

19   somebody else?

20        A    Me.

21        Q    And how did you find Big Picture Loans?

22        A    I don't remember.

23        Q    You don't remember?

24        A    No.

25        Q    Okay.  Take a look back --
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

```
1        A    I don't know whether it was a ad or what.

2        Q    You don't know if it was an ad?

3        A    Right.

4        Q    Okay.  So let's go back and look at the

5   response that you gave to Interrogatory No. 5 which

6   you read to yourself a few minutes ago.  And so,

7   again, on page ten, if you look at page ten at the

8   bottom, it says response?

9        A    Uh-huh.

10       Q    What it says, the first sentence says the

11  name of plaintiff's lender is Big Picture Loans,

12  LLC.  Plaintiff, that's you, learned about Big

13  Picture after seeing an internet advertisement; is

14  that accurate?

15       A    Yeah.

16       Q    And since you're not the one who accesses

17  the computer by yourself, who -- who was operating

18  the computer when you saw the internet advertisement

19  for Big Picture Loans?

20       A    My daughter.

21       Q    Your daughter.  And had you asked your

22  daughter to find a lending company online and she

23  came upon Big Picture Loans?  Is that how it

24  happened?

25       A    Yeah.
```

Case 20-04008-elm   Doc 90-3   Filed 05/25/20   Entered 05/25/20 16:23:47   Desc
Exhibits 18 through 28   Page 158 of 325

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

Page 28

```
 1        Q    And when that occurred in early August of

 2   2016 for the first time, as is stated in your

 3   response to interrogatories, what was your need for

 4   the loan?  Why did you need the $800?

 5        A    I had a pending bill that I needed to pay.

 6        Q    What bill was that?

 7        A    I believe it was -- I think it was my car

 8   payment.

 9        Q    Your car payment?

10        A    And something else I think it was.

11        Q    Okay.  And I take it but, again, I want to

12   make sure that I understand this and that your

13   testimony is -- that it's your testimony and

14   certainly not mine.

15             I take it that the reason you applied

16   for this loan for your car payment is because you

17   didn't have other money that you could use to pay

18   that car payment?

19        A    Yeah, at that time.

20        Q    You did not at that time?

21        A    Right.

22        Q    Okay.  What were with your sources of

23   income in 2016?

24        A    Disability.

25        Q    Disability?
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                                    Page 29

```
1        A      Spousal support.

2        Q      Okay.  So is that social security?

3        A      Right.

4        Q      Okay.  And back in 2016, if you recall,

5    approximately how much money was that disability

6    payment monthly?

7        A      I think it was 1,500.

8        Q      $1,500?

9        A      Uh-huh.

10       Q      And back in August of 2016, was that your

11   sole source of income?

12       A      Yes.

13       Q      Okay.  Now, before your daughter found Big

14   Picture Loans online, and you applied for this loan

15   on or about August 3, 2016, had you gotten other

16   loans online before?

17       A      Before?  Yeah, I have.

18       Q      And for approximately -- strike that.

19   Approximately how many loans had you applied for and

20   received online before you got the Big Picture loan

21   on or about August 3, 2016?

22       A      Two.

23       Q      Two?

24       A      (Deponent nods head.)

25       Q      And who was the lender in that instance?
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

```
1        Or in those instances, excuse me.

2        A    I --

3        Q    Was that the Allied Cash Advance loans?

4        A    Yeah.

5        Q    Okay.

6        A    It was Allied Cash Advance.

7        Q    And so it was the first online loans you

8   got were Allied Cash Advance and the next online

9   loans you got were from Big Picture Loans?

10       A    Right.

11       Q    Is that right?  Okay.  Have you ever --

12  did you ever get a loan from a company called Red

13  Rock?

14       A    No.

15       Q    No?  Did you ever get a loan from a

16  company called Duck Creek?

17       A    No.

18       Q    Okay.  Back in 2016 when -- strike that.

19  I assume -- did you pay all these loans back?

20       A    Yes.

21       Q    Okay.  And how did you make payment?

22       A    Monthly, monthly payments.

23       Q    And how was payment made?  I know you made

24  them on a monthly basis, but did you send in a

25  check, did you go some place and deliver cash?
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                                    Page 31

```
 1        A    No.  It's use usually on my -- on my

 2   phone.

 3        Q    On your phone?

 4        A    Yeah.

 5        Q    So was that --

 6        A    Call them in --

 7             THE COURT REPORTER:  I'm sorry?

 8        A    Call in to make payments.

 9   BY MR. SCHEFF:

10        Q    You call in and make a payment.  So you do

11   it online?

12        A    Yeah, with my checking account.

13        Q    So what you do online is you cause your

14   checking account --

15        A    Over the phone.

16        Q    Or over the phone, okay, to -- you cause

17   your checking account -- your -- the bank where you

18   have your checking account to send a certain amount

19   of money to Big Picture Loans?

20        A    Right, right.

21        Q    Okay.  What bank did you maintain an

22   account on -- at in 2016?

23        A    Virginia United Methodist Credit Union.

24        Q    Okay.  And for how long approximately had

25   you maintained a bank account there as of 2016?
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                                   Page 32

```
 1         A     Thirteen, 13 years.

 2         Q     And do you still have that account today?

 3         A     Yes.

 4         Q     And do you know what the account number

 5   is?

 6         A     I know partially.

 7         Q     Which part do you know?

 8         A     15657.

 9         Q     15657?

10         A     Uh-huh.

11         Q     Are those the last digits of the account?

12         A     (Deponent nods head.)

13         Q     Okay.  That's how I know my bank account.

14   Was -- was that the only bank account that you

15   maintained in 2016?

16         A     Yes.

17               MS. NASH:  Do we need -- can we take a

18         break for a second?

19               MR. SCHEFF:  Sure, of course.

20               THE VIDEOGRAPHER:  Going off the record at

21         10:35 a.m.

22                        (Break.)

23               THE VIDEOGRAPHER:  Going back on the

24         record at 10:42 a.m.

25
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                                          Page 33

```
 1   BY MR. SCHEFF:

 2       Q    Thank you.  Ms. Williams, I have one other

 3   question which I intended to ask you earlier:  Are

 4   you represented by a person named Beth Terrell?

 5       A    Beth -- never heard of her.

 6       Q    Okay, never heard of her.  Thank you.

 7   Let's -- we were -- excuse me.  Before we took the

 8   break, we were talking about your answer No. 5 in

 9   Exhibit 2, the document that's right in front of

10   you, right?

11       A    Uh-huh.

12       Q    Do you recall that?  Okay.  So it was your

13   daughter who physically sat at the computer and

14   entered information; is that correct?

15       A    Right.

16       Q    For each loan, right?

17       A    Uh-huh.

18       Q    And you supplied her with that

19   information?

20       A    Right.  We did it over the phone.  I put

21   in an application over the phone.  They took my

22   information.

23       Q    Right.

24       A    My bank account number.  So whenever they

25   needed to send me something back through the --
```

Debtor's Ex. 24, p. 035

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

1    through the e-mail or something like that, then she

2    would address it for me.  We would do it together.

3         Q    So -- so I'm trying to understand.  You

4    had previously testified before the break --

5         A    Uh-huh.

6         Q    -- that each time you took out a loan from

7    Big Picture Loans, and that there were three of

8    them, that your daughter sat at the computer, that

9    you stood or sat next to her --

10        A    Uh-huh.

11        Q    -- and that she would ask you questions

12   and you'd give her the information --

13        A    Uh-huh.

14        Q    -- that she would then type into the

15   computer?

16        A    Whatever they asked --

17        Q    Right.

18        A    -- asked for, she would do it on there but

19   I don't -- I'm the one that paid the loan.

20        Q    No, no, I understand.  I'm not suggesting

21   that your daughter paid the loan or that anyone else

22   paid the loan.  I'm not suggesting that.

23        A    Uh-huh.

24        Q    You've testified that you paid the loans

25   and that the money from those loans -- to pay those

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                            Page 35

1    loans came out of your bank account, correct?

2        A    Right.

3        Q    Okay.  So I'm just talking about the

4    process.  I just want to make sure I understand the

5    process by which you obtained the loans --

6        A    Uh-huh.

7        Q    -- because you had testified that your

8    daughter actually entered the information in and

9    that you provided her that information and that she

10   would ask you for information, you would give it to

11   her and she would type it in, correct?

12       A    Right.

13       Q    Okay.  And each time that you got a loan

14   from Big Picture Loans, did you read the loan

15   agreement?

16       A    Yes.

17       Q    Okay.  Now -- okay.

18                Can -- can we get the loan agreement?

19   Ms. Williams -- and this is going to be Exhibit 3.

20       (The Agreement was marked Exhibit No. 3.)

21   BY MR. SCHEFF:

22       Q    Okay.  Now, Ms. Williams, you see in the

23   lower, right-hand corner of the document under the

24   exhibit number it says Williams and then there is a

25   number 000071 through, if you go -- just flip over

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                              Page 36

1    to the very last page, turn it over, it says

2    Williams 000076.  Okay?  Do you see that?

3         A    Uh-huh.

4              MS. NASH:  Just for the court reporter,

5         just remember to say yes or no, please.

6              THE DEPONENT:  Oh, I'm sorry.

7              MR. SCHEFF:  That's all right.

8              MS. NASH:  You're doing -- you're doing

9         good.  It's hard -- it's easy to forget.

10             MR. SCHEFF:  Everyone does it, so don't

11        worry about it.

12             THE DEPONENT:  Yes, I see it.

13   BY MR. SCHEFF:

14        Q    Okay.  So this is a document that was

15   produced in this case by your lawyers to us.  Okay?

16        A    Okay.

17        Q    All right.  And if you turn -- if you look

18   at the first page on the very first line, you see in

19   bold Big Picture Loans, LLC.  Do you see that?

20        A    Yes.

21        Q    And if you would turn please to page two,

22   it says at the top consumer installment loan

23   agreement.  Have I read that correctly?  Right at

24   the top here.

25        A    Yes.  Yes, you did.

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                                    Page 37

```
 1        Q    Okay.  And if you look at the box directly
 2   under neat that, it says application date August 3,
 3   2016.  Have I read that correctly?
 4        A    Yes.
 5        Q    And then underneath that, it says Big
 6   Picture Loans, LLC.  Do you see that?
 7        A    Uh-huh.
 8        Q    Yes?
 9        A    Yes.
10        Q    Okay.  And then if you go over to the
11   right, it says borrower name, Lula Williams.  That's
12   you, correct?
13        A    Yes.
14        Q    And then it's got a borrower address.  Is
15   that your address?
16        A    Yes.
17        Q    And then a telephone number.  Is that your
18   phone number?
19        A    Yes.
20        Q    That's your mobile number?
21        A    Yes.
22        Q    And then there's an e-mail address and is
23   that the e-mail address you told us about a little
24   earlier today?
25        A    Yes.
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                            Page 38

```
 1        Q    Okay.  So this appears to be the loan

 2   application, the loan agreement, for your first

 3   loan, the May 3, 2016 loan.  Would you agree with

 4   that?

 5        A    Yes.

 6        Q    All right.  Now, let's go back.  If you

 7   could take Exhibit 2 again -- and don't lose this

 8   one yet.  I just want to compare.  Again, if you

 9   could go to pages ten and eleven.  Okay.  Go to page

10   ten first under that response again.  You see that

11   in bold it says response?

12        A    Uh-huh.

13        Q    And you'll see reference on line three to

14   a loan on August 3, 2016, right?

15        A    Yes.

16        Q    And that appears to be Exhibit 3.  That's

17   the installment -- consumer installment agreement

18   for May 3, 2016, right?

19        A    (Deponent nods head.) Yes.

20        Q    Where are the loan agreements for the loan

21   you took on September 30, 2016, and November 2,

22   2016?  Do you have those?

23        A    No.

24        Q    You do not have them.  So did you have

25   them at one time and you just no longer have them?
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

```
 1        A     I don't recall having them.

 2        Q     You don't recall ever having them?

 3        A     Uh-uh.

 4        Q     Okay.  How did you know when you completed

 5   these interrogatory answers that you had taken loans

 6   on September 30, 2016 and November 2, 2016?

 7        A     Repeat that again.

 8        Q     Sure.  When these interrogatory answers

 9   were completed, this Exhibit 2 --

10        A     Uh-huh.

11        Q     -- that you verified as being truthful

12   under penalties of perjury, how did you know that

13   you had taken loans on September 30, 2016 and

14   November 2, 2016?

15        A     It was deposited into my bank account.

16        Q     It was -- so did you check your bank

17   account records and you saw the deposit?

18        A     Yes.

19        Q     Do you have your bank account records?

20        A     No, I don't.

21        Q     And did you have them when this

22   complaint -- when you filed out these interrogatory

23   answers?

24        A     Yes.

25        Q     You did.  So again, if you look at page --
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

Page 40

1      the last page of Exhibit 2, this is Exhibit 2, just

2      go to the last page, these interrogatory answers

3      were verified by you on August 29, 2018.  Did you

4      have your bank records back on August 29, 2018?

5          A    I don't remember.

6          Q    You don't remember one way or the other?

7          A    No.

8          Q    Okay.  Do you -- can you get your bank

9      records online?  Is that how you access your bank?

10         A    If I needed to I could.

11         Q    Do you also get a statement in the mail?

12         A    Yes.

13         Q    Do you keep those statements?

14         A    No, I don't.

15         Q    You throw them out?

16         A    Yeah.

17         Q    Okay.  But you can get them online?

18         A    I imagine you can.  I'm not sure.

19         Q    Have you ever checked?

20         A    No.

21         Q    You've never checked?

22         A    Uh-uh.

23         Q    So how did -- what bank statements did you

24     check to verify that you had taken a loan on

25     September 30, 2016 and November 2, 2016 if you don't

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                                    Page 41

```
 1    keep the bank statements that are sent to you and

 2    you don't access your bank account online?

 3         A    I access my bank account by phone.

 4         Q    You access it by phone?

 5         A    Yes.

 6         Q    Okay.  And that's how you determined when

 7    those deposits were?

 8         A    Yes.

 9         Q    Okay, great.  So have you ever asked your

10    daughter to access your bank account --

11         A    No.

12         Q    -- on the computer?

13         A    No.

14         Q    Okay.  All right.  Thank you.  Let's go

15    back to Exhibit 3, please.  And, I'm sorry, one more

16    question about your bank account.  I assume since

17    all of the payments for all these loans came out of

18    your bank account that if we had your bank account

19    records, we could show the date of each payment,

20    right, we would be able to see it coming out of your

21    bank account, correct?

22         A    Most likely, yeah.

23         Q    Most likely.  Now you said that when you

24    took the first loan on August 3, 2016 for $800, you

25    needed it to pay bills and you think your car
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

```
 1    payment was a bill that you needed to pay?

 2        A     Included, yeah.

 3        Q     And that you didn't have any other money

 4    to pay your car payment at the time.

 5        A     Uh-huh.

 6        Q     Is that right?

 7        A     Yes.

 8        Q     What would have happened if you didn't get

 9    this loan?  How would you have paid your car

10    payment?

11        A     Probably from another finance company,

12    loan company.

13        Q     You would have taken another loan?

14        A     Yeah.

15        Q     Because you need your car, right?

16        A     Right, exactly.

17        Q     And it's important for you to have access

18    to your automobile; is that right?

19        A     Very important, yes.

20        Q     Why is it very important?

21        A     That's my only means of getting around.

22        Q     Okay.  And if you didn't have your car,

23    you wouldn't be able to --

24        A     No.

25        Q     -- get around and, like, go to the doctor;
```

Debtor's Ex. 24, p. 044

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                                          Page 43

```
 1   is that right?

 2        A     Right.

 3        Q     Or go shopping?

 4        A     Right.

 5        Q     Or do any of the errands; is that correct?

 6        A     Right.

 7        Q     Okay.  So it's important for you to have

 8   your car.

 9        A     Exactly.

10        Q     Okay.  When you took the second loan from

11   Big Picture Loans on or about September 30, 2016,

12   why did you need that money?

13        A     Well, any time that I'm in a bind or

14   something, I'll take out a loan.  I just don't take

15   it out to -- just to have money, access to money.

16   Whatsoever reason if I can't handle what I need to

17   handle, then I would take a loan.  But just to take

18   a loan to have money or help somebody, take a loan

19   out for someone else, I don't do that so I have

20   to -- it has to be something that I needed to do at

21   that particular time.

22        Q     So let me see if I understand what you've

23   just said.  I think I do but I just want to make

24   sure that I do.

25        A     Uh-huh.
```

Debtor's Ex. 24, p. 045

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

Page 44

```
 1      Q    So when you took these loans from Big
 2  Picture Loans, all three of them --
 3      A    Uh-huh.
 4      Q    -- you needed that money to pay bills?
 5      A    Whatever.  I need it for something in
 6  reference to bills.
 7      Q    And the reason that you took the loans is
 8  because you didn't have enough money in order to pay
 9  whatever you needed to pay?
10      A    Exactly.
11      Q    And you need to pay your bills, like, your
12  rent, correct?
13      A    Right.
14      Q    And your utility bills?
15      A    Right.
16      Q    The electric?
17      A    Right.
18      Q    And you need to have food?
19      A    True.
20      Q    And is it the case that the roughly $1,500
21  a month that you receive in social security
22  disability payments sometimes is not enough to pay
23  all your bills?
24      A    Sometimes it's not.
25      Q    Okay.  And that's why you take these
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                              Page 45

```
 1   loans?

 2        A    Right.

 3        Q    And if you didn't take these loans, then

 4   you wouldn't be able to pay your bills?

 5        A    At that particular time, yes.

 6        Q    Right, okay.  Now back in 2016 and

 7   specifically at the time you took these loans, did

 8   you also -- did you have credit cards?

 9        A    No.

10        Q    Okay.  Do you have credit cards today?

11        A    No.

12        Q    Okay.  So you didn't have credit cards.

13   And so is it the case that the only money that you

14   had back in 2016 was money that you either got from

15   your disability payments?

16        A    Uh-huh.

17        Q    Yes?

18        A    Yes.

19        Q    Or when you needed additional money, you

20   would --

21        A    Yes.

22        Q    -- take a loan?

23        A    Yes.

24        Q    Okay.  And would it be fair to say -- and,

25   again, I -- it's if you agree with this, fine, if
```

Debtor's Ex. 24, p. 047

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

Page 46

```
 1    you don't, just tell me.  Okay?

 2         A    Okay.

 3         Q    That you would take these loans when you

 4    had sort of an emergency situation?

 5         A    Yes.

 6         Q    Okay.  All right.  So let's take a look at

 7    this loan agreement, Exhibit 3.  Okay?

 8         A    Okay.

 9         Q    Now this is the document that I'm

10    understanding was on the computer screen that your

11    daughter would go through with you and you would

12    read this?

13         A    Uh-huh.

14         Q    Yes?

15         A    Yeah, I'm sorry.

16         Q    That's okay.  That's fine.  Don't worry

17    about it.  Take a look at -- what did I do with

18    this.  Actually, this one -- take a look at -- we

19    were looking at the box remember?

20         A    Yes.

21         Q    Okay.  Go to the -- right underneath the

22    box, it says important notice.  Do you see that?

23         A    Yes.

24         Q    And those lines are all in bold print --

25         A    Yes.
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

```
 1       Q    -- right?

 2       A    Yes.

 3       Q    And do you see that it says this loan

 4  agreement is governed by the laws of the Lac Vieux

 5  Desert Band of Lake Superior Chippewa Indians?  Do

 6  you see that?

 7       A    Yes.

 8       Q    And you had an understanding when you took

 9  each of these loans that the lending that you were

10  borrowing money from some entity, that that's -- and

11  that the agreement was governed by the laws of this

12  Indian tribe; isn't that correct?

13       A    No, I didn't know that.

14       Q    You didn't know that?  But you read this

15  document, correct?

16       A    Yeah.

17       Q    So how is it if you read the document that

18  you didn't know that?

19       A    Well I didn't understand it because I

20  don't know anything about the Indian tribes or

21  anything.  I thought it was all from Big Picture.

22       Q    Right.  And it says -- and do you see that

23  it says that the loan is governed by the tribal law?

24  Do you see that?

25       A    Yes.
```

Debtor's Ex. 24, p. 049

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

1     Q    And you read that at the time, correct?

2     A    I'm sure I did.

3     Q    Okay.  Let's go to the next page.  Okay.

4  You can put that one aside for now, that other one

5  just for now.  We're going to come back to that in a

6  minute.  You see in the middle of the page it says

7  right to rescind slash cancel?

8     A    Yeah, I see it.

9     Q    Okay.  Did you understand that you had a

10 right to rescind the loan and cancel it shortly

11 after you got it?

12    A    I wasn't aware of that.

13    Q    Well did you reed the loan agreement?  You

14 testified --

15    A    Yes.

16    Q    -- that you did.

17    A    Yes, I did.

18    Q    And you testified that you read it each

19 time you got a loan, right?

20    A    A loan, yeah, uh-huh.

21    Q    So if that's the case, how did you not

22 know that you had a right to rescind or cancel?

23    A    I knew I had to -- could cancel it.  I --

24 when I needed it, you know, if I needed to cancel, I

25 knew to call and cancel it but at that particular

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

```
 1    time, I wouldn't cancel because I needed it.

 2        Q    No, no, I understand.  I understand you

 3    needed the money and that's why you didn't cancel

 4    it --

 5        A    Yeah, uh-huh.

 6        Q    -- but did you understand at the time when

 7    you read the loan agreement --

 8        A    That I could have done that, yes.

 9        Q    Yeah, that you could have.  Okay, great.

10    Thank you.  Why don't you turn to the next page,

11    please.  I know, they stick together.  And I'm

12    looking at the bottom of the page.  You see it says

13    governing law and forum selection?

14        A    Yes, I see it.

15        Q    Okay.  And again it says this agreement

16    will be governed by the laws of the Lac Vieux Desert

17    Band of Lake Superior Chippewa Indians, paren,

18    tribal law, including but not limited to the code as

19    well as applicable federal law.  Do you see that?

20        A    Yes.

21        Q    And you read that at the time you took

22    these three loans, right?

23        A    Yes.

24        Q    And if you go to the next sentence, it

25    says all disputes shall be solely and exclusively
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

1   resolved pursuant to the tribal dispute resolution

2   procedure set forth in section nine of the code and

3   summarized below for your convenience.  Do you see

4   that?

5       A    Yes.

6       Q    Have you ever used the tribal resolution

7   dispute procedure?

8       A    No.

9       Q    Instead, you filed this lawsuit, correct?

10      A    Yes.

11      Q    Okay.  But you read the loan application

12  at the time that you took these loans, right?

13      A    Yes.

14      Q    Okay.  Let's turn to the next page,

15  please.  And you see towards the top of the page

16  there is a big paragraph that says tribal dispute

17  resolution procedure.  Do you see that?  Let me

18  point it -- I'm talking about this.

19      A    Okay.

20      Q    All right?  That's where I'm referring.

21      A    Okay.

22      Q    So that's the tribal dispute resolution

23  procedure that was just referred to in that language

24  that we just read together.  Do you see that?

25      A    Yes.

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

```
1       Q    Okay.  And you read this at the time that
2   you took these loans, correct?
3       A    I don't it re- -- I don't remember
4   reading.
5       Q    You don't remember reading what, this
6   paragraph?
7       A    Right.
8       Q    Okay.  But you read everything else except
9   this paragraph?
10      A    Yes.
11      Q    Okay.  Go a little bit further down.  You
12  see it says waiver of jury trial?
13      A    Yes, I see that.
14      Q    And do you understand that to mean that if
15  you dispute anything concerning the loan you got
16  from Big Picture, that that dispute will not be
17  heard by a jury?  Do you understand that?
18      A    No, I didn't understand it.
19      Q    Did you read it then?
20      A    I read it.
21      Q    Okay.  And if you go a little bit further
22  down, you see in the middle of the page it says
23  paragraph two and it says you acknowledge and agree
24  that by agreeing to this waiver of jury trial
25  provision, and then there is A, B, and C under it.
```

Case 20-04008-elm   Doc 90-3   Filed 05/25/20   Entered 05/25/20 16:23:47   Desc
Exhibits 18 through 28   Page 182 of 325
LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

Page 52

1    Do you see it that?

2         A    Yeah, I see it.

3         Q    Okay.  Take a look at C.  It says you are

4    giving up your right to serve as a representative,

5    paren, as a private attorney general, paren, or in

6    any other representative capacity and/or to

7    participate as a member of class of claimants in any

8    lawsuit filed against us and/or related third

9    parties.  Have I read that correctly?

10        A    Yeah, I see that.

11        Q    And you understood that at the time,

12   correct?

13        A    No, I didn't.

14        Q    You didn't, but you read that?

15        A    Yes.

16        Q    And is it true that in this lawsuit that

17   you have filed, which is -- we've marked as Exhibit

18   1, the complaint, you're trying to serve as a

19   representative of a class, right?

20        A    Yes.

21        Q    But you agreed not to do that, right?

22        A    I don't recall.

23        Q    You don't recall?

24        A    No.

25        Q    But you read this agreement --

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

Page 53

```
 1       A    Yeah, I read it but I didn't understand.

 2       Q    You didn't understand.  What didn't you

 3   understand about that?

 4       A    That I couldn't -- couldn't take -- get a

 5   jury or trial regardless of whatever the situation

 6   might be because in this loan, I didn't know that.

 7       Q    Okay.  And what about the sentence where

 8   it says 2A, you are giving up your right to have a

 9   trial by jury to resolve any dispute alleged against

10   us or related third parties.  What about that didn't

11   you understand?

12       A    Let me cut through you.  All this

13   information right here, all this, I have not gotten

14   a letter with all this stuff on it and with me

15   answering over the phone, even with signing the

16   contract, I didn't see all this, this stuff right

17   here.

18       Q    I thought you've testified several times

19   today that you read the loan agreement --

20       A    I read the loan agreement but it's so much

21   in here that I don't recall reading.

22       Q    But I thought you said -- you've testified

23   now several times today that you did read it three

24   times?

25       A    Yeah.  I mean, you know -- I don't think
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                              Page 54

1    you understand what I'm trying to say.  Do you

2    under --

3         Q    You don't think I understand what you're

4    trying to say?

5         A    Right.

6         Q    Okay.  So what are you trying to say?

7    Take -- take whatever time you need.

8         A    You know, like I said, this -- all this

9    information right here.

10        Q    Uh-huh.

11        A    I -- some of it I've seen, some of it I

12   haven't.  With all this -- I don't have -- I don't

13   have this.

14        Q    Well this is a document that your lawyers

15   produced --

16        A    Right.

17        Q    -- that says it came from you?

18        A    Yeah.

19        Q    Okay.  So you had this document and you've

20   testified today that you read it?

21        A    But I'm confused now -- I did read it.

22        Q    Okay.  Why don't you turn to the last

23   page, please.  Do you see where it says important

24   acknowledgments?

25        A    The last page?

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                         Page 55

```
 1        Q    Last page, yes.  Thank you.  I think
 2   it's -- here, let me get it for you.  Okay.  This is
 3   the page that I'm referring to, the very last page.
 4   I'm sorry, that's the first page.  Turn it over.
 5   I'm sorry.  Okay.  That's the last page of the
 6   document.
 7        A    All right.
 8        Q    I just want to make sure we're on the same
 9   page so to speak.  The lower, right-hand corner of
10   this page, if you look at the lower, right-hand
11   corner --
12        A    Uh-huh.
13        Q    -- it says Williams 000076.  Is that the
14   page you're looking at?
15        A    Yes.
16        Q    Okay, good.  So do you see -- you see at
17   the very bottom it says borrower name, Lula
18   Williams?
19        A    Yes.
20        Q    And there's a date, August 3, 2016 and a
21   time, correct?
22        A    Yes.
23        Q    And then at the bottom it says --
24        A    That I agree.
25        Q    -- signed, colon, I agree, right?
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                          Page 56

```
 1        A    Yes.

 2        Q    Okay.  Now, a little bit above that it

 3   says important acknowledgments.  Do you see that?

 4        A    Yes.

 5        Q    And that's in bold, right, it's in bold

 6   print?

 7        A    Uh-huh.

 8        Q    Okay.  Uh-huh meaning yes?

 9        A    I'm sorry, yes.

10        Q    That's okay.  That's all right.  And it

11   says -- the first acknowledgment is you acknowledge

12   and agree that this agreement is subject solely and

13   exclusively to the tribal law and jurisdiction of

14   the Lac Vieux Desert Band of Lake Superior Chippewa

15   Indians.  Have I read that correctly?

16        A    Yes.

17        Q    And the second acknowledgment that was on

18   this loan agreement that you agreed to, it says you

19   agree -- you acknowledge and agree that the tribal

20   dispute resolution procedure is the sole and

21   exclusive forum for resolving disputes and/or claims

22   arising from or relating to this agreement.  Have I

23   read that correctly?

24        A    Yes.

25        Q    And under that one, it says you
```

Debtor's Ex. 24, p. 058

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

1    acknowledge and agree to the waiver of jury trial

2    provision.  Have I read that correctly?

3         A    You read it correct.

4         Q    Okay.  And I'm not going to bother with

5    the last acknowledgment, but you see there's another

6    acknowledgment underneath that, right?

7         A    Yes.

8         Q    Concerning your bank account or your loan

9    repayments, right?

10        A    Yes.

11        Q    Okay.  Okay.  Thank you.  Let's go back

12   for a minute if we could, please, to Exhibit 2 which

13   is that document right there, right.  This is the

14   document that you verified under penalties of

15   perjury, correct?  Is that right?

16        A    Yes.

17        Q    Okay.  Take a look at page three, the very

18   bottom.  See No. 2 at the bottom?

19        A    Yes.

20        Q    It says set forth with particularity all

21   facts upon which you base your allegation in

22   complaint that defendant Martorello was the

23   proximate cause of any harm suffered by you and why

24   such proximate harm is uniform or common as to each

25   member of the proposed class.  Have I read that

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                                    Page 58

```
 1   correctly?

 2       A    Yes.

 3       Q    Okay.  Take a look at the response which

 4   starts on page four and goes all the way to page

 5   seven.  Take a look at that, please, and read it to

 6   yourself.

 7       A    (Peruses document.)  Okay.

 8       Q    Have you read it?

 9       A    Yeah.

10       Q    And what personal knowledge do you have of

11   any of the facts that are stated in the response to

12   Interrogatory No. 2?

13            MS. NASH:  Counsel, I'm going to object.

14       The response clearly indicates that plaintiff's

15       counsel provided this response.

16            MR. SCHEFF:  Well I'm asking her what

17       personal knowledge she has about the facts

18       stated in response to Interrogatory No. 2.

19       It's a perfectly proper question.

20            MS. NASH:  And that's fine.  I'm noting my

21       objection for the record.

22            MR. SCHEFF:  It's noted.

23   BY MR. SCHEFF:

24       Q    Ms. Williams?

25       A    I don't understand.
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                              Page 59

```
 1        Q    You don't understand what?  You mean you

 2   don't understand what you've read?

 3        A    No, I don't.

 4        Q    Okay.

 5        A    Red Rock --

 6        Q    This information doesn't come from you,

 7   correct?

 8        A    Right.

 9        Q    All right.  This is --

10        A    I don't --

11        Q    -- the first you're reading this, right?

12        A    Yeah --

13             MS. NASH:  Objection, misstates her prior

14        testimony.

15             MR. SCHEFF:  It does not misstate her

16        prior testimony.

17             MS. NASH:  It absolutely misstates her

18        prior testimony.

19             MR. SCHEFF:  Well the record will speak

20        for itself and you should --

21             MS. NASH:  And I'm allowed to note my

22        objection.

23             MR. SCHEFF:  Well you didn't note your

24        objection.  You just spoke.  So note your

25        objection first and then the basis for it.
```

Debtor's Ex. 24, p. 061

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                                    Page 60

```
 1              MS. NASH:  I did.  I said objection, it
 2        misstates her prior testimony.
 3              MR. SCHEFF:  And the record will speak for
 4        itself.
 5   BY MR. SCHEFF:
 6        Q    So these facts don't come from you,
 7   correct, you don't know anything about this?
 8        A    Some of them I do, some of them I don't.
 9        Q    Which ones do you know about?  Tell me
10   what you know about --
11              MS. NASH:  I'm restating my prior
12        objection that this was provided by counsel.
13        It says so clearly in the document.
14   BY MR. SCHEFF:
15        Q    State which facts you know personally,
16   Ms. Williams.
17        A    I don't understand the tribes because I --
18   I didn't know of tribes that were based on the
19   lending of the money.  I thought that it was just
20   Big Picture.
21        Q    Okay.
22        A    So now I got all these other people here,
23   all these other lenders and I don't -- I just don't
24   understand it.
25        Q    You never heard of those other places,
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                                Page 61

1   right?

2        A    No.

3        Q    And you don't know what's stated --

4   whether what's stated in response to this question

5   is true or not true, do you?  You don't know one way

6   or the other.

7        A    Such as Red Rock, all those people, I

8   don't -- I don't under -- I don't understand it.

9        Q    Right.  So my question to you,

10  Ms. Williams, is these facts that are stated in

11  response to Interrogatory No. 2, you don't know

12  personally whether they are true or not true,

13  correct?

14       A    Right.

15       MS. NASH:  Objection, calls for a legal

16       conclusion.

17       MR. SCHEFF:  It does not call for a legal

18       conclusion but you can answer the question.

19       A    I don't know.

20  BY MR. SCHEFF:

21       Q    You don't know?

22       A    No.

23       Q    You don't know whether they're true or not

24  true --

25       A    No.

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                                      Page 62

```
 1         Q    -- correct?  Okay.  Let's look at No. 4

 2    which is on page seven, begins on page seven.  No. 4

 3    reads set forth with particularity how each member

 4    of a punitive class has Article III standing.

 5    Include in your response how such standing can be

 6    proven in accordance with the requirements of

 7    Federal Rule of Civil Procedure 23.  Have I read

 8    that correctly?

 9         A    No. 4?

10         Q    Yes.

11         A    Yes.

12         Q    Okay.  Turn please to the next page where

13    it says response, and that response is on page eight

14    and page nine.  And if you read that to yourself and

15    tell me whether you have any personal knowledge of

16    what is stated in -- on pages eight and nine.

17              MS. NASH:  I'm going to restate my

18         objection.  It --

19              MR. SCHEFF:  Okay.

20              MS. NASH:  It clearly indicates that her

21         counsel provided this response.

22              MR. SCHEFF:  Doesn't mean I can't answer

23         the question -- ask her the question.

24         A    (Peruses document.)  I don't understand

25    it.
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                        Page 63

1    BY MR. SCHEFF:

2        Q    You don't understand what's written?

3        A    No.

4        Q    Okay.  And so that doesn't come from you

5    and you've never heard of that before, correct?

6        A    No.

7        Q    Okay.  Turn to page eleven, No. 7.  It

8    says identify all the facts and documents

9    supporting, tending to support, refuting or tending

10   to refute the class action allegation -- the class

11   allegations within your complaint.  Have I read that

12   correctly?

13       A    Yes.

14       Q    Okay.  See under response starting on page

15   eleven.  Read that to yourself.  It goes on for

16   several pages.  And, again, the question is do you

17   have any personal knowledge of the facts stated in

18   response to Interrogatory No. 7?

19            MS. NASH:  Same objection.  I'm just going

20       to note that the response indicates it was

21       provided by counsel.

22   BY MR. SCHEFF:

23       Q    You can answer the question, Ms. Williams.

24       A    (Peruses document.)  No.

25       Q    You don't know -- you don't have any

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                          Page 64

 1   personal knowledge of the facts stated in response
 2   to No. 7, correct?
 3        A    Yeah, I respond to No. 7.
 4        Q    I'm sorry, say that again?
 5        A    I identified the documents supporting,
 6   tending to support.
 7        Q    Right.  What I -- what I want you to do is
 8   see where it says response under there?
 9        A    Right here?
10        Q    Yeah, and it -- and start reading there
11   and it goes on for several pages.  That's the
12   response you provided to No. 7 and I'd like to
13   understand what personal knowledge you have of any
14   of those facts.
15             MS. NASH:  I'm going to object.  Your
16        question was worded such that you stated that
17        she provided this response and as we've stated,
18        counsel provided this response.
19   BY MR. SCHEFF:
20        Q    My question is -- if that's the case, I'll
21   rephrase the question.  Again, Ms. Williams, reading
22   the response to No. 7, what personal knowledge do
23   you have of any of the facts stated in response to
24   Interrogatory No. 7?
25        A    I can't respond to it.

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

Page 65

```
 1        Q    You can't respond to it?  You don't know

 2   these facts, correct?

 3        A    No.

 4        Q    You don't have any personal knowledge of

 5   what's stated in response to Interrogatory No. 7,

 6   correct?

 7        A    No.

 8        Q    Okay.  Do you know who Brian McFadden is?

 9        A    No.

10        Q    Do you know who Justin Martorello is?

11        A    No.

12        Q    Do you know who Simon Liang is, L-i-a-n-g?

13        A    (Deponent shakes head.)

14        Q    No?

15        A    No.

16        Q    Okay.  Do you know who Gloria Turnage is?

17        A    No.

18        Q    Have you ever met her?

19        A    Gloria Turnage?  No.

20        Q    Have you ever spoken to her as far as you

21   know?

22        A    No.

23        Q    Do you know an individual named George

24   Hengle?

25        A    No.
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                                Page 66

```
 1        Q    Have you ever spoken to him as far as you

 2   know?

 3        A    No.

 4        Q    Do you know an individual named Dowin,

 5   D-o-w-i-n, Coffy?

 6        A    No.

 7        Q    Have you ever spoken to him as far as you

 8   know?

 9        A    No.

10        Q    Did you know an individual named Felix

11   Gillison, Jr.?

12        A    No.

13        Q    And as far as you know, have you ever --

14   did you ever speak with an individual named Felix

15   Gillison, Jr.?

16        A    No.

17        Q    What decisions have you made about the

18   strategy of the lawsuit that you filed which is

19   marked as Exhibit 1?

20        A    I think I was overcharged for the loan

21   that I got.

22        Q    Okay.  My question was you filed this

23   complaint --

24        A    Uh-huh.

25        Q    -- Exhibit 1.  What decisions and what
```

Case 20-04008-elm   Doc 90-3   Filed 05/25/20   Entered 05/25/20 16:23:47   Desc
Exhibits 18 through 28   Page 197 of 325
LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                              Page 67

1    input have you had --

2         A    I don't think I was treated fairly.

3         Q    I understand.  Listen to my question.

4    That's not thee question I'm asking you.  My

5    question is with respect to the lawsuit that you

6    filed which is marked as Exhibit 1, what input have

7    you had into the strategy about how this case is

8    being brought?  Ms. Williams, you haven't made any

9    decisions with respect to the strategy used in this

10   case, correct?

11        A    Yes, I have.

12        Q    Okay.  What -- what strategy decisions

13   have you made?

14        A    On behalf of myself and others like myself

15   is that we are being overcharged for the amount of

16   money that we received and I don't think I'm being

17   treated fair.

18        Q    Okay.

19        A    I don't think so.

20        Q    What role have you played in the decisions

21   as to how this lawsuit is being handled by your

22   lawyers?

23        A    Well asking that the lawsuit will bring --

24   in order to give me my money back, my --

25        Q    Which money do you want back?

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                                    Page 68

```
 1       A    The -- the amount that I'm being overpaid,

 2   all -- well, in other words, all of it.

 3       Q    All of it.  So the interest that you paid?

 4       A    Right.

 5       Q    Okay.  Would you agree that if you

 6   borrowed $800 that you should pay back the $800?

 7       A    Just 800.

 8       Q    And no interest on top of that?

 9       A    Not as much interest.

10       Q    But you agree that you should pay some

11   interest?

12       A    Some, yes.

13       Q    Okay.  What role have you played in the

14   decisions about how this lawsuit is being handled?

15       A    I object.

16       Q    I'm sorry?

17       A    I object to that question.

18       Q    You object to the question?

19       A    Uh-huh.

20       Q    Okay.  Well I understand that but have

21   you -- it's the case, is it not, Ms. Williams, that

22   you haven't provided any input to your lawyers as to

23   how this case ought to be handled?

24            MS. NASH:  Objection, misstates prior

25       testimony.
```

Debtor's Ex. 24, p. 070

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                                    Page 69

```
 1    BY MR. SCHEFF:

 2         Q    Is that right?

 3         A    No, that's not right.

 4         Q    It's not right.  So what input have you

 5    provided to your lawyers?

 6         A    My lawyer will answer that.

 7         Q    Your lawyer will answer that.  Well your

 8    lawyer is not being deposed, Ms. Williams, so I'm

 9    asking you what decisions have you made in

10    connection with this lawsuit?

11         A    Decision that I made with this lawsuit is

12    for it to go forward and being able to be -- obtain

13    some of my money if not all of it back because I'm

14    being overcharged for the loan amount that I got.

15         Q    So the only decision that you made was to

16    have your lawyers file the lawsuit?

17         A    Yes.

18              MS. NASH:  Objection, misstates prior

19         testimony.

20    BY MR. SCHEFF:

21         Q    Now, did you contact your lawyers and ask

22    them to file the lawsuit --

23         A    Yes, I did.

24         Q    -- or did they contact you and ask you to

25    be a plaintiff?
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                                 Page 70

```
 1        A    No, I contact them and asked them.

 2        Q    And how did you do that?

 3        A    By phone.

 4        Q    By phone.  Who did you call?  Don't tell

 5   me what you said, just tell me who you called.

 6        A    Kelly & Crandall.

 7        Q    Any particular individual at Kelly &

 8   Crandall?

 9        A    No.

10        Q    You just called Kelly & Crandall?

11        A    Yeah, to speak to an attorney.

12        Q    Okay.  Have you ever met anyone from Kelly

13   & Crandall other than Ms. Nash who is sitting with

14   you here today?

15        A    Yes.

16        Q    And who have you met?

17        A    I don't recall the name.

18        Q    You don't recall the name.  How many times

19   have you met lawyers from Kelly & Crandall?

20        A    Once.

21        Q    Once?

22        A    Uh-huh.

23        Q    Okay.

24        A    Twice.

25        Q    Twice?
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

```
 1        A     Two times, yes.

 2        Q     Okay.  And one time was -- well what were

 3   those two times, excuse me?

 4        A     Explaining my situation to them and seeing

 5   what advice I could get as far as getting help --

 6        Q     Okay.

 7        A     -- with the loan.

 8        Q     With this loan?

 9        A     Yes.

10        Q     And you've asked them to file other

11   lawsuits on your behalf too; is that right?

12              MS. NASH:  And I'm just going to caution

13        you.  I know that he's not intending to ask for

14        attorney-client privileged information, but you

15        are not to divulge the contents of any of our

16        conversations.

17        A     No.

18   BY MR. SCHEFF:

19        Q     And that's correct, Ms. Williams.  I am

20   not looking to find out what your lawyers have told

21   you or private conversations that you've had with

22   your lawyers.  Okay?

23        A     Right.

24        Q     So if you start to tell me that, I'm going

25   to interrupt you and stop you, okay?  Fair?
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                          Page 72

1        A    Yeah.

2        Q    Okay.  Now, you are the plaintiff in other

3    lawsuits where Kelly & Crandall is representing you;

4    isn't that right?

5        A    Yes.

6        Q    And how many other lawsuits are you a

7    plaintiff in represented by --

8        A    One.

9        Q    -- Kelly & Crandall?  One?

10       A    Uh-huh.

11       Q    Are you sure about that?

12       A    Yes.

13       Q    Okay.

14             Can I have the Rees lawsuit, please?

15    And why don't we just bring them all out actually.

16            MS. LADD:  You want them all?

17            MR. SCHEFF:  Yeah.  Okay.  So this is

18       going to be four.

19    (The Complaint was marked Exhibit No. 4.)

20            MR. SCHEFF:  This one's going to be five.

21    (The Complaint was marked Exhibit No. 5.)

22            MR. SCHEFF:  This one's going to be six.

23    (The Complaint was marked Exhibit No. 6.)

24            MR. SCHEFF:  And this one's going to be

25       seven.

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

Page 73

```
 1          (The Complaint was marked Exhibit No. 7.)

 2    BY MR. SCHEFF:

 3        Q    So, Ms. Williams, the court reporter has

 4    just marked four documents, four complaints, Exhibit

 5    4, 5, 6, and 7.  Do you have those in front of you?

 6        A    Yes.

 7        Q    And let's take a look at No. 4, okay?  Do

 8    you see that your name is among the plaintiffs on

 9    the first page?

10        A    Yes.

11        Q    Okay.  So this is a lawsuit -- strike

12    that.  Look at the very last page.  I'm sorry, yeah,

13    if you could just open that up, please.  All the way

14    to the back if you would, please.  You can see that

15    you're represented by Kelly & Crandall in this case

16    as well, correct?

17        A    Yes.

18        Q    Okay.  And -- all right.  Look at No. 5,

19    please.  And you're a plaintiff in No. 5 as well

20    against Plain Green and Great Plains Lending?

21        A    Yes.

22        Q    And if you look at the last page, you're

23    represented by Kelly & Crandall in this one as well?

24        A    Right.

25        Q    Right?  Look at No. 6, please.  You're a
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

1    plaintiff in this case as well, right?

2         A    Six.

3         Q    Just look at the first page of six for

4    now, please, just to see that your name is there.

5    See it?

6         A    Yeah.

7         Q    So you're a plaintiff in No. 6 as well?

8         A    Uh-huh.

9         Q    And at the end, you're represented by

10   Kelly & Crandall again, correct?

11        A    Uh-huh.

12        Q    Uh-huh meaning yes?

13        A    I'm sorry, yes.

14        Q    That's quite all right.  And No. 7, see

15   that you're a plaintiff in this one as well and,

16   again, you're represented by Kelly & Crandall in the

17   back?

18        A    What is this?

19        Q    See that?  Do you see your name on that

20   one?

21        A    Yeah, I do.

22        Q    Okay.

23        A    Who is this?

24        Q    Well we'll get to that in a minute.  And

25   you see that Kelly & Crandall is representing you in

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

Page 75

```
 1    that one as well?

 2        A    Yes.

 3        Q    Yes?

 4        A    Yes.

 5        Q    Okay.  So let's look at four, five, and

 6    six together.  Did you take loans from Great Plains

 7    Lending?  Did you borrow money from Great Plains

 8    Lending?

 9        A    Yes.

10        Q    How many loans did you borrow from Great

11    Plains?

12        A    One.

13        Q    One?  And when did you borrow that money?

14        A    I don't remember.

15        Q    You don't remember?

16        A    May I ask a question?

17        Q    Well, that's not really what happens in

18    depositions but, you know, if you have a question

19    for me, you can certainly state whatever you'd like

20    on the record and -- but the deposition is not for

21    me to provide answers.  It's for you to provide

22    answers.  Okay?

23            MS. NASH:  Do you need to take a break?

24            THE DEPONENT:  Yeah.

25            MR. SCHEFF:  Okay.  Why don't you take a
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

```
 1        break.

 2              THE VIDEOGRAPHER:  Going off the record at

 3        11:30 a.m.

 4                       (Break.)

 5              THE VIDEOGRAPHER:  Going back on the

 6        record at 11:36 a.m.

 7   BY MR. SCHEFF:

 8        Q    Ms. Williams, I think right before we took

 9   a break you said you had taken one loan from Plain

10   Green.  Did I remember your testimony correctly?

11        A    Yes.

12        Q    And did you take a loan from Great Plains

13   as well?

14        A    Yes.

15        Q    Okay.  When did you take -- I'm sorry, did

16   you want to say something?

17        A    Yeah.  They all in one, right?

18        Q    I'm sorry?

19        A    They all -- Plain Green and Great Plain

20   are the same, right?

21        Q    Is that your understanding?

22        A    Uh-huh.

23        Q    Yes?

24        A    Yes.

25        Q    Okay.  But you have one loan from Plain
```

Debtor's Ex. 24, p. 078

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

 1    Green and one loan from Great Plains; is that right?

 2        A    Uh-huh.

 3        Q    Uh-huh meaning yes?

 4        A    Yes.

 5        Q    That's okay.  I understand.

 6        A    Yes.

 7        Q    Did you take those loans before or after

 8    you took the loans from Big Picture?

 9        A    I don't remember.  I think it was after.

10        Q    You think it was after, okay.  Okay.  So I

11    want to ask you about Exhibit 7.  That's the

12    complaint against Mr. Curry and American Web Loans

13    and others.  Do you have that?

14        A    Yes.

15        Q    Okay.  Did you take a loan from American

16    Web Loan?

17        A    Yes.

18        Q    You did.  And how many loans did you take

19    from American Web Loan?

20        A    One.

21        Q    And when did you take that loan?

22        A    I don't remember.

23        Q    You don't remember?

24        A    No.

25        Q    Was it before or after the loans you took

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

Page 78

```
 1    from Big Picture?

 2         A    I think after.

 3         Q    Afterwards.  Did you take the loan from

 4    Great Plains so you could be a plaintiff and sue

 5    them?

 6         A    No.

 7         Q    You took the loan because you needed the

 8    money, right?

 9         A    Exactly.

10         Q    And you needed it to pay your bills,

11    right?

12         A    Yes.

13         Q    And you had no other way to pay your bills

14    other than to take the loan, right?

15         A    Right.

16         Q    And is that the same with Plain Green?

17         A    Yes.

18         Q    Is that the same with American Web Loans?

19         A    Yes.

20         Q    Have you taken any loans, online loans, in

21    the past three months?

22         A    No.

23         Q    In the past six months?

24         A    No.  These are all I have right here.

25         Q    This is it, okay.
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

```
 1                    All right.  Let's mark this as
 2    Exhibit 8.
 3         (The Responses was marked Exhibit No. 8.)
 4    BY MR. SCHEFF:
 5         Q    You okay?
 6         A    Yes.
 7         Q    All right, good.  Okay.  We're not going
 8    to use those documents anymore, Ms. Williams.  All
 9    right?
10         A    Okay.  Put all these away?
11         Q    Yeah, yeah, if you'd like.  That's fine.
12    You can put them over on the side.  Okay.  So let's
13    look at what we've marked as Exhibit 8.  Do you have
14    that?
15         A    Uh-huh.
16         Q    Uh-huh meaning yes?
17         A    Yes.
18         Q    Okay.  You see at the top it says
19    plaintiff Lula Williams' responses to defendant Matt
20    Martorello's first set requests for admission
21    relating to class certification.  Have I read that
22    correctly?
23         A    Yes.
24         Q    Now, this document does not have a
25    verification that's attached to it at the end.  Take
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

Page 80

```
 1    a -- take a look, please, and just tell me whether

 2    you've ever seen this document before.  And look

 3    as -- look at as much as you need to in order to

 4    make that determination.

 5         A    (Peruses document.)  Okay.

 6         Q    Have you ever seen this document before?

 7         A    Yes.

 8         Q    You have.  When did you first see it?

 9         A    You know, this is the first time I'm

10    receiving this.

11         Q    This is the first time you're receiving

12    it?

13         A    Uh-huh.

14         Q    Okay.  So is now the first time you're

15    ever seeing it?

16         A    Yes.

17         Q    Okay.  Okay.  Ms. Williams, let me mark

18    what is going to be Exhibit 9.

19              (The E-mail was marked Exhibit No. 9.)

20    BY MR. SCHEFF:

21         Q    And I'm going to try and be efficient in

22    my questioning here so we're not taking more time

23    than we have to.  Okay.  Ms. Williams, what has been

24    placed before you is Exhibit 9.  Have you ever seen

25    this document before?
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                                    Page 81

```
 1        A    No.

 2        Q    Never have, okay.  So let's just identify

 3   a couple things here.  I'm going to direct you to

 4   certain things just to try and put this in context.

 5   Okay?  I'm on page one, all right, and I'm looking

 6   at the top and it says from Miracle Williams and

 7   then it says j-a-v-i-o-n 06@gmail.com.  I've read

 8   that correctly?

 9        A    Yes.

10        Q    And Miracle Williams is your daughter.

11   You testified to that earlier, right?

12        A    Yes.

13        Q    And the e-mail address that I just read is

14   her e-mail address, right?

15        A    Javion, yes.

16        Q    And that's the e-mail address that

17   sometimes she uses on your behalf, right?

18        A    Yes.

19        Q    Okay.  And you see the date, it says

20   Thursday, August 23, 2018?

21        A    Yes.

22        Q    3:11, okay.  Now look directly underneath

23   that.  You see it says forwarded message?  Do you

24   see that?  I'm looking right here.

25        A    Uh-huh, I see it.
```

Debtor's Ex. 24, p. 083

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                                        Page 82

1        Q    Yes?

2        A    Yes.

3        Q    And then it says from

4    support@bigpictureloans.com.  Do you see that?

5        A    Yes.

6        Q    And then there's a date of June of 2016,

7    correct?

8        A    Yes.

9        Q    And then it says subject, information

10   regarding your account with Big Picture Loans.com.

11   Did I read that correctly?

12       A    Yes.

13       Q    And then it says to, and then we see your

14   daughter's e-mail address again, correct?

15       A    Yes.

16       Q    And below that is a communication.  It's

17   an e-mail from the customer support people at Big

18   Picture Loans to you; isn't that right?

19       A    Yes.

20       Q    Okay.  Now -- do you want to say

21   something?

22       A    No.

23       Q    Okay.  We received from your lawyer -- if

24   you look at the bottom, right-hand corner again, you

25   see it says Williams 000099?

Debtor's Ex. 24, p. 084

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

```
 1        A    Yeah.

 2        Q    And the last document in this exhibit is

 3   Williams 000100.  Do you see that?  Let me show you

 4   where I'm looking to make sure that -- right here, I

 5   was looking at this number here.

 6        A    Yeah, I'm looking at that.

 7        Q    And the second number that I gave you --

 8        A    This one.

 9        Q    -- was from there.  Okay?  Just want to

10   make sure that you and I are --

11        A    Okay.

12        Q    -- you know, we're in agreement about what

13   you're looking at.

14        A    Okay.

15        Q    Okay?  Is this an e-mail that your

16   daughter received on your behalf from Big Picture

17   back in June of 2016?

18        A    I don't remember.

19        Q    You don't remember?

20        A    June 2016.

21        Q    Yeah, that's what it says.

22        A    I'm sure.

23        Q    You're not sure?

24        A    No.

25        Q    It's not.  This is not an e-mail from Big
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                                    Page 84

```
 1    Picture to you from June of 2016?

 2        A    Yes, it is.

 3        Q    It is.  So --

 4        A    Yeah, I remember.

 5        Q    -- let me ask you a question.  I'm just --

 6    we received a number of these documents, e-mails

 7    that appear to be from Big Picture to you but have

 8    your daughter's e-mail address at the top that are

 9    dated in 2018 but the e-mails from Big Picture are

10    much earlier.  Okay?

11                Did your daughter go through her

12    computer and print the e-mails that came to you at

13    her e-mail address from Big Picture Loans and

14    provide them for purposes of this lawsuit?

15        A    No.

16        Q    She did not.  Did you do that?

17        A    Yes.

18        Q    Okay.  So you went through and printed off

19    the e-mails --

20        A    Well my daughter did that.

21        Q    Your daughter did that, okay.

22        A    Yeah, uh-huh, because I don't understand

23    how to do it.

24        Q    Right.  So she's the one who operates the

25    computer.  You don't do that, right?
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

Page 85

```
 1       A     Right.

 2       Q     So do you know whether your daughter got

 3  every single e-mail that she had on her computer

 4  from Big Picture Loans to you and printed them off

 5  for this lawsuit?

 6       A     I don't know.

 7       Q     You don't know one way or the other?

 8       A     Uh-uh.

 9       Q     So we'd have to talk to your daughter; is

10  that right?

11       A     Do you?  I don't know.

12       Q     Well your daughter is the one that did the

13  printing, correct?

14       A     Yeah, right, uh-huh, but I don't know if

15  she's gotten everything off.

16       Q     You don't know one way or the other?

17       A     Right.

18       Q     So that's why we would have to find out

19  from your daughter --

20       A     But I believe she did.

21       Q     Okay.

22       A     I believe she did.

23       Q     That's fine.  So let's look at this

24  particular one which is Exhibit 9.  And what Exhibit

25  9 says, it says dear Lula Williams, your application
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

1    is in, thanks.

2          A    Uh-huh, right.

3          Q    We received your application for $400 and

4    are currently reviewing it.  Have I read that

5    correctly?

6          A    Yes.

7          Q    Okay.  Did you get a loan from Big Picture

8    for $400 before you took the 800-dollar loan on

9    August 3, 2016 which is listed in the responses to

10   your interrogatories?

11         A    Yes.

12         Q    You did?

13         A    Uh-huh.

14         Q    So the responses to your interrogatories,

15   and that's No. 2, let's see if we can just get two

16   out for a moment.  Okay.  And again, look at page

17   ten, Interrogatory No. 5.

18         A    This is so confusing to me.

19         Q    Well that's why I want to try and clear it

20   up, see if we can clear it up.

21         A    Okay.

22         Q    All right.  So you see that in -- you see

23   Interrogatory No. 5 --

24         A    Uh-huh.

25         Q    -- right up here?

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

```
 1        A     Right.

 2        Q     And if we go back to the response, we've

 3   looked at this a couple times, it talks about a loan

 4   that you received for $800 on August 3, 2016,

 5   correct?  The bottom of the page.

 6        A     Yeah, uh-huh.

 7        Q     And if you turn over to page eleven, it

 8   talks about another loan for $800 that you got on

 9   September 30, 2016, right?  Do you see that right at

10   the top of the page?

11        A     Yeah, I'm --

12        Q     Do you see that?

13        A     Uh-huh.

14              MS. NASH:  Take your time to read it if

15        you need to.

16   BY MR. SCHEFF:

17        Q     Yeah.  Take as much time as you need.  And

18   then --

19        A     Yeah, I see it.

20        Q     Okay, good.  And then a little under that

21   it talks about another loan on November 2, 2016.  Do

22   you see that?  Over here.  See it says it over here?

23        A     Right here.

24        Q     Right.  So what's not listed in your

25   responses to No. 5 are this 400-dollar loan which
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

Page 88

```
 1    you just testified to which appears to be referenced

 2    in Exhibit 9 which is right here.  Do you see that?

 3         A    Yeah.

 4         Q    So did you get another loan for $400 from

 5    Big Picture as well as the loans listed in response

 6    to Interrogatory No. 5?

 7         A    I believe so.

 8         Q    Okay.  Did you get -- I'm sorry, did you

 9    want to say something?  I didn't mean to interrupt

10    you.

11         A    You can -- you can go ahead.

12         Q    I'm sorry?

13         A    You can continue.

14         Q    Okay.  So did you receive another

15    400-dollar loan from Big Picture Loans in late June

16    of 2016 in addition to the loans that you've listed

17    in response to Interrogatory No. 5?

18         A    This loan is supposed to be for August

19    right here?

20         Q    This one -- see it's dated in June,

21    June 29, 2016?

22         A    Oh, okay.

23         Q    And that's why was asking you whether that

24    was an additional loan that you got --

25         A    Yes.
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

1        Q      -- in addition to the ones that are listed

2    in response to Interrogatory No. 5.  Is it?

3        A      Yes.

4        Q      Okay.  Other than the three loans that

5    you've listed in response to Interrogatory No. 5 and

6    the 400-dollar loan which we see that's referenced

7    in Exhibit 9, are there any other loans that you got

8    from Big Picture?

9        A      No.

10        Q      Okay.  Take a look at Exhibit 10 or what

11    will be marked as Exhibit 10.

12           (The E-mail was marked Exhibit No. 10.)

13    BY MR. SCHEFF:

14        Q      Do you have Exhibit 10?

15        A      Yes.

16        Q      So you see what your daughter has done

17    there is she's printed off an e-mail from Big

18    Picture to you from July 13, 2016.  Do you see that?

19        A      Yes, I see it right here.

20        Q      Right here, July 16, right.  And that

21    references an application for $400 that they were

22    currently reviewing.  Do you see that?

23        A      Yes.

24        Q      Is that a different loan for $400 than the

25    one that's referenced in Exhibit 9?

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

```
 1      A    I think these two are the same.

 2      Q    You think they're the same.

 3      A    Uh-huh, they're the same.

 4      Q    Okay.  So let me ask you a question and as

 5   I said --

 6      A    But I don't understand.

 7      Q    You don't remember having a second

 8   400-dollar loan, is that what you're saying?

 9      A    For June and July?

10      Q    Yes.  Exhibit 9, the e-mail is June 29,

11   2016, correct?

12      A    Right.

13      Q    And then Exhibit 10 is July 13, 2016.  Do

14   you see that?

15      A    I don't remember June and July.

16      Q    You don't remember those.  Okay, that's

17   fine.  So, Ms. Williams, these documents that are

18   marked as Exhibit 9 and 10, as I said, you produced

19   in this case several other documents that appear to

20   be e-mails from Big Picture Loans.

21           Why don't we just mark those.  We can

22   just mark them all.

23           MS. LADD:  Okay.

24           MR. SCHEFF:  Okay.  So just mark them

25       sequentially starting with eleven.
```

Case 20-04008-elm   Doc 90-3   Filed 05/25/20   Entered 05/25/20 16:23:47   Desc
Exhibits 18 through 28   Page 221 of 325
LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018
Page 91

```
 1              THE COURT REPORTER:  I'm going to need to
 2       get some more stickers.
 3              MR. SCHEFF:  Yeah, that's fine.
 4              THE DEPONENT:  These two loans are the
 5       same.
 6   BY MR. SCHEFF:
 7       Q    You think those are the same?
 8       A    Uh-huh, but different -- different dates.
 9       Q    Okay.  That's fine.  So, Ms. Williams, see
10   this stack of folders?  Each one of these folders
11   has a separate -- appears to be a separate e-mail
12   from Big Picture Loans to you that your daughter
13   printed off and provided to us as part of this
14   litigation.  Okay?
15       A    Uh-huh.
16       Q    Yes?
17       A    Yes.
18       Q    I'm going to have these marked, okay, and
19   we're going to start marking them as Exhibit 11.
20   And I'm not going to go through each one, but I just
21   want the mark them for the record.  Okay.  And --
22   and then I'm going to ask you one question or
23   hopefully one question.
24       (The E-mails were marked Exhibit Nos. 11-32.)
25              MS. NASH:  And take your time and look
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                                    Page 92

```
 1          through them as you -- as you get them.  Take

 2          your time and look through them as you get

 3          them.

 4               THE DEPONENT:  I am confused.

 5               MR. SCHEFF:  I don't want you to be

 6          confused.  I'm just going to mark these as

 7          exhibits and I'm going to try and ask you one

 8          question.  I'm sorry.

 9          (Discussion between reporter and counsel.)

10               THE DEPONENT:  Eleven and twelve are the

11          same.  Is that --

12               MR. SCHEFF:  Hold on.  There is no

13          question yet.

14               THE DEPONENT:  Okay.

15               MR. SCHEFF:  I just want to make sure that

16          we do this in as orderly a way as we possibly

17          can.

18     BY MR. SCHEFF:

19          Q    So Ms. Williams.

20          A    Yes.

21          Q    The court reporter has just placed in

22     front of you exhibits that begin at No. 11 and the

23     last one is I think No. 31 -- 32, okay.  Thirty-two.

24          A    Yeah.

25          Q    And all of these documents, I'm going to
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

1    characterize them and as Ms. Nash said, you take as

2    much time as you need with these documents, okay,

3    but they all appear to be e-mails that you received

4    or were sent to you by Big Picture Loans in either

5    2016 or '17 to your daughter's e-mail address which

6    she then printed for part of this litigation.  Okay?

7        A    Uh-huh.

8        Q    Can you just determine whether that

9    statement is correct?  Again, I'm not asking about

10   the substance of the communication.  I just want to

11   find out whether I've accurately stated that these

12   documents that we've marked as eleven to 32 appear

13   to be e-mails to your daughter's e-mail account from

14   Big Picture in 2016 and '17 that your daughter has

15   printed out and provided to your lawyers so they

16   could give them to us.

17       A    (Peruses documents.)  Yes.

18       Q    Yes, okay.  So here's the question that I

19   really want to get to:  Over the years, when Big

20   Picture would send an e-mail to you but to your

21   daughter's address, e-mail address, would your

22   daughter show you the e-mail?

23       A    Yes.

24       Q    She would.  Each time she'd show it to you

25   so you knew what was -- what the communication was?

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

```
 1       A    Yes.

 2       Q    Okay.  And when your daughter did that,

 3   would you read the e-mails that she showed you?

 4       A    Yes, sometimes I would read them.

 5       Q    So not all the times but sometime you

 6   would?

 7       A    Yes.

 8       Q    Okay.

 9       A    Because she explained and tell me, you

10   know, and I can, you know, pretty much depend on

11   her.

12       Q    So she would tell you what it was about?

13       A    Uh-huh.

14       Q    And sometimes you would read it yourself?

15       A    Uh-huh.

16       Q    And that's how you understood about what

17   Big Picture was telling you; is that right?

18       A    Yes.

19            MR. SCHEFF:  Okay.  Let's take a short

20       break.  Okay?

21            MS. NASH:  Okay.

22            THE VIDEOGRAPHER:  Going off the record at

23       12:02 p.m.

24                    (Break.)

25            THE VIDEOGRAPHER:  Going back on the
```

Debtor's Ex. 24, p. 096

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

```
 1          record at 12:04 p.m.

 2    BY MR. SCHEFF:

 3          Q     Just a couple more questions and I think

 4    we're done.  Okay.  So, Ms. Williams, I'm just going

 5    to ask you about three documents, okay?  And once I

 6    do that, I think I'm done.  All right?  And I'm

 7    going to ask you the same questions about each one

 8    of these.  I'm sorry, four documents, I apologize.

 9                     Exhibit 21, so why don't you pull out

10    Exhibit 21, Exhibit 25, and we'll just put that off

11    to the side there, okay, Exhibit 28, yep, that's 28,

12    and Exhibit 31.  Okay?  Let me just -- I'm going to

13    put these in front of you because I'm just going to

14    ask you the same question about all of them.  Okay?

15    So -- okay.  So we've got -- I just want to make

16    sure.  We don't need this one.  We've got Exhibit

17    21, Exhibit 25.

18          A     Uh-huh.

19          Q     Uh-huh meaning yes?

20          A     Yes.

21          Q     Exhibit 28?

22          A     Yes.

23          Q     And Exhibit 31.  All right?

24          A     Yes.

25          Q     These four exhibits.
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018

1       A     Okay.

2       Q     So look at these exhibits.  Each one of

3   them starts the same way and that's why I wanted to

4   ask you about it.  Okay.  They all say dear Lula

5   Williams and then they start thank you for your

6   communication.  See that here, thank you for your --

7       A     Uh-huh.

8       Q     And --

9       A     Oh, yes.

10      Q     Right?

11      A     Yes.

12      Q     This in regards to your recent collections

13   inquiry, thank you for your recent communication,

14   thank you for your recent communication and then

15   again on 31 thank you for your recent communication.

16   Do you see that?

17      A     Yes.

18      Q     Okay.  So what that suggests to me is that

19   you communicated with Big Picture Loans and that

20   Exhibits 21, 25, 28, and 31 is a response to your

21   communication.  Would you agree with me?

22      A     Yes.

23      Q     Do you have the communications that you

24   sent to Big Picture Loans?

25      A     No.

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                                       Page 97

```
 1    Q      You do not have those?

 2    A      No.

 3           MR. SCHEFF:  Okay.  I don't know how

 4    Ms. Miracle Williams maintains her computer,

 5    but we'll send you a request to see if those

 6    e-mails are in her sent items as opposed to her

 7    inbox and we'll also ask for her to check her

 8    deleted e-mails as well just in case there's

 9    anything in there.  Okay?

10           Ms. Williams, I don't have any further

11    questions.  Thank you very much.

12           THE DEPONENT:  Okay.  Thank you.

13           MS. NASH:  And I do not have any

14    questions.

15           THE VIDEOGRAPHER:  There being no further

16    questions, the deposition is concluded at

17    12:08 p.m.

18

19

20    (The deposition was concluded at 12:08 p.m.)

21       And further, this deponent saith not.

22

23

24

25
```

Debtor's Ex. 24, p. 099

Case 20-04008-elm   Doc 90-3   Filed 05/25/20   Entered 05/25/20 16:23:47   Desc
Exhibits 18 through 28   Page 228 of 325
LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                              Page 98

```
 1          CHANGES REQUESTED TO THE DEPOSITION OF
         LULA WILLIAMS, TAKEN 10/4/18 BY HEATHER GUNN
 2

 3   Page/Line:           Change to/from:        Reason:

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18   _____
19   Lula Williams

20
     Commonwealth of Virginia, to wit:
21            Subscribed to before me

22   this _____ day of _____, 2018.

23   _____
              Notary Public
24

25   My commission expires:     /   /
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
WILLIAMS, LULA on 10/04/2018                                                     Page 99

```
 1   COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

 2              I, Heather R. Gunn, Notary Public in and for the

 3   Commonwealth of Virginia at Large, and whose commission

 4   expires October 31, 2022, do certify that the aforementioned

 5   appeared before me, was sworn by me, and was thereupon

 6   examined by counsel; and that the foregoing is a true,

 7   correct and full transcript of the testimony adduced.

 8              I further certify that I am neither related to nor

 9   associated with any counsel or party to this proceeding, nor

10   otherwise interested in the event thereof.

11              Given under my hand and notarial seal at

12   Mechanicsville, Virginia, this 9th day of October, 2018.

13

14

15

16                       Heather R. Gunn
                  Heather R. Gunn - Notary Public #320684
17                      Commonwealth of Virginia

18

19

20

21

22

23

24

25
```

**In the Matter Of:**

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.

**GLORIA TURNAGE**

*October 04, 2018*



**Debtor's Ex. 25, p. 001**

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

_____

LULA WILLIAMS, et al.,

            Plaintiffs,

            v.              Civil Case No. 3:17-cv-461 (REP)

BIG PICTURE LOANS, LLC, et al.,

            Defendants.
_____

VIDEOTAPED DEPOSITION OF GLORIA TURNAGE

October 4, 2018

Richmond, Virginia

HALASZ REPORTING & VIDEO

1011 E. Main Street, Suite 100
Richmond, VA 23219
(804) 708-0025

Reported by:  Heather R. Gunn

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                              Page 2

            Videotaped deposition of GLORIA TURNAGE, taken by

and before Heather R. Gunn, Notary Public in and for the

Commonwealth of Virginia at large, pursuant to the Federal

Rules of Civil Procedure, and by Notice to take deposition,

commencing at 2:13 p.m., October 4, 2018, at the offices of

the Virginia Poverty Law Center, 919 East Main Street, Suite

610, Richmond, Virginia 23219.


Appearances:

            KELLY & CRANDALL PLC
            By:  CASEY NASH, ESQ.,
            3925 Chain Bridge Road, Suite 202
            Fairfax, VA 22030
            attorney, counsel for the Plaintiffs


            ARMSTRONG TEASDALE LLP
            By:  RICHARD SCHEFF, ESQ.,
            By:  KATHARINE LADD, ESQ.,
            1500 Market Street, 12th Floor, East Tower
            Philadelphia, PA 19102
            attorneys, counsel for Matt Martorello


Also present:

            Marc Langelier, Videographer - Halasz Reporting

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                           Page 3

## I N D E X

Deponent:              Examination by:            Page:

Ms. Turnage

                       By Mr. Scheff                 5

                       By Ms. Nash                  82

                       By Mr. Scheff                83


## E X H I B I T S

Exhibit:               Description:               Page:

1                      Complaint                   32

2                      Agreement                   42

3                      Agreement                   42

4                      Certificate                 62

5                      E-mail                      66

6                      E-mail                      66

7                      E-mail                      66

8                      E-mail                      66

9                      Responses                   74

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                    Page 4

1        THE VIDEOGRAPHER:  Today is October 4,

2   2018.  We are going on the record at 2:13 p.m.

3   This is the videotaped deposition of Gloria

4   Turnage.  The cause is Lula Williams, et al.,

5   plaintiffs v. Big Picture Loans, LLC, et al.,

6   defendants, Civil Action No. 3:17-CV-461 (REP)

7   in the U.S. District Court of the Eastern

8   District of Virginia, Richmond Division.

9        This deposition is being held at the

10  Virginia Poverty Law Center, 919 East Main

11  Street, Richmond, Virginia 23219.  The court

12  reporter is Heather Gunn, videographer is Marc

13  Langelier both representing Halasz Reporting

14  and Video in Richmond, Virginia.  Will counsel

15  please identify themselves for the record.

16       MR. SCHEFF:  Richard L. Scheff for Matt

17  Martorello.

18       MS. LADD:  Katy Ladd for Matt Martorello.

19       MS. NASH:  And Casey Nash for Ms. Turnage.

20       THE VIDEOGRAPHER:  Please swear in the

21  witness.

22               GLORIA TURNAGE

23      was sworn and deposed as follows:

24

25

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                                    Page 5

```
 1                    EXAMINATION

 2  BY MR. SCHEFF:

 3       Q    Ms. Turnage, as I introduced myself to you

 4  before the deposition started, my name is Richard

 5  Scheff.  I represent Matt Martorello and I'm going

 6  to be asking you some questions this afternoon.

 7  Okay?

 8       A    Okay.

 9       Q    Have you ever had your deposition taken

10  before?

11       A    No.

12       Q    Okay.  So let me explain to you what a

13  deposition is and if you have any questions along

14  the line, I'll try and explain it.  Okay?  So the

15  format of the deposition is I'm going to ask you

16  questions and, because you've been placed under

17  oath, the requirement that you're under is to answer

18  my questions truthfully.

19            If you don't know the answer to a

20  question, that's fine, just say you don't know.  If

21  you don't remember something and it's a truthful

22  answer, that's fine as well.  Okay?

23       A    Okay.

24       Q    If at any point in time -- and when you

25  answer questions, you need to respond with a word so
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018

```
 1    the court reporter can take it down as opposed to

 2    saying uh-huh or something like that.  Okay?

 3         A    Okay.

 4         Q    If you don't understand a question that I

 5    ask, just tell me you don't understand it and what

 6    you don't understand about it and I'll try and

 7    clarify or change the question to make it

 8    understandable for you.  Okay?

 9         A    Okay.

10         Q    If you answer a question without telling

11    me that you didn't understand it, I'm going to

12    assume that you did.  Okay?

13         A    Right.

14         Q    Have you taken any medication today which

15    affects your ability to remember or to sit for this

16    deposition?

17         A    No.

18         Q    Okay.  Do you -- and I don't -- I'm not

19    looking for what it is if the answer to this

20    question is yes, but do you suffer from any health

21    problems which make it difficult for you to sit for

22    a deposition or that affect your memory?

23         A    No.

24         Q    Okay, great.  Okay, great.  So let me ask

25    you some questions and we'll get this done as I
```

1   efficiently as possible.  Any time you want to take

2   a break, just tell us and you can take a break.  And

3   it's not an endurance test but, you know, I don't

4   expect this deposition to be very lengthy but if you

5   need to take a break just tell us.  Okay?

6        A    Okay.  Can I have some water?

7        Q    Yeah.  Let's go off the record and see if

8   we can find you some water.

9        A    I'm sorry.  I should have said it before

10  you got started.

11       Q    That's okay.

12            MS. NASH:  That's okay.

13            MR. SCHEFF:  It's not a problem.  We'll

14       see if we can find you some water.

15            THE VIDEOGRAPHER:  Going off the record at

16       2:16 p.m.

17                      (Break.)

18            THE VIDEOGRAPHER:  Going back on the

19       record at 2:18 p.m.

20  BY MR. SCHEFF:

21       Q    Ms. Turnage, do you know anyone named Matt

22  Martorello?

23       A    No, I didn't know of anyone of Matt

24  Martorello.

25       Q    Okay.  Have you ever met anyone who's

Case 20-04008-elm   Doc 90-3   Filed 05/25/20   Entered 05/25/20 16:23:47   Desc
Exhibits 18 through 28   Page 238 of 325
LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018

Page 8

1    identified themselves as Matt Martorello?

2         A    No.

3         Q    Have you ever spoken to anyone, either in

4    person or on the telephone, who's identified

5    themselves at being Matt Martorello?

6         A    No.

7         Q    Have you ever heard of company called

8    SourcePoint VI?

9         A    No.

10        Q    Have you ever heard of a company called

11   Bellicose?

12        A    No.

13        Q    Okay.  Excuse me.  And as far as you know,

14   have you -- have you ever communicated with anyone

15   who has held themselves out as being employed by

16   SourcePoint VI?

17        A    No.

18        Q    What about Bellicose?

19        A    No.

20        Q    Excuse me, sorry.  Now my throat's going.

21             Ms. Turnage, where do you live?

22        A    I live at eastern Henrico County, 739

23   North Laburnum Avenue, Apartment 1, Henrico,

24   Virginia 23223.

25        Q    How long have you lived there?

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                         Page 9

1          A      I've lived in my residence maybe over 20

2    years.

3          Q      And is it a house or apartment?

4          A      Apartment.

5          Q      And so you rent as opposed to own that

6    apartment?

7          A      I rent.

8          Q      Okay.  And are you currently employed?

9          A      I'm retired.

10         Q      And what did you retire from?

11         A      I retired from the City of Richmond Police

12   Department as a civilian employee.

13         Q      Great.  How long did you work for the

14   police department here in Richmond?

15         A      Thirty years.

16         Q      What were your duties and

17   responsibilities?

18         A      It was the front desk receptionist.  It

19   was at the police academy.

20         Q      And when did you retire approximately?

21         A      March 2008.

22         Q      So you've been retired now for ten years?

23         A      Yes.

24         Q      Okay, great.  Do you receive a pension?

25         A      I receive a pension, yes.

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                    Page 10

1     Q     Is -- is that your -- do you have other
2  sources of income other than your pension?
3     A     Well now this June and July, I just
4  started early social security retirement.
5     Q     Okay.  So according to the information
6  that I have about this case, you took two loans from
7  Big Picture Loans in 2017; is that correct?
8     A     Yes.
9     Q     All right.  So in 2017, was your only
10 source of income your pension?
11    A     Yes, with the City of Richmond, uh-huh.
12    Q     And if you can recall and, again, I don't
13 need an exact number but approximately -- and I
14 assume you got a pension check on a monthly basis?
15    A     Yes.
16    Q     Approximately how much was your pension
17 payment on a monthly basis in two seven -- 2017?
18    A     Well, my net pension is maybe 1,280
19 something.
20    Q     Okay.  And in 2017, when you took these
21 loans from Big Picture Loans, did you maintain any
22 bank accounts?
23    A     Yes.  I have the Credit Union of Richmond.
24    Q     Is that what it's called, the Credit Union
25 of Richmond?

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                        Page 11

```
 1      A    Yeah, that's what they call it.  They were

 2  Richmond Postal Credit Union.  They changed to

 3  Credit Union of Richmond.  It's a savings account.

 4      Q    Okay.  And for approximately how long have

 5  you maintained a bank account at that financial

 6  institution?

 7      A    Well, it's been awhile.  Over ten years.

 8      Q    Do you remember the account number?

 9      A    No, I don't have my account number

10  memorized off my head.

11      Q    Okay.  All right.  I'm -- I didn't think

12  you would but I thought I would ask anyway.  Okay.

13  Why did you take loans from Big Picture Loans?  Why

14  did you borrow money from Big Picture?

15      A    Because I needed money to pay my apartment

16  rent.

17      Q    And you borrowed twice; is that right?

18      A    Yes.

19      Q    Close in time to each other?

20      A    Yes.

21      Q    And for -- the first one was approximately

22  $225?

23      A    Yes.

24      Q    Do you remember what the second one was?

25      A    The second one was $300.
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018

```
 1        Q     How much was your rent in 2017?

 2        A     It was close to like 700 and some dollars.

 3        Q     So did you -- in 2017, did you have credit

 4   cards?

 5        A     Well 2017, yes, I think I had some credit

 6   cards.

 7        Q     Okay.  And did you -- was there available

 8   credit on your credit cards --

 9        A     No.

10        Q     -- in 2017 when you borrowed money from

11   Big Picture Loans?

12        A     No.

13        Q     That's another thing is because the court

14   reporter is taking down everything that I say and

15   everything that you say, if you could, wait until I

16   finish asking the question and so otherwise we're

17   going to talk over each other and it will be hard

18   for the court reporter.  Okay?

19        A     I'm sorry.

20        Q     It's all right.  I'm going to do the same

21   thing to you too so, you know, it's just the way

22   people communicate but because it's being taken

23   down, if, you know, we could try and not talk over

24   each other, it will be better.

25                    Okay.  So you had some credit cards
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018

1   in 2017 that were at their limit?

2       A    Yes.

3       Q    And how many credit cards was that if you

4   know?

5       A    I'm not sure.  Maybe like about -- I could

6   have had maybe like five maybe or six.

7       Q    Okay.  And each were at their limit?

8       A    Yes.

9       Q    And so as a result, you couldn't use your

10  credit cards to get some cash to pay for your rent?

11      A    Right, no.

12      Q    Was there any other available credit to

13  you as far as you know other than the Big Picture

14  Loans loans?

15      A    No other available credit.

16      Q    Okay.  So what would have happened if you

17  hadn't taken the loans from Big Picture Loans?

18      A    I wouldn't have been able to pay my

19  apartment rent.

20      Q    And you would have at least been at risk

21  of being evicted from your apartment?

22      A    Yes.

23      Q    Okay.  And in 2017 when that occurred,

24  when you borrowed this money from Big Picture Loans,

25  if you had been evicted from your apartment or had

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                    Page 14

 1   to leave your apartment, was there another place

 2   where you could have stayed?

 3        A    I guess I would have stayed with family

 4   members.

 5        Q    And your preference was not to do that?

 6        A    Right.

 7        Q    Okay.

 8        A    I would say yes.

 9        Q    Sorry?

10        A    I'm supposed to say yes.

11        Q    You're supposed to say yes?

12        A    Okay.

13        Q    What do you mean?

14        A    Okay.  So my preference was not to stay

15   with family members, I'm supposed to say yes, not

16   stay with family members.

17        Q    Okay.  All right.

18        A    Okay.

19        Q    I just wanted to make sure your answer was

20   clear and we understood what you were saying.  And

21   any time you need to supplement or clarify an

22   answer, just do exactly what you just did.  Okay?

23        A    Okay.

24        Q    Okay.  So you had a bank account, your

25   credit cards were at their limits, and you needed

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                          Page 15

1    the money to pay your rent.  How did you find Big

2    Picture Loans?

3        A    I received correspondence in the mail

4    about Big Picture Loans.

5        Q    And what did it say?  What do you remember

6    it saying?

7        A    It was offering me loans that I could

8    receive from them.

9        Q    Okay.  And once you -- when you got

10   that -- did you receive whatever it is you got in

11   the mail right when you needed to borrow the money

12   or had you received it and it was just sort of

13   sitting around your house?

14       A    I received it before I had to borrow the

15   money.

16       Q    Okay.  Was it a letter, was it a postcard,

17   or something else?

18       A    It was a letter in the mail.

19       Q    Okay.  And it said that you had been

20   preapproved for a loan?

21       A    Yes.

22       Q    So when you then needed the money for your

23   rent sometime after you received the letter, you

24   contacted Big Picture Loans?

25       A    Right.

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                          Page 16

```
 1        Q    How did you contact Big Picture?

 2        A    I went online and applied for the

 3   application.

 4        Q    And do you -- you have -- you have a

 5   computer at home?

 6        A    In the public library.

 7        Q    Okay.  So you went to the public library

 8   to use the computer and applied online?

 9        A    Yes.

10        Q    And the second time that you needed to get

11   a loan, did you do the same thing?

12        A    Yes.

13        Q    Did you give Big Picture Loans an e-mail

14   address where they could contact you?

15        A    Yes, they have an e-mail address to

16   contact me.

17        Q    And what is that e-mail address?

18        A    Gturnage, t-u-r-n-a-g-e, 804@aol.com.

19        Q    And how do you access your AOL e-mail?

20   You don't have a computer at home?

21        A    I visit next door at the public library.

22   That's how I access my e-mail.

23        Q    Okay.  So if somebody -- if I was to try

24   and get in contact with you and you had given me

25   that e-mail address, how would you know that I had
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                          Page 17

```
 1    sent you an e-mail?  Would you have to go over to

 2    the public library and check?

 3         A    Yes.

 4         Q    Okay.  And do you do that on a periodic

 5    basis?

 6         A    Yes.

 7         Q    How often did you do that in 2017?

 8         A    I go to the library at least two to three

 9    times a week.

10         Q    Do you do it -- do you go to the library

11    for the exclusive purpose of seeing whether you've

12    received any e-mails?

13         A    Yes.

14         Q    Okay.  And for how long approximately have

15    you been doing that?

16         A    Well I have been visiting the library for

17    awhile, until I can put the internet back on my home

18    computer.

19         Q    So you have a home computer?

20         A    Yeah, but I don't have internet.

21         Q    And is that because of the cost, the

22    monthly cost?

23         A    Right.

24         Q    So you've had to cut that out because you

25    don't have the financial wherewithal to pay for the
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                          Page 18

```
 1    internet monthly charge?

 2        A     Right, yes.

 3        Q     Okay.  So you use the public library

 4    instead and -- is that right?

 5        A     Yes.

 6        Q     And for approximately how long has that

 7    been the case?

 8        A     Well it's probably a couple of months now.

 9        Q     Back in 2017 when you applied for the

10    loans at Big Picture Loans online, did you have

11    internet service at home or did you have to go to

12    the library?

13        A     I had to go to the library.

14        Q     Okay.  So -- and I -- this is an instance

15    where I'm not sure that we were communicating so let

16    me tell you what I heard and then you tell me

17    whether it's accurate.  Okay?

18                    I thought I heard you say -- I asked

19    you how long that you hadn't had internet service at

20    home and that you had to go to the library and you

21    said it was several months which is why I asked you

22    the follow-up question about whether or not you had

23    internet service at home in early 2017 when you

24    applied for these loans.  So has it been a much

25    longer period of time that you haven't had internet
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                    Page 19

```
 1   service at home?

 2        A    Yes.

 3        Q    Okay.  Can you estimate, even if it's

 4   ballpark, approximately how long you haven't had

 5   internet service at home?

 6        A    Well it may be over six months.  The

 7   reason being, I owe a bill to Comcast.  That's why I

 8   don't have the internet service.

 9        Q    I'm sorry, you overbill?

10        A    I owe a bill to Comcast.

11        Q    Oh, you owe.  I understand.

12        A    That's why I don't have the internet

13   service.

14        Q    I understand.  So you were unable to pay

15   the bill to Comcast and so Comcast cut off the

16   internet service?

17        A    Yes.

18        Q    How much money do you owe Comcast?

19        A    Well now I guess it may be over $100.

20        Q    And you're unable to pay that $100?

21        A    Not yet.

22        Q    Okay.  Are there other services at your

23   apartment that have been cut off or stopped over the

24   years because you've been unable to pay the bill?

25        A    No other services.
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018

1      Q     Just internet?

2      A     Right.

3      Q     Okay.  Other than the online loans that

4    you took from Big Picture Loans, have you ever in

5    the last five years borrowed money from any other

6    company online?

7      A     No.

8      Q     And it sounds like that the reason you

9    went to Big Picture Loans, in addition to you having

10   to pay your rent, was because just by chance you had

11   gotten something in the mail that said that you had

12   been preapproved for a loan?

13     A     Yes.

14     Q     Is that right?

15     A     Uh-huh.

16     Q     Did you ever talk to anybody from Big

17   Picture Loans?

18     A     Yes, I've talked to people on the phone

19   after they told me I was approved for my loan.

20     Q     And what did you talk to them about?

21     A     Well they told me that I was approved for

22   the amount to receive and they told me the date I

23   would receive the money.

24     Q     Okay.  So you received a telephone call to

25   that effect?

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018

```
 1        A    Yes.

 2        Q    Do you -- do you have a mobile phone?

 3        A    I had a house phone and cell phone.

 4        Q    Okay.  Do you still have the cell phone?

 5        A    Yes, I have both the house and the cell

 6   phone.

 7        Q    Does your cell phone allow you to access

 8   the internet?

 9        A    No.

10        Q    Okay.

11        A    I have the old flip phone.

12        Q    Well it might surprise you or not surprise

13   you that up until four months ago, I did too.

14        A    Okay.

15        Q    Okay.  When -- you're represented here

16   today by Ms. Nash; is that correct?

17        A    Yes.

18        Q    When did you meet Ms. Nash for the first

19   time?

20        A    I met Ms. Nash for -- for -- the first

21   time I talked to her was yesterday.

22        Q    Okay.  And I'm not -- I don't want to know

23   what you talked about.  Okay?  I'm not entitled to

24   know what you talked about, so don't tell me what

25   you talked about.  And if you start to, I'm going to
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                        Page 22

1    cut you off and tell you not to do that.  Okay?

2                        So the first time you spoke to

3    Ms. Nash was yesterday.  And have you met other

4    people from Ms. Nash's office?

5         A    Yes.

6         Q    And who have you met?

7         A    It was Kristi Kelly.  She's handled cases

8    before.

9         Q    Okay.  And how did you meet Kristi Kelly?

10        A    I met Kristi Kelly through the Virginia

11   Poverty Law Center, Jay Speer.

12        Q    Okay.  So this office where we're sitting

13   today is the Virginia Poverty Law Center, right?

14        A    Yes.

15        Q    And what caused you to come here and speak

16   to Mr. Speer?  And again, I'm not asking for what

17   you spoke to Mr. Speer about, but what caused you to

18   come to this place?

19        A    It was past cases that was handled for me.

20   That's why I was here.

21        Q    They had handled cases for you here at the

22   Virginia Poverty Law Center?

23        A    Yes.

24        Q    And they put you in touch with Ms. Kelly?

25        A    Yes.

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018
Page 23

1      Q      When was that approximately, what year?

2      A      Well I guess -- I'm not sure.  It may be a

3  couple, two or three years ago now.

4      Q      And so other than this lawsuit that we're

5  talking about today, has Ms. Kelly represented you

6  on other matters?

7      A      Yes.

8      Q      How many other matters?

9      A      About three.

10     Q      And what are -- do you remember who you --

11  were you the plaintiff in each one of those cases?

12     A      Yes.

13     Q      And do you remember who you sued?

14     A      I think my attorney would have that

15  information.

16     Q      Okay.  Do you remember what those lawsuits

17  were about or what your claim was?

18     A      I'm still not supposed to say what they

19  are.  That's privileged information, attorney-client

20  privilege.

21     Q      All right.  I'm not -- I'm not trying to

22  understand what communications you've had with

23  Ms. Kelly or anyone from the office.  All I'm trying

24  to understand is whether you know what your other

25  claims were that Ms. Kelly represented you on.

Debtor's Ex. 25, p. 024

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                                Page 24

```
 1        A    Yes, it was about paying and this one was
 2   about -- Clarity case was one.  One was with the
 3   Cannon Law firm called Fairfax (as spoken) Dinkum
 4   and the final one was ChexSystems.
 5              THE COURT REPORTER:  I'm sorry, what
 6        ChexSystems?
 7              THE DEPONENT:  ChexSystems.
 8   BY MR. SCHEFF:
 9        Q    And so what was the lawsuit against
10   Clarity about, do you know?
11        A    I can't quite remember.  I know it was
12   credit reporting on a person's credit report.
13        Q    And was that case resolved?  Was it
14   settled?
15        A    Yes.
16        Q    Okay.  And so you got some money out of
17   that case?
18        A    It was resolved.
19        Q    Did you get some money out of that case?
20              MS. NASH:  I'm going to advise you to the
21        extent that that was a confidential settlement,
22        you should not disclose the terms of that
23        settlement.
24              MR. SCHEFF:  Well we have a protective
25        order in this case and so we can declare that
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                                  Page 25

1          aspect or any aspect of this transcript

2          confidential if that is of concern to you.  So

3          I guess my question is -- I'm going to ask the

4          question again.  If you're going to direct the

5          witness not to answer, at least we'll have a

6          record of it and we'll deal with it or not.

7          Okay?

8               MS. NASH:  Okay.

9     BY MR. SCHEFF:

10          Q    All right.  So, Ms. Turnage, it sounds

11    like -- sorry.  It sounds like the case against

12    Clarity was settled, correct?

13          A    Uh-huh.

14          Q    Is that right?

15          A    Yes.

16          Q    Okay.  And did -- as part of that

17    settlement, did Clarity pay you any money?

18          A    Yes, but I'm not at liberty to discuss the

19    amount, yes.

20          Q    Okay.  So they did pay you some money.  We

21    can protect the confidentiality of that number,

22    whatever that settlement amount is, through the

23    agreement that we have in this case, so I'm going to

24    ask the question again:  Can you tell me how much

25    money you settled the Clarity case for?

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018

1       MS. NASH:  I'm going to instruct my

2   clients not to divulge the terms of any

3   confidential settlements that she entered into.

4       MR. SCHEFF:  Okay.  Will you produce the

5   settlement agreement redacted with the number

6   so I can see what those confidentiality

7   provisions are?  I mean, you can redact the

8   number, you know, and we can fight about the

9   number, but I'd like to at least understand

10  what the confidentiality provisions are.

11      MS. NASH:  I'll look at your requests and

12  see if you've requested it.

13      MR. SCHEFF:  Okay.  Thank you.  Well I can

14  make another request.

15      MS. NASH:  Well when you do that, I'll

16  respond to it in turn.

17      MR. SCHEFF:  Well I'm making the request

18  now.  That's what I'm doing.

19      MS. NASH:  Well you have to serve a

20  written document request.

21      MR. SCHEFF:  Well I actually don't have

22  to.  I will follow up, but will you produce a

23  copy of that agreement because I'm asking for

24  it now.  I'm not asking you to produce it this

25  second obviously, but I'm asking for

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                      Page 27

```
 1        Ms. Turnage's settlement agreements between

 2        herself and Clarity.

 3             MS. NASH:  And I have given you my answer

 4        which is I will review your document request --

 5             MR. SCHEFF:  Okay.

 6             MS. NASH:  -- and see if you have

 7        requested it.

 8             MR. SCHEFF:  Well that's what it's going

 9        to say.  So if it says that, would you agree

10        that I've requested it?

11             MS. NASH:  I will respond to your document

12        request.

13             MR. SCHEFF:  Okay.

14   BY MR. SCHEFF:

15        Q    All right.  Ms. Turnage, the other cases

16   that you had where Ms. Kelly represented you, the

17   one against -- did you say ChexSystems?

18        A    Yes.

19        Q    What was that about?

20        A    It was about that they had sent my credit

21   information to online lenders like American Web

22   Loans.

23        Q    How do you know that?

24        A    I found out when I was trying to open up a

25   bank account for my church and that's when I got
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                              Page 28

```
 1    the -- received the report.

 2         Q    That showed what?

 3         A    That showed that ChexSystems had sent my

 4    credit file information to American Web Loans.

 5         Q    Had you ever heard of American Web Loans

 6    before?

 7         A    No, I hadn't heard of them before.

 8         Q    Did you ever borrow money from American

 9    Web Loans?

10         A    No.

11         Q    Okay.  And what is American Web Loans?

12         A    It's an online lender.

13         Q    Okay.  And you don't have any relationship

14    at all with American Web Loans?

15         A    No.

16         Q    Was the case with ChexSystems settled?

17         A    Yes.

18         Q    Did you get money when that case settled

19    as well?

20         A    Yes.

21         Q    How much money did you get?

22              MS. NASH:  Again, I'm going to advise you

23         if it was a confidential settlement not to

24         disclose the terms of that agreement.

25
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                        Page 29

```
 1   BY MR. SCHEFF:

 2        Q    Was it a confidential settlement as far as

 3   you understand?

 4        A    Yes.

 5             MR. SCHEFF:  Okay.  I'll make the same

 6        request.

 7   BY MR. SCHEFF:

 8        Q    And the last lawsuit that you talked

 9   about, the third one, was -- what was that one?  Who

10   was the defendant in that?

11        A    Well before that ChexSystems was Fair

12   Dinkum Cannon Law firm.

13        Q    It was a law firm?

14        A    Yeah.

15        Q    Okay.  And so was that a separate lawsuit

16   from the ChexSystems lawsuit?

17        A    Yes, uh-huh.

18        Q    And was that case settled?

19        A    Yes.

20        Q    Did you get money when that case settled?

21        A    Yes.

22        Q    And how much money did you get?

23             MS. NASH:  Same instruction if it's a

24        confidential settlement not --

25             MR. SCHEFF:  Okay.  We'll make the
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018

```
 1        request.

 2   BY MR. SCHEFF:

 3        Q    So when you got these settlement amounts

 4   from these three defendants as you've testified, did

 5   you deposit them in your bank account?

 6        A    Yes.

 7        Q    Okay.  Did you have to pay attorney's fees

 8   to Ms. Kelly's law firm?

 9        A    Yes.

10        Q    And how much attorney's fees did you pay?

11        A    Okay.  I don't quite remember what all the

12   attorney's fees was, but I know they gave them 2.5

13   percent of it but I don't remember.

14        Q    They were 2.5 percent?

15        A    I guess.  I don't remember exactly how

16   much the fees were.

17        Q    Okay.  Do you -- do you have an engagement

18   letter with Ms. Kelly's law firm?

19        A    An engagement letter.  I'm sorry, I don't

20   understand the question.

21        Q    Okay.  I'll try and -- I'll try and ask it

22   differently.  Okay?  Do you have a letter that comes

23   from Ms. Kelly's law firm to you which says that

24   they are representing you and that you've agreed to

25   hire them as your lawyer?
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                    Page 31

```
1          A    Oh, yes, I have that.

2          Q    Okay.  And how many different engagement

3     letters do you have with Ms. Kelly's law firm?

4          A    As the three cases as you know about, they

5     have them.  There's three of them.

6          Q    So there's three engagement letters?

7          A    Right.

8          Q    Is there an engagement letter for the case

9     that we're sitting here today for the deposition?

10         A    Yes.

11         Q    Okay.  And do you have copies of all those

12    engagement letters at your home?

13         A    Yes, I would have them.

14         Q    Okay.  Do you have your bank records at

15    home as well?

16         A    Yeah, they're at home.

17         Q    So -- and I just want to understand

18    because people do things differently.  Do you

19    receive on a monthly basis a bank statement?

20         A    Yes.

21         Q    Do you save those bank statements?

22         A    Yes.

23         Q    For approximately how long have you been

24    saving your bank statements?

25         A    I guess you're required to save them like
```

```
 1    no more than five years.

 2         Q    So do you have them that go back roughly

 3    five years?

 4         A    Yeah.

 5         Q    Okay.  Okay.  And you're pretty sure you

 6    have the engagement letters at home as well?

 7         A    Yes.

 8         Q    Okay, good.  All right.

 9                   Let's mark as Exhibit 1.

10         (The Complaint was marked Exhibit No. 1.

11    BY MR. SCHEFF:

12         Q    Ms. Turnage, take a look at the document

13    that's been marked Exhibit 1.  Do you see your name

14    in the caption as a plaintiff?

15         A    Yes.

16         Q    Have you ever seen this document before?

17         A    Yes.

18         Q    When did you -- when did you see it for

19    the first time?

20         A    I've seen it when my attorneys filed the

21    case.

22         Q    Did you see it before it was filed or

23    after it was filed?

24         A    I seen it before it was filed.

25         Q    And did you make any corrections or
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                                Page 33

```
 1    changes to what was stated in the complaint that you

 2    saw?

 3         A    No, I didn't.

 4         Q    Did you read it?

 5         A    Yes.

 6         Q    And did you think it was accurate?

 7         A    Yes.

 8         Q    What was the basis for your believing that

 9    it was accurate?

10         A    The basis that I believe that it was

11    accurate because -- because the company was Big

12    Picture Loans, that they were in violation of the

13    State of Virginia's laws, usury laws, charging the

14    interest rate of 12 percent.  And so that is the

15    reason for filing the lawsuit because they had an

16    unlawful, illegal loan.

17         Q    No, I understand that's the basis that is

18    alleged in the lawsuit.

19         A    Yes.

20         Q    What I want to understand is there are

21    facts stated in this lawsuit --

22         A    Right.

23         Q    -- that are alleged as being the factual

24    basis for the lawsuit and I want to understand what

25    your personal knowledge of the facts are.
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                                              Page 34

```
 1        A    I just stated my personal fact of the
 2   knowledge are that when I took these loans out and
 3   then it was discovered with my attorneys was helping
 4   me with this case that says the laws was illegal,
 5   that the money that was loaned to me and all, that
 6   the people didn't have license to practice lending
 7   money to me in Virginia and they were illegal and in
 8   violation of the usury laws which is 12 percent.
 9        Q    Take a look at paragraph three on page
10   two.  Okay?
11        A    Paragraph three on page two, okay.
12        Q    Do you have that?
13        A    Uh-huh.
14        Q    I'm going to read a sentence to you and my
15   question is going to be what personal knowledge do
16   you have which forms the basis for this fact in the
17   complaint.  Okay?
18        A    Okay.
19        Q    It says, No. 3, to facilitate blatant
20   violations of state usury laws, defendant Matt
21   Martorello approached the Lac Vieux Desert Band of
22   Lake Superior Chippewa Indians for the purpose of
23   establishing a rent-a-tribe scheme.  Have I read
24   that correctly?
25        A    Yes.
```

Debtor's Ex. 25, p. 035

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                          Page 35

1       Q    What's your personal knowledge that

2  Mr. Martorello approached this Indian tribe for the

3  purpose of establishing a rent-a-tribe scheme?

4       A    I have no personal knowledge.

5       Q    Okay.  And because when I asked you

6  earlier today whether you'd ever met or -- do you

7  know anything about Matt Martorello?

8       A    No, I do not.

9       Q    Okay.  And you don't know anything about

10  how he operated whatever companies he may have had

11  an interest in; is that right?

12      A    No, I don't have no knowledge of it.

13      Q    Okay.  So you don't have -- strike that.

14  So I want to go further down in No. 3.

15      A    Okay.

16      Q    I'm going to ask you the same question.

17  Okay?

18      A    Uh-huh.

19      Q    So it says here, and I'm skipping a

20  sentence but it says here in reality, Martorello's

21  company, Bellicose Capital, LLC, funded the loans,

22  controlled the underwriting, and handled the

23  day-to-day operations of the business.  Have I read

24  that correctly?

25      A    Yes, sir.

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                            Page 36

1        Q    Do you have any personal knowledge that is

2   the basis of that sentence?

3        A    I have no personal knowledge.

4        Q    Okay.  And I want to go on and read the

5   third sentence -- the last sentence.  It's the

6   fourth sentence actually.

7        A    Okay.

8        Q    In return for the use of its name, the

9   tribe received 2 percent of the revenue but

10  otherwise, the tribe had no control over the income

11  or expenses of Big Picture Loans.  Do you have any

12  personal knowledge which forms the basis of that

13  statement?

14       A    No, I do not.

15       Q    Okay.  Take a look, please, at paragraph

16  14 on page five.

17       A    Paragraph 14, page five.  Page five,

18  paragraph 14.  Okay.

19       Q    Got it?  Okay.

20       A    All right.

21       Q    So I'm going to read that and I'm going to

22  ask you the same question.  Okay?

23       A    Uh-huh.

24       Q    Defendant Martorello is a natural person

25  and resident of Puerto Rico.  Martorello was the

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                                    Page 37

```
 1    founder and chief executive officer of Bellicose

 2    Capital which Martorello created to make and collect

 3    the usurious loans described herein.  As explained

 4    below, Martorello was the architect of the

 5    rent-a-tribe lending scheme and had direct, personal

 6    involvement in the creation and day-to-day

 7    operations of the illegal enterprise.  Have I read

 8    that correctly?

 9        A    Yes, sir.

10        Q    Do you have any personal knowledge for

11    that statement?

12        A    No, I do not.

13        Q    Okay.  Thank you.  Have you ever heard of

14    Ascension Technologies?

15        A    No, I haven't heard of them.

16        Q    Okay.  So you've stated in your testimony

17    a few minutes ago that the reason you brought this

18    lawsuit, or was one of the persons who brought this

19    lawsuit, was because you believed that the loans

20    that were made were illegal.

21        A    Yes.

22        Q    What do you want in return for bringing

23    this lawsuit?

24        A    I want in return my monies refunded back

25    to me that I paid in the loans because it's a
```

Debtor's Ex. 25, p. 038

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                                    Page 38

1    violation of Virginia State law that charges usury

2    laws for 12 percent, and I also want in return not

3    to -- not for them to come back later to collect any

4    other outstanding debt.

5        Q    Well do you have any outstanding debt to

6    Big Picture Loans right now?

7        A    Yes.  It's supposed to have been the

8    second one, the $300.

9        Q    You haven't paid that one back?

10       A    No, it wasn't paid back.

11       Q    Okay.  But you did pay back the first one?

12       A    Yes.

13       Q    Okay.  So you borrowed $225?

14       A    Uh-huh.

15       Q    And you paid back more than $225, correct?

16       A    Yes.

17       Q    All right.  If you win this lawsuit, do

18   you want the interest that you've paid back?  Do you

19   want the $225 that you borrowed paid back to you as

20   well?  What amount of money do you want paid back to

21   you?

22       A    I want the money paid back what I borrowed

23   and plus the interest paid back.

24       Q    So -- so you want -- you borrowed $225 and

25   you paid that back.  You want the $225 back?

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                             Page 39

```
 1        A    It was $319.80 cents total interest.

 2        Q    $319 of interest?

 3        A    Yes, $319.80 total.  That was the total by

 4   law.  The interest rate was of 6.25 or 28 percent.

 5        Q    Here's my question.  Maybe I -- maybe I

 6   don't understand.  You borrowed $225 and you paid

 7   the loan back, correct?

 8        A    Yes.

 9        Q    When you paid the loan back, were the

10   total payments for that loan $319.80 or were the

11   total payments for that loan $225 plus $319.80?

12        A    The total payments for the loan was

13   $319.80.

14        Q    And that includes the $225 that you

15   borrowed?

16        A    Yes.

17        Q    Okay.

18        A    Plus the interest.

19        Q    Plus the interest.  So the interest part

20   of that is the difference between $319.80 and $225,

21   correct?

22        A    Yes.

23        Q    All right.  So we can agree, I think, that

24   you paid interest totaling $94.80 cents on the

25   225-dollar loan?
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                    Page 40

```
 1        A    Right.

 2        Q    Okay.  So if you win this lawsuit, you

 3   want that $94.80 cents back, right?

 4        A    Right.

 5        Q    And you want the $225 back that you

 6   borrowed from Big Picture Loans?

 7        A    Yes.

 8        Q    Okay.  So you want it all back?

 9        A    Yes.

10        Q    Okay.  Even the money that you borrowed?

11        A    Yes, so I -- so I wouldn't have to pay

12   that back, you know, the outstanding debt that would

13   be forgiven and not to pay that back because the

14   laws was illegal.

15        Q    Right.  So I'm understanding -- I'm

16   talking about the first loan.

17        A    Yes.

18        Q    And then we can talk about the second

19   loan.  Okay?

20        A    Uh-huh.

21        Q    All right.  So with respect to the first

22   loan, you borrowed $225?

23        A    Right.

24        Q    And to pay that loan in full, you paid

25   $319.80?
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                    Page 41

```
 1        A    Yes.

 2        Q    Is that right?

 3        A    Yes.

 4        Q    Okay.  So what you want back at least --

 5   and tell me whether this is right or wrong:  What

 6   you want back is all of that money, the $319.80

 7   which includes the interest that you paid plus the

 8   principal amount that you borrowed; is that right?

 9        A    Yes.

10        Q    Okay.  And you would agree that the $225

11   that you borrowed and used to pay your rent was lent

12   to you.  It wasn't your money to begin with, right?

13        A    Right.

14        Q    Okay.  So you want that money back anyway?

15        A    Yes.

16        Q    Okay.  And with respect to the second

17   loan, the second loan was $300?

18        A    Yes.

19        Q    And have you made any payments on the

20   300-dollar loan?

21        A    No payments was made.

22        Q    Okay.  Why didn't you make any payments on

23   the second loan?

24        A    Well the date was they was supposed to get

25   it on April the 18th and they didn't, and advice
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                         Page 42

1    from my attorney, my attorney said --

2              MS. NASH:  Don't -- don't --

3              MR. SCHEFF:  Don't -- we don't want to

4         know what the advice of your attorney was.

5              MS. NASH:  Don't disclose any advice of

6         your attorneys.

7    BY MR. SCHEFF:

8         Q    Yes, don't disclose advice of your

9    attorney, please.  Okay?  And I understand it's easy

10   to do that and this is sort of like a conversation

11   and I appreciate that, but I'm -- I'm not really

12   entitled to know what your communications were.

13        A    I was instructed to not to pay it.

14        Q    Okay.  All right.  Okay.  Okay, let's --

15             Can we have the loan agreements?

16   Great, thank you.  Thanks.  Okay.  That's going to

17   be two.

18        (The Agreement was marked Exhibit No. 2.)

19             MR. SCHEFF:  And this will be three.

20        (The Agreement was marked Exhibit No. 3.)

21   BY MR. SCHEFF:

22        Q    By the way --

23        A    Yes.

24        Q    -- the money that you borrowed, both the

25   225 and the 300, you did use that pay your rent,

Debtor's Ex. 25, p. 043

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                          Page 43

```
 1  right?

 2      A    Yes, sir.

 3      Q    Okay.  Take a look at Exhibit 2, the

 4  document that's been marked Exhibit 2.  See it at

 5  the bottom?

 6      A    Yes.

 7      Q    And, again, take -- take a look as much as

 8  you need to look at, okay, and tell me whether

 9  you've ever seen this document before.

10      A    (Peruses document.)  Okay, yeah, I might

11  have seen it or glanced at it, you know, when I

12  received it on the internet, the loan.  Yeah, I may

13  have seen it, yes, uh-huh.

14      Q    Okay.  So you're not sure whether you read

15  this?

16      A    Well I had it so I signed it quickly so I

17  could receive the money.

18      Q    Okay.  So my question is did you read it?

19      A    Not entirely.  I just glanced through it.

20  I didn't entirely -- I didn't entirely finish

21  reading it.

22      Q    Why didn't you read it?

23      A    Because I was anxious with trying to get

24  the loan that I needed.

25      Q    When you went online to borrow the
```

Debtor's Ex. 25, p. 044

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                             Page 44

```
 1    money --

 2         A    Yes.

 3         Q    -- were you already late with your rent

 4    payment?

 5         A    No, I wasn't.  I was trying to prevent

 6    from being late.

 7         Q    Okay.  So when was your rent payment due

 8    in relation to when you borrowed the first -- when

 9    you made the first loan?

10         A    The rent was due on the first and after

11    the fifth day, they file a late fee.

12         Q    Okay.

13         A    And it's been on record that they be

14    filing court to evict you if you don't get it paid.

15         Q    Okay.  So would it be accurate for me to

16    understand that you wanted to make sure that your

17    rent was paid before the fifth of the month?

18         A    Yes, sir.

19         Q    Okay.  So let's look at Exhibit 2 because

20    I'm trying to understand why it is you were in such

21    a rush to get the loan which caused you not to read

22    Exhibit 2 fully.  Was your landlord standing there

23    waiting for the money?

24         A    No, the landlord doesn't stand and wait

25    for the money over you.  They don't come to
```

Debtor's Ex. 25, p. 045

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                              Page 45

1    everybody's apartment and stand over and wait for

2    the money.

3         Q    Right.  That's why I was trying to figure

4    out why the rush to get the -- you know, to read

5    this document would take 15 minutes maybe; is that

6    right?

7         A    Okay.

8         Q    I mean, would you agree with that?

9         A    Okay.

10        Q    You would agree with that?

11        A    Yes, okay.

12        Q    Okay.  And if we look at page one, page

13   one at the bottom here where I'm pointing, I just

14   want to make sure we are on the same page so to

15   speak, you see it says borrower, Gloria Turnage?

16        A    Yes.

17        Q    Date, March 2, 2017 and there is a time,

18   4:19 in the afternoon?

19        A    Uh-huh.

20        Q    And at the -- uh-huh meaning yes?

21        A    Yes.

22        Q    And at the bottom it says signed, I agree.

23   Have I gone through that accurately?

24        A    Yes.

25        Q    Okay.  So this was three days before you

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018

```
 1   were going to get the late fee, correct?

 2        A    Yes.

 3        Q    All right.  Now, does the library close at

 4   5:00?

 5        A    They close at 6:00 on some particular

 6   days, I think it's Friday and Saturday, but other

 7   days it's open until nine.

 8        Q    Oh, okay.

 9        A    Right.

10        Q    So it's not like you were in a rush to get

11   out of the library because they were closing,

12   correct?

13        A    Right.  Yes, I'm sorry.

14        Q    That's okay.  That's all right.  Everybody

15   does it.  Did you print a copy of this at the time

16   that you did your loan?

17        A    Yes, I printed a copy.

18        Q    Okay.  So I'm just trying to visualize

19   this.  You'd gotten this card or a letter in the

20   mail which talked about Big Picture Loans.

21        A    Yes.

22        Q    You needed to pay your rent, right?

23        A    Yes.

24        Q    You wanted to get that money before it was

25   due on the fifth of the month to avoid the late fee,
```

Debtor's Ex. 25, p. 047

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018

Page 47

```
 1    correct?

 2         A    Yes.

 3         Q    And you went to the library, you logged

 4    on, you found the BPL, the Big Picture loan website,

 5    correct?

 6         A    Yes.

 7         Q    And you found and you answered all the

 8    questions?

 9         A    Yes.

10         Q    And you sort of went down, correct, and

11    you read it as you went or you didn't read it as you

12    go?

13         A    I went down and read some of it but some

14    of it I didn't.  I printed it out and I was going to

15    read it later.

16         Q    And you then did, right?

17         A    Yes.

18         Q    Okay.  And you read it shortly after you

19    had printed it out, right, same day?

20         A    Well, I didn't shortly after the same day

21    but later on, I read it.  Some of it I did and some

22    of it I didn't.  I just glanced through the

23    document.

24         Q    How long after you printed the document

25    did you actually sit down and read it?
```

Debtor's Ex. 25, p. 048

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                    Page 48

```
 1        A    It's maybe one or two days later I might

 2   have actually sit down and readed some of it.

 3        Q    Okay.  And at the point in time when you

 4   borrowed this money and then you read the loan

 5   agreement a day or two later, were you at that point

 6   represented by Kelly & Crandall?

 7        A    No.

 8        Q    So you didn't hire them before you

 9   borrowed the money?

10        A    No.

11        Q    They didn't represent you in any other

12   lawsuits before you borrowed the money?

13        A    There was past lawsuits as has already

14   been stated, yes, they got those past ones.

15        Q    So they had been your lawyers?

16        A    Yes.

17        Q    Okay.  So -- but they weren't representing

18   you at the time that you borrowed this money?

19        A    No.

20        Q    When did you get back in touch with Kelly

21   & Crandall after you had borrowed the money?  I just

22   want to know the time, you know, approximate date,

23   not the obviously what you talked about.

24        A    Kelly & Crandall was involved with this

25   lawsuit with Big Picture Loans because it was
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                              Page 49

```
 1    discovered on another case that you don't know

 2    about, ChexSystems, that they had pulled my credit

 3    report from TransUnion, so that's how the lawsuit

 4    was filed against Big Picture Loans.

 5         Q    Okay.  So let me see if I understand

 6    this --

 7              MS. NASH:  And I'm just going to remind

 8         you again, don't disclose the terms of any of

 9         our conversations with you.

10              THE DEPONENT:  Right.

11              MS. NASH:  He's not asking for that so

12         don't --

13    BY MR. SCHEFF:

14         Q    I'm not asking for what anyone from Kelly

15    & Crandall may have said to you.  Okay?

16         A    Yes, I understand.

17         Q    Okay.  I just want make sure because it's

18    easy to not think about that and start to talk about

19    what you might have talked about with your lawyers

20    and I don't want to know that.

21         A    No, I'm not disclosing that.

22         Q    Good.  Well I don't -- I don't -- nobody

23    wants you to disclose that, so we're all on the same

24    page.  Okay?

25         A    Okay.
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                                Page 50

```
 1        Q    Okay.  So Kelly & Crandall represented you

 2   in the ChexSystems lawsuit --

 3        A    Yes.

 4        Q    -- that you've talked about in the past

 5   that you settled, correct?

 6        A    Yes.

 7        Q    And there was something that came out in

 8   that lawsuit which showed that Big Picture Loans had

 9   been provided information about you?

10        A    Yes.

11        Q    Okay.  And you learned that through the

12   lawsuit with ChexSystems?

13        A    I learned it from my credit report was

14   pulled, TransUnion, that they pulled my credit

15   report.

16        Q    Okay.  So -- and again, I'm not looking

17   for what was said.  Okay?

18        A    Uh-huh.

19        Q    But after you took the first loan -- well,

20   strike that.  Before -- strike that.  After you took

21   the first loan on or about March 2 of 2017, did you

22   pick up the phone and call Kelly & Crandall?

23        A    No.

24        Q    Did they call you?

25        A    No.
```

Debtor's Ex. 25, p. 051

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018

```
 1       Q    Okay.  Did you contact Kelly & Crandall to

 2   ask them to bring a lawsuit on your behalf against

 3   Big Picture Loans?

 4       A    No, I didn't.

 5       Q    So how did it come about that you were a

 6   plaintiff in this lawsuit?

 7       A    It came about from the other case and all

 8   when I had to send them a copy of my TransUnion

 9   report, and that's when I discovered Big Picture was

10   there and that's when I had to explain to my

11   attorney why the inquiry was made.

12       Q    Did you make the decision that you wanted

13   to sue Big Picture Loans?

14       A    I didn't say to make a decision to sue Big

15   Picture Loans.

16       Q    You did not?

17       A    I said -- no, I didn't make the decision

18   about suing Big Picture Loans but, you know, I was

19   told then that, you know, something should be done.

20       Q    Okay.  And again, nobody wants to know

21   what the discussions may have been with lawyers.

22   Okay?

23       A    Right.

24       Q    Was there any -- if you remember and I

25   don't know whether your remember either, this credit
```

Debtor's Ex. 25, p. 052

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                                    Page 52

```
 1    report that you just referred to I think where Big

 2    Picture Loans was somehow on the credit report, was

 3    Mr. Martorello's name on that credit report?

 4         A    No.

 5         Q    Okay.  Was Bellicose on the name of that

 6    report?

 7         A    No.

 8         Q    Was SourcePoint on the name of that

 9    report?

10         A    No.

11         Q    Just Big Picture Loans?

12         A    Yes.

13         Q    Okay.  Was Red Rock Financial or Red Rock

14    on the credit report?

15         A    No.

16         Q    Was Duck Creek?

17         A    No.

18         Q    Okay.  So it was just Big Picture Loans?

19         A    Yes.

20         Q    Okay.  So we've marked Exhibit 2 and we --

21    we've now determined through your testimony sort of

22    what you did to get the loan and that you read this

23    loan agreement within a day or two of printing it

24    out at the library; is that correct?

25         A    Yes.
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                                    Page 53

```
 1        Q    Okay.  So let's take a look and -- take a

 2   look at -- where was I at here.  This is the first

 3   page.

 4        A    Yes.

 5        Q    So let's turn the page and let's look at

 6   the second page.  Okay?

 7        A    Okay.  All right.

 8        Q    At the very bottom in bold, it says

 9   important acknowledgments.  Do you see that?  I'm

10   right here.  I'm sorry.

11        A    Okay.

12        Q    So you see the important acknowledgments?

13        A    Yes, uh-huh.

14        Q    You acknowledge and agree that this

15   agreement is subject solely and exclusively to the

16   tribal law as well as applicable federal law and the

17   exclusive jurisdiction of the Lac Vieux Desert Band

18   of Lake Superior of Chippewa Indians.  Have I read

19   that correctly?

20        A    Yes.

21        Q    Do you remember reading that?

22        A    Yes.

23        Q    And let's go to the next one underneath

24   that.  You acknowledge and agree that the tribal

25   dispute resolution procedure in the -- is the sole
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                                    Page 54

1    and exclusive method for resolving disputes and/or

2    claims arising from or relating to this agreement.

3    Did you remember reading that?

4        A    Yes.

5        Q    Okay.  Let's go to the next page.  And I'm

6    about two-thirds, three quarters of the way down.

7    Do you see where it says tribal dispute resolution

8    procedure?

9        A    Okay.

10       Q    Have you ever gone through the tribal

11   dispute resolution procedure that's stated in the

12   agreement that you signed?

13       A    No.

14       Q    Okay.  Why not?

15       A    Because it didn't go through that far.  It

16   didn't have to ever get that far.

17       Q    What do you mean it never got that far?

18   You filed this lawsuit instead of going to the

19   tribal dispute resolution procedure?

20       A    Well I didn't have to.

21       Q    You didn't have to?

22       A    Right.

23       Q    Okay.  And why didn't you have to as far

24   as you're concerned?

25       A    I didn't have to because of advice from

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018

```
 1   my -- I mean of my attorney.

 2       Q    Okay.  I don't want to know what your

 3   attorney said.

 4       A    Yeah, I know you don't have to know what

 5   he said.

 6       Q    No, no, no, I don't want to know what your

 7   lawyer said.  It's okay.  There is -- and I'm going

 8   to look for it here because I think these

 9   actually -- these pages are out of order but I may

10   be wrong about that because maybe they're not.

11             MS. LADD:  They are, they're backwards.

12             MR. SCHEFF:  They're backwards?  Okay.

13       That's not good.  Then we'll find it

14       eventually.  Okay.  Here we go.

15             THE DEPONENT:  Which page is that?

16   BY MR. SCHEFF:

17       Q    I'm going to -- look in the lower,

18   right-hand corner.  You see it says 49?

19       A    I have trouble with my eyes because I had

20   eye surgery and I have trouble trying to see.

21       Q    Okay.  Well take your time and we'll make

22   sure that we have the same page so you see what I'm

23   asking you.  Okay?

24       A    Page 49?

25       Q    Yes, ma'am.  I think it's 49.
```

Debtor's Ex. 25, p. 056

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                                    Page 56

```
 1                  MS. NASH:  I don't think -- 49 --

 2   BY MR. SCHEFF:

 3        Q    I'm sorry, four slash nine.  I apologize.

 4   Says something about my eyes, huh?

 5        A    You want this page right here?

 6        Q    Let me --

 7        A    Or this page right here you --

 8        Q    Let me find it for you.  If you hand me

 9   the exhibit, let me find it for you and --

10        A    Okay.

11        Q    To make sure that you follow what I'm

12   asking you.  Okay?

13        A    Okay.

14        Q    Yeah, here we go.  Okay.  So if you see

15   this lower, right-hand corner, it says four slash

16   nine.

17        A    Yeah, okay.

18        Q    And that's one I've got, four slash nine.

19        A    Okay.

20        Q    Okay?  I just want to make sure.  So you

21   see about a quarter of the way down this provision

22   that says right to rescind or cancel?

23        A    Yes.

24        Q    And it's all in capital letters, right?

25        A    Yes, uh-huh.
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                                    Page 57

 1      Q    So what this says is that you can cancel
 2 or rescind the agreement that you signed within a
 3 certain period of time without any charges.  Do you
 4 see that?
 5      A    Okay, yes.
 6      Q    Why didn't you cancel or rescind this
 7 loan?
 8      A    I didn't cancel or rescind the loan
 9 because, again, I needed to pay my apartment rent.
10 That's why it wasn't canceled.
11      Q    But when you enter into agreements -- and
12 I assume -- when you enter into agreements, you're
13 only going to sign an agreement if you intend to
14 honor the agreement, right?
15      A    Yes.
16      Q    That's the type of person you are?
17      A    Yes.
18      Q    You're not a person who just signs
19 agreements and says I don't really care what the
20 provisions are, I'm not going to follow them anyway,
21 right?
22      A    Right, yes.
23      Q    Okay.  Let's go to this page.  It's two
24 slash nine.  It's the next one.  Okay?
25      A    Two slash nine?

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                                Page 58

```
 1        Q    Right, two slash nine.  I'm sorry, yeah,
 2   it's the one after this.  This one.  That's right.
 3   No, it's not, geez.  The one before that, I'm sorry.
 4        A    The one before?
 5        Q    Yes, ma'am, it's this one.
 6        A    That right there.  Okay.
 7        Q    Okay.  Two slash nine, do you have it?
 8        A    Right, okay.
 9        Q    And you see your name as the borrower name
10   in the box?
11        A    Yes.
12        Q    And is that your address?
13        A    Yes.
14        Q    Is that your telephone number?
15        A    Yes.
16        Q    Is that your mobile number?
17        A    Yes.
18        Q    Is that your e-mail address?
19        A    Yes.
20        Q    And they have that because you gave it to
21   them, right?
22        A    Yes.
23        Q    Okay.  And here's Big Picture Loans and
24   here's the date, March 2, 2017, the date that you
25   borrowed this money, right?
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                              Page 59

```
 1        A    Yes.

 2        Q    In bold under that box where your name is,

 3   it says important notice in all capital letters in

 4   bold, right?

 5        A    Right.

 6        Q    This loan agreement, hereinafter the

 7   agreement, is governed by the laws of the Lac Vieux

 8   Desert Band of Lake Superior Chippewa Indians.

 9        A    Yes.

10        Q    Do you see that?

11        A    Yes.

12        Q    So when you signed this agreement, you

13   knew that it was governed by tribal law, right?

14        A    Yes.

15        Q    Okay.  And -- okay.  Take a look at the

16   page that is eight slash nine.

17        A    Eight slash nine.

18        Q    Yeah, so it's going to be earlier in the

19   document because I think it's backwards.

20        A    This page right here, eight slash --

21        Q    Let me just see that we're on the same

22   page here.  No, that's five slash nine.  So it's

23   eight slash nine.  You're heading in the wrong

24   direction I think.  Here, if you give me the

25   document again, I'll get you the right page.  Okay?
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                                      Page 60

```
 1        A    Okay.

 2        Q    At least I'll try to.  Okay.  Eight slash

 3   nine.  Okay.  See that?

 4        A    Okay.

 5        Q    So what I'm -- I want to refer you to, see

 6   the provision two?

 7        A    Okay.

 8        Q    You acknowledge and agree that by agreeing

 9   to this waiver of jury trial provision, A, you are

10   giving up your right to have a trial by jury to

11   resolve any dispute alleged against us or related

12   third parties.  You read that when you signed the

13   agreement too, right?

14        A    Yes, uh-huh.

15        Q    And, B, you consent to the jurisdiction of

16   the tribe and have read and agree to be bound solely

17   by the tribal dispute resolution procedure found in

18   the code.  I've read that correctly, right?

19        A    Yes, uh-huh.

20        Q    And you agreed to that as well?

21        A    Yes.

22        Q    And it says, C, you are giving up your

23   right to serve as a representative, as a private

24   attorney general, or in any other representative

25   capacity and/or to participate as a member of a
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                          Page 61

1    class of claimants in any lawsuit filed against us

2    and/or related third parties.  And you read that at

3    the time and agreed to it, correct?

4        A    Yes.

5        Q    And in this lawsuit that we marked as

6    Exhibit 1, you're trying to be a class

7    representative, right?

8        A    Yes.

9        Q    Even though you agreed not to be, right?

10       A    Yes.

11       Q    Okay.  And we marked Exhibit 3 as well

12   which is the loan agreement for the second loan that

13   you took, the $300 that hasn't been paid back,

14   right?

15       A    Yes.

16       Q    Okay.  And again -- and I'm trying to save

17   time and be efficient.  In connection with the

18   second loan, the 300-dollar loan, did you follow the

19   same procedure?  That is, you went to the library,

20   you scrolled through it, you sort of scanned it, and

21   then printed it, took it home, and read it?

22       A    Yes.

23       Q    Okay.  And when you read the second loan

24   agreement, you knew that it was essentially the same

25   as the first loan agreement, right?

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                        Page 62

```
 1        A    Yes, uh-huh.

 2        Q    Okay.  And so when you signed the second

 3   loan agreement, you did so with the understanding of

 4   all the provisions that we went through in the first

 5   loan agreement?

 6        A    Yes.

 7        Q    Okay.  Okay.

 8             Could I have the interrogatories,

 9   please?  Thank you.  Let's mark this document as

10   Exhibit 4.

11        (The Certificate was marked Exhibit No. 4.)

12   BY MR. SCHEFF:

13        Q    Okay.  Court reporter's just handed you

14   Exhibit 4.  Do you recognize this document?

15        A    Yes.

16        Q    What document is that?

17        A    The document is a advertisement I received

18   in the mail offering me that I am preapproved for a

19   loan up to $400.

20        Q    So is this the first -- is this the letter

21   you referred to in your testimony earlier today?

22        A    Yes.

23        Q    Okay.  So this is what -- and you saved

24   that, right?  Is that right?

25        A    Yes.
```

 1       Q     And it's dated February 27, 2017, correct?

 2       A     Yes.

 3       Q     And the first loan is March 2, 2017?

 4       A     Yes.

 5       Q     All right.  So it's very close in time to

 6   the first loan that you took.  So you got this and

 7   you went to get a loan right away, right?

 8       A     Yes.

 9       Q     And when you read this -- when you got

10   this, you read it, right?

11       A     Yes.

12       Q     And were you sort of happy that you'd

13   gotten this offer to have -- to get a loan for up to

14   $400?

15       A     Yes.

16       Q     Because you needed the money?

17       A     Yes.

18       Q     And you didn't have any other place to get

19   the money?

20       A     Yes.

21       Q     And you didn't want to get evicted from

22   your apartment?

23       A     Yes.

24       Q     And you were afraid of that because you

25   said that your landlord does that after the fifth

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                                    Page 64

```
 1   day?

 2       A    Yes.

 3       Q    Okay.  So when you got Exhibit 4 in the

 4   mail, you read it, right?

 5       A    Yes, I read it.

 6       Q    Okay.  And you see in the middle it said

 7   this is not a payday loan and it's underlined.  Do

 8   you see that?

 9       A    Yes.

10       Q    Okay.  Do you know what a payday loan is?

11       A    Yes.  A payday loan is like the same as

12   you have online lenders.  It's a temporary line of

13   credit.

14       Q    Okay.  So let's take a look at the flip

15   side of this.  You read the flip side too, right?

16       A    Right, yes, uh-huh.

17       Q    And do you see under the box it says Big

18   Picture Loans, LLC, doing business as

19   BigPictureLoans.com is a duly licensed financial

20   services licensee of the Lac Vieux Desert Tribal

21   Financial Service Regulatory Authority and an

22   independent regulatory body of the Lac Vieux Desert

23   Band of Lake Superior Chippewa Indians.  Have I read

24   that correctly?

25       A    Yes.
```

Debtor's Ex. 25, p. 065

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                                    Page 65

1       Q    And you read that as well, right?

2       A    Yes.

3       Q    And if you go to the paragraph below, it

4    says all loan requests are approved or denied on

5    tribal land at Big Picture Loans located at N5384

6    U.S. Highway 45, Suite 400, Watersmeet, Michigan

7    49969 and are subject to final determination by Big

8    Picture Loans, a tribal enterprise wholly owned and

9    operated by the Lac Vieux Desert Band of Lake

10   Superior Chippewa Indians, a federally recognized

11   American tribe and sovereign government.  Have I

12   read that correctly?

13      A    Yes.

14      Q    And do you remember reading that when you

15   got this letter?

16      A    Yes.

17      Q    Okay.  By the way, one question I didn't

18   ask you:  Have you ever heard of the co -- a company

19   or an entity called Even Tied (ph)?

20      A    No.

21      Q    Okay.  In March of 2017, March 2 of

22   2017 -- strike that.  On February 27, 2017, do you

23   know what relationship, if any, Mr. Martorello had

24   with Big Picture Loans?

25      A    No.

Debtor's Ex. 25, p. 066

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                                      Page 66

```
 1        Q    Okay.  On March 2, 2017, when you borrowed

 2   the $225, do you have any knowledge of what

 3   Mr. Martorello's relationship was, if any, with Big

 4   Picture Loans?

 5        A    No.

 6        Q    What about with the tribe?

 7        A    No.

 8        Q    What about with -- do you know whether --

 9   strike that.  When you borrowed the $300 on or about

10   April 6, 2017, did you know what relationship, if

11   any, Mr. Martorello had with Big Picture Loans?

12        A    No.

13        Q    Okay.

14             Katy, let's -- let's mark these.

15             MS. LADD:  Okay.

16             MR. SCHEFF:  Thank you.  Okay.  Let's mark

17        this one as five.

18          (The E-mail was marked Exhibit No. 5.)

19             MR. SCHEFF:  This one as six.

20          (The E-mail was marked Exhibit No. 6.)

21             MR. SCHEFF:  This one as seven.

22          (The E-mail was marked Exhibit No. 7.)

23             MR. SCHEFF:  This one as eight.

24          (The E-mail was marked Exhibit No. 8.)

25
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                                Page 67

```
 1   BY MR. SCHEFF:

 2        Q    All right.  So let's just have these in

 3   front of us and, Ms. Turnage, if you'll permit me,

 4   can I go underneath these documents just for a

 5   second?  Thank you very much.  I want to -- and let

 6   me just go under there one more time if I could,

 7   please.  Great, because I want to -- I want to keep

 8   two and three here.

 9        A    Okay.

10        Q    And then talk about five, six, seven, and

11   eight.  Okay?

12        A    Okay.  All right.

13        Q    All right.  So -- and Exhibit 2 which is

14   the first loan, the 225-dollar loan?

15        A    Yes.

16        Q    You would agree with me that that's

17   March 2, 2017, correct?

18        A    Yes.

19        Q    All right.  So let's take a look at

20   Exhibit 5 and you'll see Exhibit 5 is an e-mail to

21   you from support.  And it says, dear Gloria Turnage,

22   your loan application for $225 has been approved and

23   your funds are on the way, right?

24        A    Yes.

25        Q    So after you signed Exhibit 2, that loan
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                          Page 68

1    agreement, you received the same day, minutes later,

2    this approval, correct?

3        A    Yes, right.

4        Q    Because this occurred at four -- what is

5    it, I can't even read that -- 4:19 p.m. and this is

6    at 4:30?

7        A    Yes.

8        Q    Okay.  So that's minutes later you get

9    Exhibit 5.  Okay?

10       A    Yes.

11       Q    And let's take a look at Exhibit 6.

12       A    Okay.

13       Q    Exhibit -- yeah, let's just put this one

14   over here.  Yeah, we'll put that one over there.

15       A    Okay.

16       Q    Take a look at Exhibit 6 and, again, this

17   is an e-mail to you from Big Picture loan support.

18   It's dated March 21, 2017, right?

19       A    Uh-huh, yes.

20       Q    And this too relates to this Exhibit 2,

21   this 225-dollar loan, correct?

22       A    Yes.

23       Q    And we know that because the next loan was

24   April 6 and so it couldn't have existed, it didn't

25   exist at the time Exhibit 6 was generated, right?

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                        Page 69

 1    Correct?

 2         A    Repeat that back.

 3         Q    Yeah, I'm sorry.  That was a little bit

 4    confusing.  I apologize.  We know that Exhibit 6 --

 5         A    Uh-huh.

 6         Q    -- which is an e-mail dated March 21,

 7    2017 --

 8         A    Yes.

 9         Q    -- from Big Picture to you has to relate

10    to the loan that's referenced in Exhibit 2 because

11    it predates the loan in Exhibit 3, right?

12         A    Right, uh-huh.

13         Q    So it can't relate to the second loan.  It

14    has to relate to the first loan?

15         A    The first loan, yes.

16         Q    Okay.  So that's Exhibit 6.  And if we

17    look at Exhibit 7.

18         A    Exhibit 7.

19         Q    Yeah, that's another e-mail.

20         A    Put this over here?

21         Q    Yeah, that's fine.  That's fine, great.

22    Exhibit 7, again, that's from support to you,

23    April 6, 2017 at 4:45 p.m.  And it says your loan

24    application for $300 has been approved and your

25    funds are on the way.  And that relates to the loan

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                              Page 70

```
 1    for Exhibit 3.

 2         A     Exhibit 3.

 3         Q     Because that's the same day and it's an

 4    hour and 15 minutes after you submitted the loan --

 5         A     Yes.

 6         Q     -- application.  So we know that this

 7    relates to the second loan, right?

 8         A     This should be over here, right?

 9         Q     Why don't you leave that one here for a

10    minute.

11         A     Okay.  I didn't --

12         Q     That's all right.  There's a method to my

13    madness and then I'll --

14         A     Okay.

15         Q     Maybe it's not very clear.

16         A     Okay.

17         Q     Now let's look at Exhibit 8.  Okay?

18         A     Exhibit 8.

19         Q     Exhibit 8 --

20         A     Put this over here?

21         Q     Yeah, that's fine.  Exhibit 8 is date --

22    is from you to Big Picture Loans dated April 20,

23    2017 at 7:46 p.m.

24         A     Uh-huh.

25         Q     And you say why did -- why you did not
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                              Page 71

1    deduct from my savings account, Richmond Postal

2    Credit Union, on Tuesday, April 18, $334 and --

3    $334.47 repayment of the loan, $300 the second time.

4    I called on April 19 -- on April 19, 2017, was

5    advised it was going to be deducted.  As of April --

6    as of Thursday, April 20, 2017, the loan amount has

7    not been deducted from my account.  This request was

8    made on Friday, April 14 at 6:05 p.m.  Please deduct

9    the money from my account and don't wait until

10   Friday, April 28, the original date of request, not

11   to keep building up interest.  I need the loan to be

12   paid as soon as possible.  I have checked my account

13   and the money has not been deducted.  Have I read

14   that correctly?

15         A     Yes, sir.

16         Q     Why did you send this e-mail?

17         A     I sent the e-mail because I was able to

18   get the money sooner to pay the loan off not to add

19   interest and I was requesting that they deduct it

20   sooner on April the 14th and they didn't deduct the

21   $334.47.

22         Q     When in relation to this e-mail, Exhibit

23   8, did you speak with lawyers from Kelly & Crandall

24   about suing Big Picture Loans?

25         A     I didn't speak with lawyers from Kelly &

Debtor's Ex. 25, p. 072

```
 1    Crandall.

 2        Q    You didn't.  I thought you said you had?

 3    I want to know whether -- if you remember, whether

 4    your conversation, whatever that conversation may

 5    have been, about Big Picture Loans and suing Big

 6    Picture Loans was before this e-mail was sent,

 7    Exhibit 8, or after if you remember?

 8        A    It was after.

 9        Q    It was after.  So your spoke to the

10    lawyers first and then you sent this e-mail?

11        A    No, I didn't spoke to the lawyers first.

12        Q    Okay.

13        A    I spoke to them first.

14        Q    Spoke to Big Picture first?

15        A    I had spoke to Big Picture Loans first

16    before the lawsuit was filed because I had the money

17    and asked them to collect it and they didn't collect

18    it, so the e-mail was sent to the attorney's office

19    to state as to, you know, what was done after the

20    lawsuit had to be filed.  It was afterwards.

21        Q    Okay.  I'm just trying to understand

22    timing.  Okay?

23        A    Yes.

24        Q    I don't want to know about the

25    communications.  All right?  We know that the
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                          Page 73

```
 1    lawsuit which is Exhibit 1 --

 2         A    Right.

 3         Q    -- was filed on or about June 22, 2017.

 4    Okay?

 5         A    Yes.

 6         Q    So about two months after Exhibit 8.

 7    Okay?

 8         A    (Deponent nods head.)

 9         Q    All right.  What I want to know is this --

10    if you remember.  If you remember, great.  If you

11    don't remember, you don't remember.  All right?

12    What I'd like to know is -- you clearly spoke to

13    Kelly & Crandall before the lawsuit was filed.  You

14    said that, right?

15         A    Yes.

16         Q    Okay.  So what I want to know is as of the

17    time of April 20, 2017, as of that date when you

18    sent this e-mail, had you spoken with lawyers from

19    Kelly & Crandall about filing this lawsuit?

20         A    No.

21         Q    Okay.  So it would have been sometime

22    between April 20 and the date the lawsuit was filed?

23         A    Yes.

24         Q    Okay, great.  Thank you very much.  I

25    appreciate that.
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                        Page 74

```
 1              MR. SCHEFF:  Would you mark this as
 2         Exhibit 9, please.
 3         (The Responses were marked Exhibit No. 9.)
 4              THE DEPONENT:  I can put all these over
 5         here?
 6              MR. SCHEFF:  Yes, ma'am, you can.  This is
 7         nine, right?
 8              THE COURT REPORTER:  Uh-huh.
 9  BY MR. SCHEFF:
10         Q    Okay.  Now, Ms. Turnage, you see this
11  document is titled plaintiff Gloria Turnage's
12  responses to Matt Martorello's first set of
13  interrogatories relating to class certification.
14  Have I read that correctly?
15         A    Yes.
16         Q    And if you go to the last page, just flip
17  it over, there is a verification which says I
18  declare under penalty of perjury that the foregoing
19  information contained in plaintiff Gloria Turnage's
20  objections and responses to Matt Martorello's first
21  set of interrogatories relating to class
22  certification is true and correct to the best of my
23  knowledge.
24         A    Yes.
25         Q    Executed on 8/31/2018, and then there is a
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                    Page 75

```
 1    signature.  Have I read this correctly?

 2         A    Yes.

 3         Q    Is this your signature?

 4         A    Yes.

 5         Q    Did you sign it on or about August 31,

 6    2018?

 7         A    Yes.

 8         Q    Okay.  Let's take a look at -- okay.  Take

 9    a look at page ten.

10         A    Page ten.

11         Q    Page ten and eleven.  Okay.  What I'm

12    focusing on is No. 5.  See that?  And there's a

13    question and then there's an answer.

14         A    Yes.

15         Q    Okay.  What I'd like you to do is read the

16    question to yourself, read the response, and then

17    I'm going to ask you question.  Okay?

18         A    Okay.

19         Q    Thank you.

20         A    Read the question?

21         Q    Just read it to yourself, correct.  You

22    don't need to read it out loud, just to yourself.

23         A    (Peruses document.)  Okay.  Would you want

24    me to continue to read the next one?

25         Q    No, no, no, just -- I just wanted you to
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                              Page 76

```
 1   read the question and the answer.  Okay?

 2       A    Yes, I've read that.

 3       Q    And this answer is all information that

 4   you supplied; is that correct?

 5       A    Yes.

 6       Q    Okay.  Take a look at the rest of the

 7   document and tell me whether the answers to the

 8   other questions are information that you supplied

 9   and that you have personal knowledge of.  Okay?

10           MS. NASH:  I'm going to object to the --

11           there's a -- it clearly states in some portions

12           of this that counsel provided certain answers.

13           MR. SCHEFF:  Well the question is

14           whether -- that may be.  The question is

15           whether Ms. Turnage has personal knowledge of

16           any of the other facts other than as she's just

17           testified in response to question five that are

18           in the interrogatories that she has sworn to.

19           Okay.

20           MS. NASH:  That's fine and I'm just noting

21           my objection.

22   BY MR. SCHEFF:

23       Q    Okay.  Do you understand my question,

24   Ms. Turnage?

25       A    Yes, I understand.
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018

Page 77

```
 1        Q    Okay.  So take a look at, for example,

 2   page three.

 3        A    Page three.

 4        Q    At the very bottom.  You see No. 2?

 5        A    Uh-huh.

 6        Q    Read that to yourself.  It goes onto page

 7   three.  And now read the response that's on pages

 8   four, five, and six and actually spills onto seven.

 9        A    Do I need to read page five too?

10        Q    Yeah.  What I want you to do is read as

11   much of that response as you need to to be able to

12   tell me whether or not you have personal knowledge

13   of any of the facts that are stated in that answer.

14   Okay?

15        A    (Peruses document.)  Okay.  I have to say

16   no, I have no personal knowledge of the facts of all

17   of this until today, until now.

18        Q    Okay.  That's fine.

19        A    Okay.

20        Q    Take a look at page eleven.

21        A    Okay.

22        Q    Number seven in the middle of the page

23   there.

24        A    Number seven, okay.

25        Q    Yeah.  It says identify all facts and
```

1   documents supporting, tending to support, refuting,

2   or tending to refute the class allegations within

3   your complaint.  And then you can see the response

4   starts a little bit lower.  Do you have that?

5       A    Yeah.

6       Q    And it goes on for at least four or five

7   pages, the response does.  The response goes all the

8   way up to page 19.  What I would like you to do is

9   read as much of that as you need to and, again, tell

10  me whether you have any personal knowledge of the

11  facts that are stated in this answer.  Okay?

12      A    Okay.  (Peruses document.)  So as all of

13  this is facts concerning the Big Picture and Matt

14  Martorello, I had no personal knowledge of this.

15      Q    Okay.  That's all I want -- that's all I

16  want to know.

17      A    Okay.

18      Q    I want to know -- or let me ask you a

19  couple of other questions.  Do you -- have you ever

20  met Lula Williams?

21      A    No.

22      Q    Have you ever spoken to her?

23      A    No.

24      Q    Do you know who she is?

25      A    No.

```
 1        Q     Have you ever met George Hengle?

 2        A     No.

 3        Q     Do you know who he is?

 4        A     No.

 5        Q     Have you ever spoken with him as far as

 6   you know?

 7        A     No.

 8        Q     Do you know Dowin Coffy?

 9        A     No.

10        Q     As far as you know, have you ever met or

11   spoken with Mr. Coffy?

12        A     No.

13        Q     Did you know an individual named Felix

14   Gillison, Jr.?

15        A     No.

16        Q     And as far as you know, had you ever

17   spoken to or met Mr. Gillison?

18        A     No.

19        Q     Do you know Brian McFadden?

20        A     No.

21        Q     Do you know Justin Martorello?

22        A     No.

23        Q     Do you know Simon Liang, L-i-a-n-g?

24        A     No.

25        Q     Okay.  Ms. Turnage, have you ever filed a
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                                Page 80

```
 1    petition -- strike that.  Have you ever filed for
 2    bankruptcy?
 3         A    Yes.
 4         Q    And how many times?
 5         A    It's one time.
 6         Q    One time.  And that was about 15 years
 7    ago; is that right?
 8         A    Yes.
 9         Q    Maybe a little longer?
10         A    Yes.
11         Q    Okay.  That bankruptcy filing that was
12    done, was that -- was that just you or were you
13    married at the time?
14         A    I never was married.
15         Q    You were never married, okay.  Who is
16    Willard Turnage?
17         A    That's my cousin.
18         Q    Your cousin, okay.  Did you ever file a
19    bankruptcy petition with your cousin?
20         A    No.
21         Q    No?  Okay.  Let's take a look at --
22              Can you mark that?  Or we'll mark
23    that.
24         A    May I explain?  His wife Gloria Turnage
25    has the same name as mine, so that's why you
```

1    probably pulled it.

2        Q    Nevermind.  We don't need to mark it.

3    Thank you very much for that explanation.  I

4    appreciate it.

5        A    Okay.

6        Q    Two Gloria Turnages.

7        A    Uh-huh.

8        Q    So you filed for bankruptcy one time?

9        A    Yes.

10       Q    About 15 or 18 years ago?

11       A    Yes.

12       Q    Okay.  And so that bankruptcy filing had

13   nothing to do with the loans you took from Big

14   Picture, correct?

15       A    No.

16            MR. SCHEFF:  All right.  Let me take a

17       break.  I may be done.  Okay.  I just want to

18       talk with my colleague here.

19            THE DEPONENT:  Okay.

20            MR. SCHEFF:  All right.

21            THE VIDEOGRAPHER:  Going off the record at

22       3:42 p.m.

23                     (Break.)

24            THE VIDEOGRAPHER:  Going back on the

25       record at 3:51 p.m.

1            MR. SCHEFF:  Ms. Turnage, I have no

2        further questions.  Thank you very much for

3        your cooperation and for coming in here a

4        little bit earlier.  We really appreciate that.

5            THE DEPONENT:  Okay.

6                        EXAMINATION

7    BY MS. NASH:

8        Q    I have just a few questions.

9        A    Yes.

10        Q    I believe that you stated earlier that you

11    reviewed the complaint before it was filed; is that

12    correct?

13        A    Yes.

14        Q    And to the best of your knowledge, the

15    information contained in the complaint is correct?

16        A    Yes.

17        Q    And you authorized the filing of the

18    complaint?

19        A    Yes.

20        Q    And you wanted to participate in the

21    lawsuit?

22        A    Yes.

23            MS. NASH:  Okay.  That's all I have.

24

25

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                              Page 83

```
 1                        EXAMINATION

 2   BY MR. SCHEFF:

 3        Q    Let me have a little follow up.

 4   Ms. Turnage, when I was asking you questions, I

 5   showed you -- take a look at paragraph one --

 6   para -- Exhibit 1.

 7        A    Exhibit 1.

 8        Q    I showed you paragraph three on page two.

 9        A    Paragraph three on page --

10        Q    Page two.  This is the wrong document.

11   Let me get you the right document.  This one.

12        A    Oh, this one.

13        Q    Yeah.

14        A    Okay.  Paragraph three on page two.

15        Q    Yep.  Right here.  And you said you had no

16   personal knowledge of any of the facts stated in

17   paragraph three, correct?

18        A    That's what I had said.

19        Q    Right.  So that hasn't changed since you

20   answered my question an hour or so ago, right?  You

21   don't have any personal knowledge --

22        A    That hasn't changed.

23        Q    Right.  So you have no way of knowing

24   whether this is true or not true, what's in

25   paragraph three, correct?
```

Debtor's Ex. 25, p. 084

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                                    Page 84

1       A    Well I know it's true now.

2       Q    Well you didn't know when you authorized

3  this complaint that it was true, right?  You didn't

4  know one way or the other?

5       A    No, I didn't until the complaint was done.

6       Q    Right.  Well you haven't seen any evidence

7  which establishes the truth of this, have you?

8       A    I've seen it now.

9       Q    What have you seen?

10      A    I've seen from this file that's I've read

11 and all the -- what these -- what Big Picture Loans

12 was involved in and who was behind the debt, you

13 know, that it was a illegal scheme that they have

14 with giving these loans to Virginia residents that I

15 have knowledge of.  I didn't have any knowledge

16 ahead of time but now I do have knowledge of.

17      Q    Let's take a look at paragraph three

18 again.

19      A    Yes.

20      Q    See it says defendant Matt Martorello

21 approached the Lac Vieux Desert Band of Lake

22 Superior Chippewa Indians, the tribe, for the

23 purpose of establishing a rent-a-tribe scheme.  How

24 do you know that to be true?

25      A    I know from advice from my attorney.

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                    Page 85

```
 1        Q    From your -- what your lawyer told you.
 2   You never talked to Mr. Martorello about that, did
 3   you?
 4        A    No.
 5        Q    Right.  You don't know who approached who,
 6   do you?
 7        A    No.
 8        Q    You don't know what the purpose of any
 9   business relationship was between Mr. Martorello and
10   the tribe assuming there was any at all, do you?
11        A    No.
12        Q    Okay.  Thank you.  Let's take a look at
13   paragraph 14.
14        A    Paragraph 14.  On which page?
15        Q    I'm sorry, page five.
16        A    Page five.  Paragraph 14, okay.
17        Q    Right.  And we went over this when we
18   started your deposition as well and you said you had
19   no personal knowledge of what was stated in
20   paragraph 14 either, did you?
21        A    Right.
22        Q    Okay.  And that hadn't changed today.  You
23   don't have any personal knowledge of this, do you?
24        A    That hasn't changed.
25             MR. SCHEFF:  Okay.  Thank you.  I have no
```

Debtor's Ex. 25, p. 086

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                                    Page 86

1      further questions.

2            THE DEPONENT:  Okay.

3            MS. NASH:  Yep, we're off the record.

4            THE VIDEOGRAPHER:  Going off the record at

5      3:55 p.m.

6

7   (The deposition was concluded at 3:55 p.m.)

8       And further, this deponent saith not.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Debtor's Ex. 25, p. 087

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018

```
 1           CHANGES REQUESTED TO THE DEPOSITION OF
          GLORIA TURNAGE, TAKEN 10/4/18 BY HEATHER GUNN
 2

 3    Page/Line:            Change to/from:       Reason:

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18    _____
19    Gloria Turnage

20
      Commonwealth of Virginia, to wit:
21            Subscribed to before me

22    this _____ day of _____, 2018.

23    _____
              Notary Public
24

25    My commission expires:    /  /
```

LULA WILLIAMS, et al. v. BIG PICTURE LOANS, et al.
TURNAGE, GLORIA on 10/04/2018                                          Page 88

```
 1   COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

 2          I, Heather R. Gunn, Notary Public in and for the

 3   Commonwealth of Virginia at Large, and whose commission

 4   expires October 31, 2022, do certify that the aforementioned

 5   appeared before me, was sworn by me, and was thereupon

 6   examined by counsel; and that the foregoing is a true,

 7   correct and full transcript of the testimony adduced.

 8          I further certify that I am neither related to nor

 9   associated with any counsel or party to this proceeding, nor

10   otherwise interested in the event thereof.

11          Given under my hand and notarial seal at

12   Mechanicsville, Virginia, this 10th day of October, 2018.

13

14

15

16                Heather R. Gunn
             Heather R. Gunn - Notary Public #320684
17                Commonwealth of Virginia

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| **LOEB & LOEB LLP** | **FORSHEY & PROSTOK, LLP** |
| Bernard R. Given II | Jeff P. Prostok |
| State Bar No. 07990180 | State Bar No. 16352500 |
| 10100 Santa Monica Blvd., Suite 2200 | Lynda Lankford |
| Los Angeles, CA 90067-4120 | State Bar No. 11935020 |
| Tel: 310-282-2000 | 777 Main Street, Suite 1290 |
| Fax: 310-282-2200 | Fort Worth, TX 76012 |
| Email: bgiven@loeb.com | Tel: 817-877-8855 |
| | Fax: 817-877-4151 |
| *Counsel to the Debtor* | Email: jprostok@forsheyprostok.com |
| *and Debtor-in-Possession* | Email: llankford@forsheyprostok.com |
| | *Counsel to the Debtor* |
| | *and Debtor-in-Possession* |

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| EVENTIDE CREDIT ACQUISITIONS, LLC, | § | Case No. 20-40349-elm11 |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |

## <u>NOTICE OF DEPOSITION OF LULA WILLIAMS</u>

**TO:**    LULA WILLIAMS
c/o Neligan LLP
325 N. St. Paul Street, Suite 3600
Dallas, Texas 75201

**PLEASE TAKE NOTICE** that Eventide Credit Acquisitions, LLC ("Debtor") will take your oral deposition on May 26, 2020, beginning at 10:00 a.m. (Central).  The deposition will take place at Neligan, LLP, 325 N. St. Paul Street, Suite 3600 Dallas, Texas 75201; Telephone Phone: 214.840.5300.

Pursuant to Rules 7030 and 7069 of the Federal Rules of Bankruptcy Procedure, you are further advised that this deposition will take place before a duly qualified shorthand court reporter, and may be recorded by stenographic method and through such means as to provide the instant visual display of the testimony (e.g., LiveNote).  You are further advised that this deposition will be recorded on videotape, in addition to the usual stenographic recording.

DATED: May 15, 2020

Respectfully submitted,

*/s/ Jeff P. Prostok*
Jeff P. Prostok
State Bar No. 16352500
Lynda Lankford
State Bar No. 11935020
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Fort Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
Email: jprostok@forsheyprostok.com
Email: llankford@forsheyprostok.com

and

**LOEB & LOEB LLP**
Bernard R. Given II
State Bar No. 07990180
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067-4120
Tel: 310-282-2000
Fax: 310-282-2200
Email: bgiven@loeb.com

**COUNSEL FOR THE DEBTOR AND
DEBTOR-IN-POSSESSION**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 15, 2020, the **NOTICE OF DEPOSITION OF**

**LULA WILLIAMS** was served on the following counsel of record for Lula Williams via

email and U.S. Mail.

Patrick J. Neligan Jr., Partner
NELIGAN LLP
325 N. St. Paul Street, Suite 3600
Dallas, Texas 75201
Tel:   214.840.5300
Tel:   214.840.5333
Cell:  214.632.4321
Fax:   214.840.5301
Email:  Patrick Neligan: pneligan@neliganlaw.com

Dated:   May 15, 2020

/s/ Bernard R. Given, II
Bernard R. Given, II

**Debtor's Ex. 26, p. 003**

**LOEB & LOEB LLP**
Bernard R. Given II
State Bar No. 07990180
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067-4120
Tel: 310-282-2000
Fax: 310-282-2200
Email: bgiven@loeb.com

*Counsel to the Debtor*
*and Debtor-in-Possession*

**FORSHEY & PROSTOK, LLP**
Jeff P. Prostok
State Bar No. 16352500
Lynda Lankford
State Bar No. 11935020
777 Main Street, Suite 1290
Fort Worth, TX 76012
Tel: 817-877-8855
Fax: 817-877-4151
Email: jprostok@forsheyprostok.com
Email: llankford@forsheyprostok.com

*Counsel to the Debtor*
*and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| EVENTIDE CREDIT ACQUISITIONS, LLC, | § | Case No. 20-40349-elm11 |
|  | § |  |
| Debtor. | § |  |
|  | § |  |

## <u>NOTICE OF DEPOSITION OF GLORIA TURNAGE</u>

**TO:**   GLORIA TURNAGE
c/o Neligan LLP
325 N. St. Paul Street, Suite 3600
Dallas, Texas 75201

**PLEASE TAKE NOTICE** that Eventide Credit Acquisitions, LLC ("Debtor") will take your oral deposition on May 26, 2020, beginning at 2:00 p.m. (Central).  The deposition will take place at Neligan, LLP, 325 N. St. Paul Street, Suite 3600 Dallas, Texas 75201; Telephone Phone: 214.840.5300.

Pursuant to Rules 7030 and 7069 of the Federal Rules of Bankruptcy Procedure, you are further advised that this deposition will take place before a duly qualified shorthand court reporter, and may be recorded by stenographic method and through such means as to provide the instant visual display of the testimony (e.g., LiveNote).  You are further advised that this deposition will be recorded on videotape, in addition to the usual stenographic recording.

DATED: May 15, 2020                                Respectfully submitted,

                                                                  */s/ Jeff P. Prostok*
                                                                  Jeff P. Prostok
                                                                  State Bar No. 16352500
                                                                  Lynda Lankford
                                                                  State Bar No. 11935020
                                                                  **FORSHEY & PROSTOK LLP**
                                                                  777 Main St., Suite 1290
                                                                  Fort Worth, TX 76102
                                                                  Telephone: (817) 877-8855
                                                                  Facsimile: (817) 877-4151
                                                                  Email: jprostok@forsheyprostok.com
                                                                  Email: llankford@forsheyprostok.com

                                                                  and

                                                                  **LOEB & LOEB LLP**
                                                                  Bernard R. Given II
                                                                  State Bar No. 07990180
                                                                  10100 Santa Monica Blvd., Suite 2200
                                                                  Los Angeles, CA 90067-4120
                                                                  Tel: 310-282-2000
                                                                  Fax: 310-282-2200
                                                                  Email: bgiven@loeb.com

                                                                  **COUNSEL FOR THE DEBTOR AND
                                                                  DEBTOR-IN-POSSESSION**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 15, 2020, the **NOTICE OF DEPOSITION OF GLORIA TURNAGE** was served on the following counsel of record for Gloria Turnage via email and U.S. Mail.


Patrick J. Neligan Jr., Partner
NELIGAN LLP
325 N. St. Paul Street, Suite 3600
Dallas, Texas 75201
Tel:  214.840.5300
Tel:  214.840.5333
Cell:  214.632.4321
Fax:  214.840.5301
Email:  Patrick Neligan: pneligan@neliganlaw.com


*/s/ Bernard R. Given, II*
Bernard R. Given, II

**Debtor's Ex. 27, p. 003**

### Schedule of Note Payments and Distributions

| | 2016 | | 2017 | | 2018 | | 2019 | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| Note Payments | $13,671,281.46 | | $9,793,322.01 | | $19,167,575.95 | | $4,871,698.71 | | $47,503,878.13 | |
| Breakwater | 7,897,000.00 | 59.6% | 5,341,476.28 | 65.0% | 9,148,600.00 | 60.2% | 449,283.00 | 56.2% | 22,836,359.28 | 61.0% |
| McFadden | 265,000.00 | 2.0% | 179,244.17 | 2.2% | 285,000.00 | 1.9% | 31,200.00 | 3.9% | 760,444.17 | 2.0% |
| Liang | 198,750.00 | 1.5% | 134,433.13 | 1.6% | 213,750.00 | 1.4% | 23,400.00 | 2.9% | 570,333.13 | 1.5% |
| Justin Martorello | 1,311,750.00 | 9.9% | 147,743.11 | 1.8% | 1,410,750.00 | 9.3% | 154,440.00 | 19.3% | 3,024,683.11 | 8.1% |
| Dowd | 198,750.00 | 1.5% | 134,433.13 | 1.6% | 213,750.00 | 1.4% | 23,400.00 | 2.9% | 570,333.13 | 1.5% |
| Gallant Capital | 3,378,750.00 | 25.5% | 2,285,363.18 | 27.8% | 3,914,250.00 | 25.8% | 117,300.00 | 14.7% | 9,695,663.18 | 25.9% |
| Total Distributions | $13,250,000.00 | | $8,222,693.00 | | $15,186,100.00 | | $799,023.00 | | $37,457,816.00 | |
| Note minus Distributions | $421,281.46 | | $1,570,629.01 | | $3,981,475.95 | | $4,072,675.71 | | $10,046,062.13 | |